THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

REX - REAL ESTATE EXCHANGE, INC.,

    Plaintiff,

  v.

ZILLOW, INC., et al.,

    Defendants.

Case No. 2:21-CV-00312-TSZ

**DECLARATION OF MATT HENDRICKS**

**[REDACTED - PUBLIC VERSION]**

I, Matt Hendricks, declare as follows:

1.  I am currently a Senior Director of Brokerage Operations at Zillow Group. I have been with Zillow for the past six years, most of it focused primarily on broker engagement. Prior to joining Zillow, I worked as a broker at MBA Commercial Real Estate, Zaxon Properties, and Peak Commercial Consultants.

2.  The matters set forth herein are based on my own personal knowledge except where otherwise stated, and in those instances the matters set forth herein are based on information and belief. If called as a witness, I could and would testify competently to the matters set forth herein

3.  In my current role at Zillow, I lead our Brokerage Operations team, which is the team that manages all of our licensed designated brokers and their memberships with state,

local, and national associations and MLSs. Prior to that, my Broker Engagement team handled business development and contract negotiations with individual brokers nationwide for the acquisition of property listings for Zillow's Internet, Media & Technology ("IMT") business.

4.      Most recently, I oversaw Zillow's nationwide process of obtaining brokerage licenses in all 50 states and the District of Columbia on behalf of Zillow, Inc., and having designated broker representatives apply for membership with local MLSs in each of those markets.  That effort was undertaken to facilitate Zillow's switch from obtaining property listings via syndication feeds from local Multiple Listing Services ("MLSs") and other sources, to more reliable, better-quality, and more comprehensive Internet Data Exchange ("IDX") feeds.

### *Overview of Sources of Listings Data*

5.      Historically, Zillow's IMT business has operated as an independent third party in the real estate industry, collecting data from a variety of sources in order to provide consumers with the most comprehensive collection of data listings nationwide.  In order to provide this service to consumers, Zillow sources data from individual brokers and brokerages, franchisors, MLSs, builders, public records, and homeowners, as well as independent third parties who license data about properties on auction.

6.      Before January 2021, the primary way in which Zillow obtained the vast majority of this listings data was through agreements with individual brokers/brokerages, franchisors, and MLSs (referred to as "syndication agreements").  With respect to the MLSs, once an agreement was executed, individual brokers or brokerages in that MLS either had the option to opt in or opt out of sending their listings to Zillow via the syndication feed.  This optionality made it challenging for Zillow to secure listings from all brokers within a particular MLS, and required extensive work from my team to continually ensure that brokers stayed "opted in" so that we were receiving their listings.

7.      The IDX is a different data source.  It was started by the National Association of REALTORS® ("NAR") to enable participant brokers in an MLS to share listings with each

other equally, for the purposes of electronic delivery and display.  For our purposes, IDX feeds were the best way to ensure that we were receiving *all* listings from a particular MLS (as opposed to receiving only listings from the participant brokers who opted in or did not opt out).  It also ensured we received all listings fields, which was not the case under some syndication agreements where MLSs or other contracting parties restricted the data sent to Zillow.  And switching to these feeds eliminated the need to continually renegotiate agreements with participant brokers in those markets.

### *Syndication Agreements with MLSs and Brokers*

8.      As explained above, historically Zillow would negotiate contracts with MLSs, franchisors, and individual brokers and brokerages.  There were four types of these agreements: (1) MLS Opt-Out Contracts and (2) MLS Opt-In Contracts (collectively "MLS Syndication Agreements"), (3) Zillow Pro for Brokers Contracts, and (4) Franchisor Contracts.

9.      The MLS Syndication Agreements were individually negotiated with MLSs.  These agreements typically had strict termination clauses, and as a result an MLS had the right to terminate these agreements without cause at any point upon notice (e.g., ██████████ ████████████████████████████████████████████████████ ██████████).  ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████.  Others contained limitations on how often data could be pulled by Zillow or on the number of fields the MLS would provide (e.g., ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████).

10.      The Zillow Pro for Brokers Contracts were fairly barebones, two-page agreements, setting out the terms and conditions for the brokers to share their listings with Zillow and for Zillow to display and create derivative works of those listings.

11.      The Franchisor Contracts were executed with the franchisor but covered the listings for all franchisees.  These agreements were individually negotiated with the

franchisors (who controlled the listings for all of their franchisees), and the listings from a particular franchise were all delivered to Zillow in one feed. ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

### *Switching to IDX Agreements*

12.     Once we decided to make the switch to IDX feeds, we had to begin the process of executing IDX agreements with the local MLSs—which was not a simple process.

13.     In order to get access to an IDX feed you need to have: (1) a state real estate license (usually required to be in the state in which the local MLS you wish to join is located), (2) an affiliation with a licensed brokerage entity, and (3) participant membership in the local MLS where you are seeking the IDX feed.  In some cases, you may also need to join the local Association of REALTORS®.  Each individual MLS sets the rules and controls the data flow of their IDX feed.

14.     Attached hereto as **Exhibit 1** is a true and correct copy of an exemplar membership agreement with an MLS.

15.     I oversaw the lengthy and involved process of hiring and licensing brokers throughout the country (in all 50 states and Washington D.C.) in order to gain membership with local MLSs, and to ultimately apply for IDX feeds.

16.     In order to become members of certain NAR-affiliated MLSs, it was also necessary to become a member of the local Association of REALTORS®, the state association of REALTORS®, and the National Association of REALTORS® ("NAR").  Attached hereto as **Exhibit 2** is a true and correct copy of an exemplar membership agreement with a local Association of REALTORS®.

17.     Once we had brokers in place, we were able to execute IDX Agreements with the various local MLSs.  MLSs offer a standard version of IDX Agreements to their participant brokers.  This means that there is no negotiation of these agreements with the MLS, and they are used by the MLS with all participant brokers to convey the same rights to everyone

entering into those agreements.  These are licensing agreements that provide access to and allow for display of the MLS's IDX data by the participant brokers, and incorporate by reference and require compliance with the MLS's Rules and Regulations as adopted by that particular MLS.

18.     The MLS Rules and Regulations are promulgated by the individual MLSs. Rules and Regulations documents govern every aspect of participating in the MLS and, in the case of NAR-affiliated MLSs, these rules include policies created by NAR on everything from procedures for listing properties or conducting open houses, to policies governing display of IDX data.

19.     The policy governing display of IDX data encompasses a prescribed set of mandatory and optional rules created by NAR, referred to herein as the "Model IDX Rules."

20.     Zillow was not involved in the creation of the Model IDX Rules.

21.     Zillow was not involved in the creation or adoption of the local MLS Rules and Regulations, which are incorporated into the local MLS IDX Agreements.

22.     Zillow is also not involved in the enforcement of the IDX Rules incorporated into each IDX Agreement.  Enforcement is undertaken only by the local MLSs.  If an MLS believes that there has been a violation of their rules, they may undertake an investigation, which could lead to fines and/or termination of access to the IDX data or MLS membership for a participant broker found to be in violation of the rules.

23.     Prior to Zillow being able to publicly display IDX data from the MLSs with whom it had executed IDX Agreements, the MLSs undertook audits of Zillow's proposed display of their IDX data to ensure compliance with their local IDX Rules.

24.     To summarize, in order for Zillow to gain access to IDX data to display those listings on its websites and Apps, it needs to execute the following agreements and comply with the following rules:

> a. *Participant Agreement:* The local, licensed broker applies for membership with the local MLS by submitting a standard membership

application and may also sign a standard membership agreement.

b. *IDX Agreement:* The (now) participant broker executes a standard IDX Agreement to license the IDX data from the MLS, which incorporates by reference the MLS's Rules and Regulations.

c. *MLS Rules and Regulations:* As incorporated by reference in the IDX Agreement, the Rules and Regulations adopted by the individual MLS govern every aspect of participant membership in the MLS, including the display of the licensed IDX data, and must be complied with by the participant broker.

25.    To date, we have executed 218 IDX agreements with local MLSs nationwide.

26.    Of those MLSs, approximately 204 are NAR-affiliated.

27.    Attached hereto as **Exhibit 3** is a true and correct copy of an exemplar participant agreement between a Zillow broker and an NAR-affiliated MLS.  This agreement was executed with the Aiken Association of REALTORS® and reflects membership with the Aiken Board of REALTORS® MLS ("Aiken MLS").

28.    Attached hereto as **Exhibit 4** is a true and correct copy of an exemplar IDX Agreement with the Aiken MLS.

29.    Attached hereto as **Exhibit 5** is a true and correct copy of the Rules and Regulations that are incorporated into the participant agreement executed with the Aiken MLS.

30.    Not all MLSs are affiliated with NAR.  For those that are not, many still use some or all of the IDX Model Rules.  For example, attached hereto as **Exhibit 6** is a true and correct copy of an exemplar subscriber agreement between a Zillow broker and an MLS that is not affiliated with NAR.  This participation agreement was executed with West Penn Multi-List, Inc. ("WPML") and reflects membership with that MLS (the "participant agreement").

31.    Attached hereto as **Exhibit 7** is a true and correct copy of an exemplar IDX Licensing Agreement with WPML.

32.    Attached hereto as **Exhibit 8** is a true and correct copy of the Rules and

Regulations that are incorporated into the participant agreement and the IDX Licensing Agreement executed with the WPML.

33.     Both Aiken and WPML have adopted a no-comingling rule.  *See* **Exhibits 5 & 8**.

34.     Attached hereto as **Exhibit 1** is a true and correct copy of an exemplar Subscriber Agreement (also known as a participant agreement) between a Zillow broker and the Arizona Regional MLS ("ARMLS"), a NAR-affiliated MLS.

35.     Attached hereto as **Exhibit 9** is a true and correct copy of an exemplar IDX Agreement with ARMLS.

36.     Attached hereto as **Exhibit 10** is a true and correct copy of the Rules and Regulations that are incorporated into both the participant agreement and the IDX Agreement executed with the ARMLS.

37.     Attached hereto as **Exhibit 11** is a true and correct copy of an exemplar application for membership with an MLS not affiliated with NAR.  This Application for Participant/Stockholder Membership was submitted to the Real Estate Information Network Inc. MLS ("REIN") and incudes a License Agreement & Acknowledgment and Understandings section (collectively "participant agreement").

38.     Attached hereto as **Exhibit 12** is a true and correct copy of an exemplar IDX Agreement with REIN.

39.     Attached hereto as **Exhibit 13** is a true and correct copy of the Rules and Regulations that are incorporated into the participant agreement and the IDX Agreement executed with REIN.

40.     Neither the REIN nor ARMLS have adopted Rules prohibiting the co-mingling of listings.  *See* **Exhibits 10 & 13**.

41.     I have reviewed an analysis undertaken at my direction and based on that my understanding is that approximately 65% of the IDX agreements that we have executed with MLSs include a "no-comingling" rule.  Of those, approximately 137 are NAR affiliated.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 28th day of April 2021, at Denver, CO

Matt Hendricks

# EXHIBIT 1

**ARMLS**

# MLS Subscriber Agreement

THIS AGREEMENT is dated and effective as of the earlier of the date set forth in writing below (if any) or the date this Agreement is last accepted electronically as provided herein, and is between **Arizona Regional Multiple Listing Service, Inc.** ("ARMLS®") and the Subscriber party hereto ("Subscriber").

WHEREAS, ARMLS® operates an on-line, computerized database of real property information for the benefit of its Subscribers (the "System" or "ARMLS® System");

WHEREAS, the System stores and makes available to Subscribers digital information, including, but not limited to, software licensed by ARMLS® from the System creator and from various vendors and suppliers, real property listing data, photographs, county assessor and property tax information, new homes and builder information, HUD/VA data, agent and office information, and other information (the "ARMLS® Data");

WHEREAS, Subscriber is a member of, or is permitted access to the ARMLS® System (subject to the requirements of ARMLS®) through, one of the Shareholder Associations of REALTORS® or an Association of REALTORS® to which ARMLS® provides services under a client/vendor relationship (collectively the "Associations" or individually an "Association") and the Associations receive certain services through ARMLS®; and

WHEREAS, Subscriber desires to receive services in accordance with this Agreement, and in consideration of such services, Subscriber agrees to abide by the terms and conditions set forth herein.

IN CONSIDERATION of the foregoing recitals and of the mutual covenants and promises hereinafter set forth, the parties hereto agree as follows:

1.  **REPRESENTATIONS OF SUBSCRIBER.**  Subscriber represents and warrants that, as of the date first set forth above, Subscriber is a real estate licensee or an appraiser licensed or certified by the State of Arizona, who is affiliated with an ARMLS® Participant who is in good standing with an Association, and Subscriber will continue in such capacity at all times while this Agreement is in effect.  If Subscriber, at any time during the term of this Agreement, is no longer affiliated with an ARMLS® Participant in good standing, Subscriber agrees to notify Subscriber's Association and ARMLS® within five (5) days of separation.

2.  **COMPLIANCE WITH ARMLS® REGULATING DOCUMENTS.**  Subscriber acknowledges that access to and use of the System is contingent on Subscriber's compliance with the terms of all of the following documents and materials (collectively, the "ARMLS® Regulating Documents"):  (i) this Agreement, (ii) ARMLS® Rules and Regulations, (iii) ARMLS®' Policies and Procedures, (iv) any other written materials promulgated by ARMLS® and made applicable generally to Subscribers, (v) any published interpretations of any of the foregoing, and (vi) any modifications and amendments of any of the foregoing.  Subscriber understands that failure to comply may result in a fine and/or suspension of ARMLS® service, which includes loss of use of the System and deactivation of the key that is used to gain access to current lockboxes.  Copies of the ARMLS® Regulating Documents may be obtained from the ARMLS® website (www.ARMLS.com).

3.  **SYSTEM ACCESS.**  ARMLS® will issue one "Agent ID" number to Subscriber.   Issuance of the Agent ID number will entitle Subscriber to (i) access and use the System through Subscriber's own System-compatible computer using Subscriber's own Internet connection, (ii) access and use the System through a System-compatible computer device and Internet connection provided by another person, and (iii) obtain an electronic key (for a separate fee and under a separate agreement) that can be used to access electronic keyboxes located on listed properties. THE AGENT ID NUMBER IS PROVIDED EXCLUSIVELY FOR THE PERSONAL USE OF SUBSCRIBER AND MAY NOT BE USED BY ANY OTHER PERSON TO ACCESS THE SYSTEM THAT IS NOT EXPRESSLY AUTHORIZED BY THE ARMLS® GOVERNING DOCUMENTS.    SUBSCRIBER AGREES TO USE REASONABLE MEANS TO PROTECT THE CONFIDENTIALITY OF SUBSCRIBER'S AGENT ID NUMBER AND PASSWORD.   Subscriber acknowledges that damages suffered by ARMLS® from access to the System or ARMLS® Data by an unauthorized third party using Subscriber's Agent ID number and password or Subscriber's unauthorized disclosure of any ARMLS® Data to a third party would be speculative and difficult to quantify.  Accordingly, and as a material inducement to ARMLS® to enter into this Agreement, Subscriber agrees that if any disclosure of Subscriber's Agent ID number and/or password results in access to the ARMLS® Data by an unauthorized third party or if Subscriber makes disclosure of MLS Information to an unauthorized third party, regardless of whether such access or disclosure is intentional, negligent or inadvertent, Subscriber shall be liable to ARMLS® for liquidated damages in the amount of the greater of $15,000 or

the amount established in the ARMLS® Governing Documents for each real estate listing accessed or disclosed; and in any such case, this Agreement may be terminated.

4. **TERM AND TERMINATION.**   The term of this Agreement shall commence as soon as Subscriber has accepted and returned this Agreement to ARMLS® (either electronically or by non-electronic means), and Subscriber has paid all fees that are due.   The term of this Agreement shall continue in full force and effect until such time as (i) Subscriber is no longer eligible to receive the services provided under this Agreement, or (ii) ARMLS® terminates this Agreement due to Subscriber's default in accordance with provisions herein or provisions of the ARMLS® Governing Documents, or (iii) ARMLS®, in its discretion, elects to terminate this Agreement in connection with the discontinuation by ARMLS® of any of the ARMLS® services generally provided hereunder to Subscribers.   Further, Subscriber shall have the right to terminate this Agreement upon any amendment or modification of the ARMLS® Governing Documents, if Subscriber is not willing to agree to the terms of such amendment or modification.   In that event, Subscriber shall notify ARMLS® of their election to terminate and such termination shall become effective upon the receipt by ARMLS® of such notice and the payment by Subscriber and receipt by ARMLS® of all fees owing through the date of termination.   Notwithstanding the foregoing, if Subscriber accesses or uses the System or otherwise avails themself of ARMLS® services provided pursuant to this Agreement at any time after Subscriber's receipt of an amendment or modification of the ARMLS® Governing Documents (either pursuant to the procedure set forth in Section 14 of this Agreement or otherwise), such access to or use of the System or ARMLS® services automatically shall constitute Subscriber's agreement to such amendment or modification and shall nullify Subscriber's right to terminate this Agreement by virtue of such amendment or modification.   Subscriber understands that, upon the termination of this Agreement, Subscriber's Agent ID number will no longer be valid and Subscriber will not be able to access or use the System, will not be eligible to receive any other services or products under this Agreement and will not be able to use the electronic key, if Subscriber has one, to open electronic keyboxes located on listed properties. Promptly upon any termination or expiration of this Agreement, (i) ARMLS® shall deactivate Subscriber's user ID and password, and Subscriber shall have no further access to the ARMLS® System; (ii) Subscriber shall purge all copies of the ARMLS® Data from Subscriber's personal computers; (iii) all licenses granted hereunder shall immediately terminate; and (iv) Subscriber will not be able to use any electronic key to open lockboxes on listed properties.

5. **FEES.**  Subscriber agrees to pay Subscriber Fees to ARMLS® within such times and in such amounts as are set forth in the ARMLS® Governing Documents or as are otherwise determined by the Board of Directors of ARMLS® from time to time.   Subscriber understands that such Fees may be due up to 14 months in advance.   THERE SHALL BE NO REFUND OR PRORATION OF ANY SUBSCRIBER FEES UPON THE TERMINATION OF THIS AGREEMENT.

6. **OWNERSHIP/MISUSES OF SYSTEM AND INFORMATION.**  Subscriber acknowledges that all ARMLS® Data, except for the text and photos that Subscriber submits ("Subscriber's Contribution"), is owned or leased by ARMLS® and that ARMLS®, and not Subscriber, shall retain all right, title and/or interest therein.  Subscriber agrees to use such ARMLS® Data only in connection with the pursuit of Subscriber's business of listing, selling, leasing and/or appraising real property and otherwise in a manner consistent with ARMLS® Governing Documents.   Subscriber agrees not to:

   a. publish, reformat, recompile, resell, repackage, copy, reverse engineer, disclose or use in any manner whatsoever the ARMLS® Data, except as permitted in this paragraph, without the prior written consent of ARMLS®;

   b. participate in the collection of large numbers of e-mail addresses, screen names, or other identifiers of others, a practice sometimes known as spidering or harvesting, or participate in the use of software (including "spyware") designed to facilitate this activity;

   c. interfere with computer networking or telecommunications service to any user, host or network, including, without limitation, denial of service attacks, flooding of a network, overloading a service, improper seizing and abusing operator privileges, and attempts to "crash" a host;

   d. transmit unsolicited bulk or commercial messages commonly known as "spam;"

   e. restrict, inhibit, or otherwise interfere with the ability of any other person, regardless of intent, purpose or knowledge, to use or enjoy the ARMLS® System, including, without limitation, posting or transmitting any information or software which contains a worm, virus, or other harmful feature, or generating levels of traffic, including excessive downloading of ARMLS® data through any manual or automatic means, or interference sufficient to impede others' ability to use, send, or retrieve information.  Subscriber further acknowledges that:

      i. Regardless of whether any of ARMLS third party vendors set any limits on data consumption of the Service, ARMLS reserves the right to set its own limits;

      ii. Excessive downloading can affect the service levels provided to other customers. If ARMLS feels (at ARMLS® sole discretion) a Subscriber's use of the ARMLS® System is excessive, ARMLS will contact the Subscriber to discuss this. If usage cannot be kept to an acceptable level after

discussion then the Subscriber will be subject to the penalty as described below.
Any Subscriber in default under this Section 6 shall be subject to a fine of up to $5,000 and a suspension of up to 90 days for each violation.

7.  **PARTICIPANT AUTHORIZATION**.  If Subscriber is also an MLS Participant, as defined by the ARMLS® Governing Documents, Subscriber affirms that Subscriber is in good standing as an MLS Participant with an Association and that any licensee affiliated by licensure with Subscriber in its capacity as an MLS Participant is eligible to receive the services contemplated under this Agreement unless Subscriber specifically notifies ARMLS®, in writing, to the contrary.

8.  **ASSIGNMENT.**  ARMLS® may assign this Agreement and its assignee may also assign same.  In the event of assignment, all rights of ARMLS® shall be succeeded to by assignee.  Subscriber may not assign or delegate this Agreement or any rights, obligations, or duties hereunder without the prior written approval of ARMLS®, which may be withheld in the sole discretion of ARMLS®.  Any purported assignment or delegation in violation of this section shall be void from the time of such purported assignment or delegation.

9.  **DEFAULT.**  Failure of Subscriber to comply with any of the terms of this Agreement or of any of the other ARMLS® Governing Documents, including, but not limited to, payment of any penalties, fines or fees due to ARMLS® or any Association, shall constitute a breach of this Agreement.  Any such breach shall be an immediate default, without notice, unless notice and an opportunity to cure are expressly required for the applicable breach pursuant to this Agreement or any of the other ARMLS® Governing Documents, in which event, such breach shall not become a default unless it remains uncured after the giving of notice and expiration of the time allowed for cure.  Notwithstanding the foregoing, each and every breach by Subscriber of Section 5 of this Agreement shall constitute an immediate default, without notice.  Upon the occurrence of a default, ARMLS® may pursue any and all remedies provided for in the ARMLS® Governing Documents or otherwise available at law or in equity.  Subscriber also shall be liable to ARMLS® for all costs reasonably incurred by ARMLS® in the enforcement of this Agreement, including court costs, collection agency fees and reasonable attorneys' fees.  After any default under this Agreement, Subscriber may reinstate eligibility for access to the System or ARMLS® products or services at the end of any suspension period by doing all of the following: (i) bringing current all accounts with ARMLS® and all Associations, (ii) paying all penalties, fines and costs as provided for herein or in any of the ARMLS® Governing Documents, (iii) curing all defaults under this Agreement, under the ARMLS® Governing Documents, and under any other agreements with ARMLS® or an Association, all to the satisfaction of ARMLS® or the applicable Association, and (iv) paying to ARMLS® a "Reinstatement Fee" in an amount determined by the Board of Directors of ARMLS® from time to time.

10.  **NOTICE.**  All notices required or permitted under this Agreement shall be given in a manner allowed by, and shall be deemed as received in accordance with the provisions of, the ARMLS® Governing Documents.

11.  **TAXES.**  In addition to all other payments hereunder, Subscriber shall pay or reimburse ARMLS® and ARMLS® suppliers or vendors for all state and local sales or other taxes of any kind assessed on the services provided hereunder, except income taxes and corporation license fees.

12.  **DISCLAIMER OF WARRANTY, LIMITATION OF ARMLS®' LIABILITY AND INDEMNIFICATION.** NEITHER ARMLS®, NOR ANY OF THE ASSOCIATIONS SHALL HAVE ANY LIABILITY FOR INACCURACIES IN DATA INPUT INTO THE SYSTEM BY SUBSCRIBER OR SYSTEM SUPPLIER OR VENDOR, OR FOR INACCURACIES IN OR INCOMPLETENESS OF DATA DISPLAYED BY THIRD-PARTY LICENSEES OF SUCH DATA.  SUBSCRIBER UNDERSTANDS AND AFFIRMS THAT NEITHER ARMLS® NOR ANY OF THE ASSOCIATIONS HAS ANY CONTROL OVER THE OPERATION OF THE SYSTEM OR SUBSCRIBER'S ABILITY TO GAIN ACCESS TO THE INTERNET.  ACCORDINGLY, SUBSCRIBER HEREBY WAIVES ANY AND ALL CLAIMS WHICH SUBSCRIBER HAS OR MAY ACQUIRE AGAINST ARMLS® OR ANY OF THE ASSOCIATIONS WITH RESPECT TO ANY FAILURE IN THE SYSTEM OR SYSTEM SOFTWARE, THE OPERATION OF THE SYSTEM ITSELF, SUBSCRIBER'S INABILITY TO GAIN ACCESS TO THE INTERNET FOR ANY REASON, OR ACTIVITIES RELATING TO OR THE PROVIDING OF PRODUCTS OR SERVICES BY VENDORS OR SUPPLIERS PURSUANT TO THIS AGREEMENT.

AS TO THE SYSTEM, SYSTEM SOFTWARE, TAX DATABASES, HUD/VA DATABASE, AND ALL DATA THEREIN, AND ANY OTHER PRODUCTS OR SERVICES PROVIDED IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT WITH ARMLS®, EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT OR ANY OTHER WRITTEN AGREEMENT TO WHICH ARMLS® AND SUBSCRIBER ARE PARTIES, ARMLS® MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  THE DATABASES ON THE SYSTEM AND ALL DATA THEREIN ARE MADE AVAILABLE ON AN "AS IS, AS AVAILABLE," BASIS AND ARMLS® DOES NOT

GUARANTEE THE ACCURACY OR COMPLETENESS OF ANY SUCH DATA.

ARMLS® SHALL NOT BE LIABLE FOR INCIDENTAL DAMAGES OR CONSEQUENTIAL DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF ARMLS® HAS BEEN ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES. ARMLS® LIABILITY TO SUBSCRIBER FOR ANY REASON SHALL NOT EXCEED THE AGGREGATE AMOUNT OF SUBSCRIPTION FEES PAID BY SUBSCRIBER OR ON BEHALF OF SUBSCRIBER, TO ARMLS® HEREUNDER DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. SUBSCRIBER FURTHER AGREES THAT ARMLS® WILL NOT BE LIABLE FOR ANY LOST PROFITS OR FOR ANY CLAIMS ASSERTED AGAINST SUBSCRIBER BY ANY OTHER PARTY.

SUBSCRIBER AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS ARMLS® AND EACH ASSOCIATION AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES AND COSTS, INCLUDING ATTORNEY FEES, ARISING FROM THE FAILURE OF SUBSCRIBER TO COMPLY WITH ANY OF SUBSCRIBER'S OBLIGATIONS OR RESPONSIBILITIES SET FORTH IN THIS AGREEMENT.  SUBSCRIBER EXPRESSLY WAIVES, RELEASES AND AGREES TO HOLD HARMLESS ARMLS® AND EACH ASSOCIATION FROM AND AGAINST ANY ACTUAL DAMAGES, CONSEQUENTIAL DAMAGES AND LOST BUSINESS AND ANY OTHER CLAIM ARISING FROM SUBSCRIBER'S USE OF OR INABILITY TO USE THE SYSTEM.  THESE INDEMNITY AND RELEASE AGREEMENTS OF SUBSCRIBER SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

SUBSCRIBER AGREES TO INDEMNIFY AND HOLD HARMLESS EACH OF MLS'S PARTICIPANTS AND SUBSCRIBERS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND ACTIONS, INCLUDING THE PAYMENT OF ALL LEGAL EXPENSES, INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS, ARISING OUT OF OR CONNECTED WITH ANY OF SUBSCRIBER'S LISTING CONTENT INCLUDING ALLEGATIONS THAT THE LISTING CONTENT VIOLATES A FAIR HOUSING LAW OR INFRINGES ON OR CONSTITUTES A MISAPPROPRIATION OF ANY PATENT, COPYRIGHT, TRADE SECRET, OR ANY OTHER INTELLECTUAL PROPERTY RIGHT OF ANY PERSON OR ENTITY ANYWHERE IN THE WORLD. THIS PROVISION IS EXPRESSLY PROVIDED FOR THE BENEFIT OF AND ENFORCEMENT BY EACH OF MLS'S PARTICIPANTS AND SUBSCRIBERS.

THE ASSOCIATIONS SHALL BE THIRD PARTY BENEFICIARIES OF THE AGREEMENTS AND UNDERTAKINGS SET FORTH IN THIS SECTION 11.

13. **COPYRIGHT ASSIGNMENT.**  Subscriber agrees to grant ARMLS® a perpetual, royalty free, non-exclusive license in and to Subscriber's Contribution, including any copyrights relating to such text and photographs.  The license will permit ARMLS® to use and compile Subscriber's Contribution and to sublicense the use of Subscriber's Contribution to and distribute to other parties as permitted or contemplated by the ARMLS® Governing Documents, or in contractual relationships and licenses for such Subscriber's Contributions which ARMLS® may enter into from time to time.  Subscriber warrants that Subscriber has the authority to grant such license and that Subscriber's Contributions do not infringe on any copyright or other intellectual property rights of any third party.   ARMLS® is not required to, and does not, review, edit, or exercise editorial control over the ARMLS® System or ARMLS® Data and use of either is subject to the exclusions of warranties and limitations of liabilities set forth in this Agreement. The foregoing notwithstanding, ARMLS® may take any steps necessary in its judgment, including deleting ARMLS® Data submitted by Subscribers, or portions of it, to avoid or remedy any violation of law or infringement of intellectual property right.

14. **CHANGES TO THIS AGREEMENT.**  The first time Subscriber uses the System after a change is made to this Agreement, the System will display a notice requesting Subscriber's agreement to the revised Agreement. Subscriber's use of the System will be conditioned on Subscriber's indication of agreement with the terms of the revised Agreement.  Each time this Agreement is revised, Subscriber must signify agreement with the revised version of this Agreement in order to continue using the System.   The provisions of the current form of this Agreement in place at any time and from time to time shall control and supersede any inconsistent provisions contained in previous versions of the Agreement.

15. **CONFLICT BETWEEN DOCUMENTS.**  This Agreement contains the entire understanding of the parties and supersedes all previous oral and written agreements on the subject hereof. This Agreement shall, if at all possible, be interpreted to be consistent with and supplemental to the other ARMLS® Governing Documents. If there is a direct conflict between this Agreement and any other ARMLS® Governing Documents, the terms and provisions of this Agreement shall prevail.

16. **SEVERABILITY.**  Each provision of this Agreement is severable from the whole, and if one provision is declared

invalid, the other provisions shall remain in full force and effect.

| | |
|---|---|
| Print Name: ███████ | Home Phone: n/a |
| Signature ████████████████ | Cell Phone: ██████████ |
| | Office Phone: |
| Date: 09/23/2020 | Fax Number: |
| | Preferred Phone*: Cell |
| Address: 4343 N. Scottsdale Rd., Suite 390 | Email Address: ████████████ |
| City/State/Zip: 85251 | Office Name: Zillow, Inc. |
| | Office ID: |
| | *Indicate Home, Cell, or Office as preferred phone location. |

17. **GOVERNING LAW.** The performance and interpretation of this Agreement shall be governed and enforced in accordance with the laws of the State of Arizona applicable to contracts made and performed in Arizona without reference to its choice of law provisions.

**FOR EXECUTION OF AGREEMENT BY AUTHORIZED SUBSCRIBER BY NON-ELECTRONIC MEANS:**

**MLS PARTICIPANT AUTHORIZATION:** MLS Participant affirms that he/she is in good standing with an Association and that Subscriber is affiliated with him/her and is eligible ███████████ services contemplated under this Agreement.

Print Name: ███████████     Signature: ████████████████

# EXHIBIT 2

**Aiken** ASSOCIATION OF **REALTORS®**

# REALTOR® Membership Application

I hereby apply for Realtor membership in the Aiken Association of REALTORS® and the South Carolina REALTORS® (SCR).

I am enclosing my check for fees in the amount of $_____ (to be completed by AAOR Staff), which is to be returned to me in the event of non-election. In the event of my election, I agree to arbitrate all contractual disputes with fellow REALTORS®, and abide by the Code of Ethics of the National Association of REALTORS®, and the Constitution of Bylaws, and Rules and Regulations of the above named Association, the State Association, and the National Association. I consent that the Association, through its Membership Committee or otherwise, may invite and receive information and comment about me from any Member or other person, and I further agree that any information and comment furnished to the Association by any person in response to the invitation shall be conclusively deemed to be privileged and not form the basis of any action by me for slander, libel, or defamation of character.

I hereby submit the following information for your consideration:

Name as shown on Real Estate License ____[redacted]_____   ☒ Mr. ☐ Ms. ☐ Mrs.

SC License # __[redacted]_____   Firm ID# _____   ☐ Broker ☐ Salesperson  Phone:

Office Address: __1301 Second Avenue Floor 31__   City: __Seattle__   State: __WA__   Zip: __98101__

Mailing Address: _____   City: _____   State: _____   Zip: _____

Home Address: _____   City: _____   State: _____   Zip: _____

*Email Address: __[redacted]_____   Receive weekly news from SCR?   ☐Yes ☒No

**\* Please note: State Association (SCR) files will be setup with all addresses. Please notify SCR of any changes immediately by emailing: information@screaltors.org**

**By signing below, I consent to receive all forms of communication from local REALTOR® Association, SC Association of REALTORS® and the National Association of REALTORS®. Such communications may be informational or advertising and may be transmitted in any written or electronic formats. To withdraw this consent, contact the sender. Currently, SCR does not sell member email addresses to vendors. SCR provides adhesive mailing labels to outside parties. LLR Sells licensee contact information and posts it on the SC Real Estate Commission website. There are other internet data sources the vendors may use to obtain licensee contact information.**

Name of Firm: ___Zillow, Inc._____

Please Check: ☐ Individual ☐ BIC ☐ Partnership ☒ Corporation ☐ Affiliate

Title or Position with Firm: __Broker in Charge_____   Partner or Officers (If Corp.) [redacted]

Are you actively engaged in the Real Estate business: ☒ Yes ☐ No

Do you hold yourself out to the general public as being actively engaged in the Real Estate business: ☒Yes ☐No

You are authorized to contact the following references:

Name: _____   Address: _____   Phone: _____

Name: _____   Address: _____   Phone: _____

It is understood that this application and the fees stated include Membership of South Carolina REALTORS® and the National Association of REALTORS®

Dated: ____March 4_____, 20 _21__   Applicant Signature: [redacted]

This application is submitted through: ____[redacted]_____

**Realtor®/ Broker in Charge)**

Page 1

## Personal Data

Date you first entered into the Real Estate Business ___██___ at what firm: ___████___

Date established at present Office: ___██___    Previous Office: _____

Have you been continually engaged in the business since then:    ☒Yes  ☐No

How many years have you been active as a:    Salesman: _____    Broker: _██_____

Memberships in Professional Societies, Fraternal Orders, Service Organizations, Board/Associations of REALTORS®, or Political Office, etc.:
███████████████████████████████████████

South Carolina resident since: N/A _____    Previous residence: ___████___

Are you a member of any Local Board/Association of REALTORS®:    ☒Yes  ☐No

If yes, which one (s): _████████_____

Have you participated in a Multiple Listing Service:    ☒Yes  ☐No

If yes, where: __██_____

How many hours per week on average, do you devote to real estate? _____

In which branches of Real Estate do you specialize? (complete all that apply)

___x___% Single-family home sales; ___x___% New Home Sales; _____% Commercial; _____% Appraising; _____% Property Management; _____% Other

Are you currently employed at another business or profession?    ☐Yes  ☒No
If yes, please list position, location and date: _____

Will you serve on State or Local Committees? (if appointed) ☒Yes    ☐No Committee Preference: _____

Have you ever been disciplined by a Local Board/Association?    ☐Yes  ☒No

Have you ever been disciplined by a licensing agency?    ☐Yes  ☒No

Please provide details (use a separate sheet of paper, if necessary) _____

---

**If you are the Broker in Charge (Designated REALTOR®) for your office, please list all agents displaying a license in your office:**

_____

_____

**As a Broker in Charge, you are responsible for payment of all NON– Member Salespeople assessment for each person not wishing to join as a REALTOR®.**

# EXHIBIT 3

## REALTOR® Membership Application

I hereby apply for Realtor membership in the Aiken Association of REALTORS® and the South Carolina REALTORS® (SCR).

I am enclosing my check for fees in the amount of $_____ (to be completed by AAOR Staff), which is to be returned to me in the event of non-election. In the event of my election, I agree to arbitrate all contractual disputes with fellow REALTORS®, and abide by the Code of Ethics of the National Association of REALTORS®, and the Constitution of Bylaws, and Rules and Regulations of the above named Association, the State Association, and the National Association. I consent that the Association, through its Membership Committee or otherwise, may invite and receive information and comment about me from any Member or other person, and I further agree that any information and comment furnished to the Association by any person in response to the invitation shall be conclusively deemed to be privileged and not form the basis of any action by me for slander, libel, or defamation of character.

I hereby submit the following information for your consideration:

Name as shown on Real Estate License ___██████████_____  ☒ Mr. ☐ Ms. ☐ Mrs.

SC License #__██████_____  Firm ID# _____  ☐ Broker ☐ Salesperson  Phone:

Office Address: __1301 Second Avenue Floor 31____  City: __Seattle____  State: WA___  Zip: _98101_

Mailing Address: _____  City: _____  State:_____  Zip: _____

Home Address: _____  City: _____  State:_____  Zip: _____

*Email Address: __██████████_____  Receive weekly news from SCR?  ☐Yes ☒No

**\* Please note: State Association (SCR) files will be setup with all addresses. Please notify SCR of any changes immediately by emailing: information@screaltors.org**

**By signing below, I consent to receive all forms of communication from local REALTOR® Association, SC Association of REALTORS® and the National Association of REALTORS®. Such communications may be informational or advertising and may be transmitted in any written or electronic formats. To withdraw this consent, contact the sender. Currently, SCR does not sell member email addresses to vendors. SCR provides adhesive mailing labels to outside parties. LLR Sells licensee contact information and posts it on the SC Real Estate Commission website. There are other internet data sources the vendors may use to obtain licensee contact information.**

Name of Firm: ___Zillow, Inc._____

Please Check: ☐ Individual ☐ BIC ☐ Partnership ☒ Corporation ☐ Affiliate

Title or Position with Firm: __Broker in Charge_____  Partner or Officers (If Corp.) ██████████_

Are you actively engaged in the Real Estate business: ☒ Yes ☐ No

Do you hold yourself out to the general public as being actively engaged in the Real Estate business: ☒Yes ☐No

You are authorized to contact the following references:

Name: _____  Address: _____  Phone:_____

Name: _____  Address: _____  Phone:_____

It is understood that this application and the fees stated include Membership of South Carolina REALTORS® and the National Association of REALTORS®

Dated: ___March 4_____, 20 _21_  Applicant Signature ██████████████

This application is submitted through: _____██████_____

**(Designated Realtor®/ Broker in Charge)**

# Personal Data

Date you first entered into the Real Estate Business ___█████_____ at what firm: ___██████████_____

Date established at present Office: ____█████_____     Previous Office: _____

Have you been continually engaged in the business since then:     ☒Yes  ☐No

How many years have you been active as a:          Salesman: _____     Broker: ___███_____

Memberships in Professional Societies, Fraternal Orders, Service Organizations, Board/Associations of REALTORS®, or Political Office, etc.:
████████████████████████████████████████████████████████████████

South Carolina resident since: _N/A_____     Previous residence: ___███████_____

Are you a member of any Local Board/Association of REALTORS®:     ☒Yes  ☐No

If yes, which one (s): _███████████████████████_____

Have you participated in a Multiple Listing Service:     ☒Yes  ☐No

If yes, where: __███_____

How many hours per week on average, do you devote to real estate? _____

In which branches of Real Estate do you specialize? (complete all that apply)

___x___% Single-family home sales; ___x___% New Home Sales; _____% Commercial; _____% Appraising; _____% Property Management; _____% Other

Are you currently employed at another business or profession?     ☐Yes  ☒No
If yes, please list position, location and date: _____

Will you serve on State or Local Committees? (if appointed) ☒Yes     ☐No Committee Preference: _____

Have you ever been disciplined by a Local Board/Association?     ☐Yes  ☒No

Have you ever been disciplined by a licensing agency?     ☐Yes  ☒No

Please provide details (use a separate sheet of paper, if necessary) _____

_____

---

**If you are the Broker in Charge (Designated REALTOR®) for your office, please list all agents displaying a license in your office:**

_____

_____

**As a Broker in Charge, you are responsible for payment of all NON– Member Salespeople assessment for each person not wishing to join as a REALTOR®.**

# EXHIBIT 4



# RETS Server Access Agreement

Systems Engineering, Inc. (SEI) agrees to provide Real Estate Transaction Standard (RETS)/Version 1.x server access for **Zillow, Inc.** that permits the undersigned third party to maintain multiple sites for agents within the undersigned Real Estate company only.  Any additional use of this data must be approved by the MLS and SEI.  This will result in additional signed agreements between all parties.  This service is provided through the **Aiken MLS** by SEI and may be terminated with thirty (30) days notice by any party to this agreement.

Data can be presented in either  STANDARD-XML, COMPACT or COMPACT-DECODED formats.  Transactions will be accepted and processed 7 days a week, 24 hours a day with restrictions on the volume of data that can be requested and transmitted during the *'normal'* business day.  The monthly fee for this agreement shall be $40 plus any additional fees to be established by the MLS.  **Zillow, Inc.** is responsible for all sales or use tax resulting from this transaction.  SEI reserves the right to adjust fees based on usage patterns.

Usage restrictions and fees within the control of SEI will not change without thirty (30) days prior notice to the above named.  Restrictions and fees resulting beyond the control of SEI are subject to change at any time without notice.

Data available through the RETS server will be limited to content the Board or MLS approves and will not contain any security information such as User Names and Passwords.  Please select from the following content options:

X Option 1:  IDX listings, IDX fields (Active & Active Contingent)
__ Option 2:  Only **Zillow, Inc.** listings, all fields

*For additional options, contact SEI.*

**Zillow, Inc.**
**Zachary Schabot**

By: _____

Title: __Broker_____

Date: __3/8/2021_____


**Zillow, Inc.**
**Curt Beardsley**

By: _____

Title: __Vice President, MLS Partnerships__

Date: __3/8/2021_____
Contact E-mail: ██████████████


**Aiken MLS**

By: _____

Title: _____

Date: _____


**Systems Engineering, Inc.**

By: _____

Title: _____

Date: _____

# EXHIBIT 5

**Aiken Association of REALTORS®**
**MLS Rules and Regulations**
**Adopted 2020**

**Purpose**
**Section 1. Purpose.** A Multiple Listing Service is a means by which authorized participants make blanket unilateral offers of compensation to other Participants (acting as subagents, buyer agents, or in other agency or non-agency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses,  and other valuations of real property for  bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common data bases; and is a facility for the orderly correlation and dissemination of listing information so participants  may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of the sale (or lease). (Added 12/08)

**Participation**
**Section 2. Participation.** Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with Participants. Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS Participant or the Participant's licensed designee. Any REALTOR® Member of this or any other Association who is a principal, partner, corporate officer, or branch office manager acting on behalf of the principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in the Multiple Listing upon agreeing in writing to conform to the Rules and Regulations thereof and to pay the costs incidental thereto.  However, under no circumstances is any individual or firm, regardless of membership status, entitled to Multiple Listing Service "membership" or "participation" unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other Participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.  Use of information developed by or published by an Association Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey "participation" or "membership" or any right of access to information developed by or published by an Association Multiple Listing Service where access to such information is prohibited by law. (Amended 12/08)

Mere possession of a broker's license is not sufficient to qualify for MLS participation.  Rather, the requirement that an individual or firm 'offers or accepts cooperation and compensation' means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS.  "Actively" means on a continual and on-going basis during the operation of the Participant's real estate business.  The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions.  Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts.  Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought.  This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a Virtual Office Website ("VOW") (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation.  An MLS may evaluate whether a Participant or potential Participant "actively endeavors during the operation of its real estate business" to "offer or accept cooperation and compensation" only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so.  The membership requirement shall be applied on a nondiscriminatory manner to all Participants and potential Participants. (Adopted 11/08)

**Section 2.1 Supervision.** The activity shall be operated under the supervision of the Multiple Listing Committee, in accordance with the rules and regulations, subject to approval of the Board of Directors of the Aiken Association of REALTORS®.

**Listing Procedures**
**Clear Cooperation**
Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. *(Adopted 11/19)*

**Section 3 - Listing Procedures:** Listings of real or personal property of the following types which are listed subject to a real estate broker's license, and are located within the territorial service area of the Aiken Association of Realtors (See Notes 1 and 2) shall be entered into the Multiple Listing system within two days (excluding weekends and federal holidays) after all necessary signatures of seller(s) have been obtained. (Amended 2014)

(a)    Single family homes for sale or exchange
(b)    Vacant lots and acreage for sale or exchange
(c)    Two-family, three-family, and four-family residential buildings for sale or exchange.

Note 1: The Multiple Listing Service does not require listings to be on a specific listing form. However, the Multiple Listing Service, through its legal counsel: (Amended 5/05)

- May reserve the right to refuse to accept a listing which fails to adequately protect the interests of the public and the Participants
- May assure that no listing filed with the Multiple Listing Service establishes, directly or indirectly, any contractual relationship between the Multiple Listing Service and the client (buyer or seller). (Amended 5/05)

The Multiple Listing Service shall accept exclusive right to sell listing contracts and exclusive agency listing contracts, and may accept other forms of agreement which make it possible for the listing broker to offer compensation to the other Participants of the Multiple Listing Service acting as subagents, buyer agents, or both. (Amended 1/96)

The listing agreement must include the seller's written authorization to submit the agreement to the Multiple Listing Service. (Amended 11/96)

2

The different types of listing agreements include-
(a)      exclusive right to sell
(b)      exclusive agency
(c)      transaction brokerage (Amended 2018)

The Service will not accept net listings because they are deemed unethical and, in most states, illegal.  Open listings are not accepted except where required by law because the inherent nature of an open listing is such as to usually not include the authority to cooperate and compensate other brokers and inherently provides a disincentive for cooperation. (Amended 4/92)

The exclusive right to sell listing is the conventional form of listing submitted to the Multiple Listing Service in that the seller authorizes the listing broker to cooperate with and to compensate other brokers. (Amended 4/92)

The exclusive agency listing also authorizes the listing broker, as exclusive agent, to offer cooperation and compensation on blanket unilateral basis, but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis.  Exclusive agency listings and exclusive right to sell listings with named prospects exempted should be clearly distinguished by a simple designation such as a code or symbol from exclusive right to sell listings with no named prospects exempted since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right to sell listings with no named prospects exempted. Care should be exercised to ensure that different codes or symbols are used to denote exclusive agency and exclusive right to sell listings with prospect reservations. (Amended 4/92)

Note 2: A Multiple Listing Service does not regulate the type of listings its Members may take. This does not mean that a Multiple Listing Service must accept every type of listing.  The Multiple Listing Service shall decline to accept open listings (except where acceptance is required by law) and net listings, and it may limit its service to listings of certain kinds of property.  But, if it chooses to limit the kind of listings it will accept, it shall leave its Members free to accept such listings to be handled outside the Multiple Listing Service.

Note 3: A Multiple Listing Service may, as a matter of local option, accept exclusively listed property that is subject to auction.  If such listings do not show a listed price, they may be included in a separate section of the MLS compilation of current listings. (Adopted 11/92)

Types of Properties: Following are some of the types of properties that may be published through the Service, including types described in the preceding paragraph that are required to be filed with the Service and other types that may be filed with the Service at the Participants option provided, however, that any listing submitted is entered into within the scope of the Participant's licensure as a real estate broker: (Amended 2018)

   1.      *Residential*
   2.      *Multi-Family*
   3.      *Lots & Land*
   4.      *Commercial*
   5.      *Lease*

3

**Section 3.1 - Listings Subject to Rules and Regulations of the Service:** Any listing taken on a contract to be filed with the Multiple Listing Service is subject to the Rules and Regulations of the Service upon signature of the seller(s).

**Section 3.2- Detail on Listings Filed with the Service:** Listings when filed with the Multiple Listing Service by the listing broker shall be complete in *every detail available. (Amended 2018)*

**Section 3.3 - Exempted Listings:** If the seller refuses to permit the listing to be disseminated by the Service, the Participant may then take the listing ("office exclusive") and such listing shall be filed with the MLS office but not disseminated to the participants. Filing of the listing shall be by submitting Exempted Listing Authorization Form signed by the seller .

> Note: MLS Participants must distribute exempt listings within (1) one business day once the listing is publicly marketed. (Amended 2020)

**Section 3.4 - Change of Status of Listing:** Any change in listed price or other change in the original listing agreement shall be made only when authorized in writing by the seller and shall be updated in the MLS system within *two* business days (excepting weekends and federal holidays) after all necessary signatures of seller(s) have been obtained. (Amended 2018)

**Section 3.5 - Withdrawal of Listing Prior to Expiration:** Listings of property may be withdrawn from the Multiple Listing Service by the listing broker before the expiration date of the listing agreement. Sellers do not have the unilateral right to require an MLS to withdraw a listing without the listing broker's concurrence.  However, when a seller(s) can document that his or her exclusive relationship with the listing broker has been terminated, the Multiple Listing Service may remove the listing at the request of the seller. (Amended 5/05)

**Section 3.6 - Contingencies Applicable to Listings:** Any contingency or conditions of any term in a listing shall be specified and noticed to the Participants.

**Section 3.7 - Listing Price Specified:** The full gross listing price stated in the listing contract will be included in the information published in the MLS compilation of current listings, unless the property is subject to auction.(Amended 11/92)

**Section 3.8 - Listing Multiple Unit Properties:** All properties which are to be sold or which may be sold separately must be indicated individually in the listing and on the proper data form. When part of a listed property has been sold, proper notification should be given to the Multiple Listing Service.

**Section 3.9 - No Control of Commission Rates or Fees Charged by Participants:** The Multiple Listing Service shall not fix**,** control, recommend, suggest, or maintain commission rates or fees for services to be rendered by Participants.  Further, the Multiple Listing Service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and non-participants.

**Section 3.10 – Expiration of Listings:** Listings filed with the Multiple Listing Service will automatically be removed from the compilation of current listings on the expiration date specified in the agreement, unless prior to that date the MLS receives notice that the listing has been extended or renewed.

If a listing has been on the market in the last 30 calendar days and was withdrawn or expired, that listing will have the same MLS number. After 30 calendar days listings will be published in the same manner as a new listing. Extensions and renewals of listings must be signed by the seller(s) and filed with the Service. (Amended 2018)

**Section 3.11 - Termination Date on Listings:** Listings filed with the Service shall bear a definite and final termination date, as negotiated between the listing broker and the seller.

**Section 3.12 - Service Area:** Only listings of the designated types of property located within the *service area* of the MLS are required to be submitted to the service. Listings of property located outside the MLS's *service area* will be accepted if submitted voluntarily by a participant, but cannot be required by the service.  The service area of Aiken MLS is Aiken County, South Carolina except that part of Aiken County North and West of a line drawn on a map of Aiken County and made a part of file, which is approximately equal distance from the city limits of Aiken, South Carolina, and North Augusta, South Carolina, all of Barnwell County, South Carolina and all of Allendale County, South Carolina[if approved by NAR]Requests to add new sub-divisions to the service must be submitted in writing to the MLS office and must include a signed and stamped subdivision approval from the City/County or the CRS Data Property Report showing the subdivision name. (Amended  2020)

**Section 3.13 - Listings of Suspended Participants:** When a Participant of the Service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, Association Bylaws, MLS Bylaws**,** MLS Rules and Regulations, or other membership obligation except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended Participant shall, at the Participant's option, be retained in the Service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective.  If a participant has been suspended from the Association (except where MLS participation without Association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an Association MLS is not obligated to provide MLS services, including continued inclusion of the suspended Participant's listings in the MLS compilation of current listing information.  Prior to any removal of a suspended Participant's listings from the MLS, the suspended Participant should be advised in writing of the intended removal so that the suspended Participant may advise his clients.

**Section 3.14 - Listings of Expelled Participants:** When a Participant of the Service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, Association Bylaws, MLS Bylaws, MLS rules and Regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS shall, at the expelled Participant's option, be retained in the Service until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective.  If a Participant has been expelled from the Association (except where MLS participation without Association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an Association MLS is not obligated to provide MLS services, including continued inclusion of the expelled Participants listings in the MLS compilation of current listing information.  Prior to any removal of an expelled Participant's listings from the MLS, the expelled Participant should be advised, in writing, of the intended removal so that the expelled Participant may advise his clients.

**Section 3.15 - Listings of Resigned Participants:** When a Participant resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned Participant's listings in the MLS compilation of current listing information.  Prior to any removal of a resigned Participant's listings from the MLS, the resigned Participant should be advised, in writing, of the intended removal so that the resigned Participant may advise his clients.

**Selling Procedures**
**Section 4 - Showings and Negotiations:** Appointments for showings and negotiations with the seller for the purchase of listed property filed with the Multiple Listing Service shall be conducted through the listing broker, except under the following circumstances:

(a)    The listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

(b)    After reasonable effort, the cooperating broker cannot contact the listing broker or his representative; however, the listing broker, at his option, may preclude such direct negotiations by cooperating brokers. (Amended 4/92)

**Section 4.1 - Presentation of Offers:** The listing broker must make arrangements to present the offer as soon as possible, or give the cooperating broker a satisfactory reason for not doing so. (Amended 4/92)

**Section 4.2 - Submission of Written Offers:** The listing broker shall submit to the seller all written offers until closing unless precluded by law, government rule or regulation.  Unless the subsequent offer is contingent upon the termination of an existing contract, the listing broker shall recommend that the seller obtain the advice of legal counsel prior to acceptance of the subsequent offer. (Approved '11)

Participants representing buyers or tenants shall submit to the buyer or tenant all offers and counter-offers until acceptance, and shall recommend that buyers and tenants obtain legal advice where there is a question about whether a pre-existing contract has been terminated (Amended 12/08)

**Section 4.3 - Right of Cooperating Broker in Presentation of Offer:**
Cooperating participants or their representatives have the right to participate in the presentation of any offer they secure to purchase or lease to the seller or lessor. They do not have the right to be present at any discussion or evaluation of the offer by the seller or lessor and the listing broker. However, if a seller or lessor gives written instructions to a listing broker that cooperating brokers may not be present when offers they procure are presented, cooperating brokers have the right to a copy of those instructions. This policy is not intended to affect listing brokers' right to control the establishment of appointments for presentation of offers.

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented.  (Updated 2019) M

**Section 4.4 - Right of Listing Broker in Presentation of Counter-Offer:** The listing broker or his representative has the right to participate in the presentation of any counter-offer made by the seller or lessor.  He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except when the cooperating broker is a subagent).

6

29

However, if the purchaser or lessee gives written instructions to the cooperating broker that the listing broker not be present when a counter-offer is presented, the listing broker has the right to a copy of the purchaser's or lessee's written instructions. (Adopted 11/93)

**Section 4.5 -** Reporting Sales to the Service: Status changes, including final closing of *sales (as reflected on closing statement)*, shall be reported to the Multiple Listing Service by the listing broker within __48__ hours after they have occurred, *if signatures and funding are delayed, written notice shall be given to the MLS Office*.  If negotiations were carried on under Section 4(a) or (b) hereof, the cooperating broker shall report the accepted offers to the listing broker within forty-eight (48) hours after occurrence and the listing broker shall report them to the MLS within __48__ hours after receiving notice from the cooperating broker. *(Amended 2018)*

**Note 1:** The listing agreement of a property filed with the MLS by the listing broker should include a provision expressly granting the listing broker authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the listing broker the right to authorize dissemination of this information by the MLS to its participants.

**Note 2:** In disclosure states, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.
In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:
1. categorizes sale price information as confidential and
2. limits use of sale price information to participants and subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to participants and subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices.

**Note 3:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records.)

**Section 4.6- Reporting of Pending or Contingencies:** The listing broker shall report to the Multiple Listing Service within forty-eight (48) hours that a contract is on file with a contingency. Brokers may put it in either active with contingencies or pending in the system. (Amended 5/05)

**Section 4.7 - Reporting Resolutions of Contingencies:** The listing broker shall report to the Multiple Listing Service within forty-eight (48) hours that a contingency on file with the Multiple Listing Service has been fulfilled or renewed, or the agreement cancelled. (Amended 5/05)

**Section 4.8 - Advertising of Listing Filed with the Service:** A listing shall not be advertised by any Participant other than the listing broker without the prior consent of the listing broker.

**Section 4.9 - Reporting Cancellation of Pending Sale:** The listing broker shall report immediately to the Multiple Listing Service the cancellation of any pending sale, and the listing shall be reinstated immediately.

**Section 4.10 – Disclosing the Existence of Offers:** Listing brokers, in response to inquiries from buyers or cooperating brokers shall, with the seller's approval, disclose the existence of offers on the property.  Where disclosure is authorized, the listing broker shall also disclose, if asked, whether offers were obtained by the listing licensee, by another licensee in the listing firm, or by a cooperating broker.  (Adopted 11/08)

**Section 4.11 – Availability of Listed Property:** Listing brokers shall not misrepresent the availability of access to show or inspect listed property. (Adopted 12/08)

**Refusal to Sell**
**Section 5 - Refusal to Sell:** If the seller of any listed property filed with the Multiple Listing Service refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact shall be transmitted immediately to the Service and to all Participants.

**Prohibitions**
**Section 6 - Information for Participants Only:** Any listing filed with the Service shall not be made available to any broker or firm not a Member of the MLS without the prior consent of the listing broker.

**Section 6.1 - "For Sale" Signs:** Only the "For Sale" sign of the listing broker may be placed on a property. (Amended 11/89*)*

**Section 6.2 Sold Signs**: Prior to closing, only the "Sold" or "Pending" signs of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign (Amended 4/96)

**Section 6.3 - Solicitation of Listing Filed with the Service:** Participants shall not solicit a listing on property filed with the Service unless such solicitation is consistent with Article 16 of the REALTORS® Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note 1:**          This Section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4.  This Section is intended to encourage sellers to permit their properties to be filed with the Service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This Section is also intended to encourage brokers to participate in the Service by assuring them that other Participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property.  Absent the protection afforded by this Section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This Section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics

**Section 6.4**, Use of the Terms MLS and Multiple Listing Service, model MLS rules and regulations (all types)

No MLS participant, subscriber or licensee affiliated with any participant shall, through the name of the firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers and licensees affiliated with participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to participants and subscribers.  This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their website or otherwise. (Adopted 12/08)

**Division of Commissions**
**Section 7 - Compensation Specified on Each Listing:** The listing broker shall specify, on each listing filed with the Multiple Listing Service, the compensation offered to other Multiple Listing Service Participants for their services in the sale of such listing. Such offers are unconditional except that entitlement to compensation is determined by the cooperating broker's performance as the procuring cause of sale (or lease**),** or as otherwise provided for in this rule**.**  The listing broker's obligation to compensate any cooperating broker as the procuring cause of sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid. (Amended 5/02)

In filing a property with the Multiple Listing Service of  Aiken Association of REALTORS®, the Participant of the Service is making blanket unilateral offers of compensation to the other MLS Participants, and shall therefore specify on each listing filed with the Service, the compensation being offered to the other MLS Participants.  Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell.* (Amended 11/96*)*

The listing broker retains the right to determine the amount of compensation offered to other Participants (acting as subagents, buyer agents, or in other agency or non agency capacities defined by law) which may be the same or different. (Amended 11/96)

This shall not preclude the listing broker from offering any MLS Participant compensation other than the compensation indicated on any listing published by the MLS, provided the listing broker informs the other broker, in writing, in advance of submitting an offer to purchase, and provided that the modification in the specified compensation is not the result of any agreement among all or any other Participants in the Service. Any superseding offer of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount. (Amended '11)

Note 1: The Association Multiple Listing Service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the Association Multiple Listing Service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a Participant. The Association Multiple Listing Service shall not disclose in any way the total commission negotiated between the seller and the listing broker.

Note 2: The listing broker may, from time to time, adjust the compensation offered to other Multiple Listing Service Participants for their services with respect to any listing by advance published notice to the Service so that all Participants will be advised. (Amended 4/92)

Note 3**:**      The Multiple Listing Service shall make no rule on the division of commissions between Participants and non-participants. This should remain solely the responsibility of the listing broker.

Note 4: Multiple Listing Services, at their discretion, may adopt rules and procedures enabling listing brokers to communicate to potential cooperating brokers that gross commissions established in listing contracts are subject to court approval; and that compensation payable to cooperating brokers may be reduced if the gross commission established in the listing contract is reduced by a court. In such instances, the fact that the gross commission is subject to court approval and either the potential reduction in compensation payable to cooperating brokers or the method by which the potential reduction in compensation will be calculated must be clearly communicated to potential cooperating brokers prior to the time they submit an offer that ultimately results in a successful transaction (Amended 12/08)

Note 5: Nothing in these MLS rules precludes a listing participant and a cooperating participant, as a matter of mutual agreement, from modifying the cooperative compensation to be paid in the event of a successful transaction.

Note 6: Multiple Listing Services must give participants the ability to disclose to other participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers; where the sale price is insufficient to pay the total of all liens and costs of sale; and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple Listing Services may, as a matter of local discretion, require participants to disclose potential short sales when participants know a transaction is a potential short sale. In any instance where a participant discloses a potential short sale, they must also be permitted to communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will

10

be apportioned between listing and cooperating participants.  All confidential disclosures and confidential information related to short sales, if allowed by local rules must be communicated through dedicated fields or confidential "remarks" available only to participants and subscribers. (Amended '11)

Participants may, but are not required to, disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) to other participants and subscribers. (Amended '11)

*The compensation specified on listings filed with the Multiple Listing Service shall appear in one of two forms.  The essential and appropriate requirement by an Association Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive in cooperative transactions, unless advised otherwise by the listing broker, in writing, in advance of submitting an offer to purchase.  The compensation specified on listings published by the MLS shall be shown in one of the following forms:

1.      By showing a percentage of the gross selling price
2.      By showing a definite dollar amount (Amended 5/10)

> Note:  MLSs may also, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation.(Adopted '11)

Note 1:  When Participants/licensees are distributing MLS detail sheets to clients/customers, they must use the Client Detail sheets and are not authorized to distribute information such as compensation, type of listing, seller's name, phone number or e-mail address and private remarks. In addition, agents are not authorized to distribute expired or withdrawn listings to customers or clients in any form.

Note 2: While MLSs are not required to authorize participants to offer cooperative compensation based on net sale prices, those that do permit such offers must define "seller concessions" for purposes other than new construction, unless that term is defined by applicable state law or regulation. (Adopted 5/12)

Definition of seller concessions: Points paid by seller on behalf of buyer, seller paid buyer closing costs, cash or cash allowances not escrowed, down payment assistance, additions or alterations not considered deferred maintenance, and personal property not usual and customary to such transactions conveyed from seller to buyer having an agreed upon monetary value. (Adopted 5/12)

**Section  7.1 - Participant as Principal:** If a Participant or any licensee (or licensed or certified appraiser) affiliated with a Participant has any ownership interest in a property, the listing which is to be disseminated through the Multiple Listing Service, that person shall disclose that interest when the listing is filed with the Multiple Listing Service and such information shall be disseminated to all Multiple Listing Service Participants.

**Section 7.2 - Participant as Purchaser:** If a Participant or any licensee (including licensed and certified appraisers) affiliated with a Participant wishes to acquire an interest in property listed with another Participant, such contemplated interest shall be disclosed, in writing, to the listing broker not later than the time an offer to purchase is submitted to the listing broker. (Adopted 2/92)

**Section 7.3 Dual or Variable Rate Commission Arrangements:**  The existence of a dual or variable rate commission arrangement (i.e., one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker without assistance and a different commission if the sale/lease results through the efforts of a cooperating broker; or one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker with or without the assistance of a cooperating broker and a different commission if the sale/lease results through the efforts of a seller/landlord) shall be disclosed by the listing broker in the private remarks section of the MLS by a key, code or symbol as required by the MLS.  The listing broker shall, in response to inquiries from potential cooperating brokers, disclose the differential that would result in either a cooperative transaction or alternatively, in a sale/lease that results through the efforts of the seller/landlord.  If the cooperating broker is a buyer/tenant representative, the buyer/tenant representative must disclose such information to their client before the client makes an offer to purchase or lease. (Amended 5/05)

**Service Charges**
**Section 8. - Service Fees and Charges:** The following service charges for operation of the Multiple Listing Service are in effect to defray the costs of the Service and are subject to change from time to time in the manner prescribed.

**(a) Initial Participation Fee**: An applicant for participation in the Service shall pay an application fee of $500.00 with such fee to accompany the application. This fee includes access to the lockbox lease system for Association members. MLS Only members may lease lockboxes for a nominal fee to be set by the Board of Directors. Note:  The initial participation fee shall approximate the cost of bringing the Service to the Participant. (Amended 2019)

**(b) Recurring Participation Fee- Association Members**: The quarterly participation fee of each participant shall be an amount equal to $(current quarterly fee) times each salesperson and licensed or certified appraiser who has access to and use of the Service, whether licensed as a broker, sales licensee, or licensed or certified appraiser who is employed by or affiliated as an independent contractor with such Participant. MLS Member Quarterly fees are billed to the Broker in Charge/Designated Realtor. Service will be suspended on the 2nd business after the due date if fees are unpaid and a $100 reinstatement fee will be assessed. Quarterly fees will be prorated by month for licensees joining a firm after the beginning of a quarter. (Amended 2019)

However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require waiver recipients and that their broker participants to sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated. (Amended 8/2018) M

12

35

**(c) Recurring Participation Fee- MLS Only Subscribers**: The quarterly participation fee of each Participant shall be an amount equal to $(double the current primary member fee) times each salesperson or certified appraiser who chooses to have access to and use of the Service, whether licensed as a broker, sales licensee or licensed or certified appraiser who is employed by or affiliated as an independent contractor with such Participant. A MLS Only Subscriber is defined as a REALTOR®, Broker or Appraisers who are members in good standing of another Association. The Office must join the MLS before any REALTOR® will be allowed access to the MLS system. The Aiken MLS does not require membership in the Aiken Association of REALTORS® for MLS Only Subscription; however, proof of a South Carolina Real Estate License is required. Quarterly fees are invoiced to the Broker in Charge/Designated REALTOR. Service will be suspended on the 2nd business day after the due date if fees are unpaid and a $100 reinstatement fee will be assessed. Quarterly fees will be prorated by month for licensees joining a firm after the beginning of a quarter. Members are prohibited from sharing access to the MLS with others. (Updated 2019)

However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS where the principal broker participates. MLSs may, at their discretion, require waiver recipients and their participants to sign a certification for nonuse of its MLS services, which can include penalties and termination of the waiver if violated. (Adopted 2018)

Members will be billed annually for their Key use in July. If payment is not received after the second business day following the due date, key will be deactivated, and a $30 reactivation fee will apply.

Members are prohibited from sharing Keys with any person (licensed or non-licensed.) First time violators will be fined $100 and have their key privileges suspended for 14 Days. Second time violators will have their key privileges suspended for one year. (Amended 2018)

Members are prohibited from sharing Navica passwords and/or accounts with <u>anyone,</u> including their assistants and any office staff.  Violators will be fined $100 for each offense. (Amended 2018)

Note 1:    This should be a minimal charge based on actual costs of producing and distributing the information.

Note 2:    Any combination of charges may be used if they are in accordance with the National Association's Multiple Listing Policy Point No. 3. Multiple Listing Policy Point No.3 prohibits a fee that is contingent on the sale of a listed property.

Note 3:    Financing from the Multiple Listing Service should be adequate but not in such amounts as to be the source of financing the Association's operation.  The Multiple Listing Service should pay its own way and allow for a reasonable operating reserve, but it is merely another service of the Association and not the principal activity or reason for the Association's existence.  As long as it is able to restrict its services exclusively or primarily to Association Members, the Service is not properly an Association profit center.

Note 4:    Multiple Listing Services that choose to include affiliated unlicensed administrative and clerical staff, personal assistants, and/or individuals seeking licensure or certification as real estate appraisers among those eligible for access to and use of MLS information as "subscribers"

13

may, at their discretion, amend Sections 6 (b) as necessary to include such individuals in the computation of MLS fees and charges. (Adopted 4/92)

**Compliance with Rules**
**Section 9.1 Compliance with Rules - Authority to Impose Discipline**

By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision.  The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

   a.  letter of warning
   b.  letter of reprimand
   c.  attendance at MLS orientation or other appropriate courses or seminars which the participant or subscriber can reasonably attend taking into consideration cost, location, and duration
   d.  appropriate, reasonable fine not to exceed $15,000
   e.  suspension of MLS rights, privileges, and services for not less than thirty (30) days nor more than one (1) year
   f.  termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years.  (Amended 2015)

Note 1: A participant (or user/subscriber, where appropriate) can be placed on probation. Probation is not a form of discipline. When a participant (or user/subscriber, where appropriate) is placed on probation the discipline is held in abeyance for a stipulated period of time not longer than one (1) year. Any subsequent finding of a violation of the MLS rules during the probationary period may, at the discretion of the Board of Directors, result in the imposition of the suspended discipline. Absent any subsequent findings of a violation during the probationary period, both the probationary status and the suspended discipline are considered fulfilled and the individual's record will reflect the fulfilment. The fact that one or more forms of discipline are held in abeyance during the probationary period does not bar imposition of other forms of discipline which will not be held in abeyances. (Added 2015)

Note 2: When determining if an alleged violation has occurred, the MLS reserves the right to request documentation as to the accuracy of the information. Failure to provide MLS with requested documentation within three (3) business days will result in a fine of $25 per day of noncompliance & the matter will be referred to MLS Committee. (Added 2020)

The following action may be taken for noncompliance with the Rules:

(a)    For failure to pay any service charge or fee within one (1) month of the date due, and provided that at least ten (10) days' notice has been given, the Service shall be suspended until service charges or fees are paid in full.

(b)  For failure to comply with any other rule, the provisions of Sections 9 and 9.1 shall apply.

Note:   Generally, warning, censure, and the imposition of a moderate fine are sufficient to constitute a deterrent to violation of the Rules and Regulations of the Multiple Listing Service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the Rules and Regulations of the Service.  If the MLS desires to establish a series of moderate fines, they should be clearly specified in the Rules and Regulations. (Amended 11/88)

14

**Section 9.2 - Applicability of Rules to Users and/or Subscribers:** Non-principal brokers, sales licensees, appraisers, and others authorized to have access to information published by the MLS are subject to these Rules and Regulations and may be disciplined for violations thereof provided that the user or subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the Rules and Regulations. Further, failure of any user or subscriber to abide by the Rules and/or any sanction imposed for violations thereof can subject the Participant to the same or other discipline. This provision does not eliminate the Participant's ultimate responsibility and accountability for all users or subscribers affiliated with the Participant. (Adopted 4/92)

## MLS Committee and Meetings

**Section 10.- MLS Committee:** The MLS Committee Structure will be as follows: at least 5 Members will serve on the MLS Committee. The MLS Chair will be elected each year every two years at the same time Association Officers and Directors are elected. The MLS Chair must be a Broker in Charge. After that election they will appoint the MLS Committee members as follows: 2 Brokers in Charge, 1 Non Participant and the Board President will serve on the MLS Committee. No two members of the MLS Committee can be from the same company. The Multiple Listing Service Committee shall meet for the transaction of its business at a time and place to be determined by the Committee or at the call of the Chairperson. (Amended 2018)

**Section 10.1 Vacancies.** Vacancies among the MLS Committee shall be filled by appointment of the Board of Directors until the next annual election. (Added 2018)

**Section 10.2 Attendance.** Any MLS Committee member, who fails to attend three (3) regular or special meetings of the Committee during one fiscal year, shall be deemed to have resigned immediately from the Committee and the vacancy shall be filled as herein provided for original appointees. (Added 2018)

**Section 10.1 - Meetings of MLS Participants:** The Committee may call meetings of the Participants in the Service to be known as meetings of the Multiple Listing Service.

**Section 10.2 - Conduct of the Meetings:** The Chairperson or Vice Chairperson shall preside at all meetings or, in their absence, a temporary Chairperson from the membership of the Committee shall be named by the Chairperson or, upon his failure to do so, by the Committee.

## Enforcement of Rules or Disputes

**Section 11 - Consideration of Alleged Violations:** The Committee shall give consideration to all written complaints from Participants having to do with violations of the Rules and Regulations. By becoming and remaining a participant, each participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors). (Updated 2020) M

**Section 11.1 - Violations of Rules and Regulations:** If the alleged offense is a violation of the Rules and Regulations of the Service and does not involve a charge of alleged unethical conduct or request for arbitration, it may be administratively considered and determined by the Multiple Listing Service Committee, and if a violation is determined, the Committee may direct the imposition of sanction, provided the recipient of such sanction may request a hearing before the Professional Standards Committee of the Association in accordance with the Bylaws and Rules and Regulations of the Association of REALTORS® within twenty (20) days following receipt of the Committee's decision.

If rather than conducting an administrative review, the Multiple Listing Committee has a procedure established to conduct hearings, the decision of the Multiple Listing Committee may be appealed to the Board of Directors within twenty (20) days of the tribunal's decision being rendered. Alleged violations involving unethical conduct shall be referred to the Association's Grievance Committee for processing in accordance with the professional standards procedures of the Association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the Board of Directors of the Association of REALTORS®.(Amended 5/02)

**Section 11.2 – Complaints of Unethical Conduct**: All other complaints of unethical conduct shall be referred by the Committee to the *Secretary/Treasurer* of the Association of REALTORS® for appropriate action in accordance with the professional standards procedures established in the Board's bylaws. *(Adopted 2018)*

*Section 11.3—Complaints of Unauthorized Use of Listing Content:* Any participant who believes another participant has engaged in the unauthorized use or display of listing content, including photographs, images, audio or video recordings, and virtual tours, shall send notice of such alleged unauthorized use to the MLS. Such notice shall be in writing, specifically identify the allegedly unauthorized content, and be delivered to the MLS not more than sixty (60) days after the alleged misuse was first identified. No participant may pursue action over the alleged unauthorized use and display of listing content in a court of law without first completing the notice and response procedures outlined in this Section 11.3 of the MLS rules.

Upon receiving a notice, the committee will send the notice to the participant who is accused of unauthorized use. Within ten (10) days from receipt, the participant must either: 1) remove the allegedly unauthorized content, or 2) provide proof to the committee that the use is authorized. Any proof submitted will be considered by the Committee, and a decision of whether it establishes authority to use the listing content will be made within thirty (30) days.

If the Committee determines that the use of the content was unauthorized, the Committee may issue a sanction pursuant to Section 9 of the MLS rules, including a request to remove and/or stop the use of the unauthorized content within ten (10) days after transmittal of the decision. If the unauthorized use stems from a violation of the MLS rules, that too will be considered at the time of establishing an appropriate sanction.

If after ten (10) days following transmittal of the Committee's determination the alleged violation remains uncured (i.e. the content is not removed or the rules violation remains uncured), then the complaining party may seek action through a court of law.

MLS participants may not take legal action against another participant for alleged rules violation(s) unless the complaining participant has first exhausted the remedies provided in these rules. (Added 2019) M

**Confidentiality of MLS Information**
**Section 12 - Confidentiality of MLS Information:** Any information provided by the Multiple Listing Service to the Participants shall be considered official information of the Service.  Such information shall be considered confidential and exclusively for the use of Participants and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants. (Amended 4/92)

**Section 12.1-MLS Not Responsible for Accuracy of Information:**  The information published and disseminated by the Service is communicated verbatim, without change by the Service, as filed with the
Service by the Participant.  The Service does not verify such information provided and disclaims any responsibility for its accuracy.  Each Participant agrees to hold the Service harmless against any liability arising from any inaccuracy or inadequacy of the information such Participant provides.


**Ownership of MLS Compilations\* and Copyrights**
**Section 13 -** By the act of submitting any property listing content to the MLS the Participant represents and warrants that he or she is fully authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations, and also thereby does grant to  the MLS to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recording, virtual tours, drawings, descriptions, remarks, narratives, pricing information and other details or information related to listed property.

Each participant who submits listing content to the MLS agrees to defend and hold the MLS and every other participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content. (Amended 2019)

> **Note:** The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet.  The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as participants and subscribers hosting an IDX display.
>
> One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work.  For this reason, it is highly recommended that MLSs, participants and subscribers comply with the DMCA safe harbor provisions discussed herein.
>
> To qualify for this safe harbor, the OSP must:
>
> (1)  Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, participant, subscriber, or other individual or entity.
> (2)  Develop and post a DMCA-compliant website policy that addresses repeat offenders.
> (3)  Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a

17

certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

(4)  Have no actual knowledge of any complained-of infringing activity.

(5)  Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

(6)  Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512.  ( Added 2015)

**Section 13.1 -** All right, title, and interest in each copy of every Multiple Listing compilation created and copyrighted by the Aiken Association of REALTORS® and in the copyrights therein, shall at all times remain vested in the Aiken Association of REALTORS®.

**Section 13.2 -** Each Participant shall be entitled to lease from the Aiken Association of REALTORS® a number of copies of each MLS compilation sufficient to provide the Participant and each person affiliated as a licensee (including licensed or certified appraisers) with such Participant with one copy of such compilation.  The Participant shall pay for each such copy the rental fee set by the Board.**

Participants shall acquire by such lease only the right to use the MLS compilations in accordance with these Rules.

* The term "MLS compilation," as used in Sections 11 and 12 herein, shall be construed to include any format in which property listing data is collected and disseminated to the Participants, including but not limited to bound book, loose-leaf binder, computer database, card file, or any other format whatsoever.

** This section should not be construed to require the Participant to lease a copy of the MLS compilation for any licensee (or licensed or certified appraiser) affiliated with the Participant who is engaged exclusively in a specialty of the real estate business other than listing, selling, or appraising the types of properties which are required to be filed with the MLS and who does not, at any time, have access to or use of the MLS information or MLS facility of the Association.

**Use of Copyrighted MLS Compilations**

**Section 14 - Distribution:** Participants shall, at all times, maintain control over and responsibility for each copy of any MLS compilation leased to them by the Association of REALTORS®, and shall not distribute any such copies to persons other than subscribers who are affiliated with such Participant as licensees, those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and any other subscribers as authorized pursuant to the governing documents of the MLS.  Use of information developed by or published by an Association Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification, and unauthorized uses are prohibited.  Further, none of the foregoing is intended to convey "Participation" or

"Membership" or any right of access to information developed or published by an Association's Multiple Listing Service where access to such information is prohibited by law. (Amended 4/92)

**Section 14.1 - Display:** Participants and those persons affiliated as licensees with such Participants shall be permitted to display the MLS compilation to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS compilation.

**Section 14.2 - Reproduction:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the Participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information.  Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers.  Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuations purposes, including automated valuations. MLS's must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLS's may require the executive of a third-party license agreement where deemed appropriate by the MLS. MLS's may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose.  Information deemed to be confidential may not be used as supporting documentation.  Any other use of such information is unauthorized and prohibited by these Rules and Regulations. Amended 2015

*It is intended that the Participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the Participant is seeking to promote interest.

The term reasonable, as used herein should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-

making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

### Use of MLS Information

**Section 15 - Limitations on Use of MLS Information:** Use of information from MLS compilation of current listing information, from the Association's statistical report, or from any sold or comparable report of the Association or MLS for public mass-media advertising by an MLS Participant or in other public representations, may not be prohibited.

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the Association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

Based on information from the Association of REALTORS® (alternatively, from the Aiken MLS) for the period (date) through (date). (Amended 11/93)

### Changes in Rules and Regulations

**Section 16 - Changes in Rules and Regulations:** Amendments to the Rules and Regulations of the Service shall be by a majority vote of the Members of the Multiple Listing Service Committee, subject to approval by the Board of Directors of the Aiken Association of REALTORS®.

### Orientation

**Section 17** – Orientation: Any applicant for MLS Participation and any licensee affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than four (4) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval and the operation of the MLS  before MLS access is granted. (Amended 2018)

Participants and subscribers may be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any twelve (12) month period when deemed necessary by the MLS to familiarize participants and subscribers with system changes or enhancement and/or changes to MLS rules or policies. Participants and subscribers must be given the opportunity to complete any mandated additional training remotely.

### Internet Data Exchange (IDX)

*IDX affords MLS participants the ability to authorize limited electronic display and delivery of their listings by other participants via the following authorized mediums under the participant's control: websites, mobile apps, and audio devices. As used throughout these rules, "display" includes "delivery" of such listings. (Added 2018)*

**Section 18** – IDX Defined: IDX affords MLS Participants the ability to authorize limited electronic display of their listings by other participants. (Amended 5/12)

**Section 18.1** – Authorization: Participants' consent for display of their listings by other Participants pursuant to these rules and regulations is presumed unless a Participant affirmatively notifies the MLS that the Participant refuses to permit display (either on a blanket or on a listing-by-listing basis).

If a participant refuses on a blanket basis to permit the display of that participant's listings, that participant may not download, frame or display the aggregated MLS data of other Participants. Even where participants have given blanket authority for other participants to display their listings on IDX sites, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet Display. (Amended '12)

**Section 18.2** – Participation: Participation in IDX is available to all MLS Participants who consent to display of their listings by other Participants. (Adopted 5/02)

**Section 18.2.1 –** Participants must notify the MLS of their intention to display IDX information and must give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies.  (Amended 5/12)

**Section 18.2.2 –** MLS participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require participants to prevent indexing of IDX listings by recognized search engines. (Amended 5/12)

**Section 18.2.3 –** Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs*) or other electronic forms of display or distribution. (Amended 2018)*

**Section 18.2.4 -**  Participants may select the listings they choose to display on their IDX sites based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown", etc.), list price, type of property (e.g. condominiums, cooperatives, single-family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-
to-sell or exclusive agency), or the level of service being provided by the listing firm.  *Selection of listings displayed through IDX must be independently made by each participant. (Updated 2018)*

**Section 18.2.5 –** Participants must refresh all MLS downloads and IDX displays automatically fed by those downloads not less frequently than every 12 hours (Amended 2015)

**Section 18.2.6 –** Except as provided in the IDX policy and these rules, an IDX site or a participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of the MLS database available to any person or entity. (Amended 5/12)

**Section 18.2.7 –**Any IDX display controlled by a participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposed of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules. (Amended 5/12)

**Section 18.2.8-** Any IDX display controlled by a participant or subscriber that

(a) allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

(b) displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by participants'. Except for the foregoing and subject to Section 18.2.9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller. (Amended 5/12)

**Section 18.2.9** - Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. (Amended 5/12)

**Section 18.2.10 -** An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules and the MLS participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page and that participants may display listing from each IDX feed on a single webpage or display. Added 2015

**Section 18.2.11 -** Participants shall not modify or manipulate information relating to other participants listings. MLS Participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. (Added 2015)

**Section 18.2.12  -** *All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.\* (Amended 2018)*

*\* Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content,*

22

*all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. (Amended 2018)*

**Section 18.3** – Display: Display of listing information pursuant to IDX is subject to the following rules: (Adopted 5/5/02)

**Section 18.3.1** – Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields
intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.(Amended 5/12)

**Section 18.3.1.1** – The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. (Amended 5/12)

**Section 18.3.3** – All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and readily visible color and typeface not smaller than the median used in the display of listing data. Displays of minimal information (e.g. "thumbnails," text messages, "tweets," etc. of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. (Amended 5/12)

**Section 18.3.4 –** All listings displayed pursuant to IDX shall identify the listing agent.  (Adopted 12/08)

**Section 18.3.5** – Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their own websites subject to their Participant's consent and control and the requirements of the state law and/or regulation. (Adopted 5/5/02)

**Section 18.3.7** – All listings displayed pursuant to IDX shall show the MLS as the source of the information. Displays of minimal information (e.g. "thumbnails," text messages, "tweets," etc. of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. (Amended 5/12)

**Section 18.3.8** – Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that data is deemed reliable but is not guaranteed accurate by the MLS.  The MLS may,
at its discretion, require use of other disclaimers as necessary to protect participants and/or the MLS from liability.  Displays of minimal information (e.g. "thumbnails," text messages, "tweets," etc. of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. (Amended 5/12)

**Section 18.3.9** – The right to display other Participants' listings pursuant to IDX shall be limited to a Participant's office(s) holding participatory rights in this MLS. (Adopted 5/02)

**Section 18.3.10**- An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules and the MLS participant (or MLS Subscriber) hold participatory rights in those MLS's. As used in this policy,

23

"co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. (Adopted 2015)

**Section 18.3.11** – Listings obtained through IDX feeds from Realtor Association MLSs where the MLS Participant hold participatory rights must be displayed separately from listings obtained from other sources.  Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained. Displays of minimal information (e.g. "thumbnails," text messages, "tweets," etc. of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures (Amended 2015)

**Section 18.3.12** – No portion of the IDX database shall be used or provided to a third party for any purpose other than those expressly provided for in these rules. (Adopted 5/02)

**Section 18.3.13 –** Display of expired, withdrawn, and sold* listings is prohibited. (Amended 2015)

*Note: If 'sold' information is publically accessible, display of "sold" listings may not be prohibited. "Publicly accessible" sold information as used in IDX policy and rules, means data that is available electronically or in hard copy to the public city, county, state and other government records. MLSs must provide for its participants' IDX displays publicly accessible sold information maintained by the MLS for at least the last three years. Amended 2016

**Section 18.3.14 –** Display of seller's (s') and/or occupant's(s') name(s), phone numbers(s), and email addresses(es) is prohibited. (Adopted 12/08)

**Section 18.4** – Service Fees and Charges: Service fees and charges for participation in IDX shall be established annually by the Board of Directors. (Adopted 5/02)

### Virtual Office Website (VOW) Rules

**Section 19.1 (a):**  A Virtual Office Website ("VOW") is a Participant's Internet website, or a feature of a Participant's website, through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS Listing Information, subject to the Participant's oversight, supervision, and accountability. A non-principal broker or sales licensee affiliated with a Participant may, with his or her Participant's consent, operate a VOW.  Any VOW of a non-principal broker or sales licensee is subject to the Participant's oversight, supervision, and accountability.

**(b)** As used in Section 19 of these Rules, the term "Participant" includes a Participant's affiliated non-principal brokers and sales licensees – except when the term is used in the phrases "Participant's consent" and "Participant's oversight, supervision, and accountability". References to "VOW" and "VOWs" include all VOWs, whether operated by a Participant, by a non-principal broker or sales licensee, or by an Affiliated VOW Partner ("AVP") on behalf of a Participant.

**(c )**"Affiliated VOW Partner" ("AVP") refers to an entity or person designated by a Participant to operate a VOW on behalf of the Participant, subject to the Participant's supervision, accountability and compliance with the VOW Policy. No AVP has independent participation rights in the MLS by virtue of its right to receive information on behalf of a Participant. No AVP has the right to use MLS Listing Information except in connection with operation of a VOW on behalf of one or more Participants.  Access by an AVP to MLS Listing information is derivative of the rights of the participant on whose behalf the AVP operates a VOW.

**(d)**  As used in Section 19 of these Rules, the term "MLS Listing Information" refers to active listing information and sold data provided by Participants to the MLS and aggregated and distributed by the MLS to Participants.

**Section 19.2 (a):**  The right of a Participant's VOW to display MLS Listing Information is limited to that supplied by the MLS(s) in which the Participant has participatory rights. However, a Participant with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices.

**(b)** Subject to the provisions of the VOW Policy and these Rules, a Participant's VOW, including any VOW operated on behalf of a Participant by an AVP, may provide other features, information, or functions, e.g.  Internet Data Exchange ("IDX").

**(c)** Except as otherwise provided in the VOW Policy or in these Rules, a Participant need not obtain separate permission from other MLS Participants whose listings will be displayed on the Participant's VOW. (Adopted 12/08)

**Section 19.3 (a):**  Before permitting any consumer to search for or retrieve any MLS Listing Information on his or her VOW, the Participant must take each of the following steps:

**(i)**  The Participant must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

**(ii)** The Participant must obtain the name of, and a valid email address for, each Registrant. The Participant must send an email to the address provided by the Registrant confirming that the Registrant has agreed to the Terms of Use (described in subsection (d) below). The Participant must verify that the email address provided by the Registrant is valid and that the Registrant has agreed to the Terms of Use.

**(iii)**  The Participant must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The Participant may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password.  The Participant must also assure that any email address is associated with only one user name and password.

**(b)**  The Participant must assure that each Registrant's password expires on a date certain but may provide for renewal of the password. The Participant must at all times maintain a record of the name, email address, user name, and current password of each Registrant.  The Participant must keep such records for not less than 180 days after the expiration of the validity of the Registrant's password.

**(c)**  If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of MLS Listing Information or a violation of MLS rules, the Participant shall, upon request of the MLS, provide the name, email address, user name, and current password, of any Registrant suspected of involvement in the breach or violation.  The Participant shall also, if requested by the MLS, provide an audit trail of activity by any such Registrant.

**(d)**  The Participant shall require each Registrant to review, and affirmatively to express agreement (by mouse click or otherwise) to, a "Terms of Use" provision that provides at least the following:

**i.** That the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant;

**ii.** That all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use;

**iii.** That the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW;

**iv.** That the Registrant will not copy, redistribute, or retransmit any of the information provided except in
connection with the Registrant's consideration of the purchase or sale of an individual property;

**v.** That the Registrant acknowledges the MLS's ownership of, and the validity of the MLS's copyright in, the MLS database.

**(e)**  The Terms of Use Agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant.  Any agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the Terms of Use, must be prominently labeled as such, and may not be accepted solely by mouse click.

**(f)**  The Terms of Use Agreement shall also expressly authorize the MLS, and other MLS Participants or
their duly authorized representatives, to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW.  The Agreement may also include such other provisions as may be agreed to between the Participant and the Registrant.(Adopted 12/08)

**Section 19.4:**  A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions, or get more information, about any property displayed on the VOW.  The Participant, or a non-principal broker or sales licensee licensed with the Participant, must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW.

**Section 19.5:** A Participant's VOW must employ reasonable efforts to monitor for, and prevent, misappropriation, "scraping", and other unauthorized use of MLS Listing  Information.  A Participant's VOW shall utilize appropriate security protection such as firewalls as long as this

requirement does not impose security obligations greater than those employed concurrently by the MLS.

(NOTE: MLSs may adopt rules requiring Participants to employ specific security measures, provided that any security measure required does not impose obligations greater than those employed by the MLS.)

**Section 19.6 (a):**  A Participant's VOW shall not display listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to the MLS that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery mechanisms, such as email, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet.

**(b)** A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that includes the following (or a substantially similar) provision:

### Seller Opt-Out Form

1.Please check either Option a or Option b

a.[    ] I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

OR

b.[    ] I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2.  I understand and acknowledge that, if I have selected option a, consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their search.


_____
initials of seller


**(c)** The Participant shall retain such forms for at least one year from the date they are signed, or one year from the date the listing goes off the market, whichever is greater.  (Adopted 12/08)

**Section 19.7:**

   **(a)** Subject to subsection (b), a Participant's VOW may allow third-parties
      (i)     to write comments or reviews about particular listings or display a hyperlink to such comments or reviews in immediate conjunction with particular listings,
      (ii)    display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing.

27

**(b)**Notwithstanding the foregoing, at the request of a seller the Participant shall disable or discontinue either or both of those features described in subsection (a) as to any listing of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Subject to the foregoing and to Section 19.8, a Participant's VOW may communicate the Participant's professional judgment concerning any listing.  A Participant's VOW may notify its customers that a particular feature has been disabled "at the request of the seller." (Adopted 12/08)

**Section 19.8:**  A Participant's VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments from the listing broker about the accuracy of any information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The Participant shall correct or remove any false information relating to a specific property within 48 hours following receipt of a communication from the listing broker explaining why the data or information is false. The Participant shall not, however, be obligated to correct or remove any data or information that simply reflects good faith opinion, advice, or professional judgment.

**Section 19.9:**  A Participant shall cause the MLS Listing Information available on its VOW to be refreshed at least once every three (3) days. (Adopted 12/08)

**Section 19.10:**  Except as provided in these rules, the NATIONAL ASSOCIATION OF REALTORS® VOW Policy, or any other applicable MLS rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS Listing Information to any person or entity. (Adopted 12/08)

**Section 19.11:**  A Participant's VOW must display the Participant's privacy policy informing Registrants of all of the ways in which information that they provide may be used. (Adopted 12/08)

**Section 19.12:** A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative
compensation offered by listing broker, and whether the listing broker is a REALTOR®.

**Section 19.13:**  A Participant who intends to operate a VOW to display MLS Listing Information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the
MLS and to all MLS Participants for purposes of verifying compliance with these Rules, the VOW Policy, and any other applicable MLS rules or policies. (Adopted 12/08)

**Section 19.14**: A Participant may operate more than one VOW himself or herself or through an AVP.  A Participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf.  However, any VOW operated on behalf of a Participant by an AVP is subject to the supervision and accountability of the Participant. (Adopted 12/08)

Note: Adoption of Sections 17.15 through 17.19 is at the discretion of the MLS. However, if any of the following sections are adopted, an equivalent requirement must be imposed on

participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.

**Section 19.15:**  A Participant's VOW may not make available for search by, or display to, Registrants any of the following information:

**a.** Expired or withdrawn listings.
**b.** The compensation offered to other MLS Participants.
**c.** The type of listing agreement, i.e., exclusive right to sell or exclusive agency.
**d.** The seller's and occupant's name(s), phone number(s), or e-mail address(es).
**e.** Instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property. (Amended 2015)

**Section 19.17:**  A Participant shall cause to be placed on his or her VOW a notice indicating that the MLS Listing Information displayed on the VOW is deemed reliable but is not guaranteed accurate by the MLS. A Participant's VOW may include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability. (Adopted 12/08)

**Section 19.24:** Participants and the AVPs operating VOWs on their behalf must execute the license agreement required by the MLS. (Adopted 12/08)

29

# EXHIBIT 6

◎ **West Penn Multi-List™**

# LIST OF SERVICES
## 2019

The following items are currently provided with Subscribership to the West Penn Multi-List.
Separate charges currently apply for Key and eKey products of Supra Products, Inc.

**MATRIX –** Newly released in 2018.  This is a state of the art, full-functioning MLS system that works with most browsers or compatible devices.

**GoMLS –** Designed for the iPad and other mobile devices.  GoMLS is a fully functional iPad native application downloadable from the App Store, which may be shared with clients.  This is also fully integrated to allow agent/broker usage for add and change listing functions.

**MYRENTAL™** from CoreLogic Rental Property Solutions offers tenant screening solutions to landlords, real estate agents, and property managers so that they can identify top-quality applicants.  Purchase single reports or conveniently bundled packages.  There is no sign-up fee or minimum order.

**DIGITAL INK –** Allows for digital signatures for documents in the system using zipForm® Plus.

**HELP DESK –** Offered by CoreLogic for the Matrix system and Realist via telephone.

**HOMESNAP –** An online mobile platform that provides real estate services to agents, brokers, and consumers. It is a Broker Public Portal.

**IDX –** Internet Data Exchange is a service offered to all BROKERS.  This is a listing reciprocity service between all West Penn broker Subscribers.

**LOCK BOXES –** WPML offers a lock box program that works with Bluetooth technology.  These lock boxes may be used with or without Bluetooth depending on the KEY selection of the user/subscriber.  WPML will provide a supply of lock boxes to each broker proportionate to the number of listings entered into the system as active.

**PROPERTY PANORAMA –** This service permits 360 degree images and Virtual Tours with a "free" upload to You Tube, Trulia, Zillow, and more.

**REALIST TAX INFORMATION –** This is a fully integrated TAX software package with parcel maps, mortgage information, and so much more – integrated with local tax data.

**RESO –** West Penn Multi-List is Data Dictionary compliant with the National Association of REALTORS requirements.

**TRAINING –** WPML offers Matrix system training at the West Penn office by online appointment schedule.

**ZIPFORM® PLUS –** This program permits for the auto-population of information with listing data.  WPML forms are available through this program.  PAR forms are only available to those individuals who are members of PAR.

**eKEY –** This key access is provided on the user's compatible Smartphone through Supra Products, Inc. with a monthly fee billed to the user.

**XpressKEY™ –** Supra's compact touchscreen key.  Easy to use, updates automatically over cellular networks, and sends showing notices in real time.  GPS technology is used for end of show notices, automatic keybox assignments, and key location assistance.  This is a leased key from Supra Products.  The user will pay a yearly fee which is determined by a monthly prorated schedule provided by Supra.

**West Penn Multi-List™**

# SUBSCRIBER COST EVALUATION
# EFFECTIVE JANUARY 1, 2018

**ADMISSION FEE:**                                    ██████████
This is a one-time, non-refundable fee, payable at the time of
application.  This amount is due and payable by check made out to
West Penn Multi-List when the application is submitted.

**DUES:**                                             ██████
This is a monthly fee billed to the Broker of Record or Pennsylvania
Certified Appraiser.
(No services are included in this fee.)

**LISTING FEE:**                                      ██████
This is a per-listing fee for those offices that data enter their properties for
sale or lease.

**SOLD FEE:**                                         ██████
This fee is billed to the selling office for each sold listing reported.

**SOLD FEE CREDIT:**                                  ██████
For every listing that is sold through the West Penn Multi-List, the listing
office will receive a $30.00 credit on their monthly statement.

**MLS SERVICE FEES:**                                 ██████
This amount is billed to **all** licensed agents, brokers, or Pennsylvania
Certified Appraisers on a monthly basis.  This fee includes, but is not
limited to:  hard-copy forms, online data service, use of "leased" lock
boxes, delivery service (if applicable), system updates, training, user Hot
Line/Help Desk, Property Panorama, MLX Wireless, attachment to
listings, zipForm® Plus, Digital Ink, and a variety of additional services.

**SUPRA KEY COST:**
Contact West Penn Multi-List office for key options and pricing.

**ELECTRONIC LOCK BOX REPLACEMENT FEE:**              ██████
$200.00 + 7% Sales Tax – Replacement Cost.
Lock Boxes are leased to the Broker of Record from WPML at no charge.
If a box is stolen/lost or damaged, a replacement fee is billed to the
Broker.  The care and maintenance of the box is the responsibility of the
Broker of Record.  Lock Boxes are not leased to Appraisers.

Page 2

## FORMS:
All forms required to process a listing in the WPML will be provided at no
cost to the Subscriber.

## MISCELLANEOUS ITEMS:
The cost of items quoted below includes 7% Sales Tax.

| ITEM | PER-ITEM COST |
|---|---|
| Lock Box Key Cup | ■ |
| Lock Box Shackle | ■ |

**The prices and formats stated above are subject to change by direction of the
Board of Directors of the West Penn Multi-List.**

**Effective 1/1/2018**



**West Penn Multi-List, Inc.**

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

## SUBSCRIBER AGREEMENT

West Penn Multi-List, Inc., (WPML) a Pennsylvania corporation with principal offices at Pittsburgh, Pennsylvania, for and in consideration of $ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ from the undersigned Broker, which sum represents the initial admission fee, and for covenants to be performed herein, does hereby agree to extend to the undersigned Broker all privileges of a subscriber broker in the multi-list service operated by WPML upon the following terms and conditions:

1. Broker represents (a) that Broker is duly licensed as a real estate broker by the State Real Estate Commission of Pennsylvania, and holds a valid real estate brokers license and (b) that all information supplied to WPML on the Application for Subscribership is true and correct.

2. Broker further represents that Broker has read and fully understands the Rules and Regulations and By-Laws of WPML which relate to the multi-list service and agrees to at all times comply with said Rules and Regulations and By-Laws as currently in effect or as may be changed from time to time by WPML.

3. Broker shall pay, when due, all dues and charges assessed by WPML pursuant to the schedule of fees and charges which shall be in effect from time to time. Broker shall be subject to termination, suspension and/or expulsion for the nonpayment of fees as defined by the WPML Rules and Regulations as may be amended.

4. Broker shall be responsible for the accuracy of all information submitted to the multi-list service by Broker. The individual listings and listing data are recognized as the exclusive property of the listing broker-subscriber. The compilation of the listings is the subject of a copyright held by the WPML.

5. Broker shall reimburse, indemnify, save harmless and forever defend WPML, it's Directors, employees and/or representatives, or any subscriber broker thereof, from and against any and all claims, causes of action, or suits asserted (frivolously or not) against WPML or subscriber brokers thereof, and from and against any and all losses or damages of any nature suffered by WPML or a subscriber broker arising out of any action or inaction on the part of Broker, whether negligent or otherwise, including, but not limited to, errors, omissions, failure of any goods, equipment or services or the submitting or transmitting of erroneous or inaccurate information with respect to any listings or otherwise, to WPML or any subscriber broker.

6. The obligation of WPML with respect to the dissemination of information and/or listing data, is recognized as being limited to the dissemination of the listing information and data as submitted to WPML. It is understood that WPML cannot and shall not assume any liability or responsibility for the accuracy of said information or for errors in publication. In the event of inaccuracies or errors in the dissemination of such listing data itself, then the only duty of WPML is to correct the information as directed by the listing broker. Further, should the WPML online system not be available, it is recognized that the WPML shall not be liable for any disruption in service or unavailability of the system. However, Subscribers shall be entitled to a refund of any listing fees paid for listings that were omitted from the listing data that was disseminated.

7. Anything herein to the contrary notwithstanding, WPML does not assume any obligation to provide access to the system or services to Broker when WPML determines, in its sole discretion, that such service is not reasonable, either electronically or otherwise.

This Agreement is executed and concluded this _____day of_____,
20_____.

WEST PENN MULTI-LIST, INC.

BY: _____
      Chief Operating Officer

BROKER:

_____
Company Name

BY: _____
      Br_____ Signature



**West Penn Multi-List, Inc.**

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

**SUBSCRIBER APPLICATION:**

DATE OF APPLICATION: _____

Business Name:

_____

Name of Broker of Record: ████████████ _____
If at any time the Broker of Record changes WPML must be notified.

Broker of Record License # ████████ ____Date of Issuance: ████████ ____
Attach copy of License to Application or approval form from State (front/back)

Business Street Address: _____

City: _____ State _____ Zip Code + 4 _____

Business Telephone Number ( ███ ) ████████ ____ Fax # ( ███ ) ████████ ____
Please include area code

Email(Mandatory): ████████ _____

Contact person for phone calls and mail: ████████ _____

Upon submission of any application for Subscribership, the applicant shall furnish the following information concerning ownership. Is the applicant a (PLEASE CHECK ONE):

[ ] Corporation   [ ] Partnership   [ ] Sole Proprietor   [ ] Association   [ ] LLC/LLP
**\*PLEASE COMPLETE APPLICABLE ITEMS BELOW\***

    If applicant is a Corporation please furnish the following:
        Broker of Record ████████ _____
        Corporation Name _____

    If the applicant is a Partnership please list the names of "all" partners:
    _____   _____
    Attach additional list if necessary.

    If the applicant is a Sole Proprietor please list the name of the:
        Broker of Record _____

    If the applicant is an Association please list the names of every member:
    _____   _____
    Attach additional list if necessary.

    If the applicant is an LLC or LLP please list the name(s) of the Officer(s)/General Partners:
    _____   _____
    Attach additional list if necessary.

**\*PLEASE COMPLETE REVERSE SIDE OF APPLICATION**

Approximate number of Independent Contractors: ___█_____

Home address and telephone number of Broker of Record:
█████████████      City/State/Zip ███████████ _____

Home Telephone number + area code: (█████████ _____

It is a requirement that each applicant (Broker) submit a "copy" of his or her license.  A license number is not sufficient.  The Broker may either photocopy their existing license or if it is a "new" office, the Broker may submit a "copy" (front and back) of the approval papers issued by the State along with the completed application.

IF THE APPLICANT IS SUBMITTING A COPY OF THE APPROVAL PAPERS FROM THE STATE THEY WILL BE REQUIRED TO SUBMIT A COPY OF THE ACTUAL BROKER'S LICENSE UPON RECEIPT FROM THE STATE.

A check in the amount of the "current" initiation fee must accompany each application.

\*Has there ever been any suspension or revocation of any Real Estate License held by you, or by any officer, director, partner or principal person associated with your company?  If the answer is YES...please explain details in a letter attached to this application:
[ ] No              [ ] Yes – Attach explanation.

If you have branch offices that would also like to receive the service please attach a list of the offices, their complete street address and telephone numbers.

Are you a Pennsylvania Licensed Real Estate Broker operating with an approved office?
[ ] Yes              [ ] No

Have you made yourself fully aware of the Rules and Regulations of the West Penn Multi-List by reviewing the current Rule Booklet submitted to you upon application request?
[ ] No              [ ] Yes

Signature: ___███████_____
This ███████ application will not be processed.



**West Penn Multi-List, Inc.**

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

Acceptance of Policy and Procedures

RULES AND REGULATIONS:

I have reviewed the enclosed copy of the Rules and Regulations of the West Penn Multi-List, Inc. and made myself fully aware of the operations of the Corporation pertaining to Policy and Procedures.

I am aware that by signing this form, I agree to accept and abide by the Rules and Regulations presented at this time and for future additions and deletions that I will receive notification of by the West Penn Multi-List, Inc. business office.

I am also aware that there are fines and penalties levied when specific Rules and Regulations have been violated by me or subagents/appraisers affiliated within my organization.

My signature indicates my awareness and acceptance of the Policy and Procedures.

Signature _____█████_____

█████ Record/Appraiser

Print Name ___█████_____

Company _____

Date _____

61



**West Penn Multi-List, Inc.**

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

**To:** Broker of Record/Appraiser          **From:** West Penn Multi-List, Inc.

**Subject:** Data Information Request          **Date:**_____

This form is required to be completed and submitted along with your application for Subscribership. The information requested is needed so that we may add you to the online system. The data that you complete below will be entered into the online system.

Please PRINT clearly:

Your Name _██████████_____
         First              Middle Initial       Last

Your Email Address _███_____
               Required

Primary Contact # _████████_____    Cell Phone _____

**Have you ever been an agent within the West Penn Multi-List, Inc.?**

YES _____    NO _____

---------------------------------------Do not complete the information below ----------------------------------------

Office ID# _____    Agent ID# _____

Kindly submit this required form along with your application.



West Penn Multi-List, Inc.

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

## WPML POLICY ON REFUNDS

The West Penn Multi-List, Inc. (WPML) has sole discretion as to whether to issue a refund of dues or fees paid during a particular year. A determination as to the amount or procedure for a refund in a particular year is made at the end of the fiscal year, and the WPML makes no representation or guarantee that a refund will be issued in any year or in any specific amount.

As Affiliate Subscribers do not pay the same fees as other Subscribers, no refunds will be issued to Affiliate Subscribers. Refunds also will not be issued to any Subscriber who did not become a Subscriber on or before June 30th of the year in which the refund is issued.

Refunds will not be issued to any Subscriber who is delinquent in payments or other obligations to the WPML or whose Subscribership was suspended, terminated, expelled, cancelled, or ended in any fashion prior to the date that refunds are issued.

Rev. 3/2018

63



West Penn Multi-List, Inc.

8980 Perry Highway
Pittsburgh, PA 15237

412-367-5860
Fax 412-367-5869
inbox@westpennmls.com

## Explanation of Internet Data Exchange (IDX)

West Penn Multi-List, Inc. has adopted an Internet Data Exchange (IDX) program for all BROKER Subscribers affiliated with the West Penn Multi-List, Inc. IDX is more commonly known as "Broker Reciprocity". This is the next stage in the evolution of all MLS's as the primary means of enhancing cooperation between MLS Subscribers to facilitate the purchase and sale of real property.

IDX provides the MLS participants the tool they need to display each other's listings on THEIR internet websites. Under IDX, BROKERS exchange consent to display each other's listings on THEIR Internet websites.

Participating brokers' listings can be displayed either by downloading data from the MLS compilation and publishing it on their (broker or company) websites or by other means which would need to be cleared with West Penn MLS. Check with the West Penn Multi-List, Inc. to make certain that your website would be in compliance with the Rules and Regulations.

Once you have had an opportunity to review the enclosed IDX program and Rules you may elect to participate. If this is the case the Broker of Record would need to sign the enclosed IDX Agreement and return it to West Penn Multi-List, Inc. via fax (412-367-5869) or mail.

Questions regarding this program and Rules should be directed to Bill Gutendorf, Internet Technology Director or Megan LaScola, Training Facilitator at 412-367-5860.

The Board of Directors of the West Penn Multi-List, Inc.

MAPS ARE
AVAILABLE UPON
REQUEST,



# West Penn™ Multi-List

## Serving the following counties:

**Allegheny**

**Armstrong**

**Beaver**

**Butler**

**Clarion**

**Clearfield**

**Crawford**

**Fayette**

**Greene**

**Indiana**

**Jefferson**

**Lawrence**

**Mercer**

**Somerset**

**Venango**

**Warren**

**Washington**

**Westmoreland**

**Over 600 Real Estate Companies
and approximately 6000 agents
Subscribe to West Penn Multi-List, Inc.**

# EXHIBIT 7

# INTERNET DATA EXCHANGE ("IDX")
# LICENSING AGREEMENT

This Agreement, known as the Internet Data Exchange ("IDX") Licensing Agreement (the "Agreement") by and between West Penn Multi-List, Inc., a Pennsylvania corporation, having its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237 ("WPML") and _____, a WPML Broker/Subscriber, having a principal place of business at 1250 Broadway 10TH Floor   New York      NY    10001     ("Broker/Subscriber"). Effective date  10/15/2020          .

## BACKGROUND/RECITALS

(A)    WPML and participating Broker/Subscriber to the IDX Program ("The Program") expressly agree to the following material conditions to participate in the IDX Program:

(i)    IDX participating Broker/Subscriber shall be a Subscriber in good standing as defined by the WPML Rules and Regulations existing at the time; and

(ii)    Each IDX participating Broker/Subscriber must currently be a party to a signed IDX Agreement to be eligible to participate; and

(iii)    The WPML Board of Directors may establish and IDX participating Broker/Subscribers agree to abide by Rules and Regulations to participate in the program.  These Rules and Regulations may be amended at the discretion of the WPML Board of Directors.

(B)    Brokers/Subscribers participating in the IDX program wish to obtain and the WPML agrees to provide data to participant's website, including the listing data of other Brokers/Subscribers participating in the WPML IDX Program. The IDX Program has been developed to provide a process under which participating Brokers/Subscribers give permission to each other to display their listings on each other's websites.

(C)    Individual listings and listing data are recognized as owned by the Listing Broker/Subscriber.  WPML retains a copyright in the compilation of listing data.

(D)    Participating Broker/Subscriber desires to obtain and WPML grants a non-exclusive license to use the IDX service mark ("the Mark"), copyrighted documentation, and know-how relating to the Program (the "Material") for Broker/Subscriber's participation in the IDX Program.

(E)     Participating Broker/Subscriber may wish to engage individuals other than employees of the Broker/Subscriber ("Website Vendors") to perform data downloading, manipulation, formatting, and/or programming, and web design. However, if non-employee Website Vendors are retained, the authorized representative of the Website Vendor is required to execute this Agreement on behalf of the Website Vendor before the Agreement becomes binding.

<u>TERMS AND CONDITIONS</u>

The above-referenced recitals are material provisions of this Agreement.

In consideration of the above recitals and the promises set forth in this Agreement, the parties agree as follows:

(1)     **Grant of License**.  WPML grants to Broker/Subscriber a non-exclusive, non-transferable, royalty-free license to use the Mark and Material to establish the Program for the Broker/Subscriber's participation in the IDX Program.  Broker/Subscriber may not transfer, assign, or sublicense the license, without prior written consent of WPML.  WPML may in the future establish fees for the license at the discretion of the WPML Board.

(2)     **Quality Control**.  Broker/Subscriber may only use the Program Mark while participating in the IDX Program.  The Mark must be used in the form provided by WPML and only in connection with the Program and no other goods or services.  Upon request by WPML, Broker/Subscriber will provide WPML with samples of materials using the Mark to verify proper use of the Mark. Broker/Subscriber will comply with all applicable laws and regulations when using the Mark.

(3)     **Ownership**.  WPML retains all ownership rights, including rights defined by trademark and copyright laws, in the Mark, Material, and the Program. Brokers/Subscriber and/or Listing Broker retains all ownership rights in their individual listings used in the program.

(4)     **Infringement**.  Broker/Subscriber will promptly notify WPML if Broker/Subscriber becomes aware of a third party infringing WPML's proprietary rights in the Mark, Material, and Program.  WPML may, in its sole discretion, bring suit against any alleged infringer. Broker/Subscriber retains all rights to bring suit or join in any suit and recovery arising from the misuse of their listings.

(5)     **Term and Termination**.  The parties may terminate the license at any time by mutual written agreement.  WPML may terminate the License in the event of a breach of this Agreement by Broker/Subscriber that is not corrected within 30 days of receiving written notice of the breach.  Upon termination, Broker/Subscriber will immediately cease all use of the Mark and return to WPML all Material related to the Program.

Rev. 9/2018

(6)    **Indemnity**. Broker/Subscriber and/or Website Vendor will indemnify and defend WPML against all losses, damages, and expenses, including attorneys' fees, incurred as a result of or related to Broker/Subscriber's and/or Website Vendor's use of the license.

(7)    **Miscellaneous**.

(7.1)    **Notice**. Any notice required or permitted to be given under this Agreement is sufficient if mailed by registered mail, postage prepaid, addressed to the party at the above addresses, or at such other address as may be furnished in writing to the notifying party.

(7.2)    **Governing Law and Venue**. This Agreement is governed by and construed in all respects in accordance with the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles. The parties agree and submit to personal jurisdiction in Allegheny County, Pennsylvania, for purposes of any action or proceeding brought to enforce or construe the terms of this Agreement.

(7.3)    **Headings**. The section headings in this Agreement are for convenient reference and are not a part of this Agreement.

(7.4)    **Waiver**. No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing.

(7.5)    **Amendments**. This Agreement can be modified or amended only by written agreement signed by the parties, including Website Vendor, if any.

(7.6)    **Severability**. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the Term, the provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision has never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

(7.7)    **Counterparts**. This Agreement may be executed manually, electronically, or via fax and in one or more counterparts.

Rev. 9/2018

(7.8)  **Construction**.  If an ambiguity or question of intent arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring either party by virtue of authorship of any of the provisions of this Agreement.

(7.9)  **Relationship of the Parties**.  Broker/Subscriber and WPML are each independent organizations.  Neither party nor their respective employees and representatives can or shall make any agreement, warranties, representations, promises, or covenants on behalf of or for the other party or any third party, unless approved in advance in writing by the other party.  This Agreement shall not be construed as a partnership or franchise for any purpose or reason, whether implied, expressed or statutory, nor is this Agreement to be construed as creating an agency relationship.

(7.10) **Complete Agreement**.  This Agreement contains the complete agreement between the parties concerning the subject matter and supersedes all prior understandings, letters of intent, proposals, or agreements, and all prior communications between the parties related to the IDX Agreement.  No representation, warranty, promise, inducement, or statement of intention has been made by either party which is not embodied in this Agreement.  However, WPML retains the right to implement, and Broker/Subscriber and Website Vendor agree to abide by rules to carry out, the IDX Program at the discretion of the WPML Board.  Violations of these rules may be subject to fines/penalties at the discretion of the WPML Board.

(8)    **Confidential Information**.

(8.1)  **Definition**.  "Confidential Information" is information or material proprietary to WPML or designated "confidential" by WPML and not generally known to the public that Broker/Subscriber and/or Website Vendor may obtain knowledge of or access to as a result of access under this Agreement.

Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether in oral, visual, audio, written, or other form):

a.   all WPML data;
b.   all documentation and other tangible or intangible discoveries, ideas, concepts, designs, drawings, specifications, models, information;

Rev. 9/2018

c.  software, source code, object code, diagrams, flow charts;
d.  techniques, procedures; and
e.  IP addresses, access codes, and passwords.

(8.2)  **Exceptions**.  The Confidential Information does not include information that:

a.  is in the public domain at the time of disclosure;
b.  is known to Broker/Subscriber at the time of disclosure;
c.  is used or disclosed by Broker/Subscriber with the prior written consent of WPML;
d.  becomes known to Broker/Subscriber from a source other than WPML without breach of this Agreement by Broker/Subscriber and provided that such source is not known by Broker/Subscriber to be bound by a confidentiality agreement with WPML; or
e.  is required to be disclosed by judicial order or other compulsion of law, provided that the Broker/Subscriber provides to WPML prompt notice of any such order.

(8.3)  **Third-Party Information**. Confidential Information also includes any information that WPML obtains from any third party that WPML treats as proprietary or designates as Confidential Information, whether or not owned or developed by WPML.

(9)  **Restrictions on Use**.

(9.1)  **Scope of Use**.  Broker/Subscriber and/or Website Vendor will use or access the Confidential Information only as required to perform the services, and Broker/Subscriber and/or Website Vendor will not use its access or the Confidential Information for any other purpose. Broker/Subscriber and/or Website Vendor will employ measures to protect the Confidential Information from disclosures at least as rigorous as those it uses to protect its own trade secrets, but in no event less than reasonable care.

(9.2)  **Unauthorized Uses**.  Broker/Subscriber and/or Website Vendor will not make copies of the Confidential Information. Broker/Subscriber and/or Website Vendor will not directly or indirectly disclose, display, provide, transfer, or otherwise make available the Confidential Information to any person or entity, unless Broker/Subscriber and/or Website Vendor has received prior written consent from WPML to do so.  At no time and under no circumstances will Broker/Subscriber and/or Website Vendor

Rev. 9/2018

reverse engineer, decompile, or disassemble any software constituting part of the Confidential Information. Broker/Subscriber and/or Website Vendor will not incorporate the Confidential Information into any other work or product.

(9.3) **No Third-Party Access**. Only Broker/Subscriber and/or Website Vendor's own employees will access the Confidential Information. Broker/Subscriber and/or Website Vendor will not provide access to the Confidential Information to third parties, including consultants or independent contractors, without prior written consent from WPML. If WPML grants consent, Broker/Subscriber and/or Website Vendor will execute an agreement with the third party that imposes at least as strict a confidentiality obligation on the third party as that imposed by this Agreement on the Broker/Subscriber and/or Website Vendor.

(9.4) **Location Restriction**. Broker/Subscriber and/or Website Vendor will not remove the Confidential Information from its principal place of business without WMPL's prior written consent. In the event WPML grants consent, Broker/Subscriber and/or Website Vendor is not relieved of any of its obligations under this Agreement.

(10) **Termination and Return of Materials**. Within five (5) days of receipt of notice of termination by WPML, Broker/Subscriber and/or Website Vendor will return to WPML all Confidential Information and all other materials provided by WPML to the Broker/Subscriber and/or Website Vendor. Broker/Subscriber and/or Website Vendor will also erase, delete, or destroy any Confidential Information stored on magnetic media or other computer storage, including system backups. Upon the request of WPML, an Officer of the Broker/Subscriber and/or Website Vendor will certify in writing that all materials have been returned to WPML and all magnetic or computer data have been destroyed.

(11) **Remedies**. Because of the unique nature of the Confidential Information, Broker/Subscriber and/or Website Vendor acknowledges that WPML would suffer irreparable harm in the event that Broker/Subscriber and/or Website Vendor breaches its obligation under this Agreement, and that monetary damages would be inadequate to compensate WPML for a breach. WPML is entitled, in addition to all other forms of relief, to injunctive relief as may be necessary to restrain any continuing or further breach by Broker/Subscriber and/or Website Vendor, without showing or proving any actual damages sustained by WPML.

(12)   **URL (Web Address)**. Subscriber shall designate below the URL where the IDX data will be displayed and further designate for each such URL whether the URL (web address) is owned by the Subscribing Broker or an Agent. The URL information is to be updated by providing written notice to the WPML Office promptly upon any change in the web address.

The parties have executed this Agreement as of the date first written above.

**WEST PENN MULTI-LIST, INC.**

By: _____
     **Its Authorized Representative**

**BROKER/SUBSCRIBER**

▬▬▬▬▬▬▬▬

By: ____ ▬▬▬▬▬▬ _____

Its: ____Designated Broker_____

**WEBSITE VENDOR**

▬▬▬▬▬▬▬▬
C7D334FCD1B4433...

By: ____ ▬▬▬▬▬▬ _____

Its: ____Vice President, MLS Partnerships_____

Phone #: ____ ▬▬▬▬▬▬ _____

Email Address: ____ ▬▬▬▬▬▬@zillowgroup.com _____

**COMPANY NAME:** ____Zillow, Inc._____
**(Please Print)**

**WEST PENN MULTI-LIST OFFICE I.D. #**_____

**URL for IDX Display:** Zillow.com & Trulia.com    **Circle One: Agent/(Broker)**

# EXHIBIT 8

# WEST PENN MULTI-LIST, INC.

# RULES
# AND
# REGULATIONS

# Effective

# April 1, 2021

# WEST PENN MULTI-LIST, INC.

8980 Perry Highway
Pittsburgh, PA  15237

Phone:  (412) 367-5860                    www.westpennmls.com
Email:  inbox@westpennmls.com

## TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| SECTION 1. | DEFINITIONS | |
| 1.1 | Subscriber | 1 |
| 1.2 | Service | 1 |
| 1.3 | Broker | 1 |
| 1.3(a) | Appraiser | 1 |
| 1.3(b) | Affiliate Subscriber | 2 |
| 1.4 | Change of Ownership | 2 |
| 1.5 | Listing Agency | 2 |
| 1.6 | Selling Agency | 2 |
| 1.7 | Coverage Area | 2 |
| 1.8 | Corporate Listing | 3 |
| 1.9 | Ownership of Listing Content | 3 |
| | | |
| SECTION 2. | SUBSCRIBERSHIP | |
| 2.1 | Qualifications | 3 |
| 2.2 | Application | 4 |
| 2.3 | Effective Date | 4 |
| 2.4 | Withdrawal / Termination | 5 |
| 2.5 | Termination / Expulsion | 5 |
| 2.6 | Eligibility for Reinstatement | 6 |
| 2.7 | Corporation Subscriberships | 6 |
| 2.8 | Subscribers with Branch Offices | 6 |
| 2.9 | Termination of Services | 6 |
| 2.10 | Limited Subscribers | 7 |
| 2.11 | Home Inspectors and Radon Testers | 7 |
| 2.12 | Change of Ownership | 8 |
| | | |
| SECTION 3. | LISTINGS | |
| 3.1 | Mandatory Listings | 8 |
| 3.2 | Exclusive Company Listing | 10 |
| 3.3 | Listing Placement | 11 |
| 3.4 | Optional Listing | 13 |
| 3.5 | Listing Procedures | 13 |
| 3.6 | Changes in Listings | 17 |
| 3.7 | Withdrawal of Listings | 18 |
| 3.8 | Hold Listings | 19 |
| 3.9 | Exceptions to a Listing | 19 |
| 3.10 | Termination of a Listing | 19 |
| 3.11 | Listing Policy | 20 |
| 3.12 | Corporate Listings | 20 |

3.13    Contract Time                                              20
3.14    Listing Location                                           21
3.15    Protection Period                                          21
3.16    Listing Insertion                                          22
3.17    Owner(s) Signature                                         22
3.18    Name of Owners                                             22
3.19    Prescribed Forms                                           23
3.20    Listing Contingencies                                      23
3.21    Listing Policy and Procedure                               24
3.22    Reason for Removal of Listing                              26
3.23    Images                                                     26
3.24    Virtual / Digital Staging of Images                        29
3.25    Procedure to Opt Out of Internet Display
         of Listing Information                                    29
3.26    Clear Cooperation Policy for Residential Listings          30
3.27    Coming Soon Listings                                       30

SECTION 4.        SELLING PROCEDURES
4.1     Sales Agreement                                            32
4.2     Contingencies                                              32
4.3     No Showings Rule                                           33
4.4     Cancellation                                               34
4.5     Time / Method of Reporting                                 34
4.6     Reporting Lease Purchase/Installment Land Contract         35
4.7     Advertising                                                35
4.8     Buyer's Name                                               35
4.9     Status Requirements                                        35
4.10    Show Explanations                                          35

SECTION 5.        MLS SERVICE FEES
5.1     Service Fees                                               38

SECTION 6.        AGENTS / APPRAISERS / AFFILIATES
6.1     Purchase Requirements                                      39
6.2     Cancellation of MLS Service Fees Format                    40
6.3     Electronic Lock Boxes                                      41
6.4     Sharing of Services                                        42
6.5     Advertising Agent, Assistant, Cert. Appraiser,
         Cert. Home Inspector, or Cert. Radon Tester Affiliation   42
6.6     Subscribers Holding More Than One (1) Designation          43

SECTION 7.        RESPONSIBILITY FOR ACCURACY
7.1     Listing Broker's Responsibility                            43
7.2     Accuracy of Advertising                                    43

SECTION 8.        COMPLIANCE / ENFORCEMENT / PENALTIES
8.1     Fines                                                      44
8.2     Suspension / Termination / Expulsion                       44
8.3     Suspension of Service Due to Past-Due Account              44

SECTION 9.          DISPUTES
    9.1    Disputes of Rules and Regulations          45
    9.2    Fee / Commission / Ethical Disputes          45
    9.3    Process for Submission of Disputes Involving
           Rules and Regulations or Data          46

SECTION 10.          FEES AND CHARGES
    10.1    Charges Imposed          46
    10.2    Payable          48
    10.3    Suspension of Service          48
    10.4    Expulsion of Subscriber          49
    10.5    Discrepancy on Monthly Billing          49

SECTION 11.          LOCK BOXES AND KEYS
    11.1    Lock Boxes          49
    11.2    Lock Box Ownership          50
    11.3    New Subscriber Policy          50
    11.4    Order Procedure          51
    11.5    Surrender Policy          51
    11.6    Inoperable, Lost, Broken, or Damaged Boxes          51
    11.7    Inventory of Lock Boxes          52
    11.8    Lock Box Location          52
    11.9    No Lock Box Present          52
    11.10   Lock Box Usage          53
    11.11   Timed Access          53
    11.12   No Showing          53
    11.13   Keys          54
    11.14   Applying for an eKEY          55
    11.15   Illegal Use of Key          56
    11.16   Right to Receive / Retain Key          56
    11.17   Termination of Key and Service          56
    11.18   Securing of Lock Box          56

SECTION 12.          COMMUNICATIONS –
                     SERVICE-SPONSORED COMPUTER
    12.1    Primary System          57
    12.2    Usage          57
    12.3    Confidentiality of Information          57
    12.4    Service Undertaking          58
    12.5    Duty to Verify Information          58
    12.6    Abuse of Online System          58
    12.7    Illegal Use of Computer System          58
    12.8    Use of Listings          58
    12.9    Status Positions          58
    12.10   Link to West Penn Multi-List, Inc.          59

SECTION 13.          INTERNET DATA EXCHANGES (IDX)
    13.1    Internet Data Exchange (IDX) Rules and
            Regulations          59
    13.2    Internet Data Exchange (IDX) Licensing
            Agreement          63

# WEST PENN MULTI-LIST, INC.
# RULES AND REGULATIONS

The West Penn Multi-List, Inc. (WPML) is committed to providing the most innovative and cost-effective multiple listing service to its Subscribers.  West Penn Multi-List, Inc. provides state-of-the-art programs for the benefit of the Brokers, Agents, and Appraisers.  These programs are offered to stay current with advancing technology and enhance the professionalism of the Brokers, Agents, and Appraisers which results in unparalleled service to their customers. West Penn Multi-List, Inc. strives to protect the integrity of the data while recognizing that the data is the exclusive property of the Broker or Appraiser.

## SECTION 1.  DEFINITIONS

**1.1**     **SUBSCRIBER –** The term **"SUBSCRIBER" OR "MULTI-LIST SUBSCRIBER"** shall mean a Pennsylvania Real Estate Broker (with a valid Pennsylvania Broker's License in good standing) or a Certified Pennsylvania Appraiser (See 1.3(a) below.) who is subscribing to the Multiple Listing Service of the West Penn Multi-List, Inc. pursuant to the procedures set forth in Section 2 below.  A separate definition appears in Section 1.3(b) for a category of Subscribership known as an "Affiliate Subscriber," which applies to Certified Home Inspectors and Certified Radon Testers.

**1.2**     **SERVICE –** The term **"SERVICE"** or **"MULTI-LIST SERVICE (MLS)"** shall mean West Penn Multi-List, Inc.; the term **"ONLINE SYSTEM"** shall mean West Penn Multi-List's online system.

**1.3**     **BROKER –** The term **"BROKER"** shall mean any person, partnership, association or corporation duly licensed as a Pennsylvania Real Estate Broker by the Pennsylvania State Real Estate Commission and who holds a valid /active Pennsylvania Real Estate Broker License along with a PA state-approved office.  This does not include an Associate Broker.

**1.3(a) APPRAISER –** The term **"APPRAISER"** shall mean any person who holds a valid/current Appraiser Certification from the State of Pennsylvania.  This individual may become a Subscriber to the Service as long as proper documentation can be presented along with the application and additional requirements.  For each Appraiser affiliated with said Subscriber Appraiser, the holder of the Subscribership must furnish West Penn Multi-List, Inc. with insurance information indicating any additional Appraisers affiliated with Appraiser Subscriber.  This format falls under the guidelines in the Rules and Regulations, and the Subscriber Appraiser will be responsible for payment to the West Penn Multi-List, Inc. for each Appraiser affiliated with said company.

**1.3(b) AFFILIATE SUBSCRIBER –** The term **"AFFILIATE SUBSCRIBER"** shall mean any Certified Home Inspector or Certified Radon Tester who becomes a Subscriber to the service in accordance with the terms and conditions as established and/or amended by the Board of Directors of the West Penn Multi-List, Inc.

**1.4     CHANGE OF OWNERSHIP -** Any time the Subscribership experiences a change of ownership, including a change in Broker of Record, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester, then the West Penn Multi-List Office must be notified of the change in writing within 48 hours of occurrence.

When the ownership of the Subscriber changes, the existing Subscribership is terminated and the new owner is required to pay the initiation fee that is in place at the time of the change of ownership. Change of ownership is determined as follows:

**A.**     *The incorporation of a Sole Proprietorship or Partnership is a change of ownership.*
**B.**     *The formation of a Partnership by two or more existing Subscribers is a change of ownership.*
**C.**     *The adding of a new Partner to a Partnership or deleting a Partner from an existing Partnership is a change of ownership.*
**D.**     *Any change in the members of a Partnership, either by adding new Partners or removing existing Partners, is a change of ownership. The merger of a Sole Proprietorship, a Partnership, or a Corporation into an existing Corporate Subscriber is not a change of ownership for the surviving corporation, but it will extinguish the Subscribership of the merged entity.*
**E.**     *The addition or removal of a Shareholder of a Corporate Subscribership is not a change of ownership.*

**1.5     LISTING AGENCY –** The term **LISTING AGENCY** shall mean the Agent who has listed the property, the Office Manager of the Listing Agent, or the Broker of the Listing Agent.

**1.6     SELLING AGENCY –** The term **SELLING AGENCY** shall mean the Agent who procures an offer to purchase a property, the Office Manager of the Selling Agent, or the Broker of the Selling Agent.

**1.7     COVERAGE AREA –** The term **"COVERAGE AREA"** shall mean the Counties of Allegheny, Armstrong, Beaver, Butler, Washington, Westmoreland, Clarion, Crawford, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Venango, Erie, and any other area designated from time to time by the Board of Directors as a coverage area.

**1.8    CORPORATE LISTING –** The term "CORPORATE LISTING" shall mean a listing signed by a party other than the actual owner of the property. The Corporate Listing is required to have written confirmation from the Corporation to list the property in the West Penn Multi-List, Inc.

**1.9    OWNERSHIP OF LISTING CONTENT –** The individual listings and listing content are recognized as the exclusive property of the Listing Broker/Subscriber.

## SECTION 2.  SUBSCRIBERSHIP

**2.1    QUALIFICATIONS –** Every Broker/Appraiser as defined in Section 1 shall be eligible to be a Subscriber of the West Penn Multi-List, Inc. except:

**A.**    A Subscribership shall not be available to a real estate franchisor or to any organization acting as a service agency to individual Brokers when such franchisor or service organization is not engaged in the brokerage or appraisal of real estate for its own account and which would utilize Subscribership in West Penn Multi-List, Inc., for the purpose of disseminating listings to franchisers, Brokers, or independent Appraisers being serviced by a service organization.

**B.**    In the case where a Broker is a franchisee or is a participant of a service group, but trades or brokers real estate under said Broker's individual name, said Broker must be a Subscriber of West Penn Multi-List, Inc., in order to receive the benefits of the West Penn Multi-List, Inc.

**C.**    Referencing an Appraiser Subscriber, it must be apparent that the Appraiser Subscriber does not provide an outside entity with any of the confidential materials available within the West Penn Multi-List, Inc.  This means that each Appraiser Subscriber will be required to produce proof (through insurance coverage) that such affiliated Appraiser is in fact affiliated with said company.  The Appraiser Subscriber may not provide West Penn Multi-List, Inc. data/information to any non-affiliated Appraiser or to any un-Certified Appraiser.  Failure to comply could result in expulsion.

**D.**    If a Broker (of record) or Appraiser no longer carries a valid Broker license, office license, or Certified Appraiser certificate, the Subscribership will be placed on inactive status.  The Broker/Appraiser will have 60 days to rectify the problem or the Subscribership in the West Penn Multi-List, Inc. will be expelled.

**E.**    Any expelled Subscriber who owed West Penn Multi-List, Inc. any sum for fees, property, fines, etc., shall not be eligible to attempt to

rejoin WPML and become a new Subscriber and/or shall not be eligible for access to any Services unless all sums and obligations that were due and owing to the WPML are paid in full.

2.2 **APPLICATION –** An application for Subscribership is required to be submitted to West Penn Multi-List, Inc. on the forms required by the Service.  The application shall be accompanied by the following items before processing can begin:

A. Completed Application signed by the Broker of Record or Certified Appraiser.
B. Completed and signed Subscriber Agreement.
C. A check in the amount of the CURRENT admission fee (non-refundable).
D. A copy of the applicant's CURRENT Pennsylvania Real Estate Broker License or Pennsylvania Appraiser Certification.
E. A copy of the applicant's office approval from the State of Pennsylvania (this applies to real estate applicant only).
F. Acceptance of Policy and Procedures-Rules and Regulations statement.  The applicant will be required to submit a signed copy of the paperwork relative to the acceptance of the Rules and Regulations of the West Penn Multi-List, Inc., as well as the Data Information Request form, prior to acceptance.

The Executive Director shall review each application and confirm that the applicant meets the qualifications outlined on the application for Subscribership.

It is imperative that all real estate applications are accompanied with a copy of the OFFICE LICENSE or a copy of the STATE APPROVAL from the inspector.  Appraisers are required to submit the Certification from the State of Pennsylvania.

2.3 **EFFECTIVE DATE –** A Subscribership shall become effective upon approval by the Executive Director and notification thereof to the Broker/Appraiser.  Acceptance shall not take place until:

A. Receipt by the Service of the one (1) time admission fee by certified check, cashier's check, money order, or check.  In the event the funds submitted are not honored by the bank, the Subscribership shall not become effective.

B. Receipt of the applicant's signed and executed West Penn Multi-List Subscriber Agreement agreeing to abide by the By-Laws (if a Shareholder) and Rules and Regulations of the Service; to indemnify and hold harmless the West Penn Multi-List, Inc. and its

Subscribers from losses or damages suffered by reason of the submission of erroneous information; and to all other matters contained in said agreement.

2.4    **WITHDRAWAL / TERMINATION –** A Subscriber may terminate his/her Subscribership at any time in the West Penn Multi-List, Inc., by delivering written notice to the Central Office.  A Subscriber withdrawing shall not be entitled to any refund of any dues or admission fees paid to the Service.

Upon notice to terminate the Subscribership, the following format is required to be followed:

A.    All forms, supplies, materials, keys, lock boxes and other West Penn property is to be returned to the Service within 48 hours of notice to cancel the subscribership.  Failure to return materials and lock boxes will result in replacement costs billed to Broker.  Any missing lock boxes are chargeable to the Broker at the current replacement fee.

B.    Written instructions must accompany the notice to cancel that gives West Penn the authority to cancel your listings in the Service.  Sold/Closed/Expired listings will remain in the system for comparable purposes.

C.    Written notice is to be sent to all sellers (by the Broker) listed with the Service that their listing will be transferred or removed from the West Penn Multi-List, Inc.

If a Subscribership in the West Penn Multi-List, Inc. is withdrawn/cancelled and the Broker decides at a later date that he/she would like to rejoin the Service, the current admission fee will be due and payable upon receipt of the application by the West Penn Multi-List, Inc., as well as any previous indebtedness owed.

2.5    **TERMINATION / EXPULSION –** Any Subscriber under suspension, revocation, cancellation, or loss of his/her Real Estate Broker's License or Certified Appraiser status may be terminated, suspended, or expelled at the discretion of the West Penn Multi-List, Inc. Service.  Subscriberships may be terminated, at the discretion of the Service, for violations of the By-laws or these Rules and Regulations.  A Subscriber whose Subscribership is terminated shall not be entitled to any refund of dues or fees paid.  All indebtedness to the West Penn Multi-List, Inc. must be paid in full.  A Subscriber who meets the criteria for Subscribership may request reinstatement following the expulsion of their Subscribership.  Only those Subscribers who satisfy the eligibility requirements shall be eligible for reinstatement.  If so, the Subscriber shall not be required to pay

the full admission fee as a new Subscriber.  Rather, reinstatement shall be possible upon the payment of all past indebtedness to the West Penn Multi-List, Inc., and a reinstatement fee of **$1,000.00**.  This option shall be made available to Subscribers on a **ONE-TIME-ONLY** basis.  In the event of a subsequent expulsion, the Subscriber shall not be eligible for reinstatement at the reduced fee and shall be required to pay the fee for new Subscribers as determined by the Board.

2.6     **ELIGIBILITY FOR REINSTATEMENT –** Any Subscriber subject to termination or expulsion as described herein, must satisfy the eligibility requirements set forth herein in order to be considered for reinstatement.  These requirements include, but are not limited to, satisfaction of any indebtedness owed to the West Penn Multi-List, Inc.  Eligibility for reinstatement will be subject to the requirements that pertain to all new Subscribers of the West Penn Multi-List, Inc. at the time the request for reinstatement is received.

2.7     **CORPORATION SUBSCRIBERSHIPS –** A corporation that is duly licensed as a Real Estate Broker or Appraiser by the STATE REAL ESTATE COMMISSION/STATE OF PENNSYLVANIA may become a Subscriber of the West Penn Multi-List, Inc.  Each Corporation is required to obtain its own separate Subscribership notwithstanding the fact that all of the stock of two (2) or more corporations is owned by one (1) individual or that the corporations operate under the same name or that one (1) corporation is the holding company of another.  This specific requirement does not apply, however, to one corporation that maintains branch offices as authorized under the rules and regulations of the Real Estate Commission.

2.8     **SUBSCRIBERS WITH BRANCH OFFICES –** Every Subscriber who maintains branch offices in the State of Pennsylvania is required to include those offices as part of the West Penn Multi-List, Inc. system.  All Sales Associates and Appraisers associated with any branch office shall be required to participate in the monthly charge designated as MLS Fees.  All real estate Sales Associates will be required to list all properties designated as mandatory listings within the Rules and Regulations of the West Penn Multi-List, Inc. unless the office location is outside the designated coverage area.

2.9     **TERMINATION OF SERVICES –** The Service recognizes that the Broker/Appraiser Subscriber to West Penn Multi-List, Inc. utilizes the services of many Associate Brokers, Sales Associates, and Certified Appraisers.  The Service also recognizes that Brokers, Associate Brokers, Sales Associates, and Certified Appraisers deal directly with the public and that any unfavorable actions by anyone designated in this group could adversely affect the West Penn Multi-List, Inc. as well as the entire real

estate industry.  For that reason, the Service reserves the right to terminate its services to any Broker, Associate Broker, Sales Associate, Certified Appraiser, or Sales Associate Director who, in the opinion of the Service, does not conform to the professional standards established by the National Association of REALTORS and the Rules and Regulations of the West Penn Multi-List, Inc.

If any person is aggrieved by the actions of the Service in terminating their services, they may appeal such action to the Board of Directors whose decision shall be final and binding on all parties.

2.10    **LIMITED SUBSCRIBERS –** A Certified Real Estate Appraiser, as defined in Section 1, may become a limited Subscriber to the Service.  Such limited Subscribers shall be entitled to access the information available through the Service.  However, a limited Subscriber shall have no right to list or sell real estate or to have any other privileges of Subscribership other than accessing information and usage of Supra Keys as herein provided.

2.11    **HOME INSPECTORS AND RADON TESTERS –** Certified Home Inspectors and Certified Radon Testers qualify for an Affiliate Subscribership in the West Penn Multi-List, Inc. with their own set of Rules and Regulations.  Home Inspectors and Radon Testers have limited access to the actual Online System. This information is to be utilized to secure the proper showing procedures and property location.

Home Inspectors may only admit the actual Buyer(s) to the home to be inspected unless Buyer(s) and Seller(s) both sign an indemnification/ waiver form. **The Home Inspector has the right to refuse the use of this form and is required to notify the individual(s) who proposed the form of his/her refusal upon receipt, via text or email.**  For purposes of this section, the Buyer(s) are identified as those individuals who are designated as the Buyer(s) on the executed Sales Agreement.  However, an exception exists for other individuals to attend the Home Inspection so long as a form is signed by the Buyers, Sellers, and those individuals who will be in attendance, and delivered to the Home Inspector before the scheduled inspection. The form shall only be valid for the date of the scheduled inspection. The indemnification / waiver form must be in the form provided by the WPML and signed and dated by the Buyer(s), Seller(s), and the individuals who will be present at the inspection, and must specifically identify the individual(s) who will attend the inspection and the date thereof.  **If the form is not signed by each of these parties and delivered to the Home Inspector at least 48 hours prior to the inspection, the waiver of this rule is not valid and the additional individuals may not attend the home inspection**

If a Home Inspector violates this procedure, they will be fined, and if this persists, they will lose their Affiliate Subscribership in the West Penn Multi-List, Inc.

**2.12  CHANGE OF OWNERSHIP –** In the event of a change of ownership, the West Penn Multi-List, Inc. Office must be notified within forty-eight (48) hours of such a change.  This requirement applies to a change in the Broker of Record, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester.  Such changes may require the payment of an admission fee for the Subscribership to continue.  This determination will be based on the factors set forth in Rule 1.4 A – E of the Rules and Regulations.

**SECTION 3.  LISTINGS**

**3.1  MANDATORY LISTINGS –** All properties/rentals listed with the Service are Exclusive to West Penn Multi-List, Inc.  Every Subscriber shall place for listing with the Service ALL of the following types or categories of listings obtained or received by said Subscriber with the MLS coverage area.  No listing may be placed with the West Penn Multi-List, Inc. by anyone other than a Subscriber of the West Penn Multi-List, Inc.

> **A.  RESIDENTIAL (RES) –** Single family dwellings, which also includes townhouses, condos, co-ops, modular, mobile, and manufactured homes.
>
> **B.  TO BE BUILT (TBB) –** Properties that have not had a foundation poured/laid or a slab installed are to appear in TBB.
>
> Once a foundation/slab is present, the listing is to be expired(X) in TBB and entered into the RES section as an Active (A) listing.
>
> **C.  RESIDENTIAL INCOME (MUL) –** Up to and including four (4) units. This type of listing, if zoned MULTI, is required to appear in the Multi-Unit Section of the Online System.
>
> **D.  SUB-DIVIDED/VACANT LOTS (FAL) –** All vacant land/lots that have not had foundations poured or laid.
>
> **E.  FARMS/AGRICULTURAL ACREAGE (FAL) –** Farms, farm property, and property zoned agricultural are classified into this section of the Online System.
>
> **F.  MOBILE HOMES –** A pre-owned structure manufactured before 1976, designed and used exclusively for living quarters or commercial purposes, but only incidentally operated on a highway.

A mobile home may only be listed in West Penn Multi-List, Inc. if it has a conveyance of property included in the sale or is on leased ground. A Mobile Home cannot be listed with the contingency that it is to be moved from the location of the listing.

**G.** **MANUFACTURED HOUSING –** A structure manufactured after 1975, transportable in one or more sections, which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities and includes the plumbing, heating, air conditioning, and electrical systems contained therein. The term shall include any structure, which meets all the requirements of this definition with respect to which the manufacturer voluntarily files a certification required by the United States Department of Housing and Urban Development.

**H.** **NEW CONSTRUCTION –** If the new construction has no foundation poured/laid or slab installed, it is to be placed in the TBB section of the Online System. If this is violated, a fine of **$100.00** will be levied. If a foundation has been poured/laid or slab installed, the new construction must appear in the RES section of the Online System and removed from TBB by changing the status to an X (Expired).

**I.** **OUT-OF-STATE LISTINGS –** No property outside the State of Pennsylvania shall be deemed a mandatory listing. This rule could change by direction of the Board of Directors of West Penn Multi-List.

**J.** **WATERFRONT PROPERTIES –** Homes which are considered waterfront properties are located on the water and shall not be listed in the system unless a parcel of land is being conveyed or unless verification of a lease for the ground or water where the dwelling is currently positioned is provided.

**K.** **ACTIVE LISTING STATUS –** No property shall be entered into the West Penn Multi-List, Inc. unless it is actively for sale. Listings that are SOLD prior to listing may not be entered into West Penn Multi-List unless they are new construction. If this occurs, a fine of **$500.00** will be levied to the Listing Agent. All listings must be actively available for all Subscribers prior to securing an agreement. If this is questionable, WPML has the right to request paperwork for verification purposes. The paperwork will be destroyed after review.

**3.2**    **EXCLUSIVE COMPANY LISTING –** An Exclusive Company Listing Acknowledgment Form shall be used for Seller(s) who have decided they do not wish to have their property displayed in the West Penn Multi-List, Inc. system. The following Rules apply to Exclusive Company Listings:

**A.**    **Forms**

Exclusive Company Listings must be submitted on the form provided by the West Penn Multi-List, Inc. known as the Exclusive Company Listing Acknowledgement. The listing may not be submitted on the West Penn Multi-List, Inc. Standard Exclusive Listing Contract, and the failure to utilize the Exclusive Company Listing Acknowledgement will result in a fine in the amount of **$1,000.00** being levied against the Listing Agent.  The fine will **increase by $1,000.00** for each subsequent violation of the rule by the same Subscriber. This rule does not apply to listings for new construction which are under agreement, as such listings are excluded from this rule.

**B.**    **Time Period for the Submission of the Exclusive Company Listing Acknowledgment Form**

The WPML Office must receive the Exclusive Company Listing Acknowledgement form **within three (3) calendar days inclusive of the Effective Date of the listing** as set forth in the body of the form.  For example, if the Effective Date of the listing is Monday, January 14, 2018, that day will count as the first day in the three-day time-period to submit the form to the WPML Office. A violation will not occur in this example as long as the Exclusive Company Listing Acknowledgement form is submitted to the WPML Office by midnight on Wednesday, January 16, 2018. The forms may be submitted by email or fax, and a violation will not occur as long as the submission is made by the end of the third day, as described above, even if the submission occurs during hours the WPML is not open. The three (3) calendar-day time period to submit the form to the WPML Office is based on calendar days and includes weekends and holidays. The form may be submitted by email or fax during non-business hours to satisfy this deadline.  **Failure to comply with this time period will result in a fine of $1,000.00 to the Listing Agent for the first violation.  The fine will increase by $1,000.00 for each subsequent violation of the Rule.**

**The signature date (where the seller(s) affix their signature(s)) cannot exceed three (3) calendar days before or after the Effective Date,** or this will result in a fine of **$1,000.00** to the Listing Agent for the first violation. The fine will **increase by $1,000.00 for each subsequent violation.**

**C.     Use of Other Forms**

If an Exclusive Company Listing is taken on a WPML Standard Exclusive Listing Contract provided by the Service, then such listing becomes a MANDATORY listing and will carry a fine if not entered into the WPML system **within the three-calendar-day time period.**

**D.     Under Agreement and/or Sold Properties**

Exclusive Company Listings that go Under Agreement or Sold/Closed prior to the submission of the required form to the West Penn Multi-List, Inc. may not be submitted/entered into the WPML Office online service for statistical or computation purposes. Violation of this Rule shall result in a **$1,000.00** fine billed to the Listing Agent and the listing will be deleted from the system.

Upon request, the listing/selling office is required to provide the WPML Office with documentation to validate the date the Listing Agreement was signed.  These copies will be reviewed only for purposes of validating the date of execution, and the documents will be destroyed thereafter, as it remains the policy of the WPML to not retain copies of Listing Agreements.

**E.     Marketing / Showing an Exclusive Company Listing**

Exclusive Listings provide Sellers who wish to maintain privacy and/or to avoid wide exposure of the property that is listed for sale with an option to place the listing within the MLS system. **Exclusive Listings may be marketed and shown ONLY to agents within the Listing Company and their clients.**  Marketing to the public in any form is not permitted.  This includes, but is not limited to, flyers, flyers/signage displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (including email blasts), social media, multi-brokerage listing sharing networks, phone calls, blasts, public and private meetings, office/company notices, and any applications available to the general public.

If Exclusive Company Listings are displayed or advertised to the general public or to other brokerage companies, then these listings must be submitted to WPML within the time period established by the Clear Cooperation Policy as defined in WPML Rule 3.26.

**3.3    LISTING PLACEMENT –** Each listing entered into the WPML system has a designated location by property type and zoning.  Listings may be initially entered in multiple sections to assist in marketing the property.

However, when the listing CLOSES it may only be closed out in the correct area of ZONING.  All other listings that were entered as duplications but in other property types are required to be EXPIRED and NOT reported as SOLD.  Only one (1) property address may be reported as Sold.

Listings that are zoned RESIDENTIAL are required to be placed in the RES section of the system only.  The charge for each listing will be billed to the listing office.

Listings that carry a MULTI-UNIT designation/zoning may appear in RES, CIB, and MUL simultaneously.  The charge for each additional listing will be billed to the listing office.

Listings that carry a CIB designation/zoning may appear in CIB, RES, and MUL simultaneously.  The charge for each additional listing will be billed to the listing office.

***All listings that are placed in more than one section of the online simultaneously must carry the "designated" zoning information in the first line of REMARKS so that the information is not misleading to the consumer and Agent.***

Vacant land that has not had ground broken and zoned residential may only appear in the FAL section of the system unless it fits the criteria associated with TBB listings.  Vacant land may not appear in the FRR or FARM section of FAL unless it is zoned agricultural.

If the vacant land or lot is listed in the Online System and a construction package is subsequently signed for that lot, then the listing for the lot would be EXPIRED and NOT reported as SOLD status.  The lot and dwelling to be built on that lot would be entered as a new RES listing.  In the event there is a construction package attached to the lot and the lot is reported as SOLD, the WPML Office will remove the listing for the lot and notify the Broker and Agent of the infraction.

When any one (1) of the simultaneously placed listings has a change in status (example: C, U, W, X) all listings must carry the change in status. Failure to comply will result in a fine of **$100.00 per listing** that carries the wrong status information.  **The remaining additional listings must carry the status of X – not W or S.**

When any of the simultaneously placed listings have SOLD/CLOSED, only one (1) of the properties may carry the SOLD data.  The choice for reporting will be determined by the accurate zoning.  Any subsequent listings entered in addition to the original listing are to be reported as

EXPIRED (X) when the listing closes.  This change must be completed within 48 hours of closing or a fine of **$50.00 per day** will be levied from when the status change occurred.

**All listings are required to appear in the township or borough where their taxes are levied.**

All listings submitted to West Penn Multi-List, Inc. for processing must appear in the correct township, borough, etc.  If a listing is placed in an incorrect area, a **$25.00 per day** fine will be levied to the Listing Agent until corrected.

In the event of a severe violation, West Penn Multi-List, Inc. reserves the right to place a listing on HOLD until compliance can be met.

3.4    **OPTIONAL LISTING –** A Subscriber has the option to list the following property types at their discretion:

   **A.**    Business Opportunity

   **B.**    Industrial

   **C.**    Commercial

   **D.**    Multi-Units - over four (4) units

If a Subscriber elects to process an Optional Listing, the prescribed forms of the Service are required to be completed within the specified time period as outlined by the Service for mandatory listings.

3.5    **LISTING PROCEDURES –** All listings entered into the WPML database, whether a listing contract or lease contract, shall utilize the West Penn Multi-List Standard Exclusive Listing Contract or the Pennsylvania Association of REALTORS® (PAR) Exclusive Right To Sell Real Estate Listing Contract.  This requirement does not apply to Exclusive Company Listings because the Exclusive Listing Contracts are not entered into the WPML database.  In the case of an Exclusive Listing, the West Penn Multi-List Exclusive Company Listing Acknowledgement is required to be utilized, rather than the WPML Listing Contract.  The PAR Exclusive Listing Form shall not be submitted to the WPML.  Other than the PAR Exclusive Listing Form and the PAR Change Listing Form, Subscribers may use any other form published by PAR as a substitute for the corresponding WPML form.  Such forms include the PAR Seller Disclosure Statement, Par Lead-Based Paint form, PAR Consumer Notice form, and the PAR OGM and PAR COGM forms.  WPML does not accept the PAR Exclusive Listing Form or the PAR Change Listing Form as

WPML forms must be used for those purposes.  All WPML forms and PAR forms are currently available to WPML Subscribers via zipForm® Plus.  The PAR forms are available from the Pennsylvania Association of REALTORS.

**Other than the WPML Exclusive Company Listing Acknowledgement and the Status/Change Listing Report, Subscribers may use any form published by the West Penn Multi-List, Inc. OR the corresponding PAR form.**

Subscribers are free to utilize other PAR forms with listings entered in the WPML system, including:  PAR Seller Disclosure,* PAR Lead-Based Paint, PAR Consumer Notice, PAR OGM, and PAR COGM forms.

*  The PAR Seller Disclosure is to be completed in accordance with the Real Estate Seller Disclosure Law of Pennsylvania, and all WPML Subscribers are responsible to follow this format.  West Penn Multi-List, Inc. is not responsible for the information provided on this form.

West Penn Multi-List, Inc. forms are available to print or complete online through zipForm Plus.

A.    Every listing shall be entered into the WPML Online System within three (3) calendar days, inclusive of the Effective Date noted on the contract.  The Effective Date shall commence within three (3) calendar days of the signature date.  For purposes of example, if the Effective Date is a Tuesday, the three (3) calendar day period shall expire on Thursday of the same week. In the event the property is marketed as described in Rules 3.2(G) and 3.5(F), the listing must be submitted within one (1) calendar day of the marketing of the Property which can shorten the three (3) day time period to submit the listing. Failure to comply with this Rule will result in a $1,000.00 fine being levied against the Listing Agent.  If an Agent/Broker re-enters a listing after it has been placed on HOLD by the WPML Office, a fine in the amount of $500.00 will be levied to the Agent/Broker who violated this Rule by re-entering a listing that is in HOLD status.

B.    Use of existing images is expressly prohibited when properties are relisted following the release/cancellation of a listing.  Any Subscriber who wishes to relist the property is prohibited from using the images from the prior listing in the new listing.  A violation shall occur if the existing images are downloaded or used in the new listing.  The information contained within each listing is recognized as the property of the Broker.  The fine for each violation of this rule is **$100.00**.  Each fine shall be levied on a per listing basis.

*An exception exists to this rule for the images that are the property of the homeowner and can be substantiated or if the property is being relisted by the same Agent, affiliated with the same company as originally listed, or by written acknowledgement from the previous Listing Broker to the newly designated Listing Agent.*

**C.**    Online forms may not be altered in any fashion—alteration or modification of any of the forms available online is strictly prohibited.  Should any of the forms that are available online—whether the forms are PAR (Pennsylvania Association of Realtors), WPML, or otherwise—be altered or modified in any fashion, the listing will be placed on HOLD status and a fine of **$100.00 per each listing** will be levied against the Subscriber responsible for the modification of the form.  Repeat violations of this rule may result in the suspension of the Subscriber's West Penn Multi-List privileges.

**D.**    The information that appears in the REMARKS, DIRECTIONS, and TOUR INFO or any other free field format is intended to include information concerning the physical components of the listed property only.  This means that no personal information regarding the Agent, agency, website addresses, URLs, bonus arrangements, Agent offers, telephone numbers, email addresses, or any other information not related to the property in question may not appear in the listing data fields.  This format also applies to attachments to the listing.  This does not affect the field designated as URL.

The fine for entering any information not deemed to be specific to the property as indicated in this rule will result in an immediate **$25.00** fine to the Agent and the listing will be placed on HOLD status until written authorization is given to the WPML Office to correct the item(s) in violation.

If anyone other than the deeded owner is signing the listing contract and remaining documents, proper identifying paperwork is required. In the case of a Corporation Listing, Guardianship, Power of Attorney, Limited Power of Attorney, etc. it is required by the Service.  A copy of the death certificate is NOT required for an executor/executrix.

**E.**    Listings entered into West Penn Multi-List, Inc. must be Active listings for sale.

The West Penn Multi-List, Inc. will not accept listings that have been placed Under Agreement or Sold (status C, U, or S) prior to

the listing Effective Date in the WPML Standard Exclusive Listing Contract or the PAR Exclusive Right To Sell Real Estate Listing Contract.  The exceptions to this Rule are properties that are listed as new construction.  They may be entered with a C or U status.  Any listing that violates this rule will result in a fine of **$500.00** levied upon the Listing Agent.  Each separate offense will be subject to a separate fine.  Such listings shall also be deleted from the system immediately regardless of the length of time taken on the original listing document.

The West Penn Multi-List, Inc. may request copies of the listing contract and/or sales agreement to verify the date of the listing contract and sales agreement.  Upon receipt of these documents, they will not be retained by the WPML Office, but will be destroyed by shredding after the confirmation is noted as the request for a copy of the listing contract is only to obtain confirmation of the date.

**F.    Requirement to submit listing upon marketing**

Within one (1) calendar day of marketing any property to the public, the Listing Broker/Agent must submit the listing to the WPML, or within three (3) calendar days inclusive of the Effective Date of the listing described in Section 3.5(A) above, whichever date is sooner.  The requirement to submit the listing to the WPML Office within one (1) calendar day of marketing the property does not extend the three (3) calendar day requirement when the listing is to be submitted.  The requirement the listing must be submitted within one (1) calendar day of marketing new property in any format is to ensure cooperation with other WPML Subscribers.  For purposes of this Rule, the listing must be submitted within one (1) calendar day of the marketing.  Therefore, if the initial marketing of the property occurs on a Monday, the listing must be submitted by Tuesday.  Likewise, if the initial marketing is on Friday, Saturday, Sunday, or a day before a legal holiday, the listing must be submitted the next calendar day.

This Rule applies to marketing the property to the public in any nature and includes, but is not limited to, flyers, flyers/signage displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (including email blasts), social media, multi-brokerage listing sharing networks, and the applications available to the general public. The dates set forth herein refer to calendar days and are not extended by weekends or holidays. A violation of this Rule will result in a fine of $1,000.00.  In the event of repeat violations by the same Agent/Subscriber, the amount of each subsequent fine will double.

The EFFECTIVE DATE of the listing contract is the date that appears in the BODY of the listing contract in an area designated as COMMENCEMENT DATE.  If for some reason, that date changes PRIOR to the seller(s) affixing their signature to the listing contract, the date may be changed as long as the seller(s) initial the change.

Any listing entered into the Online System more than **three (3) calendar days** beyond the COMMENCEMENT DATE will not be processed and will be placed on HOLD in the Online System.

If a listing is entered into the Online System **after the three-day time period** has passed, a fine of **$500.00 per occurrence** will be charged to the Listing Agent.

*The West Penn Multi-List, Inc. may request copies of the listing contract for date verification.*

If an Agent re-enters a listing that has been placed on HOLD status in the Online System by the Service without proper documentation/documents, the Agent will be fined **$200.00**.

The placement of any type of advertisement, including a WEB address, phone number, or any other information within the body of ALL photographs submitted to the West Penn Multi-List, Inc. is expressly prohibited.  Violation of this restriction will result in a fine being levied upon the offending individual or office for **$250.00.**  Notice will be provided to the individual that the violation MUST be corrected within three (3) business days or the amount of the fine will be subject to increase, depending upon the number of actual listings which violate this rule.  If said violations are not corrected by the fourth (4th) business day, the amount of the fine levied upon the individual Subscriber/Office will be **$100.00 per listing or photo** which is found to violate this rule.

When submitting images into the Online System and electing to add additional comments to the images, it is not permissible to add any comments that identify the names(s) of the listing company, the Listing Agent, telephone numbers, or any type of website address.  This section is only for comments that relate to the property image.

**3.6    CHANGES IN LISTINGS –** Any change in listing price, status, or any other change from the original listing contract and data submission shall be made only when authorized in writing by the seller(s).  All changes are to be reported in the Online System **within three (3) calendar days**, or a fine of **$50.00 per day** will be levied.

**A CHANGE STATUS FORM SHOULD <u>NOT</u> BE SENT TO WPML <u>IF</u> THE CHANGE HAS BEEN IMPLEMENTED IN THE ONLINE SERVICE.**

Do not send any type of change form to West Penn Multi-List, Inc. if you have performed the change in the Online System.  Keep the documents for your records.  Do not report Sold status in advance of the closing.

A change in STATUS is the responsibility of the listing office to report the change in the Online System or via mail/fax if Internet access does not exist.  If the listing office fails to report the change in status, the responsibility to report this change will revert to the selling office.  The selling office will then be required to complete a Change Status Form and submit this document to WPML for processing via email or fax within the specified time element.

Failure to comply with the above format will result in a **$50.00 per day** fine until the status change has been reported in the Online System.  In this case, the fine will be levied to both the listing and selling offices for failure to report the status change in the Online System.

This rule will also apply to a listing office that receives a notice of cancellation, as outlined in the listing contract, and fails to change the status of the listing to Expired (X) after the ten (10) day notice has elapsed.  A fine of **$50.00 per day** will be levied to the LISTING AGENT until the status change is effected.  If the Listing Agent changes the status to Withdrawn (W) versus the Expired (X) status, the fine will be levied at **$50.00 per day** for identifying the wrong status.

3.7   **WITHDRAWAL OF LISTINGS –** WITHDRAWN means TEMPORARILY OFF THE MARKET.  A listing may be withdrawn from the Multi-List Service by the Listing Broker at the request of the owner(s) before the expiration date of the listing contract (negotiable days).  There is no charge to the listing office for a listing withdrawal, but the original listing fee is due the Service.  The withdrawal of a listing prior to its expiration date does not affect the validity and enforceability of the listing and the Seller and Listing Agency continue to be bound by the terms of the listing contract until its termination.  This should not be confused with the termination of a listing, which is status X.

If a listing is WITHDRAWN (status W) it will remain in the system for the 365 days for which it was contracted or until the seller sends a notice of cancellation to the Listing Agent in compliance with the listing contract.

A listing fee will be required to be paid to the Service regardless of the length of time the listing has appeared in the system.  This is not to be confused with the CANCELLATION of a listing.

**3.8**  **HOLD LISTINGS –** An office may not re-enter a listing the Service has changed to a HOLD status.  If this occurs, a fine of **$200.00** will be levied to the Listing Agent.  A HOLD listing will remain in the Online System for 30 days from the date it was placed on HOLD status.  After 30 days, the listing will be deleted from the West Penn system.

**3.9**  **EXCEPTIONS TO A LISTING –** All listings submitted to the WPML Office may not carry exceptions in any form.  This includes, but is not limited to, deed restrictions, income guidelines and contingencies, etc.  The listings also shall not include any exception or contingency which could be construed as discriminatory on the basis of race, color, religion, religious creed, sex, disability (physical or mental), familial status (children under 18 years of age), age (40 or older), national origin, use or handling training of support or guide animals, or the fact of a relationship or association to an individual known to have a disability as reasons for refusing to show, sell, or rent properties, loan money or set deposit amounts, or as reasons for any decision relating to the sale of the property, as such limitations are prohibited by Federal, State, and/or Local laws in existence at the time of the listing.  In the event an exception or contingency which has not been pre-approved is discovered, the listing will be place on HOLD status and the agent will be notified the listing has been placed on hold.

**3.10**  **TERMINATION OF A LISTING –** A West Penn listing may be terminated by the parties using the procedure defined in the Standard Exclusive Listing Contract.  The ten (10) day NOTIFICATION period, as outlined in the Standard Exclusive Listing Contract, begins with the FIRST POSTMARK DATE that appears on the envelope sent to the Listing Broker via CERTIFIED MAIL (return receipt).  The date of the first postmark is considered day #1 when computing the ten (10) day notice.  Termination remains contingent upon delivery of the notice at the proper address.

The termination notice may be sent ten (10) or more days PRIOR to the Early Termination Date as defined in the Standard Exclusive Listing Contract.  The parties need not wait until the negotiated period of time has elapsed before sending the notice of cancellation to the listing office.  If a party elects to send the termination notice more than ten (10) days before the Early Termination Date, this will not terminate the listing contract before the actual Early Termination Date defined in the contract.  Rather, the listing will expire and be transferred to X status effective as of midnight on the Early Termination Date agreed to by the parties in the Standard Exclusive Listing Contract contingent only upon the notice being sent ten (10) or more days prior to the Early Termination Date.

**Example:**
A listing is taken on July 1, for 30 days.  On July 10, the owner/seller sends the Certified Letter.  The listing should then be changed to status X effective midnight of July 30.  If the notice of termination is sent on July 23, the listing will continue for ten (10) days beyond July 23 and will expire midnight of August 1.

The termination of the listing, as described herein, requires the Online System status be changed to carry the status of X.  A terminated listing may NOT carry a W status in the Online System.  Failure to comply with this rule will result in a fine of **$5.00 per day** to the original Listing Agent from the date of termination.

At no time may the listing information be removed from the system or altered in such a fashion that it renders the online information useless.  If a violation of this type occurs, a **$100.00** fine will be levied against the Listing Agent.

**3.11    LISTING POLICY –** All listings are the exclusive property of the Broker of Record unless specifically agreed upon otherwise.

**3.12    CORPORATE LISTINGS**

    **A.**    When an existing listing is taken over by a Corporation, a new listing number, new listing contract, new property input sheet, new property disclosure statement, and new consumer notice are required.  The previous listing must be expired from the system.

    **B.**    When processing a Corporate listing, the Corporate Representative is to sign the Standard Exclusive Listing Contract or submit a letter authorizing the Listing Broker to sign on behalf of the Corporation.

    **C.**    In any Corporate Listing, it is permissible for the Listing Agent to substitute the words "Corporate Listing" or "Corporate Owned" in the spaces designated for the Owner's name.

    **D.**    West Penn Multi-List, Inc., will not accept any Corporation Clause that is exclusionary to the Broker's compensation.

    **E.**    Offices accepting a Corporate listing are bound by the Corporate agreement regarding notification of cancellation.

**3.13    CONTRACT TIME –** The area designated in the contract with a blank _____(Early Termination Date) is referring to the length of time the Agreement shall remain in effect before it may be terminated.  If the parties agree upon an Early Termination Date, the blank is to be

completed by inserting a date between one and 365 days. By law, the term of the listing contract may not exceed one (1) year. Therefore, if a date is inserted which results in a period of more than one (1) year, the contract is presumed to terminate at midnight of the one-year period.

All West Penn Multi-List, Inc. listings are taken for a period of up to 365 days and may be terminated after the length of time negotiated with the Seller. Listings may not be extended beyond 365 days. New paperwork is required for a relist.

When a Subscriber receives notice to cancel the listing from the owner(s), it is the listing office's responsibility to change the expiration date (or notify the WPML Office in writing to terminate the listing). The expiration date should be changed to reflect a date which is ten (10) days from the first postmark on the envelope, but no sooner than the date selected by the parties as the Early Termination Date.

**Example:**
If a listing is dated January 1, and the negotiated termination period is 30 days, a party may send the notice to terminate anytime prior to the 30th day for the contract to terminate on the 30th day. Termination becomes effective on the Early Termination Date so long as the postmark on the Certified Letter is at least ten (10) days prior to the Early Termination Date. If the notice is not postmarked and sent until the 40th day to terminate, then the contract would continue on until the 50th day.

3.14 **LISTING LOCATION –** Each listing may now appear in multiple areas of the MLS Online System. However, the listing, when sold, may only be reported once and not multiple times. The sold listing is to be closed out according to the correct zoning location. The other related listings must carry the status of X (Expired) and not S (Sold).

3.15 **PROTECTION PERIOD –** A new listing contract automatically cancels and supersedes any rights under any prior listing contract, except under the conditions in A, B, and C.

A. A listing is terminated by the owner, or expires; *and*

B. It is relisted by the same owner with another Broker in West Penn Multi-List, Inc., within 10 days after the effective date of termination or expiration; *and*

C. If within 10 days of the effective date of termination or expiration of the first listing (whichever occurs first), it is, for the first time, put under contract to a Buyer or Buyers at least one of whom was shown the interior of the property during the period of the first

listing, then the original Listing Broker shall be entitled to the Listing compensation.  Other than the above, the rights that the first Listing Broker might otherwise have in a sale to a Buyer who was shown the property during the original listing, but to whom it was put under contract during the period of the second listing, shall flow to the second Listing Broker.

**Example 1:**
If Broker A has a listing that was terminated by the owner, allowing for the ten (10) day termination notice, effective July 1, and the property is subsequently listed by the same owner with Broker B on July 5, then if the property is put under contract on or before July 10, to a purchaser(s) one of whom was shown the interior of the property during the term of the original listing contract, Broker A is entitled to the listing compensation.

**Example 2:**
In the above illustration, if the property were put under contract on July 12, then the listing compensation would be payable to Broker B since the ten (10) day period runs from the effective date of termination and not from the date Broker B lists the property.

**3.16    LISTING INSERTION –** All listings entered into the West Penn Multi-List, Inc. Online System are required to have a fully executed listing contract in place.  The listing contract may be either a WPML Standard Exclusive Listing Contract or the PAR Exclusive Right To Sell Real Estate Listing Contract, as the WPML will accept either of these contracts.

All listings entered should have a West Penn Multi-List, Inc. Seller Disclosure or a Pennsylvania Association of REALTORS Seller Disclosure (if applicable), and all other appreciable forms that are required with that specific listing.  The type of forms will vary according to type of listing and requirements by the State of Pennsylvania.

**3.17    OWNER(S) SIGNATURE –** All owner(s) are required to sign the listing documents.  If the deed is recorded in more than one (1) name, ALL owners MUST sign the documents.

**3.18    NAME OF OWNERS –** The person(s) signing as the OWNER shall have the ability to produce and shall produce documents proving his/her ability to list the property for sale if there is a discrepancy noted from the actual deed.

If other factors exist, such as:  Power of Attorney, Guardianship, etc., the WPML Office may request copies of such documents so that the person entering into the Listing produces proof of their authority to do so.

If the owner is a company, corporation, Trust, etc., the name of such entity must be entered in this area.

The deeded name of the owner(s) is required to appear in this field.  Due to space issues, the LAST NAME(S) of the deeded owner MUST appear first or the listing will be placed on HOLD status until the WPML Office receives valid proof of the owner(s) name.  Nicknames, variations of the name, first names, and middle initial/name are not acceptable for listing a property in the West Penn Multi-List, Inc.  If an agent/Subscriber violates this Rule, the infraction will be brought to the Board of Directors of the West Penn Multi-List., Inc. for a fine.

See Rule 3.12 C for Corporate Listings.

**3.19    PRESCRIBED FORMS –** The Service from time to time will alter its forms. When this occurs, all Subscriber offices will be notified of the change. Thereafter, all Subscribers are required to use the new forms.  West Penn Multi-List, Inc. does accept specific PAR forms.

**3.20    LISTING CONTINGENCIES –** A listing may NOT be placed in the Online System if the listing is contingent upon the owner/seller finding a suitable dwelling or purchase of another home.  If a listing is entered into the Online System with such a contingency, the listing will be placed on HOLD until written verification of removal is received by the West Penn Multi-List, Inc. by the owner/seller.

A property shall not be placed in the system unless a separate deed is available for conveyance of the parcel.  However, in the event a contingency exists that the parcel must be subdivided, then the property may be placed in the system if the Listing Agent fully discloses this contingency in the AGENT REMARKS section during data entry.  ***The Listing Agent is responsible for making this disclosure in the AGENT REMARKS section.***

The Listing Agent and the seller/owner will have **three (3) calendar days** after notification to either remove the contingency or remove the listing, except as noted in Rule 3.9, or the listing will be placed on HOLD.  West Penn requires documentation from the owner/seller regarding the removal of the contingency/exception before the listing can be reactivated in the Online System.

The exception to this prohibition against contingencies shall include a listing of a unit in a condominium, planned community, and/or cooperative in the Commonwealth of Pennsylvania which contains a right of first refusal in its governing documents.

**3.21  LISTING POLICY AND PROCEDURE –** Each listing entered into the Online System will be required to follow the requirements stated below:

**A.**  All blank areas on the listing contract must be completed.

**B.**  Those listings which consist of multiple parcels may be included in one (1) listing contract and placed in the Online System with one (1) listing number.  In the event that one or more but not all of the parcels become the subject of an Agreement of Sale, the listing shall be expired and a new listing entered with the parcel(s) which have sold being removed from the listing.  The remaining parcel(s) shall then be re-listed with a new listing number assigned and the updated pricing information included.

**C.**  All listings entered into the Online System are required to be taken on the forms prescribed by the West Penn Multi-List.  There is an exception for exclusive agency listings.  The West Penn Multi-List, Inc. accepts both exclusive agency and exclusive right-to-sell listings.

**D.**  A listing may appear in the Online System more than once.  However, when the listing closes (Sold) it may only be reported once.  All other related listings must carry an X (Expired) status.

**E.**  Any pre-approved changes made on the listing contract, as well as write-overs and scratch outs, must be initialed by the owner(s).

**F.**  In the case of a Corporate Listing, the Listing Agent should have a copy of the Corporation Contract.

**G.**  The West Penn Standard Exclusive Listing Contract may not be altered except by permission of the Executive Director.

**H.**  If a bonus is offered for a particular listing, the offer must be made to the Selling Broker/Agency.  The offer may not be made to the Selling Agent.  This information may only appear in Agent Remarks.

**I.**  A listing may not be entered with a contingency, except for subdivisions or new construction (never occupied).

There are some exceptions to this rule, e.g., no access/land locked or no appreciable land mass.

**J.**  The section of the Property Input Statement designated as SAC/BAC/TLC requires that the Listing Broker include and

designate on this section of the form the compensation being offered by the Listing Broker to the Selling Broker. This section of the form is mandatory and must be completed.  For those listings which do not offer compensation to the Buyer's Agent, this section of the form should not be left blank. Rather, the form should be completed by indicating $0.00 if no compensation is being offered. For those listings in which compensation is being offered, the amount must be designated on the form. The Listing Broker may modify the SAC/BAC/TLC offered to other Brokers without notifying the WPML Office of such modification as the WPML plays no role in such negotiations or agreements.

**K.**     If there is a different compensation offered for an in-house sale, on any listing, this fact must be disclosed in the ICD section of the Property Input Statement and Online System.

**L.**     When a listing is entered into the Online System and the listing information indicates that a lock box is present, that lock box is required to be a lock box furnished by the Service and available for entry by all Subscribers.  Failure to comply will carry a fine of **$100.00**.

**M.**     There are specific areas identified in the Online System as MANDATORY fields.  If these fields are not completed with the correct information, a fine of **$5.00 per day** will be levied to the Listing Agent until the areas are completed or corrected.

Certain fields in the Online System are designated as mandatory and must be completed.  If any of the mandatory fields are not completed, a fine in the amount of **$5.00 per day** will be levied on the Listing Agent. The Agent is responsible to complete the fields that are mandatory. If the Agent is not able to complete a mandatory field because of circumstances, such as new construction or other situation, the Agent should include a designation in the field explaining why the information was unavailable, such as N/A or See Agent Remarks and shall also provide an explanation in the AGENT REMARKS field why the mandatory field(s) have not been completed.

**N.**     If at any time an Agent/Broker places a non-Service-supplied lock box on a listing in the Online System, and this listing carries information on how to access the lock box, the listing will be placed on HOLD status and the Agent/Broker will be informed that this information should be removed from the Online System.  Upon removal of this information, the listing will then be reactivated.  Only

Service-provided lock boxes may be placed on properties listed in the West Penn Multi-List, Inc.

If a corporation is listing a property with a Broker/Agent and they require "their own" lock box be present for maintenance purposes, this is acceptable in the West Penn Multi-List, Inc., but it may not be indicated anywhere in the online information.

**O.    Square Footage – Single Family Dwelling or Building**:  When entering data into the Online System for the field titled Square Footage, the information shall be limited to the square footage of the Single-Family Dwelling or Building only. The information entered should not include the square footage of the land the dwelling or building is located upon.  Square Footage is not a mandatory field and is optional.  The WPML is not responsible for, nor do they direct, the manner in which this information is obtained. Each Agent subscribing to the Service is encouraged to consult with the Broker of Record as to the manner in which this information should be obtained before it is entered in the system. WPML recommends that the Agent keep accurate records and verification on where the information was obtained. The Listing Agent should obtain direction from the Broker of Record as to whether this information is obtained from county tax records, an appraisal, Realist®, or another source.

**3.22    REASON FOR REMOVAL OF LISTING –** The Service may, at any time, remove a listing that does not conform to the Rules and Regulations of West Penn Multi-List, Inc.

**3.23    IMAGES –** Each office/company is required to provide their own images within the online Service.  Each image that is added to the Online System shall not include images of individuals in the home.  The inclusion of images (including photos) of children or other individuals on the property is strictly prohibited.

Photographs are no longer accepted by the West Penn Multi-List office for insertion in the system.  Each Broker/Agent is responsible for the insertion of images as well as the care and maintenance of the images uploaded.

In SLOT #1 of the image sequence, an EXTERIOR VIEW of the ENTRANCE of the dwelling/main structure (if residential) or building/main structure (if commercial) is mandatory.  This also applies to FAL properties that may have multiple structures/buildings. This image in SLOT #1 may not be a split screen or multiple screenshot.  There are no exceptions.  If an image other than a dwelling/main structure and/or building/main structure EXTERIOR VIEW ENTRANCE is uploaded, the fine is set at

**$100.00** and will be levied to the Listing Agent.  The Agent will be notified of the infraction and will have 24 hours to correct the violation.  If the image is not removed/replaced, the West Penn office will remove the image and notify the Agent.  The Agent will have 24 hours from notification to add an acceptable image of a dwelling EXTERIOR VIEW ENTRANCE to the image line up.  Failure to comply will result in an **additional $100.00** fine levied to the listing agent.

Additional images of the listing may be uploaded to the system using the recommended format acceptable to the vendor.  The additional images may vary from additional exterior images, interior images, survey, property images, pool, etc.  All images MUST be of the property for sale/lease (or of amenities available if it is a community which offers specific add-ons).  No personal images of Agents, business cards, signs, advertising, or other information is acceptable.  If in doubt, contact the West Penn Multi-List office for more details.

A.    The West Penn Multi-List has the right to remove any image that does not conform to the listed requirements or is inappropriate.

B.    The West Penn Multi-List, Inc. will levy a **$100.00** fine to anyone who removes pertinent listing information or images from the Online System.  **Example:** Information removed from a listing that has expired or has been Withdrawn or Sold (but not limited to these statuses) such as:  owner name, address, etc.  All information that was previously associated with a listing MUST remain with that listing in the system regardless of status, with the exception of show information.

The homeowner may request removal of images (except for the EXTERIOR image in SLOT #1) after the sale of said property.  This request is required to be sent to West Penn Multi-List by the Listing Agent.

C.    When properties are relisted following the release or expiration of a listing, the Broker/Agent relisting the property is prohibited from using the previous images from the prior listing in the new listing.  All images, as well as listings, are the property of the Broker of Record and remain with the listing in the system at the company where the property was originally listed.  Unless it is the original Listing Agent affiliated with the original listing company, or if the Broker of Record gives written permission to the Agent requesting usage of the image(s).

A violation occurs if images from a previous listing are uploaded to a new listing.  The fine for this infraction is **$100.00 per image per**

**occurrence** and the image(s) must be removed within 48 hours of notification of the rule infraction.  Failure to respond will result in additional fines, removal of image(s), or finally, the listing placed on HOLD status.  Each fine will be levied on a per-listing basis.

**D.**     An exception exists to this rule for the images that are the property of the homeowner, and they must have proof of ownership.

**E.**     Within four (4) days of the listing date, all new listings with a dwelling/building constructed thereon shall be required to have an exterior view of an entrance to the property image of the dwelling.  The exterior view of an entrance to the property is to be inserted in SLOT #1 of the listing.  Failure to comply with this requirement shall result in a fine of **$25.00 per day** for each day Subscribers are found to be in violation.  This rule shall apply to all RES, MUL, CIB with a structure, and FAL with a structure listings that have a building or dwelling erected thereon.  This rule will apply to all listings, regardless of status.

**F.**     The Listing Broker retains all proprietary rights of the listing, including the images.  Images that have been uploaded onto the Online System may be utilized by another Company/Agent under the following circumstances only:

**1.**     The original listing company may permit the use of these images by another Subscriber upon WRITTEN authorization from the LISTING BROKER.  *Permission for such use is not valid if provided by an Associate Broker or Listing Agent. Permission may only be obtained from the LISTING BROKER.*

**2.**     The letter allowing the use of the images is required to be sent to the West Penn MLS office prior to use or a fine of **$100.00** will be levied to the office that is utilizing the images without written authorization.

**3.**     The letter authorizing the use must clearly and expressly identify those images which may be used by another Subscriber, and only the Subscriber who is being granted permission to use the images shall be permitted to display the images.

**4.**     Each time the property is listed, it will require a letter of authorization if the company listing the property plans to reuse the images.  Each such letter must only pertain to a specific listing and a specific listing number.

**5.**    Failure to follow this format will result in an immediate **$100.00** fine.

**3.24    VIRTUAL / DIGITAL STAGING OF IMAGES –** Virtual Staging is defined as using a photo editing software or other means to create a photo or conceptual rendering of what the interior room(s) and/or interior of the property would look like if the current image was staged to appear differently than at the time the photo or image was taken.  An example would be to place furniture so that the image provides an example of what the room would look like with furniture being in place.  Any virtual staging of the images shall be only of the interior of the property and no photos of the exterior of the property shall be virtually staged.

Subscribers also are not permitted to include visual elements concerning the property which do not exist, such as the inclusion of a golf course, lake, ocean, mountain, or any other scene or location which is not an accurate description of the actual background of the subject property. Subscribers also should not modify visual elements of the interior of the property, such as holes in the wall, exposed wiring, damaged flooring, or any other condition of the property itself.  The use of virtual staging shall also not include branding nor shall it include images of people or words or descriptions across the image.  The image also shall not distort the dimensions of a room or space by placing small furniture within a room to make the room appear larger or any other distortion of the actual dimensions of the image itself.

A fine shall be imposed upon the Subscriber who violates the Virtual/Digital Staging of Images rule.  The initial fine shall be in the amount of **$500.00** per occurrence, and the staged or modified photo shall be removed from the listing.  In the event of repeat violations of this rule, the fine may be increased at the discretion of the West Penn Multi-List, with the amount of each subsequent violation increasing **$500.00 per occurrence.**

**3.25    PROCEDURE TO OPT OUT OF INTERNET DISPLAY OF LISTING INFORMATION –** The PAR OPT form, as may be amended, defines certain options for the Seller to elect concerning the display of property information.  The Seller may elect the option of not having the property information and/or address displayed on the internet.  The Seller may also elect options for how the property is displayed on a VOW and or IDX website.  WPML Subscribers are required to return the PAR Seller Opt-Out Addendum to the Listing Contract to the WPML Office **within three (3) calendar days** of this form being completed.  The failure to return this form to the WPML Office **within three (3) calendar days** shall result in a fine in the amount of **$250.00 per occurrence**.

3.26 **CLEAR COOPERATION POLICY FOR RESIDENTIAL LISTINGS – Each Residential Listing is subject to the following requirements:** Within one (1) calendar day of marketing a Residential Listing to the public, the Listing Broker must submit the listing to the WPML for cooperation with other MLS Participants. The one (1) day time period to submit the Residential Listing is one (1) calendar day and shall not be extended in the event of a weekend or holiday. Marketing to the public and the requirement to submit the listing within one (1) day thereof applies to marketing of any nature, including, but not limited to, flyers displayed in windows, yard signs, digital marketing on public-facing websites, Brokerage website displays (including IDX and VOW), digital communications marketing (including email blasts), social media, multi-brokerage listing sharing networks, and the applications available to the general public. Copies of the Listing Contract are to be provided, upon request, to confirm the date of execution and will then be destroyed as WPML does not retain the copies. A violation of any of the terms of this rule shall result in a fine of $1,000 for the first violation and will be subject to the fine doubling for subsequent violations. These requirements apply to all Residential Listings.

3.27 **COMING SOON LISTINGS (CS) –** Coming Soon Listings (CS) are those which are intended to provide the Seller with time to prepare the property before it is ready to be shown.

**<u>The Effective Date is always counted as Day #1 when determining the timeframe for submissions and signatures on Coming Soon Listings. All forms are due by midnight on Day #3.</u>**

In the case of Coming Soon listings, the Seller is required to sign and date the WPML **Seller Authorization For Coming Soon - No Showings** form within three (3) calendar days of the Effective Date. Forms on which the signatures are not dated within three (3) calendar days of the Effective Date will result in a fine of **$1,000.00** being levied against the Listing Agent. The amount of **the fine will double** for each subsequent violation.

**The Coming Soon - No Showings form must be submitted to the WPML Office, with a Listing #, within three (3) calendar days of the Effective Date** (the Effective Date counts as Day #1), or if marketed to the public as described in these Rules, within one (1) calendar day, of the Effective Date. Because these requirements refer to calendar days rather than business days, the time period is not extended by weekends or legal holidays.

The Coming Soon – No Showings form is required to be sent via email (inbox@westpennmls.com) or fax to the West Penn Multi-List, Inc. office

within three (3) calendar days of the EFFECTIVE DATE.  The Effective Date is Day #1, the next day is considered Day #2, and Day #3 is the due date; the form MUST be sent to the West Penn Multi-List, Inc. by midnight of Day #3.  The agent must place the listing number of the Coming Soon in the UPPER LEFT-HAND CORNER of the form, and submit the completed form to WPML, as noted.

**Failure to send the document to the WPML office within the time period noted will result in a fine of $1,000.00 levied against the Listing Agent for the initial violation.  The amount of the fine will double for each subsequent violation.**

**Coming Soon Listings are required to go "LIVE" (be entered into the system as Coming Soon) within three (3) days of the Effective Date, with the Effective Date counting as Day #1.  If a listing does not become LIVE (as a Coming Soon) within three (3) days of the Effective Date, the fine is $1,000.00 levied against the Listing Agent for the initial violation.  The amount of the fine will double for each subsequent violation.**

Listings shall be placed in the Coming Soon status for no more than thirty (30) days. The days the listing shall be considered on the market will commence on the date the listing is placed in Active (A) status in the Matrix system.  If the listing is not designated as Active within 30 days, the listing will automatically convert to Active status. Coming Soon Listings may not include any property for which an Agreement of Sale / Lease has been accepted prior to listing.  During the time period before a Coming Soon Listing is placed in Active status, the property is intended to be prepared for marketing and is not to be shown. It shall be the responsibility of the Agent to change the status of the listing when it becomes Active.  A violation of this Rule shall result in a fine of **$1,000.00** levied against the Listing Agent for the initial violation.  The amount of **the fine will double** for each subsequent violation.

During the Coming Soon status, which can be up to 30 days, you are permitted to market the property as Coming Soon.  However, you are not permitted to have any showings.  You will be asked/prompted to place a date into the MLS for the estimated date for when the property will become available.  You are permitted to move that date up or back during the Coming Soon phase, but not beyond the original 30-day time limit.

**Open Houses may not be conducted when a listing is in the Coming Soon status.  No one may enter the property while it is in Coming Soon status.**  This includes, but is not limited to:  Brokers, Agents, Appraisers, Home Inspectors, Radon Testers, etc.  The fine for violating this Rule will be determined by the WPML Board of Directors.

Offers may be presented during the Coming Soon phase.  This is in accordance with the requirements as outlined by the Real Estate Commission. These offers may be contingent upon the buyers viewing the property after the Coming Soon time period has passed.  Viewings may not take place until the status of the listing is Active.  If an offer is presented and accepted during the Coming Soon phase, the actual SALES AGREEMENT is required to have specific verbiage indicating that a showing did not take place.  This verbiage is to state "**This offer is being made sight unseen**" and must appear on the last page of the Sales Agreement.

## SECTION 4.  SELLING PROCEDURES

**4.1**    **SALES AGREEMENT –** When an agreement of sale is signed (fully executed by all parties), the sale must be reported **within three (3) calendar days** of execution, or a **per-day fine of $50.00** will be levied. The reporting of this information is the responsibility of both the office listing the property and the office selling the property.

The listing office would report the sale via the Online System and the selling office (if not the same) would send a Change Listing Report to the WPML Office via email or fax if the listing company has not complied.

**4.2**    **CONTINGENCIES –** A listing may only be placed under the status of C if the owner(s)/seller(s) is willing to CONTINUE TO SHOW the property and TAKE BACK-UP AGREEMENTS.

If the C status is used when, in fact, the owner(s)/seller(s) is not willing to take back-up agreements to the property, a fine in the amount of **$100.00** will be levied to the Listing Agent as well as a fine in the amount of **$50.00 per day** from date of fully executed sales agreement until the status is corrected online.

The listing may NOT carry an A (Active status) in the Online System when an agreement is in effect **except in the case of specific language that releases the seller to sign a subsequent agreement of sale with NO notice of cancellation to the buyer(s) of the first agreement.** This clause (addendum) must be sent to the West Penn Multi-List, Inc. with the listing number noted on the addendum.

The only PAR form that will permit a listing to remain ACTIVE (A) in the Online System is the SSP/CM.

If a company has designed their own form, it must be in compliance with the Rules and Regulations of West Penn Multi-List, Inc.  The language for

the form must be approved by WPML prior to usage.  Any such form submitted to the West Penn Multi-List, Inc. for verification of the contingency must be comparable to the PAR form SSP/CM or any other form that PAR may publish that is consistent with the SSP/CM form. WPML retains the right to reject the form if it is similar to the PAR forms: SSP/TKO or SSP.

The listing status may not be changed to Active until either the PAR form REL or TER has been signed by the appropriate party or parties.  PAR forms SSP/TKO and SSP may not place the listing to Active status.

Any listing that carries a signed sales agreement MUST carry a status of U or C.  If the listing carries an A status (see above exception), a fine will be levied to the Listing Agent from the date of the sales agreement at **$50.00 per day** until the status is changed in the Online System to U or C.

**4.3**    **NO SHOWINGS RULE – Procedure for violations as a result of showing a property when other Subscribers are led to believe property is not available for showing.**

**It will be improper for a listing agency to permit a property to be shown when other Subscribers are led to believe the property is not available for showing.  It is also improper for any Broker or Sales Associate to violate a NO SHOWING NOTICE by either contacting the owner, directly or indirectly, or doing any act which attempts to evade the terms of the NO SHOWING NOTICE. Violation of this rule will result in a minimum fine of $1,000.00.  For each subsequent violation by the same Broker or Sales Associate, the fine will increase by an additional $1,000.00 per occurrence, to deter repeat violations.**

It is recommended that whenever a Subscriber indicates "no showing until a specific date" that you also change the SHOW information in the Online System to correspond with the request as well as the CONTACT name and phone number.

**A**.    Any alleged violation of the rule concerning the showing of a property when other Subscribers are led to believe the property is not available for show shall be referred to the Executive Director of West Penn Multi-List, Inc.

**B.**    The Executive Director shall require the complainant to furnish a written description of the alleged violation.  **A complaint may only be filed by the Subscriber Broker.  No complaint will be considered if not in writing and signed by the Complainant.**

**C.**    The Executive Director shall conduct an independent investigation of the alleged violation:

    **1.**    If such investigation reveals that no actual violation has occurred, the Executive Director shall notify the Complainant of the results of the investigation and shall make note in the file that the complaint was dismissed.  Prior to proceeding with the investigation, the Subscriber who is alleged to have committed the violation shall be notified of the complaint and provided an opportunity to respond.

    **2.**    If the investigation by the Executive Director reveals that there may be reasonable grounds to believe a violation has occurred, then the procedures set forth in Paragraph D shall be implemented.

**D.**    The Executive Director, upon determining that a violation may have occurred, shall forward a copy of the written complaint to the Subscriber Broker (the "Respondent") who has been charged with such violation.  This written Complaint shall be accompanied by a letter containing the following information:

    **1.**    The Respondent shall have a period of ten (10) days in which to file a written answer to the Complaint.  This response should contain all information pertinent to the allegations and a time line, if applicable, as well as any other documentation pertinent to the alleged violation of the occurrence.

    **2.**    The Respondent shall be notified that the fine for a first offense is set at $1,000.00, and this fine, if levied, shall have a due date as noted on the statement sent to the Respondent.

    **3.**    At the conclusion of the review, the Executive Director shall notify the Respondent of the decision, and that decision shall be final and not subject to any appeal.

**4.4**    **CANCELLATION –** A cancellation of a sale, or termination of a sale agreement, shall be reported in the Online System **within three (3) calendar days**, or a fine will be levied for an incorrect status (**$50.00 per day**).

**4.5**    **TIME / METHOD OF REPORTING –** All reports that are required to be implemented under this section (Section 4 Selling Procedures) shall be

made **within three (3) calendar days** of the occurrence of the matter to be reported, by entering the information into the Online System, or sending it to the West Penn office by mail, email, or fax.

If the reporting of sales or under agreements is not reported **within three (3) calendar days** from the time of all signatures being affixed, a fine will be levied from the Multi-List office at **$50.00 per day**.

**4.6    REPORTING LEASE PURCHASE/INSTALLMENT LAND CONTRACT –** A listing that has been put under contract with a lease purchase, lease option, or installment land contract is to be reported as a Sold listing as soon as the Buyer has taken possession of the residence.

**4.7    ADVERTISING –** Each Broker shall advertise only his/her own listings and shall not advertise the listing of any other Broker without the written consent of the Broker of Record.

**4.8    BUYER'S NAME –** Anyone not completing the Buyer's name area in the Online System ("unknown" is not acceptable) will receive an initial fine of **$100.00** plus an additional fine of **$5.00 per day** from date of closing.  The use of initials for a last name is not acceptable.  The last name of the Buyer is required.

**4.9    STATUS REQUIREMENTS –** When a listing status is changed in the Online System, it is the responsibility of the Agent to secure verified, signed documentation of the change.

In the event of a sales agreement, the Agent is required to receive a copy of the fully executed sales agreement with ALL signatures affixed.  Until this completed paperwork is received by the Agent, the status cannot be altered.

A notice of listing cancellation MUST follow the prescribed format clearly defined in the West Penn Standard Exclusive Listing Contract.  This format requires the owner(s) to send a CERTIFIED LETTER return receipt to the Listing Broker giving a ten (10) day notice of cancellation.  If the owner does not follow this defined format in the listing contract (as long as the amount of negotiable days has elapsed), the listing will remain with the original Listing Broker.

**4.10    SHOW EXPLANATIONS:**

This rule applies to Brokers, Agents, and Appraisers.

**APT OCC –**    Appointment with occupant:  The showing real estate Agent/Appraiser is to call the owner, occupant, or contact of the

property to schedule an appointment to show the property.  This field means that there is NO lock box present on the property.  If a showing Agent/Appraiser is informed that there is a lock box on the property (or the showing Agent finds a lock box on the property), West Penn must be notified.  Upon notification, West Penn will fine the LISTING AGENT **$100.00**.  The LISTING AGENT will have 30 days to pay the fine or their Supra Key will be deactivated until the fine is paid.

**APT LIS –**    Appointment with listor:  The Showing Agent/Appraiser is required to call the Listing Agent to schedule an appointment to show the property.  This field means there is NO lock box on the property.  If a lock box is on the property, a fine in the amount of **$100.00** will be levied to the LISTING AGENT.  The LISTING AGENT will have 30 days to pay the fine or their Supra Key will be deactivated until the fine is paid.

**CALL/LB –**    Call lock box:  The Showing Agent/Appraiser is required to call the owner/contact to show the property.  If the Showing Agent is unable to reach the owner/contact, the property MAY be shown using the lock box to gain access.  If the property owner/contact has an answering machine, the showing Agent/Appraiser is to leave a message on the machine that they are going to show the property and the date and approximate time of the showing.  Naturally, if the Showing Agent/Appraiser is successful in reaching the owner/contact, an appointment can be made to show the property. If the Showing Agent/Appraiser does not call and attempts to show the property, a fine of **$100.00** will be levied to the Showing Agent/Appraiser.  This fine will be levied directly to the Showing Agent/Appraiser.  The Showing Agent/Appraiser will have 30 days to pay the fine or their Supra Key will be deactivated until the fine is paid.  Prior to using a lock box on an occupied listing, the showing Agent/Appraiser is required to announce entry (with doorbell if available or knocking on door).  If there is no lock box on a property and the listing information stated that a lock box is present, a fine in the amount of **$100.00** will be levied to the Listing Agent.  If the fine is not paid within 30 days, the Listing Agent's Supra Key will be deactivated until the fine is paid.

**VAC/LB –**    Vacant/Lock Box:  The property is vacant/unoccupied and may be shown by utilizing the lock box.  If the Showing Agent/Appraiser attempts to show a property that indicates VAC/LB and there is no lock box present, the Listing Agent will be billed for a **$100.00** fine.  This fine will be required to be paid within 30 days.  If the fine is not paid within 30 days, the Listing Agent's/Appraiser's Supra Key will be deactivated until the fine is paid in full.

**APT/LB –**     Appointment Lock Box:  A lock box is present on the property.  The Showing Agent or Appraiser is required to contact the person designated as the CONTACT in the listing information or other contact arrangements stipulated in the REMARKS area for a showing.  It is understood that a showing of this particular property may ONLY take place after confirmation of the APPOINTMENT. Confirmation of the scheduled appointment must be by phone or in writing in the form of a text message or email. Confirmation is not to be presumed, and telephone confirmation requires actually speaking with the contact rather than simply leaving a message. Confirmation requires agreeing on a date and time for the showing. **Confirmation by text, email, or other format shall not be presumed and is established by a reply.**  If the Showing Agent or Appraiser violates the SHOW instructions, a fine of **$500.00** will be levied to the Agent/Appraiser.  If it has been determined that a violation has occurred, the showing information will be obtained from the lock box to levy the fine.  The Agent/Appraiser who violated the SHOW request will be fined **$500.00** (for each offense) and will have 30 days to pay the levied fine.  If the fine is not paid within the 30-day period, the user's services (Supra access and MLS) will be placed on hold until the fine is paid in full.

**KEY/LIST –**    Key/Listor:  In order to show this property, the key to gain access is available for pickup at the listing office.  The key MUST be returned the same day unless other arrangements are made with the Listing Agent or Office Manager.  If after 48 hours the showing Agent/Appraiser has not returned the key, the Agent's/Appraiser's services will be placed on HOLD until the key is returned.  If the key is unavailable for use after 48 hours of a request, a **$5.00 per day** fine is levied to the Listing Agent until the key to the property is produced.  This fine levied to the Listing Agent will have a due date of 30 days.  If the fine is not paid within 30 days, the Listing Agent's Supra Key will be deactivated until the fine is paid in full.  If a lock box is present on the property, a fine in the amount of **$100.00** will be levied to the Listing Agent.  The Listing Agent will have 30 days to pay the fine in full.  If the fine is not paid, the Listing Agent's Supra Key will be deactivated until the fine is paid in full.

**CALL TEN –**   Call Tenant:  This property is currently occupied by a tenant and a Lock Box is not present.  PRIOR to showing the property, the TENANT must be called to make an appointment to show.  The tenant's name and phone number MUST be listed in the Contact area of the input sheet or a per-day fine of **$5.00** will be levied to the Listing Agent from date of listing.  This fine will have a 30-day period to be paid.  If not paid, the Listing Agent's Supra Key will be

deactivated until the fine is paid in full.  If a lock box is present on the property, a fine in the amount of **$100.00** will be levied to the Listing Agent.  This fine will have a due date of 30 days.  If the fine is not paid within 30 days, the Listing Agent's Supra Key will be deactivated until the fine is paid in full.

**OTHER –**     Other:  Call the Listing Agent to receive showing information.  If a lock box is present, a fine of **$100.00** is levied to the Listing Agent.  This fine is due and payable within 30 days.  If the fine is not paid within 30 days, the Listing Agent's Supra Key will be deactivated until the fine is paid in full.

The West Penn Multi-List, Inc. will not recognize a lock box on any property unless it is indicated as such in the SHOW area of the input sheet and/or in the Online System.  If a lock box is present on a property and it is not indicated in the Online System, a fine of **$100.00** will be levied to the Listing Agent.  The WPML recognizes only Supra Lock Boxes on properties.

## SECTION 5.  MLS SERVICE FEES

**5.1     SERVICE FEES –** Each month, the Subscriber (as defined by these Rules, including Affiliate Subscribers) will be charged for each licensed Agent/Certified Appraiser, Affiliate, or authorized user utilizing the services provided by the West Penn Multi-List, Inc.  These charges shall be determined by the Board of Directors of the West Penn Multi-List, Inc. and the amount of the charges may be set or modified at the discretion of the Board.

All MLS Service Fees are required to be paid upon receipt of the invoice by the Subscriber.  Failure to pay the indebtedness within the specified time will result in suspension of services and possible expulsion.

MLS Service Fees encompass a variety of services:  Online System, lock boxes, forms, upgrades to the system, training, help desks for keys and Online System, supply delivery, online training, and onsite assistance.

MLS Service Fees will be charged to each Subscriber, Affiliate, or authorized user for each Licensed Agent/Certified Appraiser/Certified Home Inspector/Certified Radon Tester affiliated with each Subscriber office.  From time to time, the West Penn Multi-List will review the state website and add active Agents to an office if they are not registered.  Any Subscriber will be charged MLS Service Fees for these additional associates if they currently do not appear on their roster to be charged for MLS Service Fees.  This will be done without notice.  This also applies to any Broker advertising Agents affiliated with their company but not

subscribing to MLS Service Fees.  These Agents will be added to the Broker's MLS Service Fee monthly charge.

An Agent ID# (identifying account number for each participant in the West Penn Multi-List, Inc.) will be issued to each system participant in accordance with their affiliation with the State of Pennsylvania and qualifications required in West Penn Multi-List, Inc., including Appraisers, Home Inspectors, and Radon Testers. Each participant will be issued a specific Agent ID# in the system that will identify them as an authorized user.  Only one (1) Agent ID# may be issued to the following system users:  Broker, Associate Broker, Agent, Appraiser, Home Inspector, and Radon Tester.  At no time may a system user have more than one (1) Agent ID# assigned to them.  Agent ID#s currently in use (and not in use) and assigned to specific system users may not be reassigned to another system user.

If at any time West Penn Multi-List, Inc. is alerted to the fact that any Agent is listing properties under another Agent's name while they are in fact listed by an individual not currently being charged MLS Service Fees, the Service will have the right to add the individual to the next month's billing cycle.  A **$100.00** fine for this infraction will be levied to the Agent who is currently active in the Service.

## SECTION 6.  AGENTS / APPRAISERS / AFFILIATES

**6.1**    **PURCHASE REQUIREMENTS –** Each Subscriber is required to order MLS Service Fees equal to the number of Agents/Appraisers/Affiliates/ Licensed Assistants/Licensed Administrative Assistants/authorized users (including part-time and teams) associated with said Broker/Appraiser. This may change at any time by direction of the Board of Directors of West Penn Multi-List, Inc.  West Penn Multi-List, Inc. does not permit sharing services or system information.

At any time, if a Broker/Appraiser advertises that an authorized user is affiliated with his/her company, the West Penn Multi-List, Inc. will add this individual to their MLS Service Fee Roster without notification.  The West Penn Multi-List, Inc. will file the substantiating document used to secure this data in the company's file for their reference.

If the West Penn Multi-List, Inc. is notified that a Broker is listing properties under one Agent's name while they are in fact listed by another Agent that is not listed under the MLS Service Fee Schedule, then the Service will have the exclusive right to add the Agent's name in question to the MLS Service Fee account of that Broker and, in addition, a fine in the amount of **$100.00** will be levied to the Broker of Record.  If this happens on more than one (1) occasion, the Broker of Record will be asked to attend a

Board of Directors Meeting for further discussion, fine, or possible suspension or expulsion.

In the case of an appraisal firm, if the West Penn Multi-List, Inc. is notified that an Appraiser is sharing the data or allowing the Appraiser's User ID# and login to be utilized by non-Subscribers within his/her office, a fine in the amount of **$100.00** will be levied to the Appraiser Subscriber. If the Appraiser Subscriber shares West Penn Data with a non-Subscriber or an outside source looking to secure the confidential data owned by the Broker of Record affiliated with the West Penn Multi-List, Inc., the Appraiser Subscriber will be asked to appear before the Board of Directors for a fine and possible expulsion from the West Penn Multi-List, Inc. Appraisers are not to furnish the MLS confidential data to anyone who is not formally affiliated with their organization.

**6.2    CANCELLATION OF MLS SERVICE FEES FORMAT –** MLS Service Fees may be cancelled under the following conditions and following the format below:

**A.**    A letter signed by the Broker/Manager/Certified Appraiser/Certified Home Inspector/Certified Radon Tester must be sent to the WPML Office informing the Service to terminate the individual from their office; the letter must include the effective date. Agents cannot cancel Multi-List Service. The letter must be signed by the Broker, Manager, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester. If the Agent is going into escrow or referral, a copy of that paperwork is required to be submitted with the notice.

**B.**    The cancellation letter MUST arrive before the 15th day of the month for cancellation in the following month. The letter is required to provide the Office ID# of the office canceling the Agent/Certified Appraiser or Affiliate, and it is required to provide the name and assigned AGENT ID# of the person in question.

If the office has information as to where the Agents/Certified Appraisers, or Affiliates are relocating, we ask that this also be provided at the time of correspondence. NO VERBAL CANCELLATION WILL BE HONORED!

**C.**    If transfer information on the Agent, Certified Appraiser, Home Inspector, or Certified Radon Tester is not provided at the time of cancellation, the individual's key will be deactivated until notification is provided (in writing) to the West Penn Multi-List, Inc.

**D.**    All existing listings carrying the transferred individual's ID# should be transferred, by written direction from the Broker of Record, to

another active Agent/Broker within the office who carries an active ID#.

**E.** After the cancellation notice is received by West Penn Multi-List, Inc. all services to the individual will be canceled. This means that they will no longer have access to the Multi-List Service, and the key will be deactivated.

**F.** All keys and lock boxes must be returned to West Penn Multi-List office.

**G.** If an Agent returns a key, this does not cancel their MLS Service unless a letter is received at WPML signed by the Broker, Office Manager, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester informing the Service of the cancellation. Only the Broker, Office Manager, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester can cancel an Agent's, Appraiser's, Home Inspector's, or Radon Tester's Service. The return of a key does not constitute cancellation of Multi-List Service unless specific instructions accompany the key.

**H.** Unlicensed Administrative Assistants do not generate a monthly charge. WPML does request that upon departure of an Administrative Assistant, a written notice is to be sent to deactivate their ability to use the system. There is no charge for this. West Penn is to be notified of the new Administrative Assistant's name, and a new number and password will be issued.

**6.3    ELECTRONIC LOCK BOXES** – Lock Boxes are the property of the West Penn Multi-List, Inc. They are LEASED to the Broker of Record of a Subscribing Real Estate company. If a lock box is lost, stolen, damaged, defaced, or rendered inoperable in any way, the Broker of Record will be billed the current replacement cost fee. Lock boxes are issued according to the number of available Active listings — not Agent count.

Lock boxes are not issued to agents. Lock boxes are issued to the Broker of Record only.

Removal of an inoperable lock box will be at the time and expense of the Broker of Record.

WPML may recall lock boxes after review of a company's lock box inventory. If WPML determines that the amount of lock boxes "not in use" exceeds what is reasonable and customary based on available listings in the company's inventory, the overage will be recalled. It will be the responsibility of the Broker of Record to have the recalled lock boxes

delivered to the MLS Office within the time period outlined in the recall request.

**The following may NOT be altered or a fine of $100.00 will be levied to the agent who made changes to the box:** the CBS may not be activated; the shackle code may not be changed; the time selections may not be changed to anything other than those permitted in WPML, which are 24-hour access or TIMED ACCESS (preset by WPML). Each such violation of this rule shall result in a fine to the Agent of **$100.00 per occurrence**, and a separate occurrence shall be recognized for each alteration that is discovered. Subsequent violations of this rule shall result in the amount of the fine **increasing per occurrence** at the discretion of the WPML Board of Directors.
If the box is changed to 24-hour access, the box MUST be changed back to TIMED ACCESS after removal of the box from the property. Failure to comply will result in a fine of **$100.00** to the Agent.

The lock box should be removed within 24 hours after a listing has been Sold/Closed.

6.4  **SHARING OF SERVICES –** Sharing services between Agents is NOT permitted in the West Penn Multi-List, Inc. This means that no services may be shared (Online System, Supra Key, etc.) among the Subscribers. **Example:** Agent/Licensed Assistant, husband/wife, mother/daughter, father/son, teams, etc. Regardless of the circumstances, each individual utilizing the Service is required to subscribe to the monthly MLS Service Fee independently.

6.5  **ADVERTISING AGENT, ASSISTANT, CERTIFIED APPRAISER, CERTIFIED HOME INSPECTOR, OR CERTIFIED RADON TESTER AFFILIATION –** At any time, if an advertisement appears in any type of publication, radio, television, online, Real Estate Commission website, etc., that indicates a particular Agent/Certified Appraiser, LICENSED Assistant, Home Inspector, or Radon Tester is affiliated with a company, and that individual is not subscribing to the monthly MLS Service Fee, the individual will be added to that particular company's billing statement without notification.

If this person feels that an error has occurred in adding this person to the company's billing statement, a signed notarized statement must be received at West Penn Multi-List, Inc. (signed by the Broker or Certified Appraiser) stating the error. This statement must indicate that the individual is not actively involved in real estate and show validated proof that the license or certification is in escrow. If the same individual again surfaces in an advertisement, the Broker, Certified Appraiser, Certified Home Inspector, or Certified Radon Tester will be fined **$100.00** and

placed on notice that future fine amounts will escalate, and possible suspension could occur.

**6.6    SUBSCRIBERS HOLDING MORE THAN ONE (1) DESIGNATION –** In the event a Subscriber or Affiliate Subscriber holds more than one type of Subscribership, the following guidelines shall apply:

If any of the West Penn Multi-List, Inc. Subscribers join as more than one (1) category of Subscribership, they would be required to pay the requisite fee for each separate category of Subscribership.  The lock box key privileges would be tied to the fee arrangement that is conducive to the most usage of system programs.

**Example:**
If a Subscriber joins as a Certified Home Inspector or Certified Radon Tester and also as a Licensed Real Estate Agent, the individual would be required to be registered as a Licensed Real Estate Agent and pay the designated fee for each category of Subscribership to the West Penn Multi-List, Inc. They would qualify for only one lock box key.

Regardless of the designation, the Subscriber would be required to identify themselves and their affiliation upon securing a listing, appraising a listing, securing a sales agreement, or completing a home inspection. Failure to properly identify their capacity will result in a fine to be determined by the West Penn Multi-List, Inc. based on severity and possible loss of all services for an appropriate time period.

## SECTION 7.   RESPONSIBILITY FOR ACCURACY

**7.1    LISTING BROKER'S RESPONSIBILITY –** Every Subscriber placing a listing with the Service shall bear full responsibility for the accuracy of the information submitted.  Each Broker, by becoming a Subscriber of the Multi-List Service, automatically agrees to reimburse, indemnify, hold harmless, and forever defend West Penn Multi-List, Inc., or any member thereof, from any claim or action brought against West Penn Multi-List, Inc., or Subscriber thereof, on account of erroneous information submitted to the listing Service by said listing member.

**7.2    ACCURACY OF ADVERTISING –** As a condition of Subscribership in the West Penn Multi-List, Inc., each Subscriber agrees that any and all advertising of any form that includes the West Penn Multi-List, Inc. name or in any way makes reference to the West Penn Multi-List, Inc. either directly or by implication, shall be accurate and provide a true picture of the listing data and does not exaggerate the listing data in any way. Reference to the number of listings that are available by and through IDX program must be accurate and not exaggerated or inflated in any way.

Subscriber agrees to reimburse, indemnify, hold harmless, and forever defend the West Penn Multi-List, Inc. from any claim or action brought against the West Penn Multi-List, Inc. or Subscriber on account of erroneous information contained in any advertisement.  Subscriber acknowledges that the content of the advertisement is solely the responsibility of the Subscriber and not West Penn Multi-List, Inc.  This restriction and agreement will apply to advertisements in any form, whether print, electronic media, or other form.

## SECTION 8.  COMPLIANCE / ENFORCEMENT / PENALTIES

**8.1    FINES –** The Service shall impose fines upon each Subscriber, Agent, Appraiser, Affiliate, and/or Authorized User who has violated any of the Rules and Regulations.  A more in-depth method of fining will result for a second or subsequent offense.  Each violation of any provision of these Rules and Regulations or By-Laws shall constitute a separate offense.

**A.**    Agent/Appraiser/Home Inspector/Radon Tester Fines - Any fines incurred by Agent/Appraiser/Home Inspector/Radon Tester and/or authorized user will be billed directly to the Agent/Appraiser/Home Inspector/Radon Tester on a separate billing process.  If the balance of the fine is not paid in full within 30 days, the Agent/Appraiser/Home Inspector/Radon Tester's key will be deactivated and service discontinued.  Upon payment of the fine, in full, the key and Service will then be reactivated.

**B.**    Information/Status Fines - Notice will be sent to the Agents directly and they will have five (5) days to comply.  The fine will begin on the sixth (6th) day.

**8.2    SUSPENSION / TERMINATION / EXPULSION –** A Subscriber's Subscribership may be suspended or terminated if three (3) or more violations of the Rules and Regulations occur or three (3) or more past-due account notices occur within any 365-day consecutive period.  Expulsion can occur if the Subscriber does not adhere to the Service's Rules and Regulations after official notification of violation is sent via Certified Mail.  (Refusal of Certified Mail is not an acceptable issue for a grace period.)

**8.3    SUSPENSION OF SERVICE DUE TO PAST-DUE ACCOUNT –** If an account is past due, notification will be sent to the Subscriber in question.  If after 15 days the account is not brought up to date, suspension of ALL services to all Brokers/Agents/Appraisers/Home Inspectors/Radon Testers within the company will occur in the following manner:

**A.**    All services to all individuals affiliated with the Subscriber will be suspended as well as the Broker, Certified Appraiser, Certified Home Inspector, Certified Radon Testers, and/or authorized users.

**B.**    All West Penn Multi-List, Inc. keys will be deactivated until account has been brought up to date as outlined in statement notice.

**C.**    Online service to all users within the company will be curtailed until the account has been brought up to date as outlined in the statement notice.

**D.**    All services from West Penn Multi-List, Inc. will be unavailable to the Subscriber and all individuals associated with the Subscriber.

**E.**    Dues to the Subscriber will incur during suspension and are due and payable.

**F.**    Thirty (30) days after Service suspension has occurred, the account will be brought to the Board of Directors of West Penn Multi-List, Inc. for termination/expulsion of Subscribership.  Once termination/expulsion has occurred and the Broker/Certified Appraiser/Certified Home Inspector/Certified Radon Tester wishes to subscribe to the Service, the admission fee and all past indebtedness is required to be paid before Subscribership can be approved.

## SECTION 9.  DISPUTES

**9.1**    **DISPUTES OF RULES AND REGULATIONS –** Certain procedures apply to disputes involving the West Penn Multi-List, Inc. Rules and Regulations that all Subscribers are to follow.  The West Penn Multi-List is established to provide an exchange of information for real estate Brokers, Agents, and Certified Appraisers, and the Rules and Regulations of the West Penn Multi-List, Inc. define the process and procedure for the distribution and processing of data.  Therefore, disputes/complaints which are submitted to the West Penn Multi-List Office are limited to those matters involving a specific West Penn Multi-List, Inc. Rule and not other matters outside of the jurisdiction of the West Penn Multi-List, Inc.

**9.2**    **FEE / COMMISSION / ETHICAL DISPUTES –** Any dispute/complaint which is submitted to the West Penn Multi-List, Inc. Office must be limited to specific West Penn Multi-List, Inc. Rule violations.  The West Penn Multi-List, Inc. does not act as an arbitrator or grievance committee to hear or resolve any dispute that involves commissions, the division of fees, or ethical practices nor does the West Penn Multi-List, Inc. hear or resolve disputes or complaints involving the Sales Agreement or the sale of a

particular property.  Such matters are handled outside of the West Penn Multi-List, Inc. and are to be submitted through the appropriate channels, such as the Board of Realtors, Pennsylvania Association of REALTORS, National Association of REALTORS, Pennsylvania Real Estate Commission, or other entity which has jurisdiction of such disputes.

9.3     **PROCESS FOR SUBMISSION OF DISPUTES INVOLVING RULES AND REGULATIONS OR DATA –** Any dispute submitted to the West Penn Multi-List, Inc. Office shall be limited to alleged violations of the West Penn Multi-List, Inc. Rules and Regulations, and these may include issues involving the submission of data, etc.  Such disputes/complaints are not to be submitted to the West Penn Multi-List, Inc. Office directly by Agents.  Rather, these disputes are to be submitted by the Broker of Record.  Such disputes/complaints must also be submitted in writing.  For purposes of this Rule, an email is sufficient for the dispute/complaint to be considered.  Each such dispute/complaint must identify the specific West Penn Multi-List, Inc. Rule(s) which are alleged to have been violated and include a copy of the listing in question which is to be appended to the dispute/complaint.

## SECTION 10.  FEES AND CHARGES

10.1    **CHARGES IMPOSED –** Subscribers shall pay such fees and charges as adopted by the Board of Directors from time to time.

    A.    Lock boxes are owned by West Penn Multi-List, Inc. and leased to the Broker of Record at no charge.  Any lock box that is stolen, lost, defaced, damaged, or deemed not reusable by West Penn Multi-List will result in a current replacement fee cost levied to the Broker of Record/Subscriber.

    Removal of an inoperable lock box will be at the time and expense of the Broker/Subscriber.  If a lock box is unresponsive and must be removed (cut off the property), the Agent will need to secure a reference number.  This number will be supplied by the manufacturer, Supra Products, Inc., and will need to be obtained prior to cutting the box from the property.  Failure to secure a reference number will result in the Broker of Record being charged the current replacement fee for the lock box.

    Once an unresponsive lock box is removed from a property, it must be returned to the West Penn office WITH THE REFERENCE NUMBER and Office ID number.  After processing, a replacement lock box will be sent to the office to which the lock box is assigned.

WPML may recall lock boxes at any time to circulate among its Subscribership.  Lock boxes are NOT leased to Agents!

**The following may NOT be altered or a $100.00 per item will be levied to the Agent:  You may NOT use CBS codes.  You may not change the shackle code and you may NOT change the time unless you are using the preset times of 24 hours or factory set hours.**

B.    Fines will be imposed to the Listing Agent for incomplete listing data in the West Penn system for the following missing or incorrect features:

1.    **PROPERTY TAXES –** (Except new construction) Property tax is a required field and must be completed.  Failure to complete will result in a **$5.00 per day** charge to listing Agents from list date.  New construction/not assessed is excluded.  WPML will accept the information provided by auto-population.  However, if this area is blank in auto-population, the listing Agent will be required to complete this area with the correct data within 48 hours of data entry into the system, or a fine of **$5.00 per day** from the list date will be levied to the Listing Agent.

2.    **LOT SIZE –** The dimensions or square footage of a property are required.  For properties with five (5) acres or more land, lot dimensions are not required.  If lot dimensions are not available, a copy of the Deed must be sent to the West Penn Multi-List Office.  WPML will accept the information provided by auto-population.  However, if this area is blank in auto-population, the Listing Agent will be required to complete this area with the correct data within 48 hours of data entry into the system, or a fine of **$5.00 per day** from the list date will be levied to the Listing Agent.

3.    **OWNER(S) NAME –** The name (not initials) of the owner(s) must appear in the Online System or a fine will be levied.  See Section 3.12 C for a Corporate Listing owner's name.  WPML will accept the information provided by auto-population.  However, if this area is blank in auto-population, the Listing Agent will be required to complete this area with the correct data within 48 hours of data entry into the system or a fine of **$5.00 per day** from the list date will be levied to the Listing Agent.

4.    **SUB-AGENCY AND BUYER AGENCY COMPENSATION - (ICD) (SAC) AND (BAC) –** These areas on the input sheet are required fields and MUST be completed.  The field may NOT carry the full rate of the listing compensation or the total minimum fee.  It should be a decimal figure or dollar amount of what will be paid from the sales price to the selling office at the time of closing and zero (0) is an acceptable answer.  **Example:**  It may not carry 50%, 40%, 60%, etc.  It should carry something such as 3.0, 2.5, and 5.0, etc.  **Please note that the above are examples only and should not be misconstrued as rates fixed by the Service.**

5.    If there is a different compensation for an in-house sale on any listing, it must be indicated in the ICD area on the input sheet with a Yes or No.  Failure to do this will result in a fine of **$100.00**.

6.    **NSF OR ACCOUNT-CLOSED CHECK –** A **$50.00** service charge will be levied to anyone who submits a check to West Penn Multi-List that does not clear the bank.  If the WPML Office receives three (3) NSF (non-sufficient funds) or Account-Closed Checks within a 12-month period, all future payments will be required to be made with CERTIFIED CHECK, MONEY ORDER, or CASH.  An NSF check may only be replaced with cash, certified check, or money order.

7.    The amount of a fine is set by the Executive Director and the Board of Directors.  The fine amount may vary according to the severity of the violation or the number of occurrences the office tallies for the same type of violation.

8.    A **$100.00** fine will be levied to the Listing Agent for removing pertinent information that appears in the Online System.  **Example:**  Information removed from a listing that has expired or has been withdrawn (but not limited to these statuses), such as owner name, address, Slot #1 image, etc.  All information that was previously associated with a listing MUST remain with that listing in the system, regardless of status.

10.2   **PAYABLE –** All fees and charges are due and payable by the 15th of the month following the month in which the fee or charge was incurred.

10.3   **SUSPENSION OF SERVICE –** All Multi-List services shall be suspended (except dues) for any Subscriber whose account shall remain unpaid for more than forty-five (45) days from the due date of said account.

If a suspended Subscriber wishes to reinstate Service, such Subscriber must pay all outstanding indebtedness to the Multi-List. The West Penn Office shall give at least fifteen (15) days written notice of intent to suspend Service.

During suspension of Service, the monthly dues levied by West Penn will continue to be charged to the past-due account.

**10.4    EXPULSION OF SUBSCRIBER –** Any Subscriber whose account shall remain unpaid for more than one hundred five (105) days from the due date of said account shall be expelled from Subscribership in the Multi-List. If an expelled Subscriber should thereafter wish to rejoin the Multi-List, all past due indebtedness plus a new admission fee will be due.

The West Penn Office shall give at least fifteen (15) days written notice of intent to expel a Subscriber.

**10.5    DISCREPANCY ON MONTHLY BILLING –** Any discrepancy on monthly billing is to be reported within fifteen (15) days of receipt of a bill in WRITING to the Accounting Department of the West Penn Office. All discrepancies will be reviewed and West Penn will respond in writing to your query.

If queries are not handled in this fashion, we will be unable to issue any credit.

## SECTION 11.  LOCK BOXES AND KEYS

**11.1    LOCK BOXES –** The lock boxes supplied to each Broker/Subscriber are supplied by the West Penn Multi-List, Inc. on a LEASE basis. The West Penn Multi-List, Inc. owns all lock boxes. The Broker has no ownership of the lock box. These lock boxes can be recalled from time to time by West Penn and redistributed within the West Penn system. Each Broker is required to participate in the lock box recalls from the West Penn Multi-List, Inc. when they arise. Failure to respond in the prescribed time allotted will result in a fine and temporary cessation of Services until compliance is met.

If a lock box is placed on a property LISTED in the West Penn Multi-List, the box must be operable by the key approved by the Service. Violation of this rule will result in a fine of **$100.00**.

The Broker/Subscriber may place a non-Service box on their listing for maintenance purposes. This non-Service lock box may NOT carry instructions on accessing the lock box in the Online System. All

indications of lock boxes on any listing in the Online System MUST be Service-owned lock boxes.  Failure to comply will result in a **$100.00** fine.

REMOVAL OF INOPERABLE LOCK BOXES WILL BE AT THE TIME AND EXPENSE OF THE SUBSCRIBER.

Lock Boxes MUST remain in the possession of and the responsibility of the Subscriber to which the box was originally assigned unless transferred by the West Penn Office.  Lock boxes may be rotated within specific companies that have multiple offices if the office notifies WPML in writing of the lock box's new location.

Lock boxes are not automatically transferred when a company merges or is purchased.  In this case, ALL lock boxes must be returned to West Penn Multi-List within 14 days of a change in ownership unless other arrangements have been made with the approval of the West Penn Office **PRIOR TO** the Subscriber office closing or an ownership change.  Failure to comply will result in a charge to the company to replace the lock boxes at current market value plus tax, shipping, and handling.

The lock box may not be defaced in any manner.  This means no writing of any type is to appear anywhere on the lock box.  To do so will result in a replacement charge to the Broker leasing the box.  Shackle codes are NOT to be written anywhere on the lock box.  This is considered defacing the lock box, and a charge for replacement will be levied.

If a lock box is lost, misplaced, stolen, or damaged, the cost for replacement will be the responsibility of the Broker of Record who carries the lease on the lock box.  The cost for replacement will be at current market price plus Pennsylvania sales tax.

**11.2** **LOCK BOX OWNERSHIP –** All lock boxes are the property of West Penn Multi-List, Inc.  The Subscribing Broker office will be supplied with LEASED lock boxes from West Penn Multi-List, Inc. The West Penn Office will determine the number of lock boxes leased to an office based upon their listing inventory of the office—not Agent count.  The Executive Director shall have sole discretion as to the number of lock boxes issued to each Subscriber as well as how many lock boxes can remain in any Subscriber's inventory.  Lock Boxes will be redistributed by the West Penn Office on a regular basis.

**11.3** **NEW SUBSCRIBER POLICY –** When a real estate Broker becomes a Subscriber of the West Penn Multi-List, Inc., the Broker will be required to submit a report of current listings.  The West Penn Office will then issue leased lock boxes.  The ratio of lock boxes to listings is **not** set at 100%.

**11.4    ORDER PROCEDURE –** Before a lock box order request is sent to West Penn, the office is required to run an Inventory of Lock Boxes in the Online System.  If the current inventory carries lock boxes on W status listings, additional lock boxes will not be issued to the office in question.  If the office has an unused supply of lock boxes, no additional lock boxes will be issued.

The Service requires a written request for lock boxes.  This request may be faxed or emailed to the Service.  This request must carry the company name, office ID#, and name of the person placing the lock box order.  Upon receipt of the request, the West Penn Office will analyze the request and, if the Subscriber's inventory warrants additional lock boxes, an order will be prepared.

The West Penn Office will contact the Subscriber office when the order is prepared and ready for distribution.  It will be the responsibility of the office requesting the lock boxes to make arrangements to pick them up at the West Penn Office.

**11.5    SURRENDER POLICY –** If a real estate Broker ceases affiliation with the West Penn Multi-List, Inc. for any reason, ALL lock boxes must be returned to the Service within 14 days unless other arrangements have been made with the approval of the West Penn Office **PRIOR TO** the Subscriber office withdrawing.  Failure to comply will result in the Subscriber office being required to replace the lock boxes at current market value plus tax, shipping, and handling.

If a Subscriber office retires from the Service and transfers its lock boxes to another Subscriber office without the consent of West Penn Multi-List, the company that took possession of the lock boxes must return them to the West Penn Office.  Failure to do so within 14 days of notification will result in the Subscriber office being required to replace the lock boxes at current market value plus tax, shipping, and handling.

**11.6    INOPERABLE, LOST, BROKEN, OR DAMAGED BOXES –** If a lock box becomes inoperable, lost, broken, or damaged, the West Penn Multi-List, Inc. will review the box in question to determine who is responsible for repair costs or replacement costs.  If the cause is by unusual wear and tear, paint, or insertion of foreign matter (key rings, paper, paper clips, rubber bands, etc.), a charge will be levied to the Broker.  NOTHING is to be placed inside the lock box key cup other than the key(s) to the property.  If it is found by the West Penn Multi-List, Inc. that foreign matter has caused a jam, the Listing Broker will bear the cost of repair/replacement at current market value plus tax, shipping, and handling.

Removal of an inoperable lock box will be at the time and expense of the Broker/Subscriber.  If a lock box is unresponsive and must be removed (cut off the property), the Agent will need to secure a reference number.  This number will be supplied by the manufacturer, Supra Products, Inc., and will need to be obtained prior to cutting the box from the property.  Failure to secure a reference number will result in the Broker of Record being charged the current replacement fee for the lock box.

Once an unresponsive lock box is removed from a property, it must be returned to the West Penn Office WITH THE REFERENCE NUMBER and Office ID number.  After processing, a replacement lock box will be sent to the office to which the lock box is assigned if the inventory warrants a replacement box.

**11.7   INVENTORY OF LOCK BOXES –** Each Subscriber office will be responsible to manage their company's supply of leased lock boxes via the Online System.  In situations where a company has multiple offices, the lock boxes will be required to be rotated on an "as-needed" basis within the company infrastructure as requested by WPML.  If lock boxes are rotated, WPML is required notification of rotation.

**A.    LOCK BOX REMOVAL –** The Listing Agent is responsible for lock box removal from the property.  The lock box should be removed **within three (3) calendar days** after closing, withdrawal, or expiration.  Failure to comply with the removal policy will result in a fine of **$5.00 per day** levied to the Listing Agent until the lock box is removed.

**B.    LOCK BOX SHOW INFORMATION –** It is the responsibility of the Listing Agent to change the SHOW field in the Online System to reflect removal of the lock box from the property by changing this field to OTHER within 48 hours after closing, withdrawal, or expiration.  Failure to comply with the change policy will result in a fine of **$5.00 per day** levied to the Listing Agent until the lock box SHOW field is corrected.  If for any reason the Agent is unable to change this field, a Change Listing Report should be faxed or emailed to the West Penn Multi-List, Inc. Office for correction.

**11.8   LOCK BOX LOCATION –** A West Penn Multi-List, Inc. lock box may NOT be placed on a property unless it is listed within the Multi-List Service.  A fine of **$100.00** will be levied to the Broker/Agent violating this rule and regulation.  Lock boxes may only be placed on properties listed within the Service with a valid listing number.

**11.9   NO LOCK BOX PRESENT –** If a property, listed in the West Penn Multi-List, Inc., indicates there is a lock box present in the SHOW area of the

Online System, and if a Broker/Agent attempts to show said property and NO lock box is present and this is reported to the West Penn Multi-List, Inc. (in writing) supplying listing number, property address, date and time of showing, and stating that NO lock box was present, then the Listing Agent will be fined **$100.00**.  If this situation should occur more than once with any Broker/Agent, the Board of Directors of West Penn Multi-List, Inc. may increase the fine to a maximum of **$500.00 per occurrence**.

**11.10 LOCK BOX USAGE –** A lock box may NOT be GIVEN to a SELLER/TENANT to control the showing of a listing.  If it is reported to the West Penn Multi-List, Inc. (in writing) that a SELLER/TENANT has a lock box in their possession and is placing the box out for Agents to use for showing purposes, a fine in the amount of **$100.00** will be levied to the Listing Agent.  If the Agent continues to follow this format, the fine can escalate to **$500.00 for each occurrence**.  If a seller/tenant wishes to control showings, then the show information should be APT/LB.  If an agent violates APT/LB, the fine is **$100.00**.

The shackle code assigned to a lock box may NOT be changed by anyone for any reason except the WPML Office.  If an Agent or Broker changes the shackle code of any lock box on lease to that office, a fine of **$500.00** will be levied to the Agent who made the change.

**11.11 TIMED ACCESS –** ALL lock boxes shipped from the West Penn Multi-List, Inc. are set for TIMED ACCESS and can be changed to 24-hour access by contacting Supra and notifying the Listing Broker.  The lock box must be changed back to TIMED ACCESS when removed from that specific property.

**The following may NOT be altered or a fine of $100.00 will be levied to the agent who made changes to the box:**  the CBS may not be activated; the shackle code may not be changed; the time selections may not be changed to anything other than those permitted in WPML, which are 24-hour access or TIMED ACCESS (preset by WPML).  Each such violation of this rule shall result in a fine to the Agent of **$100.00 per occurrence**, and a separate occurrence shall be recognized for each alteration that is discovered.  Subsequent violations of this rule shall result in the amount of the fine **increasing per occurrence** at the discretion of the WPML Board of Directors.

If the box is changed to 24-hour access, the box MUST be changed back to TIMED ACCESS after removal of the box from the property.  Failure to comply will result in a fine of **$100.00** to the Agent.

**11.12 NO SHOWING –** If a Listing has a statement of NO SHOWING in the Agent Remarks area, this statement is to be adhered to by all parties,

including the Listing Agent and the Listing Company.  If this is violated, a fine of **$1,000.00** will be levied to the individual who has shown the property for the first offense with an escalation of the fine for subsequent violations.  Refer to Rule 4.3 for more details.  A lock box may not be present on a property listed as No Showings.

11.13  **KEYS –** Effective August 1, 2021 Supra Express Keys will become inoperable due to the 5G conversion nationally.

**Each key applicant acknowledges that the MLS data is owned solely by the Broker/Subscriber and that the data is copyrighted.  Applicant must be aware that the data is only to be used with consent of the Broker of Record and is the exclusive property of the Broker of Record.  Applicant is provided access to this data as a sub-Agent and is utilizing the information by permission of the Broker of Record.**

A.    The recognized key for the West Penn Multi-List, Inc. system is now relegated to the use of Smartphones.  The contractual lease agreement that a key applicant signs is binding.

B.    The contractual arrangement between the applicant and vendor is outlined in the paperwork supplied to the applicant.

C.    The vendor and West Penn Multi-List, Inc. have explicit directions relative to the access of properties for which key service is provided.

D.    The access to a lock box may not be given, loaned, leased, or sold to anyone for any reason or circumstance.  This access information is required to remain in the possession of the individual who leases the service through the vendor and West Penn Multi-List, Inc.  If this Rule is violated, it will result in a fine levied to the key applicant as well as loss of key privileges depending on the severity of the circumstances.

E.    After the Key Holder, who is showing the property, has accessed the property, the Key Holder shall remain with the individual(s) during the entire showing time at the property.  This means that the showing agent, appraiser, home inspector, etc. may not permit individuals in the property unaccompanied by the Key Holder.  A violation of this Rule shall result in a fine to the Key Holder who accesses the property in the amount of **$1,000.00** for the first violation.  To deter violations of this Rule, this fine will **increase by**

**$1,000.00 per occurrence**.  The amount of this fine may be increased by the Board of Directors depending on the severity and consequences of this violation.  In addition, the Key Holder may be subject to a suspension of WPML services for 30 days or more as a result of an infraction of this Rule.  In the event of repeat violations of this Rule, the Key Holder may be subject to a suspension of services up to 365 days (or more) and/or expulsion.

11.14 **APPLYING FOR AN eKEY –** The directions for applying for an eKEY are listed online.  Since the format and cost changes from time to time by direction of the vendor, we recommend that all applicants review the online procedure BEFORE making application. It is important to note that the following items are included in the requirements to begin an application.  Visit West Penn's website at www.westpennmls.com.

A.     The applicant MUST have a current Pennsylvania Real Estate License, a Pennsylvania Appraiser Certification, a Pennsylvania Home Inspector Certification, a Pennsylvania Radon Tester Certification or such other State Certification that applies to authorizing users as determined by the Board of Directors.  The applicant shall submit proof of insurance if required and noted on application at the time the key application is submitted.  Proper proof of insurance, if applicable, in accordance with the requirements in the application information, is required for Home Inspectors and Radon Testers before the key application will be processed.  In the case of a real estate Agent, they are required to have their license or hard-copy paperwork from the State's website. An Appraiser is required to have a copy of the Pennsylvania Certification as well as a copy of the Company's Insurance Policy citing the Appraiser's affiliation with said company.  It is also required that they have a letter of authorization from their current Broker/Appraiser/Manager, which includes the Office ID# of the applicant and instructs the West Penn Multi-List, Inc. to issue the bearer an eKEY.

B.     It is important each Key Holder be aware that all key issuances will be handled via email.

C.     If West Penn Multi-List, Inc. receives notification that a Key Holder is no longer affiliated with their current company, West Penn Multi-List, Inc. and the vendor will curtail all service to the key, rendering it useless.  This cancellation also applies to the WPML Online System.  The Key Holder should make certain if they are moving to another company that ample notice is given to West Penn Multi-List, Inc. so that there is no interruption in service.

**D.**    The vendor has the right to curtail service to their customers due to non-payment.

**11.15  ILLEGAL USE OF KEY –** Any Subscriber who engages in the unauthorized use of the West Penn Multi-List, Inc. key or Key Services for purposes other than showing, inspecting, viewing, or the appraisal of properties for sale/lease will be subject to a suspension of services and a fine.  The Board of Directors will determine the length of time a Key Holder will be removed from Service and the amount of the fine.

**A.**    The key may only be used by the Subscriber to whom the key is assigned.  The key may not be given, loaned, leased, rented, or sold to anyone for any reason.  If such a violation occurs, a fine in the amount of **$1,000.00** shall be levied, along with a suspension of Multi-List Service for not less than thirty (30) days, with possible loss of Service of up to 365 days for the first infraction.  Following reinstatement, the amount of the fine and length of time Service shall be suspended for subsequent violations will be determined at the discretion of the West Penn Multi-List, Inc. Board of Directors.

**B.**    West Penn Multi-List, Inc. has the right to deactivate a key if the Key Holder has been involved in activity that could affect the liability of the West Penn Multi-List, Inc.  Each occurrence would be reviewed on a case-by-case basis.

**11.16  RIGHT TO RECEIVE / RETAIN KEY –** The Board of Directors has the sole right to determine who may possess a key.  The Board of Directors retains the right to refuse Key Service to any person if the Board of Directors believes that such issuance would not be in the best interest of either the real estate industry or the buying or selling public.  Therefore, the Board of Directors may terminate Key Service and Multi-List Service for any reason.  Any person aggrieved by a decision of the Board of Directors may request a hearing before the Board of Directors of the West Penn Multi-List, Inc.

**11.17  TERMINATION OF KEY AND SERVICE –** If a Key Holder is delinquent in the payment of any fees to West Penn Multi-List, Inc., or is in default of the performance of any obligation owing West Penn Multi-List, Inc., all Services to the Key Holder will be curtailed until the delinquency or default is corrected.

**11.18  SECURING OF LOCK BOX –** Any Subscriber or Key Holder who accesses a listing is required to replace the key in the lock box prior to departing the property. The key must be returned to the lock box and the lock box secured by the Subscriber or Key Holder, whether an Agent, Appraiser, or any other type of Subscriber.  No Subscriber or Key Holder

shall leave the lock box unsecured.  Any violation of this rule shall be reported to the West Penn Multi-List, Inc. Office, and a fine in the amount of **$1,000.00** shall be levied against the responsible Subscriber.  In the event of a repeat violation of this rule, any Subscriber who had a prior violation of this particular rule shall be subject to a fine which **increases by $1,000.00 for each subsequent violation**. Repeat violations to this rule may result in additional penalties including a suspension of services in addition to the tiered fine structure.

### SECTION 12.  COMMUNICATIONS – SERVICE-SPONSORED COMPUTER

**12.1    PRIMARY SYSTEM –** The primary communication system of the Service will be an online Internet-based system.  All Subscribers are urged to participate in the computer system for more effective communication.

**12.2    USAGE –** The use of the Online System will be available to all active Subscribers of the Service.

The Online System will be accessible to each Subscriber that has Internet access.

Neither the West Penn Multi-List, Inc. nor Subscribers to the Service will furnish information to non-Subscribers of the Online System.  Any Subscriber that sells, loans, leases, etc. any of the confidential data to a non-authorized entity, company, or individual will be fined **$25,000.00** and expelled from the West Penn Multi-List, Inc.

In addition to a fine of **up to $25,000.00** for the sale, loan, lease, etc. of the confidential data to non-authorized entities or individuals, Subscribers who violate the rules in this nature also may be subject to expulsion. In addition to the sale, loan, or lease of the confidential data, a Subscriber is also subject to a fine if they provide their login information to a non-subscriber.  The use of the West Penn Multi-List, Inc. system is limited to Subscribers, and Subscribers are responsible to protect and not disclose the information contained therein. Any Subscriber who is found to have provided login information to non-subscribers shall be subject to a fine of **$5,000.00**, and this fine may be increased for each subsequent violation. Depending on the nature of the offense, the Subscriber shall also be subject to a suspension of services or expulsion.

**12.3    CONFIDENTIALITY OF INFORMATION –** The information available from the Service-sponsored Online System shall be for the exclusive use of the Subscribers of West Penn Multi-List, Inc. in the day-to-day operations of said Subscriber's real estate Brokerage/Appraisal Business/Affiliate Service.  The information shall not be utilized for any other purpose.

**12.4    SERVICE UNDERTAKING –** The Service shall not in any way be liable for equipment failure or malfunction or non-operation for any reason or for inaccurate information.  In the event of inaccurate information, the Service's only obligation is to correct said information within a reasonable time after said inaccuracies are called to the attention of the West Penn Office.

**12.5    DUTY TO VERIFY INFORMATION –** Information from the Online System should be verified with the Listing Broker or the owner before making legally binding representations or including such information in legal documents.

**12.6    ABUSE OF ONLINE SYSTEM –** A fine of **$500.00 per day** will be levied to any Office or Agent that abuses the West Penn Multi-List Online System database.

**12.7    ILLEGAL USE OF COMPUTER SYSTEM –** The Online System and all of its equipment, hardware, software, and component parts are solely owned by West Penn Multi-List, Inc.  No person may break into, illegally access, or make use of any part of the Online System without specific written authorization from WPML.  If any person intentionally and without authorization accesses, alters, interferes with the operation of, damages, or destroys any computer, computer system, computer network, computer software, computer program, or computer database, they shall be charged with a civil offense and shall be prosecuted to the full extent of the law.

**12.8    USE OF LISTINGS –** By placing a listing with the Service, the Subscriber authorizes the Service to publish, distribute, disseminate, reproduce, and transmit any part or all of said listing.  The use of a listing shall include, by way of illustration, the right to place it on the Internet, and any other computer-generated means of communication.

If any Subscriber wishes to limit or prohibit the use of a listing, they must notify the Service, in writing, as to the extent and nature of such limitation or prohibition.

Listings should not carry any information that could affect the personal liability of the listing.

**12.9    STATUS POSITIONS –** The following will give a detailed explanation on status positions and how long they will remain in the queue:

**A -    ACTIVE STATUS:**  Remains in the Online System for a period of up to 365 days from list date as determined by Pennsylvania law. A 365-day listing may not be extended; it must be relisted.

**C -**    **CONTINGENCY STATUS:**  Will remain in the Online System for 365 days from the date of the status change.  AFTER 365 days, the listing will be changed to Expired (X) and remain in the system indefinitely as X.  Reinstatement of this listing as Active (A) will require newly signed documents if 365 days have elapsed.

**U -**    **UNDER AGREEMENT/CONTRACT STATUS:**  A listing will remain under contract for 365 days from date of sales agreement.  After 365 days, it will revert to Expired (X).

**S -**    **SOLD STATUS:**  Listings will stay in the Sold file for an undetermined period of time.

**W -**    **WITHDRAWN STATUS:**  This status will retain a listing for a period of 365 days from the date of the listing contract.  After 365 days, the listing then moves into the Expired status (X) and will remain there indefinitely.

**X -**    **EXPIRED STATUS:**  Listings will remain in the system for an undetermined period of time.

**H -**    **HOLD STATUS:**  This status is utilized by the West Penn Multi-List Office for listings that do not fit the criteria for processing within the West Penn Multi-List, Inc.  A listing can remain in this status for 30 days from the date changed to HOLD and then will be deleted from the Online System.

**12.10  LINK TO WEST PENN MULTI-LIST, INC. –** The compilation of the West Penn Multi-List, Inc. listing data is proprietary information, which is subject to copyright protection.  Subscribers of the West Penn Multi-List, Inc. will not cause the compilation of the listing data to be directly accessible to the public nor will Subscribers create a link to the West Penn Multi-List, Inc. site on their own website or through any other means. Violations of this rule shall be subject to a fine of **$200.00 per day**, per listing if such violation is found to occur and may result in possible expulsion from the West Penn Multi-List, Inc.

## SECTION 13.   INTERNET DATA EXCHANGE (IDX)

## 13.1    INTERNET DATA EXCHANGE (IDX) RULES AND REGULATIONS

**A.**    **IDX DEFINED –** IDX affords MLS Subscribers the option of authorizing display of their Active listings on other Subscribers' Internet websites.

B. **AUTHORIZATION –** Participation in IDX is available to all MLS Subscribers engaged in real estate brokerage who consent to display of their listings by other Subscribers. This requirement can be met by maintaining an office or Internet presence from which Subscribers are available to represent real estate sellers or buyers (or both). Participation is contingent on having a signed IDX Agreement on file at the WPML Office. The IDX Agreement shall designate and identify the URL (website address(es)) where the IDX data will be displayed. A change in the URL shall be updated in writing.

Subscribers' consent for display of their Active listings by other Subscribers pursuant to these Rules and Regulations must be established in writing. If a Subscriber withholds consent to permit the display of that Subscriber's listings, that Subscriber may not download or frame the compiled MLS data of other Subscribers.

C. **DISPLAY –** Display of listing information pursuant to IDX is subject to the following rules:

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited.

MLS shall determine which listings or the types of listings that can be displayed on websites. Examples include property type (condos, single-family detached, multi-family, etc.), price, or location (downtown).

Subscribers shall not modify or manipulate information relating to other Subscribers listings. (This is not a limitation on site design but refers to changes to actual listing data.) Subscribers shall not manipulate the listing data or images of other Subscribers and are prohibited from making additions, deletions, or overlays to the data/listing information of other Subscribers.

All listings displayed pursuant to IDX shall identify the listing firm (i.e., "Courtesy of (Listing Broker Name)").

**ALL LISTINGS DISPLAYED PURSUANT TO IDX SHALL CONTAIN THE FOLLOWING DISCLAIMER: "INFORMATION DEEMED RELIABLE, BUT NOT GUARANTEED."** The above disclaimer will be passed <u>as a field for</u> every listing.

**ALL LISTINGS DISPLAYED PURSUANT TO IDX SHALL CONTAIN THE APPROVED IDX MARK OF WEST PENN MULTI-**

**LIST, INC.** This Mark will be provided to your Webmaster electronically by WPML.

Non-principal Brokers and Sales Licensees affiliated with IDX Subscribers may display information available through IDX on their own websites with approval from their Broker of Record. Permission to display the IDX data is established and subject to the procedures set forth herein and/or the WPML Rules and Regulations, as may be amended. The Subscribing Broker who provides the Agent with permission to display IDX data on websites/webpages owned by the Agent must designate the URL address for those Agent webpages/websites on the IDX Agreement that is on file at the WPML Office.

Effective October 1, 2013, all Subscribers are required to refresh all downloads and refresh all data at least once every 48 hours. If this format is not followed and a complaint with substantiating evidence is filed, the infraction will be brought before the Board of Directors of the West Penn Multi-List, Inc. to determine a fine.

Subscribers shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing.

The data consumers can retrieve or download in response to any inquiry shall be limited to 300 listings per search.

The right to display other Subscribers' listings pursuant to IDX shall be limited to a Subscriber's office(s) holding participatory rights in West Penn Multi-List, Inc.

Listings obtained through IDX must be displayed separately from listings obtained from other sources, including information provided by other multi-lists.

No portion of the IDX database shall be used or provided to a third party for any purpose other than those expressly provided for in these Rules.

**D.**    **STATUS –** Only the following statuses may be transferred through IDX: A=Active, C=Contingency, U=Under Agreement, S=Sold. Listings that carry W=Withdrawn and X=Expired listings may NOT be transferred through IDX.

**E.    PROPERTY INFORMATION –** The following listing information WILL NOT be permitted to appear on any IDX listing:

| | |
|---|---|
| AGENT REMARKS | OFFICE PHONE NUMBER(S) |
| SHOW INFORMATION | OFFICE ID # |
| OWNER NAME | ICD |
| CONTACT NAME | BAC |
| AGENT NAME | SAC |
| AGENT EMAIL ADDRESS | TLC |
| LIST OFFICE | SELLER CONCESSIONS |
| TOUR DATE | SELLER CONCESSION AMT. |
| AGENT PHONE NUMBER(S) | |

**F.    IDX VIOLATIONS / FINES – AS THE IDX DATA INCLUDES PROPRIETARY INFORMATION, VIOLATIONS OF THE IDX RULES SHALL RESULT IN A MONETARY FINE AND POSSIBLE CESSATION OF SERVICES.**

If the Agent provides the data feed which results in the infraction, the Agent will be subject to a fine of **$2,000.00** for the first offense. The second violation will result in a fine of **$5,000.00,** and third or subsequent violations will result in a fine in an amount to be determined by the West Penn Multi-List, Inc. Board of Directors and the Agent being expelled from the WPML for a defined period of time.  In the case of a violation resulting from the Agent providing the data feed, the Agent shall correct the violation within forty-eight (48) hours or be subject to an immediate cessation of services.

If the Broker provides the data feed which results in a violation of the IDX Rules, the Broker shall be fined **$7,500.00** for the first offense.  This fine shall be payable in the event that the violation occurred either with the Broker's site or a corporate site.  In addition, the Broker must correct the violation within a period of forty-eight (48) hours or suffer further sanctions, including the interruption of services.  A second infraction shall result in a **$15,000.00** fine to the Subscribing Broker, along with the forty-eight (48) hour limitation to correct the violation.  Third and subsequent offenses shall result in a fine to be determined by the Board of Directors of the West Penn Multi-List, Inc.  Third and subsequent violations also shall be subject to the forty-eight (48) hour time period to correct the violation.

Notwithstanding anything contained in these IDX Rules and Regulations, all of the other WPML Rules and Regulations remain in effect, including but not limited to the Rules that apply to the display of information/data on social media sites.

## 13.2.  INTERNET DATA EXCHANGE (IDX) LICENSING AGREEMENT

### INTERNET DATA EXCHANGE (IDX) LICENSING AGREEMENT

This Agreement, known as the Internet Data Exchange ("IDX") Licensing Agreement (the "Agreement") by and between West Penn Multi-List, Inc., a Pennsylvania corporation, having its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237 ("WPML") and _____, a WPML Broker/Subscriber, having a principal place of business at _____ ("Broker/Subscriber"). Effective date _____.

### BACKGROUND/RECITALS

(A)    WPML and participating Broker/Subscriber to the IDX Program ("The Program") expressly agree to the following material conditions to participate in the IDX Program:

(i)    IDX participating Broker/Subscriber shall be a Subscriber in good standing as defined by the WPML Rules and Regulations existing at the time; and

(ii)    Each IDX participating Broker/Subscriber must currently be a party to a signed IDX Agreement to be eligible to participate; and

(iii)    The WPML Board of Directors may establish and IDX participating Broker/Subscribers agree to abide by Rules and Regulations to participate in the program.  These Rules and Regulations may be amended at the discretion of the WPML Board of Directors.

(B)    Brokers/Subscribers participating in the IDX program wish to obtain and the WPML agrees to provide data to participant's website, including the listing data of other Brokers/Subscribers participating in the WPML IDX Program. The IDX Program has been developed to provide a process under which participating Brokers/Subscribers give permission to each other to display their listings on each other's websites.

(C)    Individual listings and listing data are recognized as owned by the Listing Broker/Subscriber.  WPML retains a copyright in the compilation of listing data.

(D)    Participating Broker/Subscriber desires to obtain and WPML grants a non-exclusive license to use the IDX service mark ("the Mark"), copyrighted documentation, and know-how relating to the Program (the "Material") for Broker/Subscriber's participation in the IDX Program.

(E)    Participating Broker/Subscriber may wish to engage individuals other than employees of the Broker/Subscriber ("Website Vendors") to perform data downloading, manipulation, formatting, and/or programming, and web design.  However, if non-employee Website Vendors are retained, the authorized representative of the Website Vendor is required to execute this Agreement on behalf of the Website Vendor before the Agreement becomes binding.

<u>TERMS AND CONDITIONS</u>

The above-referenced recitals are material provisions of this Agreement.

In consideration of the above recitals and the promises set forth in this Agreement, the parties agree as follows:

(1)    **Grant of License**.  WPML grants to Broker/Subscriber a non-exclusive, non-transferable, royalty-free license to use the Mark and Material to establish the Program for the Broker/Subscriber's participation in the IDX Program.  Broker/Subscriber may not transfer, assign, or sublicense the license, without prior written consent of WPML.  WPML may in the future establish fees for the license at the discretion of the WPML Board.

(2)    **Quality Control**.  Broker/Subscriber may only use the Program Mark while participating in the IDX Program.  The Mark must be used in the form provided by WPML and only in connection with the Program and no other goods or services.  Upon request by WPML, Broker/Subscriber will provide WPML with samples of materials using the Mark to verify proper use of the Mark.  Broker/Subscriber will comply with all applicable laws and regulations when using the Mark.

(3)    **Ownership**.  WPML retains all ownership rights, including rights defined by trademark and copyright laws, in the Mark, Material, and the Program.  Brokers/Subscriber and/or Listing Broker retains all ownership rights in their individual listings used in the program.

(4)    **Infringement**.  Broker/Subscriber will promptly notify WPML if Broker/Subscriber becomes aware of a third party infringing WPML's proprietary rights in the Mark, Material, and Program.  WPML may, in its sole discretion, bring suit against any alleged infringer. Broker/Subscriber retains all rights to bring suit or join in any suit and recovery arising from the misuse of their listings.

(5)    **Term and Termination**.  The parties may terminate the license at any time by mutual written agreement.  WPML may terminate the License in the event of a breach of this Agreement by Broker/Subscriber that is not corrected within 30 days of receiving written notice of the breach.  Upon termination,

Broker/Subscriber will immediately cease all use of the Mark and return to WPML all Material related to the Program.

(6)    **Indemnity**.  Broker/Subscriber and/or Website Vendor will indemnify and defend WPML against all losses, damages, and expenses, including attorneys' fees, incurred as a result of or related to Broker/Subscriber's and/or Website Vendor's use of the license.

(7)    **Miscellaneous**.

(7.1)    **Notice**.  Any notice required or permitted to be given under this Agreement is sufficient if mailed by registered mail, postage prepaid, addressed to the party at the above addresses, or at such other address as may be furnished in writing to the notifying party.

(7.2)    **Governing Law and Venue**.  This Agreement is governed by and construed in all respects in accordance with the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles.  The parties agree and submit to personal jurisdiction in Allegheny County, Pennsylvania, for purposes of any action or proceeding brought to enforce or construe the terms of this Agreement.

(7.3)    **Headings**.  The section headings in this Agreement are for convenient reference and are not a part of this Agreement.

(7.4)    **Waiver**.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing.

(7.5)    **Amendments**.  This Agreement can be modified or amended only by written agreement signed by the parties, including Website Vendor, if any.

(7.6)    **Severability**.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the Term, the provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision has never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

(7.7)  **Counterparts**.  This Agreement may be executed manually, electronically, or via fax and in one or more counterparts.

(7.8)  **Construction**.  If an ambiguity or question of intent arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring either party by virtue of authorship of any of the provisions of this Agreement.

(7.9)  **Relationship of the Parties**.  Broker/Subscriber and WPML are each independent organizations.  Neither party nor their respective employees and representatives can or shall make any agreement, warranties, representations, promises, or covenants on behalf of or for the other party or any third party, unless approved in advance in writing by the other party.  This Agreement shall not be construed as a partnership or franchise for any purpose or reason, whether implied, expressed or statutory, nor is this Agreement to be construed as creating an agency relationship.

(7.10) **Complete Agreement**.  This Agreement contains the complete agreement between the parties concerning the subject matter and supersedes all prior understandings, letters of intent, proposals, or agreements, and all prior communications between the parties related to the IDX Agreement.  No representation, warranty, promise, inducement, or statement of intention has been made by either party which is not embodied in this Agreement. However, WPML retains the right to implement, and Broker/Subscriber and Website Vendor agree to abide by rules to carry out, the IDX Program at the discretion of the WPML Board. Violations of these rules may be subject to fines/penalties at the discretion of the WPML Board.

(8)    **Confidential Information**.

(8.1)  **Definition**.  "Confidential Information" is information or material proprietary to WPML or designated "confidential" by WPML and not generally known to the public that Broker/Subscriber and/or Website Vendor may obtain knowledge of or access to as a result of access under this Agreement.

Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether in oral, visual, audio, written, or other form):

        a.      all WPML data;

b. all documentation and other tangible or intangible discoveries, ideas, concepts, designs, drawings, specifications, models, information;

c. software, source code, object code, diagrams, flow charts;

d. techniques, procedures; and

e. IP addresses, access codes, and passwords.

(8.2) **Exceptions**. The Confidential Information does not include information that:

a. is in the public domain at the time of disclosure;

b. is known to Broker/Subscriber at the time of disclosure;

c. is used or disclosed by Broker/Subscriber with the prior written consent of WPML;

d. becomes known to Broker/Subscriber from a source other than WPML without breach of this Agreement by Broker/Subscriber and provided that such source is not known by Broker/Subscriber to be bound by a confidentiality agreement with WPML; or

e. is required to be disclosed by judicial order or other compulsion of law, provided that the Broker/Subscriber provides to WPML prompt notice of any such order.

(8.3) **Third-Party Information**. Confidential Information also includes any information that WPML obtains from any third party that WPML treats as proprietary or designates as Confidential Information, whether or not owned or developed by WPML.

(9) **Restrictions on Use**.

(9.1) **Scope of Use**. Broker/Subscriber and/or Website Vendor will use or access the Confidential Information only as required to perform the services, and Broker/Subscriber and/or Website Vendor will not use its access or the Confidential Information for any other purpose. Broker/Subscriber and/or Website Vendor will employ measures to protect the Confidential Information from disclosures at least as rigorous as those it uses to protect its own trade secrets, but in no event less than reasonable care.

(9.2) **Unauthorized Uses**. Broker/Subscriber and/or Website Vendor will not make copies of the Confidential Information. Broker/Subscriber and/or Website Vendor will not directly or indirectly disclose, display, provide, transfer, or otherwise make available the Confidential Information to any person or entity,

unless Broker/Subscriber and/or Website Vendor has received prior written consent from WPML to do so.  At no time and under no circumstances will Broker/Subscriber and/or Website Vendor reverse engineer, decompile, or disassemble any software constituting part of the Confidential Information. Broker/Subscriber and/or Website Vendor will not incorporate the Confidential Information into any other work or product.

(9.3)   **No Third-Party Access**. Only Broker/Subscriber and/or Website Vendor's own employees will access the Confidential Information. Broker/Subscriber and/or Website Vendor will not provide access to the Confidential Information to third parties, including consultants or independent contractors, without prior written consent from WPML.  If WPML grants consent, Broker/Subscriber and/or Website Vendor will execute an agreement with the third party that imposes at least as strict a confidentiality obligation on the third party as that imposed by this Agreement on the Broker/Subscriber and/or Website Vendor.

(9.4)   **Location Restriction**.  Broker/Subscriber and/or Website Vendor will not remove the Confidential Information from its principal place of business without WMPL's prior written consent. In the event WPML grants consent, Broker/Subscriber and/or Website Vendor is not relieved of any of its obligations under this Agreement.

(10)   **Termination and Return of Materials**.  Within five (5) days of receipt of notice of termination by WPML, Broker/Subscriber and/or Website Vendor will return to WPML all Confidential Information and all other materials provided by WPML to the Broker/Subscriber and/or Website Vendor. Broker/Subscriber and/or Website Vendor will also erase, delete, or destroy any Confidential Information stored on magnetic media or other computer storage, including system backups.  Upon the request of WPML, an Officer of the Broker/Subscriber and/or Website Vendor will certify in writing that all materials have been returned to WPML and all magnetic or computer data have been destroyed.

(11)   **Remedies**.  Because of the unique nature of the Confidential Information, Broker/Subscriber and/or Website Vendor acknowledges that WPML would suffer irreparable harm in the event that Broker/Subscriber and/or Website Vendor breaches its obligation under this Agreement, and that monetary damages would be inadequate to compensate WPML for a breach.  WPML is entitled, in addition to all other forms of relief, to injunctive relief as may be necessary to restrain any continuing or further breach by Broker/Subscriber and/or Website Vendor, without showing or proving any actual damages sustained by WPML.

(12)   **URL (Web Address)**. Subscriber shall designate below the URL where the IDX data will be displayed and further designate for each such URL whether the URL (web address) is owned by the Subscribing Broker or an Agent. The URL information is to be updated by providing written notice to the WPML Office promptly upon any change in the web address.

The parties have executed this Agreement as of the date first written above.

**WEST PENN MULTI-LIST, INC.**          **BROKER/SUBSCRIBER**

By: _____          _____

      Its Authorized Representative

                                               By: _____

                                               Its: _____

**WEBSITE VENDOR**

_____

By:_____

Its:_____

Phone #: _____

Email Address: _____

**COMPANY NAME:** _____
**(Please Print)**

**WEST PENN MULTI-LIST OFFICE I.D. #**_____

**URL for IDX Display:** _____ **Circle One:  Agent/Broker**

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10



**The following are the Rules and Regulations of Arizona Regional Multiple Listing Service, Inc. These Rules and Regulations apply to all brands of ARMLS, including both ARMLS and the Southeast Area Multiple Listing Service ("SAMLS").**

1. **DEFINITIONS**. The following terms shall have the respective meanings indicated as used in these Rules:

    1.1. "Access Credentials" means the information issued by ARMLS (such as a user identification number), created by the Subscriber (such as a password), or provided by other means that collectively and severally are required for the Subscriber to be identified by the ARMLS system as a Subscriber in good standing and to gain access to use the MLS.

    1.2. "Affiliate/Affiliates" are defined as a person, persons, or a firm who has been granted limited access to MLS data through the MLS system and/or permitted to lease a lockbox key by virtue of membership in a Shareholder or Client Board that permits such access according to its rules and policies.

    1.3. "Appraiser" means a person holding a valid license or certificate issued by an appropriate Arizona regulatory agency permitting such person to engage in the appraisal of real property.

    1.4. "ARMLS" means, for the purposes of these Rules, the Arizona Regional Multiple Listing Service, Inc. and its brand, the Southeast Arizona Multiple Listing Service.

    1.5. "ARMLS Compilation" means the collection of information relating to real property and other subjects that is compiled by ARMLS for dissemination to Subscribers, whether compiled or disseminated in electronic or printed form or in any other form or format.

    1.6. "ARMLS Governing Documents" means all of the governing documents of ARMLS in place and as modified from time to time, including, without limitation, the Articles of Incorporation, the Bylaws, and the Shareholders Agreement of the ARMLS Shareholders.

    1.7. "ARMLS Roster Database" means any collection of contact information (e.g., e-mail addresses, physical addresses, etc.) for Participants, Subscribers and/or any other parties maintained by ARMLS in the MLS system or otherwise in its records).

    1.8. "Association" means the REALTOR® Associations that are shareholders of ARMLS, as the context requires (collectively the "Associations").

    1.9. "BOD" means the ARMLS Board of Directors.

1.10.   "Coming Soon Status" means an MLS status available for use with premises in all property types, prior to the premises being officially listed on the MLS for sale or lease. See Section 8.25 for rules associated with this status.

1.11.   "Cooperating Participant" means a Participant who acts in cooperation with a Listing Participant to find or obtain a buyer or lessee for a listed property.

1.12.   "Cooperating Subscriber" means a Subscriber affiliated with a Cooperating Participant and principally responsible for rendering service to a buyer, either as customer or client, interested in purchasing a property listed by a Listing Participant.

1.13.   "Day" means one calendar day regardless of whether such day falls on a weekend or holiday. A Day shall begin at 12:00:00 AM (Midnight) on the day immediately following the event or situation that invoked the defined term and shall end at 11:59:59 PM that same day.

1.14.    "DOH" means the Arizona Department of Housing.

1.15.   "Exclusive Agency Listing" means a contractual agreement under which the Listing Participant acts as the agent of seller(s), and the seller(s) agrees to pay a commission to the Listing Participant if the property is sold through the efforts of any real estate broker.  If the property is sold solely through the efforts of the seller(s), the seller(s) is not obligated to pay a commission to the Listing Participant.

1.16.   "Exclusive Right to Sell Listing" means a contractual agreement under which the Listing Participant acts as the agent of the seller(s), and the seller(s) agrees to pay a commission to the Listing Participant regardless of whether the property is sold through the efforts of the Listing Participant, the seller(s), or anyone else, except that the seller(s) may name one or more individuals or entities as exemptions in the Listing agreement and if the property is sold to any exempted individual or entity, the seller(s) is not obligated to pay a commission to the Listing Participant.

1.17.   "First Right of Refusal" means that a tenant or buyer has an executed option to purchase the property on the same terms as an offer from a bona fide third party.

1.18.   "FWA" (literally, "filed with ARMLS") means the filing with or submission of information to ARMLS by a Subscriber, or the Subscriber's authorized representative, for inclusion in the ARMLS Compilation. FWA may take on the tense required by usage, and may mean "file," "filed," or "filing" depending on context.

1.19.   "IDX" means Internet Data Exchange, which is a program through which Participants grant each other permission to display their Listings on certain limited electronic displays operated by the Participants.

1.20.   "Keyholder Agreement" means the contract executed between the Subscriber or Affiliate, the electronic lockbox service provider, and ARMLS governing the use of and access to the electronic lockbox service.

1.21.  "Listed Property" means the real estate that is the subject of a Listing.

1.22.  "Listing" means the electronic data record of a property for sale or in the Coming Soon Status. For a Listing to be accepted by ARMLS for filing on the MLS, the Listing requires two parts: (i) the Exclusive Right to Sell Listing or Exclusive Agency Listing that creates the contractual relationship between seller and broker, and (ii) the appropriate Profile Sheet that defines the property. The electronic version of the Profile Sheet located within the MLS is automatically populated upon entry of a Listing. ARMLS does not require that Profile Sheets be signed, but each Listing Participant may have their own requirements of their associated Listing Subscribers. ARMLS or the Association may request a copy of any documents.

1.23.  "Listing Participant" means a Participant having a Listing agreement with the owner of property appropriate for listing in the MLS.

1.24.  "Listing Subscriber" means a Subscriber affiliated with a Listing Participant and principally responsible for rendering service on a Listed Property.

1.25.  "Lockbox" means either an ARMLS approved Lockbox and associated electronic keys provided by the electronic lockbox service provider covered by the Keyholder Agreement, or any other Lockbox used by a Subscriber to allow access to a Listed Property by providing a key from a secured container using a code or combination provided by the Subscriber.

1.26.  Manufactured/Mobile Housing Definitions

   (a)  "Installed" means having gone through the installation process as determined by the DOH.

   (b)  "Manufactured Home" means a structure built in accordance with the National Manufactured Home Construction and Safety Standards Act of 1974 and Title VI of The Housing and Community Development Act of 1974 (P.L. 93-383, as amended by P.L. 95-128, 95-557, 96-153 and 96-339).

   (c)  "Manufactured Housing Dealer" means a company licensed by the DOH, depending on the license classification, to purchase and sell Manufactured homes and Mobile homes.

   (d)  "Mobile Home" means a structure built prior to June 15, 1976, on a permanent chassis, capable of being transported in one or more sections and designed to be used with or without a permanent foundation as a dwelling when connected to on-site utilities except recreational vehicles and factory-built buildings.

   (e)  "Mobile Home Park" means and is defined at A.R.S. § 33-1409 as a parcel of land with four or more rental spaces for these kinds of homes.

   (f)  "Park Model," or park trailer, means a structure built on a single chassis, mounted on wheels or originally mounted on wheels and from which the wheels have been removed and designed to be connected

to utilities necessary for operation of installed fixtures and appliances and has a gross trailer area of not less than three hundred twenty (320) square feet and not more than four hundred (400) square feet when it is set up, except that it does not include fifth wheel trailers. A park model is defined by A.R.S. § 33-2102 as a recreational vehicle and governed by the Arizona Recreational Vehicle Long-term Rental Space Act.

(g)    "Used" means a Manufactured or Mobile Home that has been sold, bargained, exchanged or given away from a purchaser who first acquired the unit that was titled in the name of such purchaser.

1.27.    "Media" are any non-textual information that is part of or an addendum to a Listing, including but not limited to photographs, floor plans, electronic files of any format, rendering, and virtual tours.

1.28.    "MLS" means the multiple listing service(s) that is provided by ARMLS.

1.29.    "NAR" means NATIONAL ASSOCIATION OF REALTORS®.

1.30.    "Net Listing" means a Listing in which the commission paid is the excess of the sale price over an agreed-upon (net) price to the seller.

1.31.    "Nonmember" means a person who holds a valid Arizona real estate broker's or salesperson's license or is licensed or certified by an appropriate Arizona regulatory agency to engage in the appraisal of real property, but who is not a member of any Association.

1.32.    "Office Exclusive Listing" means a Listing of any type where the owner chooses to defer filing a Listing with ARMLS, either for a specified delay period or for the term of the entire Listing. For clarity, an Office Exclusive Listing may or may not be entered into the Coming Soon Status depending on the preference of the owner of the Premises. Note: Office Exclusive Listings must adhere with section 8.0, Clear Cooperation.

1.33.    "Open Listing" means a contractual agreement under which the Listing Participant acts as the agent of the seller(s), and the seller(s) agrees to pay a commission to the Listing Participant only if the property is sold through the efforts of the Listing Participant.

1.34.    "Participant" Any REALTOR® of an association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these rules, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto. However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized

under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. The REALTOR® principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant shall have all rights, benefits, and privileges of the service, and shall accept all obligations to the service for the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliated with the participant who utilize the service.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law.

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. Note: This paragraph and the preceding paragraph apply to both REALTOR® Participants and Non-member Participants to the MLS as described in the paragraph below.

Participation in the service is also available to nonmember principals who meet the qualifications established in the association's bylaws and MLS rules and regulations. However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service participation or membership unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. The nonmember principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant shall have only those rights, benefits, and privileges as specified by the service, and shall accept all obligations to the service for the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliated with the participant who utilize the service.

1.35. "Penalty Policy" means the ARMLS Penalty Policy, as modified from time to time, along with any other penalties, fines, suspensions, revocations and other measures adopted by ARMLS from time to time in accordance with the ARMLS Governing Documents.

1.36. "Policy" is any interpretation, procedure, or clarification of these Rules and Regulations, approved by the Board of Directors and published by ARMLS, that clarifies, facilitates, or expedites the application of the Rules.

1.37. "Premises" means the physical location of a property or land that is the subject of a Listing.

1.38. "Profile Sheet" means one of the ARMLS approved data collection forms used to profile a property to be inserted into the ARMLS Compilation.

1.39. "REALTOR®" means a real estate professional who is a member of NAR (collectively, "REALTORS®").

1.40. "Rules" means these Rules and Regulations.

1.41. "Shareholder" shall mean the Association having an ownership interest in ARMLS.

1.42. "Short Sale" means a transaction where title transfers, where the sales price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies.

1.43. "Subscriber" means (a) a person who is, or who is affiliated with, a Participant, or (b) an Appraiser, to whom ARMLS has granted (subject to ARMLS Policies, these Rules, and payment of required fees) an identification code and password that permit access to the MLS and the ARMLS Compilation (collectively the "Subscribers").

1.44. "Teams" means a single group of two or more Subscribers, under the sponsorship of one Participant that functions as a single business enterprise for the purpose of transacting real estate business.

1.45. "USPS" means the United States Postal Service.

2. **NAME AND SHAREHOLDERS**. The name of this organization is Arizona Regional Multiple Listing Service, Inc.  ("ARMLS"). All shares of ARMLS common stock are owned equally as defined in the ARMLS Shareholder Agreement (individually a "Shareholder" or collectively the "Shareholders").

3. **AUTHORITY**. ARMLS, an Arizona corporation, maintains for the use of the Associations and the Subscribers the MLS, which is subject to the ARMLS Governing Documents and these Rules.

4. **POWERS**. The business of ARMLS is managed by the BOD, which exercises all such powers of ARMLS and performs such lawful acts as are not done by statute or by the Governing Documents directed or required to be performed by the Shareholders or otherwise.

5. **PURPOSE**. The purpose of ARMLS is to provide the MLS for use by Subscribers and the Associations.  The MLS is:

   (a)  A facility for the orderly correlation and dissemination of Listing information so Subscribers may better serve their clients and the public;

   (b)  A means by which Participants make blanket unilateral offers of compensation to other Participants (acting as subagents, buyer agents, or in other agency or non-agency capacities defined by law);

   (c)  A means of enhancing cooperation among the Subscribers;

   (d)  A means by which information is accumulated and disseminated to enable Subscribers to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; and

   (e)  A means by which Subscribers engaging in real estate appraisals contribute to common databases.

6. **SERVICE AREA**. The ARMLS service area shall, at a minimum, include the combined jurisdiction of all Associations.  The service area may encompass natural market areas outside the jurisdiction of the Associations as may be defined by the BOD.

7. **PARTICIPATION**

   Participation is defined under Section 1.34 herein.

7.1. **APPLICATION**. Application for MLS participation shall be made in such manner and form as prescribed by the Board of Directors of each Association. Access to the ARMLS system is available only through one of the Shareholder of ARMLS.  No direct Participant or Subscriber access is allowed. The application forms may vary from Shareholder, but all applications shall contain a signed statement agreeing to abide by the ARMLS regulatory documents and any other applicable rules and regulations of ARMLS as from time to time amended or adopted.

7.2. **ACCESS CREDENTIALS**. Subscribers shall be given access credentials in the form of an identification word or number, a password, and any other form of individual secure identification that ARMLS may implement to preserve security of the system.  Subscribers may not share their access credentials with anyone, whether the other party is another Subscriber or non-Subscriber. Further Subscribers may not share access to the system by allowing anyone else to participate in an online access session using their access credentials, whether or not the actual credentials were disclosed or shared.  Further, except as provided for in Section 20, in the course of their normal real estate practices, Subscribers may not use or convey all or any portion of the ARMLS Compilation from the system in any way to any non-Subscriber, non-Participant, or any ancillary business (whether or not affiliated with a Participant).

7.3. **FULL PARTICIPATION**. All real estate and/or appraiser licensees in a Participant's firm must be enrolled as Subscribers to ARMLS unless application for a waiver is made and the waiver subsequently granted.  Within Twenty-One (21) Days of their affiliation with an ARMLS Participant's firm, all licensees affiliated with the Participant must apply for either (1) subscription to the ARMLS service or (2) waiver of requirement to participate and subscribe. ARMLS shall notify Participant when ARMLS becomes aware of licensees in Participant's firm that have not complied with these requirements.

  7.3.1.  To be granted a waiver, the applicant (hereinafter, "Waiver Applicant") must satisfy and continue to satisfy all of the following requirements:

   (a)  Waiver Applicant is NOT a Listing agent for any active Listing included in the MLS;

   (b)  Waiver Applicant does NOT possess, control, or use a lockbox key to enter, view, or show any property that is listed in the MLS;

   (c)  Waiver Applicant does NOT directly or indirectly access or use in any manner whatsoever the Listing information stored in the MLS. Such access and use includes, but is not limited to, direct access to or use of the MLS and the use of the other devices or services provided by the MLS or its affiliated or licensed vendors or suppliers, that permit access to and use of any Listing information from the MLS; and

(d) Waiver Applicant does NOT use, directly or indirectly, in any manner whatsoever information from the MLS to list properties for sale or lease, to identify or locate properties for any potential buyers or lessees, and does not participate in listing or sales activity requiring licensure for any properties listed in the MLS.

7.3.2.    The Participant who employs the Waiver Applicant, or with whom Waiver Applicant is affiliated through licensure, shall attest and certify in writing that Waiver Applicant meets all of the requirements for waiver of participation and shall agree to notify ARMLS within Ten (10) Days of the change should any of the requirements for continuing the waiver no longer be met.

7.4.    **ADMINISTRATIVE SUPPORT PERSONNEL**. Administrative support personnel shall be allowed access to the system to the extent necessary for them to perform their duties with and for the Participant and/or the Participant's Subscribers.

7.4.1.    Participants may apply for administrative support credentials for a fee specified by the BOD in the current fee schedule.

7.4.2.    A Subscriber, who is not a Participant, who desires to utilize administrative support personnel may apply for an individual administrative support credential only with the written permission of the Participant. This permission must be obtained on the form provided by ARMLS.

7.4.3.    No person with an administrative support credential shall be designated as a listing or selling agent on a property under any circumstances.

7.4.4.    Administrative support credentials issued by ARMLS are for the individual assigned the credentials use only and shall not be shared with any other person or entity, nor transferred or assigned to another person or entity.

7.5.    **STANDARDS OF CONDUCT FOR PARTICIPANTS AND SUBSCRIBERS**.

7.5.1.    Subscribers shall not engage in any practice or take any action inconsistent with the exclusive representation or exclusive brokerage relationship agreements that other Subscribers have with clients.

7.5.2.    Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the owner or any other legally authorized party (e.g., a trustee).

7.5.3.    Subscribers, when acting as subagents, as buyer/tenant representatives, or as brokers, shall not attempt to extend a Listing Participant's offer of cooperation and/or compensation to other brokers without the consent of the Listing Participant.

7.5.4.    Subscribers shall not solicit a Listing that is currently listed exclusively with another broker. However, if the Listing Participant, when asked by a Subscriber, refuses to disclose the expiration date and nature of such Listing (i.e., an Exclusive Right to Sell Listing, an Exclusive Agency Listing, an

Open Listing, a Net Listing or other form of contractual agreement between the Listing Participant and the client), the Subscriber may contact the owner to obtain such information and may discuss the terms upon which the Subscriber might take a future Listing or, alternatively, may take a Listing to become effective upon expiration of any existing exclusive Listing.

7.5.5.    Subscribers shall not solicit buyer/tenant agreements from buyers/tenants who are subject to exclusive buyer/tenant agreements. However, if when asked by a Subscriber, the buyer/tenant broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the Subscriber may contact the buyer/tenant to secure such information and may discuss the terms upon which the Subscriber might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement.

7.5.6.    Subscribers shall not use information obtained from Listing Participants through offers to cooperate made through ARMLS to refer Listing Participants' clients to other brokers or to create buyer/tenant relationships with Listing Participants' clients, unless such use is authorized by the Listing Participant.

7.5.7.    The fact that an agreement has been entered into with a Subscriber shall not preclude or inhibit any other Subscriber from entering into a similar agreement after the expiration of the prior agreement.

7.5.8.    The fact that a prospect has retained a Subscriber as an exclusive representative or exclusive broker in one or more past transactions does not preclude another Subscriber from seeking such former prospect's future business.

7.5.9.    Subscribers are free to enter into contractual relationships or to negotiate with sellers/lessors, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one commission except with their informed consent.

7.5.10.    When Subscribers are contacted by the client of another Subscriber regarding the creation of an exclusive relationship to provide the same type of service, and that Subscriber has not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement.

7.5.11.    In cooperative transactions, Participants shall compensate cooperating Participants and shall not compensate or offer to compensate, directly or indirectly, any of the sales licensees (even if they are Subscribers) employed by or affiliated with other Participants without the prior express knowledge and consent of the cooperating Participant.

7.5.12.    Subscribers are not precluded from making general announcements to prospects describing their services and the terms of their availability even

though some recipients may have entered into agency agreements or other exclusive relationships with another Subscriber. A general telephone canvass, general mailing, or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed general for purposes of this rule.

The following types of solicitations are prohibited: Telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another Subscriber: and mail or other forms of written solicitations of prospects whose properties are exclusively listed with another Subscriber when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current Listings, for sale or for rent signs, or other sources of information intended to foster cooperation with Subscribers.

7.5.13.    Subscribers, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service.

7.5.14.    Subscribers, acting as buyer or tenant representatives or brokers, shall disclose that relationship to the owner's representative at first contact and shall provide written confirmation of that disclosure to the owner's representative or broker not later than execution of a purchase agreement or lease.

7.5.15.    Subscribers, acting as representatives or brokers of owners or as subagents of Listing Participants, shall disclose that relationship to buyers/tenants as soon as practicable, and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement.

7.5.16.    Subscribers are not precluded from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a multiple listing service or any other offer of cooperation may not be used to target clients of other Subscribers to whom such offers to provide services may be made.

7.5.17.    Subscribers, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the Listing Participant's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an

executed offer to purchase/lease contingent on the Listing Participant's agreement to modify the offer of compensation.

7.5.18.    All dealings concerning property exclusively listed or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client. Before providing substantive services (such as writing a purchase offer or presenting a comparative market analysis) to prospects, Subscribers shall ask prospects whether they are a party to any exclusive representation agreement. A Subscriber shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects.

7.5.19.    Subscribers, prior to or after terminating their relationship with their current firm shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude Participants from establishing agreements with their associated licensees governing assignability of exclusive agreements.

7.5.20.    These Rules are not intended to prohibit ethical albeit aggressive or innovative business practices, and do not prohibit disagreements with other Subscribers involving commission, fees, compensation or other forms of payment or expenses.

7.5.21.    Subscribers shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices.

7.5.22.    The services which MLS Participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS Participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth.

7.6.    **ARBITRATION OF DISPUTES**.  By becoming and remaining a Subscriber, each Subscriber agrees to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in

Standard of Practice 17-4 of the NAR Code of Ethics and Arbitration Manual with Subscribers in different firms arising out of their relationships as Subscribers, subject to the following qualifications:

(a) If all disputants are members of the same Association, or have their principal place of business within the same Association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that Association, and

(b) If the disputants are members of different Associations or if their principal place of business is located within the territorial jurisdiction of different Associations, they remain obligated to arbitrate in accordance with the procedures of the Arizona Association of REALTORS®.

If the Arizona Association of REALTORS® does not provide arbitration services, arbitration shall be conducted in accordance with any existing inter-board/regional agreement or, alternatively, in accordance with the Interboard/Regional Arbitration Procedures in the NAR Code of Ethics and Arbitration Manual. Nothing herein shall preclude Subscribers from agreeing to arbitrate the dispute before a particular Association.

A Subscriber's obligation to arbitrate includes the duty to either:

1. Pay an award to the party(ies) named in the award; or

2. Deposit the funds with the Professional Standards Administrator to be held in an escrow or trust account maintained for this purpose.

Failure to satisfy the award or deposit the funds with the Association within ten (10) days may be considered a violation of these rules and the Subscriber may be subject to disciplinary action at the sole discretion of ARMLS.

7.7. **DISCONTINUANCE OF SERVICE.**  A Participant may discontinue MLS service by giving proper notice to his or her Association in a manner specified by the Association. Participants may reapply to an Association for MLS participation in the same manner prescribed for new applicants, provided all outstanding dues, fines, and fees are fully paid.

7.8. **SUBSCRIBERS UNDER A SUSPENDED PARTICIPANT**. A firm whose Participant is suspended by the MLS for any reason shall also result in the suspension of all Subscribers under the suspended Participant, until such time as the firm once again employs a Participant in good standing with the MLS.

## 8. **LISTING PROCEDURES.**

8.0. **CLEAR COOPERATION**. Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital

communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. This section also applies to Office Exclusive Listings.

8.1. **TYPES OF PROPERTY**.

(a) Listings of real property or private property of the following types, which are listed subject to a real estate broker's license, and which are located within the ARMLS service area, taken by Subscribers, on exclusive right to sell or exclusive agency forms, shall be FWA within two Days, after all necessary signatures of seller(s) have been obtained, unless otherwise directed by seller in the written Listing Agreement or a subsequent amendment to the Listing Agreement:

   (i) Residential (For Sale) including, but not limited to:

   a. Fractional Interests
   b. Time Shares
   c. Auction Properties
   d. IRC (Internal Revenue Code) §1031 Exchanges
   e. New Construction
   f. Manufactured or Mobile Home (subject to section 8.1(b))

   (ii) Residential (For Lease) including, but not limited to:

   a. Fractional Interests
   b. Time Shares
   c. Vacation Ready
   d. New Construction
   e. Manufactured or Mobile Homes (subject to section 8.1(b))

   (iii) Vacant Land and Lots

   (iv) Commercial/Industrial Buildings (For Sale)

   (v) Commercial/Industrial Buildings (For Lease)

   (vi) Multiple Dwellings

   (vii) Business Opportunities

(b) There are three scenarios for which Manufactured or Mobile Homes are allowed to be listed in the MLS (see section 1.26 for definitions applying to this section):
NOTE: Recreational vehicles, including park models are prohibited to be listed in the MLS, unless it has been issued an Affidavit of Affixture.

   (i) A used Mobile or Manufactured home, which is Installed on and conveyed with real property, may be listed as a residential property if it qualifies under the licensing exemptions allowed by the DOH. To qualify under this exemption, the property must meet ALL of the following tests:

      1. The Manufactured/Mobile home must be Used; and

2. The Manufactured/Mobile home must be Installed on the property; and

3. The Manufactured/Mobile home must be listed in a contract for transfer of an interest in real property executed by its owner.

(ii) A new or Used Manufactured/Mobile home located in a Mobile Home Park if the Listing Subscriber is acting as an agent for a home that is being offered for sale by a licensed Manufactured Housing Dealer.

NOTE: Only a licensed Manufactured Housing Dealer may write the contract for the sale of a new or Used Manufactured home, or a Mobile home being offered for sale by the Manufactured Housing Dealer.

(iii) A Used Manufactured/Mobile home located in a Mobile Home Park that is owned by a private party (homeowner).

8.1.1. No property may be FWA that contains an assessor number other than the individual number assigned to the parcel or, in the absence of an individual number, the master number of the development.

8.2. **LISTING AGREEMENTS**.  A Listing agreement must be in writing and fully executed before that Listing is acceptable to be FWA. The Listing agreement of a property filed with the MLS by the listing participant should include a provision expressly granting the Listing Participant authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the Listing Participant the right to authorize dissemination of this information by the MLS to its Participants.  Hard copies of Listing agreements shall not be FWA.

Net Listings are not accepted for listing on the MLS. Except for Business Opportunities and Commercial (Sale or Lease) listing types, only Listings taken using Exclusive Right to Sell Listing and Exclusive Agency Listing contracts are accepted by ARMLS. For Business Opportunities and Commercial listing types, ARMLS will accept Open Listings but NOT Net Listings.

ARMLS may accept Listings taken using other forms of agreement, which make it possible for the Listing Participant to offer cooperation and compensation to Participants acting as subagents, buyer agents, or both. Neither ARMLS nor the Associations regulate the type of Listing that a Subscriber may take. Subscribers are free to take a Listing using a form of

agreement that is not accepted by ARMLS for listing on the MLS and market these Listings outside the MLS.

ARMLS may refuse to publish information that may create legal liability.

8.3. **SUBMISSION OF LISTINGS**. Listings must be entered directly into the MLS only by the Listing Participant, Subscriber, or authorized administrative support personnel having access to the MLS under the provisions of Section 7.4 above.  ARMLS reserves the right to:

    (a)   Remove from the ARMLS Compilation any Listing in a form that fails to adequately protect the interest of the public and the Subscribers.

    (b)   Assure that no Listing FWA establishes, directly or indirectly, any contractual relationship between ARMLS or an Association on the one hand and the buyer, seller, lessor or tenant on the other.

8.4. **LISTINGS SUBJECT TO THE RULES**. Any Listing to be FWA is subject to these Rules.  Subscribers shall have a written Listing agreement with all necessary signatures for each Listing that is FWA. ARMLS or the Subscriber's Association shall have the right to receive a copy of a written Listing agreement to verify a Listing's existence or adequacy at any time. ARMLS or the Subscriber's Association shall also have the right to receive a copy of the owner's written authorization for sales, leases, or exchanges that are FWA. If a request is made and the Subscriber fails to provide the requested information within five (5) Days, ARMLS or the Subscriber's Association shall have the right to remove each applicable Listing and discipline the Subscriber for a violation of these Rules.

8.5. **DETAILS ON LISTINGS FILED WITH ARMLS**. A Listing, when FWA by a Subscriber, must include all required information or ARMLS will not accept the Listing. An "R" beside a field name on the Profile Sheet or input screen indicates "required information" that must be included on each Listing that is FWA.

Detailed information on Listings FWA shall be accurate and factual at all times, whether the Listing status is coming soon, active, expired, canceled, temporarily-off-market, sold, pending sale, or any other status. Subscribers may not change any required Listing information, except the owner's name and phone number, to be non-factual or to eliminate factual information from a Listing.  Subscribers may not manipulate data by altering, amending, or refiling Listings to create a statistical or categorical result that is not supported by all applicable facts. This applies to all Listings, whether the Listing status is active, expired, canceled, temporarily-off-market, pending sale, sold or any other status. ARMLS may refuse to publish information that may create legal liability.

8.6. **DUAL LISTINGS**. Only one Listing for each property may be FWA by or on behalf of the Listing Participant, except under the following circumstances:

    (a)    The listed property is offered both for sale and for lease; or

    (b)    The property is for sale at one price and extra property may be purchased with the original property at a different price; or

    (c)    A residential rental property is available for lease furnished and unfurnished; or

    (d)    Properties currently zoned under multiple zoning classes that would allow for multiple uses; or

    (e)    The property is for sale as a single parcel or it may be divided and is available for sale as multiple smaller parcels; or

    (f)    The property is being leased as a Vacation Ready Rental and may also be leased as a regular Residential Rental, and/or may be sold as a Residential property; or

    (g)    The property is Vacant Land with an existing structure that is considered to be a "tear down" but the structure can still be sold. These properties may be listed in Vacant Land and Lots and also the appropriate other property class that reflects the existing structure (Residential, Commercial for Sale, or Multiple Dwellings). The Vacant Land and Lots listing must have the appropriate selection marked on the listing indicating what type of existing structure is on the property.

    (h)    The property is Vacant Land and is offered both for sale as a vacant lot at one price and as a to-be-built structure on the lot at a different price. These properties may be listed in Vacant Land and Lots and also the appropriate other property class that reflects the to-be-built structure (Residential, Commercial for Sale, or Multiple Dwellings). The to-be-built listing must reflect the specific structure being offered.

8.6.1.    Subscribers may not create multiple active Listings for a property except under one of the exceptions listed above.

8.6.2.    If Listings for the same property are FWA by or on behalf of different Listing Participants, ARMLS will notify all such Listing Participants. The notified Listing Participants will have five (5) Days to resolve the matter. At the end of the five (5) Day period, ARMLS shall have the right to change the status of one, some, or all of the Listings to a canceled or temporarily-off-market status.

8.7.    **OFFICE EXCLUSIVE LISTINGS**. An Office Exclusive Listing shall be provided to the Listing Participant's Association or to ARMLS upon written request, but not FWA for dissemination to other Subscribers. The Listing must be accompanied by a written authorization signed by the owner that he or she does not want the Listing to be FWA, until a specific date or not at all. Office Exclusive Listings shall adhere to section 8.0, Clear Cooperation policy.

8.8.   **CHANGE IN LISTING AGREEMENT TERMS**. Any change in listed price or other change in the terms of the original Listing agreement shall be made only when authorized in writing by the owner and shall be FWA within two (2) Days after the effective date of the change.

Each Listing shall be assigned a unique identification number. Changing the data within an existing Listing to create a new Listing is prohibited.

8.9.   **CANCELLATION OF LISTINGS PRIOR TO EXPIRATION**. Listings of property may be canceled from the MLS by the Listing Participant before the expiration date of the Listing agreement provided notice is FWA informing all other Subscribers of said cancellation. ARMLS or an Association shall have the right to receive a copy of such cancellation agreement at any time.

8.10.  **SALE, EXCHANGE, OR LEASE CONTINGENCIES APPLICABLE TO LISTINGS**. Any sale, exchange, or lease contingencies or conditions in a Listing shall be specified and fully disclosed. Contingencies or conditions that must be disclosed include but are not limited to: the existence of equitable interest in a property; the offer to purchase is contingent upon the sale of another property or upon the satisfactory inspection(s) of the property to be purchased); or that there is an existing First Right of Refusal.

8.11.  **LISTING PRICE SPECIFIED**. The full gross Listing price stated in the Listing agreement will be included in the information published in the ARMLS compilation of current Listings unless the property is subject to auction. If a property will only be sold by auction, the Listing must state whether the Listing has a reserve price or that the property will be sold at auction without reserve.

8.12.  **EXCLUSIONS**. When a Listing contains an exclusion (e.g., a provision excluding from the sale certain fixtures located on the property), the exclusion must be disclosed and explained in the public remarks field of the Profile Sheet for the Listing.

8.12.1.   Subscribers may exclude certain buyers that are identified in a Listing by entering in the REALTOR® remarks field of the Profile Sheet either "Prospects reserved by seller, contact listing office for names" or, at the option of the Listing Participant, the actual names of the excluded buyers may be entered.

8.12.2.   Exclusions of offers to cooperate between specific Participants must not be included in the public remarks field and should remain private communications between the Participants.

8.13.  **THIRD-PARTY APPROVAL**. If a property that is FWA is under court jurisdiction, or the sale is subject to any third-party approval, the Subscriber must disclose this fact in the appropriate place in the Profile Sheet for the Listing, unless prohibited in writing by the court.

8.14.  **LISTING MULTIPLE UNIT PROPERTIES**. All properties which are to be sold or which may be sold separately must be indicated by individual Listings, one for each property.

8.15. **NO CONTROL OF COMMISSION RATES OR FEES CHARGED BY SUBSCRIBERS**. Neither ARMLS nor an Association shall fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by Subscribers. Further, neither ARMLS nor any Association shall fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and non-participants.

8.16. **FORMS AND DOCUMENTS**. ARMLS or the Subscriber's Association shall have the right to request, and the Subscriber shall provide within five (5) Days of the request, copies of any documents that are required to verify the accuracy of any information that is included in the ARMLS Compilation.

8.17. **TERMINATION AND INCEPTION DATE ON LISTINGS**. All Listings shall bear a definite inception date (the "list date") and a definite and final termination date (the "expiration date") as negotiated between the Listing Participant and the owner.

8.18. **EXPIRATION, EXTENSION, AND RENEWAL OF LISTINGS**. Any Listing automatically expires on the expiration date specified in the Listing agreement unless renewed by the Listing Participant and the owner and notice of renewal or extension is FWA prior to expiration.

If notice of renewal or extension is dated after the expiration date of the original Listing (or the date of any prior renewal of the original Listing), a new Listing Agreement must be secured for the Listing to be FWA. It should then be published as a new Listing. Any extension or renewal of a Listing must take effect on or before the expiration date of the original Listing (or any prior renewal thereof), must be signed by the owner, and must be FWA. ARMLS and the Subscriber's Association shall, upon request, have the right to receive a copy of any renewal agreement at any time to ensure compliance with the Rules.

8.19. **SERVICE AREA**. Only Listings of the designated types of property, as described in Section 8.1, which are located within the ARMLS service area, are required to be FWA. Listings of properties, of the types designated in Section 8.1, located outside of the ARMLS service area will be accepted if the Listing (i) is submitted voluntarily by a Subscriber and (ii) complies with all of these Rules and Arizona law.

8.20. **LISTINGS OF SUSPENDED or EXPELLED PARTICIPANTS**.  When a Participant is suspended or expelled from the MLS by ARMLS or his/her Association for failing to abide by a membership duty (i.e., violation of the Code of Ethics, the ARMLS Governing Documents, these Rules, or other membership obligations, except failure to pay appropriate dues, fines, fees or charges), all Listings currently FWA by the suspended or expelled Participant shall, at the suspended or expelled Participant's option, be retained in the ARMLS Compilation until sold, canceled or expired, and shall not be renewed or extended by ARMLS beyond the termination date of the Listing

agreements in effect when the suspension became effective. If a Participant has been suspended or expelled from the Association or MLS or both by his/her Association for failure to pay appropriate dues, fines, fees or charges, neither the Association nor ARMLS is obligated to provide MLS services, including continued inclusion of the Participant's or Participant's Subscribers' Listings in the ARMLS Compilation of current listing information. On the day the Participant is suspended, Participant shall be sent notice that all Active listings (not UCB, CCBS or Pending) of that firm shall immediately be changed to a status of Temporarily Off Market ("TOM"), and further that five business days after said notice date, if the firm remains without a Participant, the UCB, CCBS and Pending listings shall be changed to a status of TOM.

8.21. **LISTINGS OF RESIGNED PARTICIPANT**. When a Participant resigns from the MLS, ARMLS will not provide any services to such resigned Participant, including continued inclusion of such resigned Participant's or Participant's Subscribers' Listings in the ARMLS Compilation of current listing information. When a Participant resigns, the resigned Participant shall be advised in writing that all active Listings of such resigned Participant will be cancelled upon his/her resignation so that he or she may advise his/her clients and affiliated Subscribers.

8.22. **LISTINGS OF RESIGNED, SUSPENDED, OR EXPELLED SUBSCRIBERS**. When a Subscriber resigns or is suspended or expelled from the MLS, as described in Sections 8.20 through 8.22, the Listings in the ARMLS Compilation of the Subscriber so affected shall be transferred by ARMLS and/or the Local Association to the Subscriber's Participant, or to such other Subscriber as the Participant shall designate.

8.23. **PHOTOGRAPHS, RENDERINGS, FLOOR PLANS, FILES, VIDEO, MEDIA**. The ARMLS Compilation may have the capacity to store and display one or more photographs, floor plans, electronic files in various public and proprietary formats, virtual tours, renderings, or other Media for a listed property.

Media may include features such as mortgage calculators and the ability to forward the Media by e-mail. However, Media cannot direct the user in any way to contact information or other information about a real estate agent or broker or any other individual or entity with a connection to the business of real estate. Media may not be used to advertise or promote an agent, broker or a real estate brokerage, or any other individual or entity, except that the Media producing enterprise may have its name, address, and logo on or in the Media, so long as the name, address or logo does not include any hyperlinks that lead back to the Listing Subscriber or their Participant or other entities other than the Media producing enterprise.

For the benefit of all Subscribers, Listings are sent to customers and clients of Subscribers and Participants. The intention of this rule is to preclude contact information of any kind or the use of inducement to work directly with any

Broker other than the Buyer Broker in any way within the display of the Listing. Items that do not convey specific contact information will be allowed so long as they comply with the intent of this rule.

The following specific items are permitted within Media:

(a)  A "for sale" sign located on the property may appear in an image of the exterior of the home or property so long as the sign does not convey any specific contact information or company identification.

(b)  An image may contain the date and/or time it was taken, as well as the MLS number of the property it represents.

(c)  A rendering or floor plan may have text typical to renderings and floor plans (e.g.  room names and dimensions, model home name).

(d)  An electronic file may have text to describe the property and also may have exceptions of the type described above when the electronic file is or contains a photograph, floor plan, rendering, or other image media.

(e)  Property information links are acceptable so long as they do not exhibit or link to contact information.

Any other use of a photograph, floor plan, electronic file, rendering, virtual tour, or other media to advertise or promote an agent, broker or real estate brokerage, or any other individual or entity, is strictly prohibited.

Except for Media independently licensed by ARMLS for the benefit of all Subscribers, a Subscriber may not copy and use for any purpose any Media from another Subscriber's Listing without specific permission from the Listing Participant. It is permissible, however, for a Subscriber to purchase and use Media being used by another Subscriber so long as the Media is purchased from a third-party owning rights to such Media and having the legal capacity to license the Media.

In addition to any penalty that may be imposed under the ARMLS Penalty Policy, ARMLS shall have the right to immediately remove any Media from a Listing that is not in compliance with this rule.

8.24.  **PHOTO REQUIREMENTS**. Unless specifically directed otherwise in writing by the seller, each property FWA in Property Class 1 (Residential For Sale) and 2 (Residential Rental) must have a minimum of one photo of the exterior of the property attached to the Listing and submitted by the Listing Subscriber or Subscriber's contractor. This rule does not apply to properties in the Coming Soon Status. This exterior photo is defined as the street view of the front elevation of the dwelling which incorporates a substantial portion of the entire dwelling. For apartment style or loft properties this exterior photo must represent the exterior of the building in which the unit is located.  This exterior photo must be attached to the Listing within four (4) Days of the Listing being

FWA. This exterior photo must remain with the Listing throughout its life regardless of any status changes and may not be removed by the Listing Subscriber or Subscribers contractors under any circumstances.  This main exterior photo does not have to be the primary photo attached to the listing unless it is the sole photo attached to the listing.

8.25.  **COMING SOON STATUS LISTINGS**. Listings that are FWA in any property type may be initially entered into the MLS with a Coming Soon Status. Rules that specifically apply to the Coming Soon Status:

    (a)  Listings entered into this status must have a current executed Listing Agreement.

    (b)  Listings may be in Coming Soon Status for a maximum of 30 days.

        (i)  If the Listing is left in Coming Soon Status for the full 30 days, it will automatically be placed into active status on the 31st day.

        (ii)  A Coming Soon Listing that has subsequently moved to any other status is ineligible to be placed back into a Coming Soon status.

        (iii)  A Premises may only be in a Coming Soon Status for 30 of every 45 calendar days.

    (c)  Section 8.24 Photo Requirements shall not apply to Listings while in a Coming Soon Status.  However, if photos are included with a Coming Soon listing, the photos must comply with photo use rules.

8.26.  **COMPLIANCE**.  ARMLS or the Subscriber's Association shall have the right to Cancel or place into TOM (Temporarily Off Market status) any Listing in the ARMLS Compilation that does not comply with these Rules.

9.  **INTERNET DATA EXCHANGE PROGRAM**. The rules that govern the ARMLS IDX program are found in Section 23 of these Rules. There is a presumption that all Participants engaged in real estate brokerage consent to participation in the IDX program and to the display of their Listings by other IDX Participants subject to the rules established for the program. However, any Participant may opt-out of the IDX program unchecking the Participant's "IDX Program Sharing" selection in the MLS.

10. **SELLING PROCEDURES**.

10.1.  **SHOWINGS**. Appointments to show a property that is FWA, including showings where access to the property is gained by use of a lockbox, shall be conducted through the Listing Participant except under the following circumstances:

    (a)  The Listing Participant gives Subscribers specific authority to show the property in the appropriate place in the Listing, or

    (b)  After reasonable effort (minimum one (1) Day) the Cooperating Subscriber cannot contact the Listing Subscriber or his/her representative, however, the Listing Participant at his/her option, may preclude such direct showings by Cooperating Participants or Cooperating Subscribers.

The Cooperating Participant must disclose his/her agency status to the Listing Participant or owner as soon as practicable.

10.2. **NEGOTIATIONS**. All negotiations for a listed property shall be conducted exclusively through the Listing Participant or his/her Subscriber or representative unless:

    (a)  The owner waives this requirement in writing, and

    (b)  No licensed representative of the Listing Participant is available for a period of twenty-four (24) hours, however, the Listing Participant, at his or her option, may preclude such direct negotiations by Cooperating Participants.

The Cooperating Participant must disclose his/her agency status to the Listing Participant or owner as soon as practicable.

If any negotiations are carried on in the absence of the Listing Participant, pursuant to this Section 10.2, the Cooperating Participant shall report the status change to the Listing Participant, and at Cooperating Participant's option to ARMLS, within one (1) day after occurrence, and the Listing Participant shall report the status change to ARMLS within one (1) day after receiving notice from the Cooperating Participant.

10.3. **PRESENTATION OF OFFERS**. The Listing Subscriber must make arrangements to present the offer as soon as possible, or give the Cooperating Subscriber a satisfactory reason for not doing so.

10.4. **SUBMISSION OF WRITTEN OFFERS**. The Listing Subscriber shall submit to the seller all written offers until closing unless precluded by law, government rule, or regulation, or agreed otherwise in writing between the seller and the Listing Subscriber. Unless a subsequent offer is contingent upon the termination of an existing contract, the Listing Subscriber/Subscriber shall recommend that the seller obtain the advice of legal counsel prior to acceptance of a subsequent offer.

10.5. **RIGHT OF COOPERATING SUBSCRIBER IN PRESENTATION OF OFFER**. Except as provided in this Section, the Cooperating Subscriber (when acting as a buyer agent or subagent) or his/her representative has the right to participate in the presentation to the owner of any offer he/she secures to purchase or lease. He/she does not have the right to be present at any discussion or evaluation of that offer by the owner and the Listing Subscriber. However, if the owner gives written instructions to the Listing Subscriber that the Cooperating Subscriber or his/her representative not be present when an offer the Cooperating Subscriber secured is presented, the Cooperating Subscriber has the right to a copy of the owner's written instructions. None of the foregoing diminishes the Listing Subscriber's right to control the establishment of appointments for such presentations.

Where the Cooperating Subscriber is not present during the presentation of

the offer, the Cooperating Subscriber can request in writing, and the Listing Subscriber must provide, written affirmation stating that the offer has been submitted to the owner, or written notification that the owner has waived the obligation to have the offer presented.

10.6. **RIGHT OF LISTING SUBSCRIBER IN PRESENTATION OF COUNTER-OFFERS**.  Except as provided in this Section, the Listing Subscriber or his/her representative has the right to participate in the presentation of any counter-offer made by the owner. He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except where the Cooperating Subscriber is a subagent). However, if the purchaser or lessee gives written instructions to the Cooperating Subscriber that the Listing Subscriber not be present when a counter-offer is presented, the Listing Subscriber has the right to a copy of the purchaser's or lessee's written instructions.

10.7. **STATUS CHANGES AND REPORTING THE SALE/LEASE OF A LISTED PROPERTY**. Status changes for Coming Soon, Active, Temporarily Off Market, Expired, and Cancelled listings shall be reported to the multiple listing service by the Listing Subscriber within (2) Days after they have occurred. Within three (3) Days (or 4 Days when a legal holidays fall adjacent to a weekend) after all parties to the transaction have executed an agreement to purchase and sell, or lease, a property that is FWA, the status of the Listing must be changed to a Sale Pending or Leased status by the Listing Subscriber, subject to Section 10.8. Likewise, within two (2) Days after the close of escrow or completion of the transaction, a property that is FWA must be changed to a Sold or Leased status as appropriate, with the final closing sales price, subject to Section 10.8. Note: In disclosure states such as Arizona, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.  The requirement of this Section 10.7 shall not apply to Vacation Ready Rental listings in Residential Rental property class, which listings shall have only the following statuses applied: Coming Soon, Active, Temporarily Off Market, Expired, or Cancelled.

10.8. **UNDER CONTRACT**.  Notwithstanding the preceding paragraph, and within the same time requirements, a Listing may, instead of Pending, be changed to an Under Contract-Backups (UCB) or Contract Contingent on Buyer Sale (CCBS) status if one of the following conditions is true:

    (a)   The seller provides the Listing Subscriber with written instructions to actively market the property to obtain additional offers (Status Code: UCB); or

    (b)   The purchase of the listed property is contingent on the sale of the buyer's property (Status Code: CCBS).

ARMLS shall have the right to place a Listing that does not comply with this rule in a Temporarily Off Market (Status Code: TOM) status.

10.9.   **SHORT SALE PROPERTIES**. The policies that govern a Short Sale are found in the ARMLS Short Sale Policy.  A copy of this Policy statement can be found on the ARMLS website (ARMLS.com).

10.10.  **REPORTING RESOLUTIONS OF CONTINGENCIES**. The Listing Subscriber shall FWA, within three (3) Days (or four (4) Days when a legal holidays fall adjacent to a weekend) following the occurrence that a contingency on file with the MLS has been fulfilled or renewed or the agreement has been canceled.

10.11.  **ADVERTISING OF LISTINGS FILED WITH ARMLS**. A Listing shall not be advertised by any Subscriber, other than the Listing Participant/Subscriber, in any medium whatsoever, without prior consent of the Listing Subscriber.

10.12.  **REPORTING CANCELLATION OF PENDING SALE**. The Listing Subscriber shall FWA the cancellation of any pending sale within three (3) Days (or four (4) Days when a legal holidays fall adjacent to a weekend) following its occurrence, and the Listing shall be reinstated immediately.

10.13.  **REFUSAL TO SELL**. If the seller of any listed property that is FWA refuses to accept a written offer satisfying the terms and conditions stated in the Listing, Listing Subscriber shall within three (3) Days (or four (4) Days when a legal holidays fall adjacent to a weekend) change the Listing to an off market status (other than SOLD).  For the purposes of this section, an "off market" status shall be any status except Active, Under Contract-Backups (UCB), or Contract Contingent on Buyer Sale (CCBS).

11. **PROHIBITIONS**.

11.1.   I**NFORMATION FOR SUBSCRIBERS ONLY**. Except as expressly permitted by Section 20, any Listing FWA shall not be made available to any individual, broker or firm not a MLS Subscriber without prior consent of the Listing Participant, except pursuant to a subpoena or specific action of the ARMLS Board of Directors.

11.2.   **"FOR SALE" SIGNS**. Only the "For Sale" signs of the Listing Participant may be placed on the property, unless agreed to by the Listing Participant.

11.3.   **"SOLD" SIGNS**.  Prior to closing, only the "Sold" sign of the Listing Participant may be placed on the property, unless the Listing Participant authorizes the Cooperating Participant to post such a sign.

11.4.   **SOLICITATION OF LISTINGS FILED WITH ARMLS**. Subscribers shall not solicit a Listing of a property that is FWA unless such solicitation is consistent with Article 16 of the NAR Code of Ethics or Section 7.5 of these Rules.

11.5.   **LANGUAGE AND INFORMATION IN A LISTING FWA**. The Policies that govern the information and language that can be contained in a Listing that is FWA are found in the ARMLS Inappropriate Language Policy. A copy of this Policy can be found on the ARMLS website (ARMLS.com).

11.6.   **INFORMATION IN PUBLIC REMARKS**. Information in the Public Remarks field in the Listing shall be limited to information describing or marketing the

listed property. Such field shall not include information about individuals or co-brokerage arrangements or any alarm codes or other information about how to gain access to a property.  Public Remarks shall not direct the user in any way to contact information or other information about a real estate agent or broker or any other individual or entity with a connection to the business of real estate.

11.7.  **USE OF INFORMATION FIELDS**. Subscribers may only enter in any field on the Profile Sheet the information required or reasonably contemplated by such field.

11.8.  **PROPERTY AND COMMUNITY ACCESS CODE DISPLAY**. Subscribers shall not display, nor link to a display, any access code for a property or community in any field other than the specific code fields designated in the listing.

12. **DIVISION OF COMMISSIONS**.

12.1.  **COOPERATIVE COMPENSATION SPECIFIED ON EACH LISTING**. The Listing Participant shall specify, on each Listing that is FWA, the compensation being offered to Participants for their services in the sale/lease of such Listing. The compensation amount shall be either a percentage of the gross selling/lease price or a definite dollar (non-zero) amount. Compensation amounts that are not based on the gross sales/lease price (e. g., compensation is based on the base price of a new home) must be shown as a fixed dollar (non-zero) amount. ARMLS shall not accept or publish any Listing that does not include an offer of compensation, nor shall ARMLS include general invitations by Listing Participants to Subscribers to discuss the terms and conditions of possible cooperative relationships.

Such offers of compensation are unconditional except that entitlement to compensation is determined by the Cooperating Participant's performance as the procuring cause of a successful transaction. The Listing Participant's obligation to compensate any Cooperating Participant as the procuring cause of a successful transaction may be excused if it is determined through arbitration that, through no fault of the Listing Participant and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the Listing Participant to collect a commission pursuant to the Listing agreement. For the purposes of this section, a "successful transaction" means a sale that closes or a lease that is executed. In such instances, entitlement to cooperative compensation offered through the MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the Listing Participant to collect some or all of the commission established in the Listing agreement; at what point in the transaction the Listing Participant knew (or should have known) that some or all of the commission established in the Listing agreement might not be paid; and how promptly the Listing Participant communicated to Cooperating Participants that the commission established in the Listing agreement might

not be paid.

This shall not preclude the Listing Participant from offering any Participant compensation other than the compensation indicated on his/her Listings as published by ARMLS provided the Listing Participant informs the such Participant in writing before the Participant submits an offer to purchase and provided that the modification in the specified compensation is not the result of any agreement among all or with any other Subscribers. Any superseding offer of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount.

Neither ARMLS nor the Associations shall have a rule requiring the Listing Participant to disclose the total negotiated commission as stated in the Listing agreement. ARMLS shall not publish or disclose in any manner the total negotiated commission on any Listing that is FWA. Neither ARMLS nor the Associations shall make any rule on the division of commissions between Participants and non-participants. This is solely the responsibility of the Listing Participant.

The Listing Participant may, from time to time, adjust the compensation being offered to Participants for their services with respect to any Listing by changing the offer of compensation in the Listing. However, notwithstanding the foregoing, the offer of compensation published in the Listing and the ARMLS Compilation at the time a written contract offer is presented shall be the compensation applicable to that transaction.

Neither the buyer nor the seller of a property is a participant in the multiple listing service. Therefore, it is inappropriate for either buyer or seller to offer compensation to any party through the multiple listing service. The Listing Participant shall not include in the Listing any offer of compensation that is not made directly by the Listing Participant to cooperating Participants.

12.2. **DUAL OR VARIABLE RATE COMMISSIONS**. The existence of a dual or variable rate commission arrangement (i.e. one in which the owner agrees to pay a specified commission if the property is sold/leased by the Listing Subscriber without assistance and a different commission if the sale/lease results through the efforts of a Cooperating Subscriber; or one in which the owner agrees to pay a specified commission if the property is sold/leased by the Listing Subscriber either with or without the assistance of a Cooperating Subscriber and a different commission if the sale/lease results through the efforts of the owner) shall be disclosed by the Listing Subscriber in a manner specified by ARMLS. The Listing Subscriber shall, in response to inquiries from potential Cooperating Subscribers, disclose the differential that would result in either a cooperative transaction or, alternatively, in a sale/lease that results through the efforts of the owner. If the Cooperating Subscriber is a buyer/tenant representative, the Cooperating Subscriber must disclose such

information to his or her client before the client makes an offer to purchase or lease.

12.3. **SUBSCRIBER AS PRINCIPAL**. If a Subscriber has any ownership interest in a property that is FWA, that Subscriber shall disclose the ownership interest by selecting "Owner/Agent" in the Features section of the Profile Sheet when the Listing is FWA so such information will be disseminated to all Subscribers.

12.4. **SUBSCRIBER AS PURCHASER**. If a Subscriber wishes to acquire an interest in a property that is listed with another Subscriber, such contemplated interest shall be disclosed in writing to the Listing Subscriber not later than the time an offer to purchase is submitted to the Listing Subscriber.

13. **LOCKBOX AND/OR ACCESS SYSTEMS**. The provisions of this Section 13 shall apply equally to all Lockboxes used by Subscribers, whether procured from the current electronic lockbox service provider or from an alternate source, and whether electronic or mechanical in operation.

13.1. **AUTHORIZATION TO USE A LOCKBOX**. A Lockbox may not be placed on a property that is FWA without the written permission of the property owner.

A listing Subscriber may use another Subscriber's Lockbox to place on a property that is FWA so long as the lockbox owner has granted permission. However, the lockbox owner is ultimately responsible for the Lockbox and must comply with all rules in sections 13.

13.2. **REMOVING KEYS FROM THE LISTED PROPERTY**. Only the owner of the Lockbox may remove the keys from a listed property unless the Lockbox owner grants permission to another Subscriber to do so. If the Lockbox placed on a property is borrowed from another Subscriber the authorized Listing Subscriber may grant permission to another Subscriber to remove the keys from the listed property.

13.3. **LOCKBOX KEYS**. When a Lockbox key is assigned to a Subscriber or Affiliate, that key is for the Subscriber's or Affiliate's own use. A Subscriber or Affiliate is not permitted to allow any other person to use his/her assigned key, nor shall a Subscriber or Affiliate use another Subscriber's or Affiliate's key.  In addition, the personal identification number that is required to operate the key is not to be disclosed to any other person and is not to be written on the key or written on any paper or document that is stored with or near the key.  Furthermore, a Lockbox Key may only be used to the extent of its assigned privilege authorized by the Subscriber's or Affiliate's Association.

13.4. **USE OF LOCKBOX ACCESS**. A Subscriber may use a Lockbox to retrieve the listing key to gain access to a property only with the consent of the Listing Subscriber pursuant to Section 10.1 and only for the purpose of viewing or showing the property with the goal of producing a prospective purchaser or purchaser for the property. Subscribers and Affiliates must obtain the prior consent of the Listing Subscriber for any other use of Lockbox access including without limitation in connection with an appraisal, a home

inspection, or production of a virtual tour.

Furthermore, lockbox code(s) will not be disclosed to anyone who is not an ARMLS Subscriber without the Listing Subscriber's written permission.

13.5. **TIMELY REMOVAL OF LOCKBOX**. A Lockbox must be removed from the property within two (2) Days after the date that the Listing status is changed to sold, leased, cancelled, or expired.

13.6. **REMOVAL OF LOCKBOX BY UNAUTHORIZED INDIVIDUALS**. Only the owner of the Lockbox may remove the Lockbox from a property, unless the Lockbox owner provides authorization for another person to do so. ARMLS, or its designee, shall have the right to remove a Lockbox from a property that is not in compliance with the Rules.

13.7. **FAILURE TO COMPLY WITH THE KEYHOLDER AGREEMENT OR THIS SECTION 13**. Any violation by a Subscriber or Affiliate of that Subscriber's or Affiliate's Keyholder Agreement also shall be deemed as a violation by that Subscriber or Affiliate of the requirements of this Section 13. The BOD reserves the right to review such violations on a case by case basis and such violations may require special consideration and action by the BOD in addition to any other penalties for such violations already mandated in the ARMLS Penalty Policy.

13.8. **EQUAL APPLICATION**. All provisions of this Section 13 apply equally to Lockboxes and to any other method that allows access to the property, including Lockboxes provided by sources other than the ARMLS electronic Lockbox service provider.

14. **COMPLIANCE WITH RULES – AUTHORITY TO IMPOSE DISCIPLINE**.  By becoming and remaining a Participant or Subscriber, each Participant and Subscriber agrees to be subject to these Rules and any other ARMLS governance provisions. ARMLS may, through the administrative and hearing procedures established in these Rules, impose discipline for violations of these Rules and/or any other ARMLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

(a)  letter of warning

(b)  letter of reprimand

(c)  attendance at MLS orientation or other appropriate courses or seminars which the Participant or Subscriber can reasonably attend taking into consideration cost, location, and duration

(d)  required attendance to a hearing after reaching three (3) violations within a calendar year each at a $200 fine or more, the Subscriber's Participant must attend the Subscriber's hearing

(e)  a fine not to exceed $15,000

(f)  probation for a stated period of time not less than thirty (30) Days or more than one (1) year

(g)    suspension of MLS rights, privileges, and services for not less than thirty (30) Days or more than one (1) year

(h)    termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years.

14.1.    **ARMLS FEES AND CHARGES**. The BOD is responsible for establishing fees and charges for services that are provided by ARMLS. The BOD is also responsible for establishing fines or other penalties that shall be imposed for violations of these Rules. The schedule of fines shall be adopted as Policy and may be amended from time to time as approved by the BOD.  Fees and fines shall be published on the ARMLS website and in such other forms as the BOD may direct.

14.2.    **PENALTIES FOR VIOLATIONS OF THESE RULES**. The Policies that govern the application of fines or penalties for violation of these rules are contained in the ARMLS Penalty Policy.  A copy of this Policy can be found on the ARMLS website (ARMLS.com). If two or more violations exist with respect to a single Listing and these violations are identified at the same time, the violations shall be noticed and handled together and the provisions applicable to the more severe violation shall prevail.

15. **COMPLIANCE WITH RULES**.

15.1.    **COMPLIANCE WITH RULES**. The following actions may be taken by ARMLS or the Subscriber's Association for failure to comply with these Rules:

(a)    For failure to pay any service charge, fine or fee on or before the specified date due, and provided that said failure continues thereafter for at least ten (10) Days after notice has been given, the Subscriber's MLS service may be suspended until all service charges, fees and fines are paid in full and any identified errors are corrected.

(b)    For failure to comply with any other rule, the provisions of Sections 14 and 17 of these Rules shall apply.

15.2.    **APPLICABILITY OF RULES TO SUBSCRIBERS**. Non-principal brokers, sales persons, Appraisers, and others authorized as Subscribers hereunder to access the ARMLS Compilation are subject to these Rules and may be disciplined for violations thereof provided that each such applicable Subscriber has executed, either by signature or by electronic means, an agreement acknowledging that access to and use of the MLS is contingent on compliance with the Rules. This provision does not eliminate the Participant's ultimate responsibility and accountability for Subscribers who are affiliated with the Participant.

16. **NOTICES**.

16.1.    Notices of violations and applicable fines associated with those violations shall be delivered according to the procedures defined in the ARMLS Penalty Policy, as adopted by the BOD and amended from time to time. Any notices

required or permitted by these Rules to be sent by ARMLS may be sent by either of the following two methods.

16.1.1.    By e-mail to either the e-mail address on file in the ARMLS Roster Database or via internal e-mail delivery through the MLS system. Electronic messages are instantaneous. Therefore, Notice shall be deemed to have been constructively delivered at the time the e-mail message is sent to the recipient.

16.1.2.    By U.S. Postal Service ("USPS") mail to a postal address on file for a Subscriber or Participant at the postal address shown for the Participant's office in the ARMLS Roster Database. Notice shall be deemed to have been constructively delivered two (2) USPS Service Days after being deposited in the USPS system for delivery.

16.2.    Subscribers shall be responsible for maintaining current contact information, including mailing and e-mail addresses, with ARMLS and with their Associations.

17. **CONSIDERATION OF ALLEGED VIOLATIONS**. The ARMLS Data Integrity Department is responsible for investigating all complaints alleging a violation of these Rules.  ARMLS may, at its discretion, require complaints to be submitted in writing or by electronic means, including but not limited to email or an electronic notification system built within the MLS system.

17.1.    **VIOLATION OF RULES**. If the alleged offense is a violation of the ARMLS Rules and does not involve a charge of alleged violation of one or more of the provisions of Sections 7.5 (Standards of Conduct) of these Rules or a request for arbitration, ARMLS shall consider the alleged violation pursuant to the procedures set forth in Section 14 hereof.  If a violation is determined by the ARMLS staff, the staff shall direct imposition of sanction(s) according to the ARMLS Penalty Policy as published at the time of the violation, provided that the recipient of such sanction(s) may appeal such determinations to the ARMLS Appeals Committee and subsequently to the BOD in accordance with these Rules.  Alleged violations of Sections 7.5 (Standards of Conduct) of the Rules shall be referred to the Association from which the Subscriber receives MLS services. The process for appeal shall be defined in the ARMLS Penalty Policy.

17.2.    **COMPLAINTS OF UNETHICAL CONDUCT AND ARBITRATION REQUESTS**. ARMLS may refer complaints of unethical conduct and requests for arbitration to the Association from which the Subscriber receives MLS service.

18. **CONFIDENTIALITY OF ARMLS INFORMATION**. Except as expressly permitted by Section 20, all MLS information and other information provided by ARMLS to the Subscribers shall be considered official information of ARMLS. Such information shall be considered confidential and is for the exclusive use of the Subscribers as defined in these Rules and ARMLS' Policies.  (For similar provisions, please see Sections 7.2, 11.1 and 20.1.)

18.1. **ARMLS NOT RESPONSIBLE FOR ACCURACY OF INFORMATION**. Neither ARMLS nor the Associations verify the information that is provided by the Subscribers and both ARMLS and the Associations disclaim any responsibility for its accuracy. Each Subscriber, and such Subscriber's Participant, agrees to hold ARMLS and the Associations harmless against any liability arising from any inaccuracy or inadequacy of the information that such Subscriber provides.

18.2. **ACCESS TO COMPARABLE AND STATISTICAL INFORMATION**. REALTORS® who are actively engaged in real estate brokerage, management, appraising, land development, or construction, but who do not participate in MLS, are nonetheless entitled to receive, by purchase or lease, all information other than current (active) listing information that is generated wholly or in part by ARMLS including "comparable" information, "sold" information and statistical reports. This information is provided for the exclusive use of Association members and individuals affiliated with these members who are also engaged in the real estate business and may not be transmitted, retransmitted or provided in any manner to any unauthorized individual, office or firm except as otherwise provided in these Rules.

19. **OWNERSHIP OF ARMLS COMPILATIONS AND COPYRIGHTS**. By the act of submitting any property Listing content to the MLS, the Participant represents that and warrants he or she is fully authorized to license the property Listing content as contemplated by and in compliance with this section and these rules, and also thereby does grant ARMLS license to include the property Listing content in its copyrighted ARMLS Compilation and also in any statistical report. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information and other details or information related to the listed property. All rights, title, and interest in each copy of the ARMLS Compilation created and copyrighted by ARMLS, and in the copyrights therein, shall at all times remain vested in ARMLS.

Each participant who submits listing content to ARMLS agrees to defend and hold ARMLS and all other Participants/Subscribers harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content.

20. **USE OF COPYRIGHTED ARMLS COMPILATIONS**.

20.1. **DISTRIBUTION**. Except as provided in this Section 20, Subscribers shall not provide copies of or access to the ARMLS Compilation to persons other than Subscribers, real estate licensees affiliated with such Subscribers or those Subscribers who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.

Use of information developed by or published by ARMLS is strictly limited to the activities authorized under a Subscriber's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended

to convey access to or the right to use the ARMLS Compilation under any circumstances where access to such information would be prohibited by law.

20.2. **DISPLAY**. Subscribers shall be permitted to display information contained in the ARMLS Compilation to prospective purchasers only in conjunction with such Subscriber's ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in the ARMLS Compilation.

20.3. **REPRODUCTION**. Participants or their affiliated licensees shall not reproduce any ARMLS Compilation or any portion thereof except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the ARMLS Compilation, and distribute to prospective purchasers, a reasonable number of single copies of property listing data contained in the ARMLS Compilation, which relate to any properties in which the prospective purchasers are, or may, in the judgment of the Participants or their affiliated licensees, be interested.

Reproductions made in accordance with this Section 20.3 shall be prepared in such a fashion that the property listing data of properties other than those in which the Participants or their affiliated licensees has expressed an interest, or in which the Participants or their affiliated licensees is seeking to promote interest, do not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property data profile sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current Listing information, "sold" information, "comparables," or statistical information from utilizing such information to support valuations on particular property for a particular clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who

will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be reproduced as supporting documentation.  Any other use of such information is unauthorized and prohibited by these Rules.

21. **USE OF ARMLS INFORMATION**.

21.1. Use of information from the ARMLS Compilation, from ARMLS "Statistical Reports" or from any "sold" or "comparable" report of ARMLS for public mass-media advertising by a Subscriber or in other public representations is not prohibited. However, any advertisement, whether in print or not, or other forms of public representations based in whole or in part on information supplied by ARMLS must clearly demonstrate the period of time over which such advertisement or representations are based and must include the following Notice:

"Based on information from the Arizona Regional Multiple Listing Service for the period (date) through (date)."

Non-print forms of advertising or representation, including radio and television advertising, must include the following, or substantially similar, disclaimer:

"Based on information from the Arizona Regional Multiple Listing Service for the period (date) through (date)."

21.2. A Participant may disclose to any person with whom the Participant has a client-broker or fiduciary relationship any of the following information:

(a)   The compensation offered to other MLS Participants.

Further, a Participant may not disclose to any person any of the following information:

(a)   The seller's and occupant's phone number(s) or e-mail address(es),

(b)   Instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property.

22. **RULES CHANGES**.  Amendments to these Rules shall be by consideration and approval of the BOD in accordance with the provisions of the ARMLS Governing Documents. These Rules may not be altered, amended, or repealed and new Rules may not be adopted, except in accordance with the procedures set forth in the ARMLS Governing Documents.

Amendments to these Rules shall become effective at such future date as the BOD may designate, but no sooner than ten (10) Days after their approval in accordance with the ARMLS Governing Documents. ARMLS will send each Association written notification of approved changes to these Rules.

## INTERNET DATA EXCHANGE (IDX) RULES

23. **IDX PROGRAM DEFINED**. IDX affords ARMLS Participants the ability to authorize limited electronic display and delivery of their listings by other Participants via the following authorized mediums under the Participant's control: websites, mobile apps, and audio devices. As used throughout these rules, "display" includes "delivery" of such listing.

    23.1. **AUTHORIZATION**. Participants' consent for display of their listings by other Participants pursuant to these rules and regulations is presumed unless a Participant affirmatively notifies ARMLS that the Participant refuses to permit display (either on a blanket or on a listing-by-listing basis). If a Participant refuses on a blanket basis to permit the display of that Participant's listings, that Participant may not download, frame or display the aggregated ARMLS data of other Participants. Even where Participants have given blanket authority for other Participants to display their listings through IDX, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet display or other electronic forms of display or distribution.

    23.2. **PARTICIPATION IN IDX**. Participation in IDX is available to all ARMLS Participants engaged in real estate brokerage who consent to display of their listings by other Participants.

        23.2.1.    Participants must notify ARMLS of their intention to display IDX information and must give ARMLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies.

        23.2.2.    ARMLS Participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require Participants to prevent indexing of IDX listings by recognized search engines.

        23.2.3.    Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs) or other electronic forms of display or distribution.

        23.2.4.    Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., single-family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed through IDX must be independently made by each Participant.

        23.2.5.    Participants must refresh all ARMLS downloads and IDX displays automatically fed by those downloads at least once every twelve (12) hours.

23.2.6.    Except as provided in the IDX policy and these rules, an IDX site or a Participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of ARMLS database available to any person or entity.

23.2.7.    Any IDX display controlled by a Participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and ARMLS rules.

23.2.8.    Any IDX display controlled by a Participant or subscriber that:

(a)    allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

(b)    displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to ARMLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by Participants. Except for the foregoing and subject to Section 23.2.9, a Participant's IDX display may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller.

23.2.9.    Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the Participant beyond that supplied by ARMLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, Participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

23.2.10.    A Participant (or where permitted locally, an ARMLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and ARMLS Participant (or ARMLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information

from each of MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display.

23.2.11.  Participants shall not modify or manipulate information relating to other Participants' listings. Participants may augment their IDX display of ARMLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by ARMLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of ARMLS data display or display of fewer than all of the available listings or fewer authorized fields.

23.2.12.  All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.

23.2.13.  Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application.

23.3.  **DISPLAY**. Display of listing information pursuant to IDX is subject to the following rules:

23.3.1.   Listings displayed pursuant to IDX shall contain only those fields of data designated by ARMLS. Display of all other fields (as determined by ARMLS) is prohibited. Confidential fields intended only for other ARMLS Participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.

23.3.1.1.   The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed.

23.3.2.   Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their own websites subject to their Participant's consent and control and the requirements of state law and/or regulation.

23.3.3.   All listings displayed pursuant to IDX shall show ARMLS as the source of the information.

23.3.4.   Participants (and their affiliated licensees, if applicable) shall indicate on their websites "All information should be verified by the recipient and none is guaranteed as accurate by ARMLS".

Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required

disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application.

23.3.5.    Display of expired, and cancelled listings is prohibited.

23.3.6.    Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and e-mail address(es) is prohibited.

23.3.7.    The Participant's brokerage name must be visible on the front page of the online display and each subsequent page of the online display, without the necessity of scrolling down, regardless of the screen size of the display.

23.3.8.    When advertising a "team" name it must be clear that the team is a part of the Participant's brokerage. For example, placing "The (Team Name) Team" at the top of the page in large letters with a much smaller brokerage symbol somewhere below is not sufficient.

23.3.9.    The Participant's brokerage name must be spelled out in its entirety. For example, if an employing broker's legal or dba name on a license includes "Southeast Valley," that is what must appear in the online display; simply saying "SE" is not sufficient.

23.3.10.  If the brokerage is an office of a franchise, the office must be identified; simply displaying the franchise name alone is not sufficient.

23.4.  **SERVICE FEES AND CHARGES**. Service fees and charges for participation in IDX shall be as established by the Board of Directors.

23.5.  **PENALTIES**. Penalties due to violations of this Section 23 shall be subject only to the terms and conditions of the Content License Agreement between the Participant or Subscriber and ARMLS. For clarity, the ARMLS Penalty Policy does not apply to violations of Section 23.

# EXHIBIT 11



# REAL ESTATE INFORMATION NETWORK, INC.

## APPLICATION FOR PARTICIPANT/STOCKHOLDER MEMBERSHIP

I, _____ **(Principal Broker), attest that I am actively engaged in brokerage activities, consisting of selling or offering for sale, buying or offering to buy, negotiating the purchase or sale or exchange of real estate, or leasing, renting or offering for rent any real estate, or negotiating leases thereof, or of the improvements thereon, as defined in §54.1-2100 of the Code of Virginia. (If you cannot make this attestation, you are not eligible to become a participant or stockholder member of REIN, pursuant to REIN's By-Laws). REIN does not offer membership to "paper brokerages" or those who engage only in referrals. REIN reserves the right to refuse (or revoke) membership to any broker that does not currently meet REIN's criteria for membership).**

1. a. Applicant's Name:   Zillow, Inc. _____ ████████

   _____
   (Firm License #)*

   _____
   (Trade As Name)

   ***Copy of Firm License received from DPOR must be submitted with this application***

   b. Applicant is a Principal Broker, duly licensed under the laws of the Commonwealth of Virginia or the following contiguous states: North Carolina, West Virginia, Washington DC, or Maryland.
   Operating as:

   **(Check one)**  ☐ **Sole Proprietor** _____ **EIN (Federal Tax ID)**
                      ☐ **Partnership** _____ **EIN**
                      ☑ **Corporation** ████████_____ **EIN**
                      ☐ **LLC** _____ **EIN**

   Principal Office as Registered with SCC:

   Zillow Inc. 1301 2nd Ave.   Floor 31, Attn: Legal
   _____
   (Name of Firm and Virginia Address as Registered with Virginia State Corporation Commission)
   Seattle WA 98101
   _____

   _____
   (Trade As Name)

   c. Select an Option:
   ☑ **Participant Membership** (Entitles member to full MLS Broker access)
   I, ████████_____ (Principal Broker), elect to become a
   Participant member of REIN and decline stockholder membership.

   ☐ **Stockholder Membership** (Entitles member to full MLS Broker access, provides an equity interest in REIN, allows the Principal Broker to serve on REIN's Board of Directors, and vote on matters at the annual Stockholder meeting)
   I, _____ (Principal Broker),
   elect to become a Stockholder Member.

2.  a.  Office Address (as registered with DPOR): 1301 2nd Ave, Floor 31, Attn: Legal

Seattle, WA 98101

Mailing Address (if different than physical address above):

Phone #: ███████████          Fax: _____

Office Email: ███████@zillowgroup.com

Web Site Address: www.zillow.com    www.trulia.com

Broker Email: ██████@zillowgroup.com

REIN.com Preferred Phone #* ██████████    REIN.com Preferred Email* ████████@zillowgroup.com
*above information allows firm to specify and alternative email/phone for REIN.com lead generation, instead
of using the Broker's preferred contacts for REIN communications.

b.  List branch office locations and real estate license numbers.  (Use separate sheet if needed.)
N/A

3.  a.  List names and real estate license numbers of Principal and Managing Brokers and sales agents currently
licensed with applicant.  (Use separate sheet if needed.)

| Names | Titles | License # |
|---|---|---|
| ██████████ | **Principal Broker** | ██████████ |
| | **Managing Broker (if applicable)** | N/A |

4.  Applicant agrees to furnish such additional information, including but not limited to credit or other references, as
may be deemed necessary by Real Estate Information Network, Inc., in order to properly process this application.

Revised 04/2020                          2 of 4                          Initials: ██████

**LICENSE AGREEMENT**
&
**ACKNOWLEDGMENTS AND UNDERSTANDINGS**

AS A BROKER MEMBER OF REAL ESTATE INFORMATION NETWORK, INC:

a. I/We have read, understand and agree to abide by the Rules and Regulations and By-Laws of the Real Estate Information Network, Inc. and such other regulations as may from time to time be approved and established.

b. I/We agree to attend the mandatory New Broker Orientation within the allotted time frame. New Broker Orientation classes are typically held the second week of every other month. New principal brokers and managing brokers are required to attend one of the first two scheduled meetings after approval. I acknowledge that non-compliance with this rule will result in $100 being assessed to my account for each missed orientation class.

c. I/We agree to indemnify and hold harmless Real Estate Information Network, Inc. for any judgment, attorneys' fees, expert fees, interest and costs that Real Estate Information Network, Inc. becomes liable for as a result of any conduct on the part of applicant.

d. I/We agree that REIN has copyrighted its forms regardless of the form or media in or on which the original and other copies may subsequently exist related to the purchase and sale of real property and has provided to its members the specific right to use such forms in accordance with the Rules and Regulations. Members must obtain a license from REIN to copy and use the REIN forms in an electronic format. Failure to obtain a license or to abide by said license shall be a violation of the Rules and Regulations. Members shall not provide the REIN Standard Purchase Agreement and related addenda to any non-member for use by that non-member or for use for any other purposes, and any such action shall be a violation of REIN's Rules and Regulations.

e. I/We agree that the listing data and information, including photos, which is compiled, generated and prepared by REIN in connection with its business ("Information"), is owned by REIN. The information is not generally ascertained from public records, published information or trade sources and is unique as compiled and prepared by REIN. The Information is designed to facilitate and further the exchange of information and services among Members for the sale, mortgage and lease of real property and the use of the Information by a Member for other than such purposes is prohibited. The REIN Information is the sole and exclusive property of Real Estate Information Network and is provided to its members for their use in accordance with the Rules and Regulations of Real Estate Information Network. No member shall disclose, disseminate or permit others to use the REIN Information, except in accordance with the Rules and Regulations.

f. I/We agree to make all listings submitted by this office available to all other REIN members regardless of the type of agency practiced.

g. I/We agree to use the Information solely for the purpose of providing background and comparable information in connection with the purchase, sale, lease, ownership, financing and refinancing of real property and for other similar uses. I further agree not to use the Information with respect to any real property for the preparation of calculations, appraisals or reports for persons who have no interest in said real property except for lenders for such real property.

h. I/We understand that REIN's primary relationship is with the Principal Broker of this firm and all interactions pertaining to REIN services are the responsibility of the Principal Broker.

i. I/We understand that it is the Principal Broker's responsibility to report to REIN any changes to firm information, including email, address, corporate or trading as firm name, etc., I/We understand that REIN's records must be the same as what is reported with DPOR and the SCC. Failure to do so may result in fines.

j. I/We understand that both Principal Broker and Firm license must be in an active status with DPOR in order to continue REIN services. I/We also understand that it is the Principal Broker's responsibility to report any changes regarding agents activating or deactivating within firm.

k. I/We understand that my firm's listings will be excluded from the Realtors Property Resource (RPR) data feed and that my firm's settled sales volume on REIN's monthly statistical reports will not be shown until after I have attended the Broker Orientation and completed the proper authorization forms.

Revised 04/2020                    3 of 4                    Initials: ▮▮▮▮▮▮▮▮

199

I.   Term and Termination – Principal Broker may terminate REIN membership, with or without cause, **with advanced written notice of intent to terminate.**   The Member's termination will be registered and processed by REIN **based on the date of receipt of this written notice.**  Principal Broker will remain liable for all amounts due and owing to REIN as of the effective date of membership termination.

On making this application, I/We hereby waive and release all claims against Real Estate Information Network, Inc., its officers, directors, employees, and any and all members, arising out of, o r in connection with, R E I N ' s consideration, rejection or acceptance of this application.

**FEES:**  In consideration for REIN providing access to REIN services, applicant broker shall pay the following at the time of application submission via **certified funds** made payable to REIN:

**Participant :**
Non-refundable Application Fee
Non-refundable Participant Fee
User Setup Fee
Quarterly Licensee Fee for Principal Broker



**Total Due:** ███████

**Stockholder:**
Non-refundable Application Fee
1 Share of Stock
User Setup Fee
Quarterly Licensee Fee for Principal Broker



**Total Due:** ██████

Signature: ████████████ _____   9/29/2020
                                                                                                     (Date)

Initials: █████

200

# EXHIBIT 12

# REIN MLS
## DATA ACCESS & LICENSE AGREEMENT

In exchange for the covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which each party acknowledges, this MLS Data Access and License Agreement including its schedules ("License Agreement"), is entered into as of the Effective Date shown in the Signature Page hereto by and between Real Estate Information Network, Inc. ("REIN" or "Licensor") and the vendor sponsored by a REIN Broker Member, identified in the Signature Page ("Vendor").

1.  Definitions.  Capitalized terms used in this License Agreement shall have the meanings set forth below as well as elsewhere in this License Agreement and in the REIN Rules and Regulations.

    a.  Confidential Information:  as defined in Section 5 below.

    b.  REIN Listings Information:  the compilation of listing data of real property that is submitted to the REIN MLS system by REIN Broker Members or Broker Member's licensees.  For purposes of this License Agreement, the term REIN Listings Information shall also include contents of REIN's database, Broker Member or licensee information and photos that reside in the REIN MLS database system and/or that is added by REIN to the REIN MLS database, but shall exclude any listing, or portion thereof, excluded pursuant to REIN's Rules and Regulations.

    c.  License Fees:  the setup and quarterly fees specified in Schedule A hereto, and any additional fees set forth herein.  Unless expressly stated to the contrary, setup fees are payable upon execution of this License Agreement; quarterly fees are payable quarterly as described in Schedule A and Section 9.

    d.  Licensed Subject Matter:  the Licensed Subject Matter consists of those portions of the REIN Listings Information that REIN licenses to Vendor pursuant to this License Agreement, by Data Feed or other delivery mechanisms selected by REIN in its sole discretion, for use in accordance with this License Agreement and REIN's Rules and Regulations.

    e.  Rules and Regulations: REIN's Rules and Regulations, as amended and modified from time to time by REIN, in its sole discretion.  REIN's current Rules and Regulations are attached hereto as Schedule B.

    f.  Broker Member means any broker member of REIN, in good standing.

    g.  Licensee means a licensee whose license is under a Broker Member.

    h.  Vendor:  any consultant, independent contractor, affiliate, or partner that Broker Member or Licensee engages or retains to provide it with assistance in delivering Approved Products utilizing REIN Licensed Subject Matter.  Vendors include but are not necessarily limited to consultants and contractors who perform data downloading, manipulation, formatting, programming, Internet web-site design and/or hosting or back-up services.  Broker Members may serve as their own Vendor for the purposes of managing and accessing Licensed Subject Matter, and in such cases, must enter into this License Agreement.

    i.  Data Feed:  the principal mode of transmission of Licensed Subject Matter from REIN to Vendor.

    j.  Approved Product:  Vendor's product or service offering to REIN's Broker Members and Licensees, following its final approval by REIN, after completion of the process described in

202

Section 4 of this License Agreement. An approved Product may not be one that is resold or re-disseminated by REIN Broker Members or Licensees, for compensation.

k.  Go-Live Date:  the date REIN approves a Vendor's product for release or sale to Vendor's customers (REIN Broker Members and/or Licensees).  This is the commencement date for REIN's quarterly billing to Vendor.

2.  **License Grant.**  REIN hereby grants to Vendor a limited, nonexclusive, nontransferable license and right to use the Licensed Subject Matter provided to it by REIN only as is expressly authorized in this License Agreement and REIN's Rules and Regulations.

a.  **Changes in Rules and Regulations.**   Vendor acknowledges that it has received and reviewed REIN's current Rules and Regulations attached hereto as Schedule B, and that REIN may amend the Rules and Regulations at any time, in its sole discretion.  REIN will notify Vendor, by email or other electronic means, of any amendments to its Rules and Regulations.  Vendor agrees to review regularly the Rules and Regulations and to always conform its use of the Licensed Subject Matter to the current REIN Rules and Regulations.  In the event that Vendor does not agree to abide by REIN's Rules and Regulations as they may be modified in the future, Vendor shall immediately cease all access to and use of the Licensed Subject Matter and immediately inform REIN that it is terminating this License Agreement.

b.  **Prohibited Uses.**  In addition to any restrictions in the Rules and Regulations and elsewhere in this License Agreement, Vendor agrees that it shall not: (a) reproduce, modify, distribute, disclose, or display the Licensed Subject Matter other than as is expressly authorized in this License Agreement, the Acceptable Use Worksheet (as defined below) and the Rules and Regulations. (Notwithstanding the foregoing, Vendor may distribute only the listings of the REIN Broker Member identified on the Signature Page of this License Agreement, only to recipients approved in writing by such Broker Member); (b) decode, decompile, disassemble, reverse assemble or otherwise reverse engineer the Licensed Subject Matter; (c) acquire, access or attempt to acquire or access REIN Listings Information  in any manner other than as the Licensed Subject Matter is provided by REIN; (d) violate, attempt to violate, interfere with, disrupt, or undermine any security measures employed by REIN; (e) distort or damage the Licensed Subject Matter, including the databases comprising the Licensed Subject Matter; (f) make false or misleading representations with respect to the Licensed Subject Matter; (g) fail to take adequate electronic and other security precautions to prevent unauthorized access to and use of the Licensed Subject Matter in its possession or otherwise as received or disseminated by it; (h) violate any law or regulation in connection with its possession, handling, manipulations and other use of the Licensed Subject Matter.  Without limiting the generality of the foregoing, Vendor specifically agrees that it will not use any of the Licensed Subject Matter in an Approved Product, or market or sell an Approved Product, in such a way as will violate the Real Estate Settlement Practices Act ("RESPA") or cause or contribute to a Broker Member, or any of its agents, violating RESPA. Vendor will indemnify and hold harmless REIN, Vendor's sponsoring Broker Member, and its agents, from any claims against them based on allegations that Vendor's Approved Product, or the manner in which such Approved Products were marketed or sold, violate RESPA or any other law; (i) sell, rent, license or sublicense the Licensed Subject Matter to anyone or any entity without prior written authorization by REIN; (j) incorporate the REIN Listings Information or the Licensed Subject Matter into an independent multiple listing service marketed to real estate professionals; and (k) sell, rent, license, sublicense or distribute or disseminate the Licensed Subject Matter, in whole or in part, or any Approved Product, to any person or entity other than a REIN Broker Member or Licensee.  (Notwithstanding the foregoing, Vendor may distribute only the listings of the REIN Broker Member identified on the Signature Page of this License Agreement, only to recipients approved in writing by such Broker Member).

c.  **Reservation.**  REIN reserves all rights not expressly licensed.

2/2014

d.  Ownership.  Notwithstanding Vendor's limited license to use the Licensed Subject Matter, REIN shall at all times remain the owner of all right, title and interest in and to the Licensed Subject Matter, including all patent, copyright, trade secret and other intellectual property interests.

e.  Use of Subcontractors.  To the extent any Vendor (including any Broker Member or Licensee serving as its own Vendor (in the case of Licensee, only with the written approval of its Broker Member)) disseminates the Licensed Subject Matter, or any part thereof, to any third person (including any other Vendor) ("Subcontractor") in connection with the creation, administration or implementation of an Approved Product on behalf of Vendor, Vendor agrees to have any such Subcontractor agree, in writing, to all of the provisions of this License Agreement applicable to the Licensed Subject Matter, in writing, in a form acceptable to REIN (Schedule C or D, depending on whether the subcontract only applies to creation of the Approved Product (Schedule C) or its ongoing administration and implementation (Schedule D)), naming REIN as an express and intended third-party beneficiary of such agreement with the independent right to enforce such agreement.  In addition, REIN may hold Vendor liable for any breach of this License Agreement, even if it occurs as a result of the actions or inactions of Vendor's Subcontractors.  Upon execution of a Long-Term Subcontractor Agreement, and for so long as such Long-Term Subcontractor Agreement remains in effect and has not been terminated with written notice to REIN and the Subcontractor, Vendor agrees to pay REIN the quarterly fees set forth on Schedule A, as adjusted by REIN from time to time pursuant to Section 9(b).

3.  Right to Suspend Access and Delivery.  In addition to its other rights and remedies under this License Agreement and available under applicable law, REIN reserves the right to suspend or terminate access to or provision of Licensed Subject Matter in the event that Vendor (or Vendor's Subcontractor(s)) violates any of the restrictions in this License Agreement, or otherwise, in REIN's sole discretion.  REIN may suspend or terminate a Data Feed to Vendor if the Vendor, or the Vendor's Approved Product(s), violate this License Agreement (and the Vendor fails to timely remedy the violation).  REIN reserves the right to suspend access to a Data Feed to Vendor, or to not approve a request for a Data Feed from a Vendor, for any reason, in REIN's sole discretion.

4.  Vendor Obligations.

a.  Vendors may access and use the Licensed Subject Matter only for the sole purpose of preparing or providing Approved Products to REIN Broker Members and Licensees.  (Notwithstanding the foregoing, Vendor may distribute only the listings of the REIN Broker Member identified on the Signature Page of this License Agreement, only to recipients approved in writing by such Broker Member).  Under no circumstances may Vendor charge or contract with any person or entity other than REIN Broker Members or Licensees for Approved Products.

b.  Before disseminating any Approved Product to any REIN Broker Member or Licensee:

(1)  Vendor shall submit to REIN a fully completed Broker Sponsorship form (Schedule E).

(2)  Vendor shall cooperate with REIN in completing the Acceptable Use Worksheet (Schedule F), one for each product offering Vendor proposes to disseminate to REIN Broker Members or Licensees.  Vendor agrees to immediately notify REIN in writing when there is a change to the Approved Product.  Vendor is required to submit another Acceptable Use Worksheet itemizing or describing product changes or new product offerings, for REIN's review.  Any new or updated product offerings will undergo a compliance review by REIN and Vendor agrees to pay the compliance review fees in Schedule A.

(3)  Vendor shall submit to REIN, in writing, a complete list of features and functions of its proposed product offering.

2/2014

(4)    Vendor shall provide a production site available to REIN for accessing and reviewing the product offering and must pass a full compliance review prior to the Go-Live Date, when Vendor will receive a full Data Feed from REIN for the Approved Product.

c.    Vendor is required to provide a monthly report to REIN as described in Schedule G which lists all users of each Approved Product that Vendor disseminates to REIN Broker Members or Licensees. The format of this report will be determined by REIN.

d.    If Vendor's Broker Member sponsor no longer subscribes to Vendor's Approved Product, REIN reserves the right to suspend access to the Data Feed until Vendor secures another REIN Broker Member sponsor.  Any fees paid are non-refundable.

e.    Unless otherwise agreed, in writing, if Vendor's product does not become an Approved Product within ninety (90) days of the Effective Date of this Agreement (Go-Live Date), REIN, in REIN's sole discretion, may rescind the License Agreement as to that product.  In such cases, any fees paid by Vendor to REIN are non-refundable.

5.    Confidentiality.    Vendor agrees that the Licensed Subject Matter comprises and contains the confidential and trade secret information of REIN, and further that the manner, methods and terms on which REIN provides the Licensed Subject Matter is also the confidential and trade secret information of REIN (collectively, the "Confidential Information").  It is expressly agreed that the Licensed Subject Matter and the compilation and collection of the REIN Listings Information constitutes REIN Confidential Information even though individual data comprising the compilation is or may be publicly known.  Confidential Information also includes any non-public information disclosed by or received from REIN in the course of this License Agreement and the parties' performance hereunder. Confidential Information does not include information that is or becomes generally known to the public other than by reason of violation of this License Agreement, information that is independently developed by Vendor, as evidenced by contemporaneous documentation, and information that is learned from third parties lawfully holding same and not under an obligation of confidentiality to REIN or its affiliates or licensors.  Vendor agrees that it shall not use the Confidential Information except for the purposes or uses expressly authorized by this License Agreement and the Vendor's Approved Product, and that it shall not disclose or disseminate the Confidential Information to any third party without the express prior written consent of REIN, excepting only that it may make limited disclosures of Confidential Information to its employees and customers as authorized herein for their use solely to the extent necessary for such third parties to assist Vendor in exercising its rights and performing its obligations under, and only for use in accordance with the terms and restrictions of, this License Agreement, including the applicable Rules and Regulations.  Vendor shall be responsible for ensuring that any such authorized third-party recipients of Confidential Information agree to hold same in confidence as required by this License Agreement and, in the case of Licensed Subject Matter, that they agree to use same only as is permitted by this License Agreement and applicable Rules and Regulations. Vendor shall safeguard the Confidential Information against unauthorized use and disclosure with means at least as stringent as it employs to protect its own confidential, proprietary and trade secret information, and in no event with less than reasonable means calculated to prevent effectively unauthorized use and disclosure (including but not necessarily limited to firewall, encryption and access controls on servers and other electronic media containing the Confidential Information to prevent unauthorized access and use).  Vendor's obligations of confidentiality as set forth in this Section 5 are in addition to and not in lieu of its obligations as a matter of law, and its obligations of confidentiality shall survive the termination or expiration of this License Agreement without limitation in duration for so long as the information continues to meet the definition of Confidential Information.

6.    Audit.  REIN shall have the right (itself or through a designee of its choice) to inspect and audit the facilities and records of Vendor to monitor and verify its compliance with this License Agreement. Such audits may be conducted at any time while this License Agreement is in force and within six (6)

months after the termination or expiration of this License Agreement, but REIN shall not exercise its audit right more than two (2) times in any calendar year. REIN shall provide at least five (5) business days advance notice of any audit, and shall conduct same during regular business hours. Vendor agrees to make its facilities and records available and to cooperate with the conduct of any audits. Such audits shall be conducted at Licensor's expense, except that Vendor shall bear the cost of an audit in the event it reveals material noncompliance with the terms and conditions of this License Agreement.

7.   Warranty Disclaimer and Limitations.

   a.   No Warranty. The Licensed Subject Matter and REIN Listings Information are provided "AS IS" and "WITH ALL FAULTS." REIN makes no express warranties, and it disclaims all implied warranties, including without limitation any implied warranties of title, noninfringement, noninterference, accuracy, merchantability or fitness for any particular use or purpose. REIN makes no representation with respect to the accuracy or completeness of the REIN Listings Information or the Licensed Subject Matter or whether any results can be obtained by the use thereof. REIN further does not warrant that the Licensed Subject Matter will be available without interruption or communication failure.

   b.   LIMITATION OF LIABILITY. IN NO EVENT SHALL REIN, ITS OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES OR LICENSORS BE LIABLE TO VENDOR, OR CUSTOMERS OF VENDOR, OR ANYONE ELSE, UNDER ANY LEGAL THEORY, FOR INDIRECT, PUNITIVE, SPECIAL, EXEMPLARY, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOST PROFITS, LOST DATA, LOST BUSINESS AND LOST OPPORTUNITY) IN CONNECTION WITH THIS LICENSE AGREEMENT OR VENDOR'S OR ITS CUSTOMERS' USE OR INABILITY TO USE THE LICENSED SUBJECT MATTER OR APPROVED PRODUCT INCORPORATING OR INCLUDING, IN WHOLE OR IN PART, THE LICENSED SUBJECT MATTER.

   c.   LIMITATION OF REMEDIES. IN NO EVENT SHALL REIN'S CUMULATIVE MONETARY LIABILITY TO VENDOR (INCLUDING VENDOR'S CUSTOMERS) EXCEED THE AGGREGATE AMOUNT PAID BY LICENSEE TO REIN IN THE ONE-YEAR PERIOD IMMEDIATELY PRECEDING THE DATE ON WHICH THE CLAIM AGAINST REIN FIRST ACCRUED.

   d.   LIMITATION OF ACTIONS. IN NO EVENT SHALL VENDOR BRING ANY CAUSE OF ACTION OR CLAIM FOR RELIEF OF ANY TYPE AGAINST REIN MORE THAN ONE (1) YEAR AFTER SUCH CLAIM OR CAUSE OF ACTION FIRST ACCRUED.

   e.   Acknowledgment. Vendor and REIN agree that the disclaimers and limitations set forth in this Section 7 reflect an effort by the parties to allocate the business risk between them given the nature of the transaction being undertaken, and that the allocation embodied in this Section 7 is reasonable.

8.   Indemnity. Vendor shall indemnify REIN, its officers, directors, employees, and affiliates and hold them harmless against any claims, causes of action, damages, liabilities, demands, damages, fines, expenses and costs (including reasonable attorneys' fees) that stem from, arise from or are related to: (a) the use, reproduction, display, transmission, advertising, distribution or dissemination of the Licensed Subject Matter and the REIN Listings Information, including in any Approved Product incorporating or including such information, in whole or in part; or (b) Vendor's Approved Product, including claims that any Approved Product violates the intellectual property rights of any third party. This provision shall survive the termination or expiration of the License Agreement.

2/2014

9.    Payment of License Fees.

    a.    Method and Timing of Payment.  Setup fees, in the amounts set forth on Schedule A, are payable in full upon execution of this License Agreement and are non-refundable.  REIN shall also require payment in the equivalent of one quarter's license fees, as set forth on Schedule A, upon execution of this License Agreement. Quarterly billings will be invoiced in advance and are not refundable.

    b.    Adjustment to Fees.  REIN shall have the right, in its sole discretion, to modify fees applicable to Licensed Subject Matter by giving thirty (30) days prior written notice of same to Vendor.  In the event Vendor requests a Data Feed or delivery of Licensed Subject Manner not provided by REIN in the ordinary course, REIN reserves the right to specify a different fee for such delivery.

10.    Term and Termination.

    a.    Term.  This License Agreement takes effect as of the Effective Date stated on the Signature Page and shall remain in force on a quarterly basis, renewing automatically for successive quarterly terms upon Vendor's timely payment of the applicable fees stated in Schedule A.

    b.    Termination for Convenience.  Either party may terminate this License Agreement without cause by giving thirty (30) days prior written notice of termination to the other party.

    c.    Termination for Cause.   Either party may terminate this License Agreement upon a material uncured breach of the License Agreement by the other (including a breach by Vendor's employees), other than nonpayment, by giving thirty (30) days written notice of termination specifying the breach with particularity, and termination shall be effective at the end of such thirty-day period unless the breach is then fully cured. In the event REIN, in its sole discretion, deems the material breach to be of a serious nature, or in the event of a default in any payments required under this License Agreement, REIN reserves the right to terminate this License Agreement by giving five (5) days written notice of termination as provided for herein, and termination shall be effective at the end of such five-day period unless the breach is then fully cured. Violation of REIN's Rules and Regulations shall constitute a material breach of this License Agreement.  The failure by Vendor to ensure compliance with the obligations of this License Agreement by its Subcontractors and employees shall also constitute a material breach of this License Agreement.

    d.    Termination for Default.  REIN may terminate this License Agreement immediately and without written notice to Vendor upon the occurrence of an Event of Default.  Events of Default include: (1) if Vendor assigns or attempts to assign this License Agreement or its rights or obligations hereunder in violation of this License Agreement; (2) if Vendor assigns or attempts to assign this License Agreement for the benefit of creditors; (3) if Vendor ceases to do business for more than thirty (30) days, is dissolved or liquidates; (4) if Vendor becomes insolvent, or becomes unable to pay its bill as they generally become due; (5) if Vendor becomes the subject of voluntary or involuntary bankruptcy or receivership proceedings, and such proceedings are not dismissed within (90) days; (6) if Vendor ceases to have REIN Broker Member or Licensee customers; or (7) if Vendor makes unauthorized use or disclosure of REIN Confidential Information, the Licensed Subject Matter or the REIN Listings Information.

    e.    Effects of Termination or Expiration.  Upon termination or expiration of this License Agreement, Vendor shall return to REIN all Confidential Information, Licensed Subject Matter and REIN Listings Information in its possession, custody and control (or, at the option of REIN, certify in writing that all such matter and information has been destroyed in a manner that prevents undeletion and reconstruction).

2/2014

11. General Provisions.

a. Entire Agreement. This License Agreement is the entire agreement between REIN and Vendor with respect to the subject matter of this License Agreement, and it supersedes all prior agreements, understandings and representations with respect to the subject matter of this License Agreement. Except as is provided herein to the contrary, this Agreement can be modified only by a written instrument executed by duly authorized representatives of each of REIN and Vendor.

b. Compliance with Laws. Vendor shall comply with all applicable laws and regulations in connection with its use of the Licensed Subject Matter.

c. No Waiver. No delay or omission by either party hereto in exercising any right or power accruing upon the compliance or failure of performance by the other party hereto under the provisions of this License Agreement or documents entered into pursuant to this License Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by a party hereto of a breach of any of the covenants, conditions or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

d. No Assignment. This License Agreement and the license granted herein are personal to Vendor. Vendor shall not assign, transfer, or convey this License Agreement or its rights and obligations hereunder without the express, prior written consent of REIN, which consent may be granted or withheld in REIN's sole discretion.

e. Relationship of Parties. The parties are independent entities. Nothing in this License Agreement or the parties' conduct pursuant to it shall create a relationship of partnership, joint venture, agency, franchise, or employer-employee. This is not an agreement for a transaction in goods under the Uniform Commercial Code.

f. Survival. The following provisions of this License Agreement survive the termination or expiration of the License Agreement Sections 2(c) and (d), 5, 6, 7, 8, 10(e) and 11.

g. REIN's Remedies. Vendor agrees that any unauthorized use or disclosure of the Licensed Subject Matter and/or the Confidential Information would cause REIN irreparable harm for which it could not be fully compensated by money damages, and that in the event of such unauthorized use or disclosure REIN shall be entitled, in addition to other available relief, to seek and obtain preliminary and permanent injunctive relief, including specific performance, without the necessity of posting bond or security.

h. Attorney's fees. In the event REIN substantially prevails in a dispute with Vendor in connection with this License Agreement or the rights licensed herein, Vendor shall pay REIN its reasonable attorneys' fees, expert fees and costs incurred in connection with such dispute.

i. Notices. Any Notice required or permitted under this License Agreement shall be sufficiently given if delivered personally or sent by first class U.S. mail, postage prepaid; registered or certified mail, postage prepaid and return receipt requested; or by Federal Express or other reputable overnight and delivery service, to the Notice Address of the receiving party. The Notice Address of REIN is:

> 4575 Bonney Road
> Virginia Beach, VA 23462

The Notice Address of Vendor is set forth on the Signature Page. Either party may change its Notice Address by giving proper notice hereunder. Notice given by first class U.S. mail shall be

2/2014

Authentisign ID: 0767F89D-6C7A-4F8D-8124-C99D4B9C1-1D8B2B12F3E7

deemed give forty-eight (48) hours after deposit; notice by other means shall be deemed given the day of delivery.

j.     Governing Law, Jurisdiction and Venue. This License Agreement shall be governed by, and construed in accordance with the substantive laws of the Commonwealth of Virginia, without regard to its choice of law rules.   Any legal or equitable action arising in connection with this License Agreement or the rights granted hereunder shall be commenced and maintained exclusively in the U.S. District Court for the Eastern District of Virginia, Norfolk Division or the Circuit Court for the City of Virginia Beach, Virginia, and Vendor irrevocably consents to personal jurisdiction and venue in such courts.  Vendor agrees that, by entering into this License Agreement, it is transacting business in Virginia for purposes of applying the Virginia Long-Arm statute.

k.     Severability.  If any provision, or portion of a provision, of this License Agreement is finally held by a court of competent subject matter jurisdiction to be void, invalid, unenforceable or otherwise contrary to law or equity, the parties agree that such provision or portion thereof shall be reformed automatically to the extent necessary to cure such defect, or if necessary to delete such provision, and that the remainder of this License Agreement that can be given effect shall remain in full force and effect.

l.     No Third Party Beneficiaries.   Except as is expressly provided herein to the contrary, no term or provision of this Agreement is intended to be, nor shall any such term or provision be construed to be, for the benefit of any third-party person, firm, corporation or any other entity.

m.    Headings.  The headings in this License Agreement are for the convenience of the reader and shall not be construed to expand, limit or alter the substance of any provision.

[The remainder of this page is left blank intentionally.]

# REIN MLS DATA
# ACCESS AND LICENSE AGREEMENT

## SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have executed this Data Access and License Agreement by their authorized representatives as of the Effective Date of ___03/09/2021___.

**Vendor and Vendor's Notice Address**       **Real Estate Information Network, Inc.**

Company Name: Zillow, Inc.

Address: 1301 Second Ave, Floor 31, ATTN: Legal      Address: ___4575 Bonney Road___

City, State &ZIP: Seattle, WA 98101      City, State & ZIP: ___Virginia Beach, VA 23462___

Phone: ████      Phone: ████

Contact Name: ████      Date: ___03/09/2021___

Email: ████@zillowgroup.com      Name: ████

Signature: ████      Signature: ████
DocuSigned by:      Authentisign
900D5844BBB6446...      3/9/2021 8:48:29 AM EST

---

### REIN USE ONLY

Broker Sponsorship Form Received: _____

Acceptable Use Worksheet Approved: _____

Data License Agreement Received: _____

Payment(s) Received: _____

Estimated Go-Live Date: _____

RETS Credentials: _____

Product in compliance (passed): _____

Actual Go-Live Date: _____ (Within 90 days of Effective Date of this Agreement; quarterly billing commences as of this date)

---

2/2014

# EXHIBIT 13

# Real Estate Information Network Inc.'s



# Rules and Regulations

**Approved by BOD:**
**06/18/2020**

**Released:**
**07/15/2020**

# TABLE OF CONTENTS

1 **1. DEFINITIONS** ................................................................................................ **4**

2 **1.1. ADMINISTRATIVE PERSONNEL**……………………………………………………………**4**
3 **1.2. AFFILIATE** .................................................................................................... **4**
4 **1.3. APPRAISER MEMBER** .................................................................................. **4**
5 **1.4. AUTHORIZED USER** .................................................................................... **4**
6 **1.5. BROKER MEMBER** ...................................................................................... **4**
7 **1.6. COMMERCIAL LISTING** .............................................................................. **4**
8 **1.7. DATA FEED** .................................................................................................. **4**
9 **1.8. DATA INPUT SHEET** .................................................................................... **4**
10 **1.9. EXCLUSIVE LISTINGS** ................................................................................ **4**
11 **1.10. INTERNET DATA EXCHANGE (IDX) DATA FEED** ......................................... **4**
12 **1.11. KEYBOX SYSTEM RULES ("POLICIES AND PROCEDURES")** ....................... **4**
13 **1.12. LICENSEE** ................................................................................................... **4**
14 **1.13. LISTINGS INFORMATION** ........................................................................... **4**
15 **1.14. MEMBER** .................................................................................................... **4**
16 **1.15. OFF-MARKET LISTINGS** ............................................................................. **5**
17 **1.16. PARTICIPANT MEMBER** ............................................................................. **5**
18 **1.17. REGISTRANT** .............................................................................................. **5**
19 **1.18. REIN** .......................................................................................................... **5**
20 **1.19. REIN MLS COMPUTER SYSTEM ("REIN SYSTEM")** .................................. **5**
21 **1.20. REIN PRIMARY SERVICE AREA** .................................................................. **5**
22 **1.21. RENTAL LISTINGS** ...................................................................................... **5**
23 **1.22. RULES AND REGULATIONS** ........................................................................ **5**
24 **1.23. SOLD DATA** ................................................................................................ **5**
25 **1.24. STOCKHOLDER MEMBER** ........................................................................... **5**
26 **1.25. SUPRA KEYBOX SYSTEM ("KEYBOX SYSTEM")** ....................................... **5**
27 **1.26. UNLICENSED ASSISTANT** ........................................................................... **5**
28 **1.27. VENDOR** .................................................................................................... **6**
29 **1.28. VIRTUAL OFFICE WEBSITE ("VOW")** ....................................................... **6**

30 **2. MEMBERSHIP AND FEES** ...................................................................... **6**

31 **2.1. MEMBERSHIP** ............................................................................................ **6**
32 **2.2. REPORTING REQUIREMENTS TO REIN** ...................................................... **7**
33 **2.3. FEES** .......................................................................................................... **8**
34 **2.4. PASSWORDS:** ............................................................................................. **10**
35 **2.5. VIOLATION OF RULES AND REGULATIONS** ................................................ **10**

36 **3. LISTINGS** ................................................................................................ **10**

37 **3.1. EXCLUSIVE LISTING SUBMISSION REQUIREMENTS** .................................. **10**
38 **3.2. LISTING RULES** .......................................................................................... **12**

39 **4. COOPERATION AMONG MEMBERS/OFFER OF COMPENSATION** ...... **15**

40 **4.1. COOPERATION RULES** ............................................................................... **15**
41 **4.2. OFFER OF COMPENSATION** ........................................................................ **16**

42 **5. USE OF REIN LISTINGS INFORMATION** .............................................. **17**

43 **5.1. REIN OWNERSHIP** ..................................................................................... **17**
44 **5.2. USE OF REIN LISTINGS INFORMATION** ..................................................... **18**
45 **5.3. REIN'S COPYRIGHT** .................................................................................. **18**
46 **5.4. MEMBERSHIP EMAIL INFORMATION** ........................................................ **18**

Approved 06/18/2020 Released 07/15/2020        2 of 34
REIN Rules and Regulations

213

47     **5.5.**     REIN CONTRACTS & FORMS ........................................................................ **18**

48     **5.6.**     LISTING FIRM NAME ................................................................................. **19**

49     **5.7.**     PERPETUAL LICENSE IN BROKER'S OWN LISTINGS .................................... **19**

50     **5.8.**     CONFIDENTIAL FIELDS .............................................................................. **19**

51     **5.9.**     LIMITED USE OF OFF-MARKET LISTINGS (EXPIRED, WITHDRAWN & FALL-THROUGH) ...... **19**

52     **5.10.**   COMPARATIVE MARKET ANALYSIS ............................................................ **19**

53     **5.11.**   REIN LISTINGS INFORMATION DISTRIBUTION ("REASONABLE" NUMBER OF COPIES) ..... **19**

54     **5.12.**   ADMINISTRATIVE PERSONNEL ACCESS ...................................................... **19**

55     **5.13.**   REIN SYSTEM PUBLIC RECORDS AND TAX DATA ......................................... **19**

56     **5.14.**   REIN SYSTEM USAGE ................................................................................ **20**

57     **5.15.**   DISPLAY OF LISTING INFORMATION ON ELECTRONIC MEDIA: ...................... **20**

58     **5.16.**   USE/MISUSE OF STATISTICAL REPORTS, CHARTS, GRAPHS & BROKER STANDING/RANKING REPORTS .. **20**

59     **6.**      **USE AND DISPLAY OF REIN LISTINGS INFORMATION/LISTING DATA FEEDS** ........... **20**

60     **6.1.**     ANALYTIC DATA FEED ............................................................................. **20**

61     **6.2.**     IDX: USE & DISPLAY OF REIN LISTINGS INFORMATION FOR WEBSITE & OTHER APPLICATIONS ... **22**

62     **6.3.**     VIRTUAL OFFICE WEBSITES (VOW'S) ...................................................... **27**

63     **6.4.**     BROKER MEMBER'S OWN LISTINGS ("BMO") DATA FEED .......................... **33**

64     **7.**      **KEYBOX SYSTEMS** ................................................................................. **33**

65     **7.1.**     KEYBOX SYSTEM ..................................................................................... **33**

66     **7.2.**     KEY ISSUANCE ........................................................................................ **33**

67     **7.3.**     REIN KEYBOX SYSTEM RULES .................................................................. **33**

68     **7.4.**     OTHER APPROVED MLS/ASSOCIATION KEYBOX SYSTEM ............................. **33**

69     **8.**      **AMENDMENTS** ...................................................................................... **33**

70     **8.1.**     PROPOSAL PROCESS ................................................................................ **33**

71     **8.2.**     ADOPTION .............................................................................................. **33**

72     **8.3.**     SUBMISSION TO STOCKHOLDERS .............................................................. **34**

73     **9.**      **MISCELLANEOUS  NOTICES** ................................................................. **34**

74     **9.1.**     NOTICES ................................................................................................. **34**

75     **10.**     **PROMULGATION OF RULES AND REGULATIONS** ................................... **34**

76     **10.1.**   AVAILABILITY ........................................................................................ **34**

# 1. <u>DEFINITIONS</u>

**1.1.    Administrative Personnel:** A non-licensed person who works for the Member and is in need of accessing REIN's services and information.

**1.2.    Affiliate:** Individuals, partnerships, firms, associations, corporations, businesses, government entities, or legal entities engaged in a real estate related service, business or profession who have been permitted access to certain services and information as determined by REIN's Board of Directors.

**1.3.    Appraiser Member:** Any person licensed as a real estate appraiser who is entitled to have access to or to receive REIN's services and information.

**1.4.    Authorized User:** Any Broker Member and their Licensees, Appraiser Member, Affiliate or Member Administrative Personnel authorized by REIN to use REIN data in accordance with the Rules and Regulations.

**1.5.    Broker Member:** A Stockholder or Participant Member of REIN as defined by REIN's By-Laws.

**1.6.    Commercial Listing:** Classification of real estate that includes income-producing properties such as office buildings, gas stations, restaurants, shopping centers, hotels and motels, parking lots and stores. Commercial properties must be zoned commercial in order to be input as commercial.

**1.7.    Data Feed:** A data delivery mechanism specified by REIN and which is subject to change with proper notice for providing REIN Listings Information to approved Broker Members, Licensees and Vendors.

**1.8.    Data Input Sheet:** Form used to fill out certain fields of information about the property to be listed. A specific data input form is used for each property type. Seller and agent signatures are required on this form.

**1.9.    Exclusive Listings:** All property listings that are listed by a Broker Member.

**1.10.    Internet Data Exchange (IDX) Data Feed:** An industry standard data protocol which is a data feed of limited data fields comprised of active and pending REIN Listings Information of Broker Members who have opted in their listings, including sellers who have not opted out their listings, and sold listings for display on Broker Members' IDX websites to the general public. IDX is considered a form of advertising.

**1.11.    Keybox System Rules ("Policies and Procedures"):** The rules pertaining to the use of the Keybox System as set forth in these Rules and REIN's Policies and Procedures.

**1.12.    Licensee:** A licensed real estate person whose license is registered with a Broker Member or a licensed real estate appraiser whose license is registered with an Appraiser Member.

**1.13.    Listings Information:** The compilation of property information derived from all Exclusive Listings entered into REIN's System, including all content and especially including photographs, video, and text.

**1.14.    Member:** Shall mean all Stockholder Members, all Participant Members and all Appraiser Members entitled to list real estate properties with REIN or to have access to or to receive REIN services and information.

**1.15.**   **Off-Market Listings**: Off-Market Listings are listings that are no longer active in the REIN system. Statuses are Withdrawn, Expired, Fall Thru, Pending, Sold and Rented.

**1.16.**   **Participant Member:** Shall mean real estate brokerages, including sole proprietors, partnerships, firms, associations, corporations or other business or legal entities duly licensed by the appropriate governmental authority as a broker to sell real estate (those selling or offering for sale, buying or offering to buy, or negotiating the purchase or sale or exchange of real estate VA. Code Section 54.1-2100 "brokerage activities") provided they are actively engaged in brokerage activities and have applied for and been granted rights as a Participating Member of REIN.

**1.17.**   **Registrant:** A consumer with whom a Broker Member has established through their Virtual Office Website a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers**.**

**1.18.**   **REIN:** The Real Estate Information Network Inc. which is the Multiple Listing Service.

**1.19.**   **REIN MLS Computer System ("REIN System"):** The network of computer/web systems that stores all REIN Listings Information, membership information, tax data information and Licensee customer/client information which is accessed by Broker Members, their Licensees, and Administrative Personnel, REIN personnel and REIN Appraiser Members and Administrative Personnel and in a limited capacity by REIN Affiliates.

**1.20.**   **REIN Primary Service Area:** Includes Norfolk, Portsmouth, Chesapeake, Virginia Beach, Suffolk, Isle of Wight, Smithfield, Franklin, Hampton, Newport News, York County, and Poquoson. In addition to the Primary Service Area, the Extended Service Areas are Emporia, James City, Greensville, Mathews, Gloucester, Middlesex, Williamsburg, and any other areas of Virginia, areas of North Carolina, and other out-of-state areas as approved by the Board of Directors.

**1.21.**   **Rental Listings**: A classification of real estate that includes properties being offered for rent/lease.

**1.22.**   **Rules and Regulations:** Standards of conduct regarding participation in REIN as outlined in REIN's most current Rules and Regulations, and any supporting documents referenced therein.

**1.23.**   **Sold Data:** Listings which have been reported and entered as closed/settled.

**1.24.**   **Stockholder Member:** Shall mean real estate brokerages, including sole proprietorships, partnerships, firms, associations, corporations or other business or legal entities duly licensed by the appropriate Virginia governmental authority to engage in real estate brokerage activities (e.g., those selling or offering for sale, buying or offering to buy, or negotiating the purchase or sale or exchange of real estate as defined in VA Code Section 54.1-2100 "brokerage activities") provided they are actively engaged in brokerage activities and own stock in REIN.

**1.25.**   **Supra Keybox System ("Keybox System"):** The primary key and keybox system approved for use on properties listed in the REIN System.

**1.26.**   **Unlicensed Assistant:** An individual who:
   (a) is solely acting to assist a licensed real estate agent in conducting their bona fide real estate business under the ongoing active supervision and control of a licensed real estate agent;
   (b) is not accessing or using the REIN database on his or her own behalf, or on behalf of a third party, such as a real estate investor, other than as specifically directed and supervised by a licensed real estate agent; and

(c) will not perform any actions that require a real estate license under the laws of the Commonwealth of Virginia.

**1.27.**  **Vendor:** A REIN Data Feed recipient.

**1.28.**  **Virtual Office Website ("VOW"):**  A Broker Member's or Licensee's Internet website, or a feature of a Broker Member's or Licensee's  website, through which the Broker Member or Licensee is capable of providing real estate brokerage services to consumers with whom the Broker Member or Licensee has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search REIN Listings Information, subject to the Broker Member's or Licensee's oversight, supervision, and accountability.

# 2.  <u>MEMBERSHIP AND FEES</u>

## 2.1.  **Membership:**

**2.1.1.**  **Member Commitment:** Members are required at all times to meet the membership requirements as outlined in REIN's By-Laws.

**2.1.2.**  **Joining:** To become a Member of this Corporation, applicants must submit a REIN membership application along with the required fees.  During the stock offering period, firms will have the option to join as a "Participant" or "Stockholder" member. When REIN is in a state mandated Quiet Period all applicant firms will join as a "Participant" member. Applicants may select to join as a "Participant with Future Stockholder Membership Option" or as a "Participant Member" only, subject to Board of Directors' approval. All firm applicants are reviewed at the next meeting of the Board of Directors.

**2.1.3.**  **Broker Orientation:** All Broker Members are required to attend one of the next two available Broker Orientation classes after being named principal or managing broker of a firm or office.

**2.1.4.**  **Stockholder Benefits:** Stockholder membership provides an equity interest in REIN, and requires the purchase of one share of stock at the then-current stock price. Stockholder membership allows the Principal Broker and/or Managing Broker with the Principal Broker's authorization the opportunity to serve on REIN's Board of Directors. Stockholders are eligible to vote on REIN corporate matters at the annual shareholder meeting.

**2.1.5.**  **Stockholder Member Converting to Participant Member**: An annual cap will be established each year by the Board of Directors for the number of firms wishing to convert to Participant Membership based on REIN's financial conditions and ability to repurchase stock. Such requests shall be converted on a first-come, first-serve basis. REIN will repurchase stock based on the above conditions and from any monies due back to the member firm, deduct the then-current Participant join fee, and an administrative processing fee.

**2.1.6.**  **Participant Member Converting to Stockholder Member:** On the membership application, if a Broker Member opts to join REIN as a "Participant Member joining with Future Stockholder Membership Option" (during the state mandated Quiet Period), then that Member will be notified when stock becomes available and will be offered the opportunity to purchase one (1) share of stock at the then-current stock purchase price. The participant membership fee paid at the time of application will be applied toward the stock price.

230    If on the membership application a Broker Member joins as a "Participant Member" only, if
231    he/she wishes to purchase stock at a later date (any time after the initial membership
232    application) the member will be required to remit the then-full stock price, and an
233    administrative fee will be assessed. The non-refundable participant membership fee paid at the
234    time of application is NOT eligible to be applied toward the stock purchase price.
235

236    **2.2.    Reporting Requirements to REIN:**

237    **2.2.1.    Obligation:** Members shall promptly submit to REIN any changes to firm and licensee
238    information as reported to the Virginia Real Estate Board (VREB) and, if applicable, Virginia
239    State Corporation Commission (SCC).  REIN's records must be the same as reported to
240    VREB and the SCC.
241

242    **2.2.2.    Corporate Name Changes:** All Broker Members shall promptly submit to REIN any
243    changes in Corporate or Trading As Firm Name. A new REIN membership application and
244    name change fee is required for all Corporate Name changes. A Stockholder Member is
245    required to return the stock certificate for re-issuance in the new Corporate Name. Changes
246    in Trading As Firm Names must be reported in writing.
247

248    **2.2.3.    Changes in Company Status:** Members shall promptly submit in writing to REIN any
249    changes in firm information, including address, email, phone numbers and company status.
250

251    **2.2.4.    Termination of Firm:** Broker Members wishing to terminate services with REIN shall
252    complete the Firm Termination Request Form. Appraiser Members and Affiliate Members
253    wishing to terminate REIN services must submit a request in writing. Termination will be
254    effective as of the date of the next Board of Directors meeting.
255

256    **2.2.5.    Changes to Principal/Managing Broker:** Broker Members shall promptly submit in writing
257    to REIN any changes to the Principal or Managing Broker as reported to VREB. New
258    Principal and Managing Brokers are required to attend the Broker Orientation class as stated
259    in section 2.1.3.
260

261    **2.2.6.    Deceased Principal Broker:** REIN must receive written notice within 45 days of the death
262    of a Principal Broker as to the intentions of the Member Firm (i.e., firm to terminate
263    membership, or to appoint a new Principal Broker) as submitted to VREB. REIN will allow
264    the appointed person the six months timeframe allowed in DPOR Section 54.1-2109 to
265    continue/conclude business. If the firm is continuing with a new Principal Broker, the new
266    Principal Broker must be reported to REIN as stated in section 2.2.5
267

268    **2.2.7.    New Licensees (ACC-1a):**  All Broker Members shall promptly submit to REIN an "ID
269    Assignment/License Agreement Form" (ACC-1a) for every licensed sales person with the
270    Broker Member Firm. A copy of the Virginia Real Estate Board Salesperson License
271    Application for each new Licensee employed by the Broker Member Firm must accompany
272    the ACC-1a form.   It is optional for Appraiser Members to include newly licensed appraisers.
273    If a newly licensed appraiser is joining, the Appraiser Member shall submit to REIN the "ID
274    Assignment/License Agreement Form" (ACC-1a) and the VREB Appraiser License
275    Application.
276

277    **2.2.8.    Member Administrative Personnel (ACC-1a):** Member shall submit an "ID
278    Assignment/License Agreement Form" (ACC-1a) for non-licensed Administrative Personnel
279    who work for the Member Firm and need to access REIN's system. Administrative Personnel
280    may hold a referral license only if placed with a referral company, otherwise they will be
281    classified as a Licensee.

**2.2.9.   REIN Identity Sharing Authorization Option For Licensed Users (ISA):** REIN will authorize a Licensee to share his/her identity with a licensed partner or licensed team member. This allows the partner to access the REIN System, on behalf of the Licensee ("identity share"). Identity Sharing does not require or imply the sharing of IDs and passwords. IDs and passwords may not be shared with others. Identity Sharing is an administrative function based on individual users' unique IDs.

**2.2.10.   Transfers of Licensees Between Broker Member Firms (ACC-2):** For Licensees transferring from one Broker Member Firm to another Broker Member Firm, the new Broker Member Firm shall promptly submit a "Change Form" (ACC-2) along with a copy of the VREB Activate/Transfer Application transferring the Licensee. The effective date noted on the DPOR Activate/Transfer Application will be used as the transfer date in REIN's System. The Licensee's new Broker Member Firm will then become responsible for any unpaid licensee fees from that date forward.

**2.2.11.   Termination of Licensees and Administrative Personnel (ACC-2):** When a Licensee or Administrative Personnel leaves a firm; the Broker Member shall promptly submit a "Change Form" (ACC-2) to REIN. For Broker Members returning a license to the VREB, the ACC-2 form must be submitted to REIN along with either a copy of the letter to VREB returning the license or a copy of the license being returned, signed and dated by the Broker Member.

**2.2.12.   False Reporting:** Any submission of a false declaration by a Member may result in actions (fines and/or termination) as determined by the Board of Directors.

## 2.3.    Fees:

**2.3.1.   Setting of Fees:** The Board of Directors shall establish and levy such fees and charges necessary to maintain the Corporation as an ongoing concern, with the maintenance of reasonable reserves.

**2.3.2.    Quarterly Licensee Fees:** Each Member will pay a quarterly licensee fee for each Licensee with their firm. As a courtesy to the Member, REIN will bill the Licensee on their behalf. Unpaid licensee fees will be billed to the Member and are due by the indicated due date. Any licensee fees that remain unpaid are classified as "delinquent" and may be subject the Member Firm to late charges and suspension of services.

**2.3.3.   Payments**: Payments are due by the indicated due date. Past due amounts are classified as "delinquent" and may be subject to late fees and other penalties.

**2.3.4.    Delinquent Accounts:** Any Member or Licensee whose unpaid amounts are classified as "delinquent" shall be notified by REIN. Should the total amount due not be paid by the due date, additional late fees may be assessed and services may be suspended. Should a Member's Licensee become delinquent, the Member will be notified and be afforded the following options: a) to return the Licensee's license to VREB with a copy of such return to REIN by the due date; or b) to pay the licensee's fee by the due date. Should the Member take no action by the due date, the Member is invoiced the outstanding Licensee fees and becomes subject to late fees should the outstanding licensee fees not be paid by the revised due date. REIN shall have the right at any time to apply any rebates, refunds and/or fees due to any Member or Licensee to the total amount then due REIN. REIN's Board of Directors reviews delinquencies at each scheduled meeting. The Board of Directors may immediately initiate action to terminate the Member's services and to recall and repurchase the REIN share(s) of stock, if applicable, in accordance with the procedures set forth in REIN's Bylaws. All delinquent fees, costs and charges will be deducted from the stock repurchase price, if

335  applicable, for Stockholder Broker Members. For all other Members (non-Stockholder
336  Members), REIN's Board of Directors may immediately initiate action to terminate the
337  Participant or Appraiser Member in REIN and outstanding amounts may be submitted to
338  collections. A Member is required to sign up for the Credit Card Auto-Pay Program if their
339  firm or the Licensee has been delinquent two (2) times within a year. They must remain on
340  the program until one (1) year of good standing has been reached.
341
342  **2.3.5.**  **Non-Payment of Fees:**  All amounts due to REIN are payable to REIN when billed.

343  Delays in payment may result in late fees.

344  A fee will be assessed to any Member, Affiliate, or Licensee whose check is returned to REIN
345  due to non-sufficient funds (NSF), issuance on a closed or wrong account, or other related
346  reasons. If REIN receives one NSF payment, the Member or Licensee must pay by credit card
347  or money order for a six-month period. When two NSF's are received within a year, the
348  Member or Licensee is required to enroll in the Credit Card Auto-Pay Program for a full year.
349
350  If a credit card is declined, the Member or Licensee is notified of the declined status and that
351  REIN cannot and will not attempt to reprocess that account without the cardholder's
352  knowledge. In this case, the Member or Licensee is subject to late fees and suspension of
353  services until a successful payment is processed.
354
355  **2.3.6.**  **Attorney's Fees and Costs:**  REIN shall have the right to recover all costs and expenses
356  (including attorneys' fees) incurred in connection with the enforcement of the Bylaws and
357  Rules and Regulations of REIN including, but not limited to, actions to collect fees, charges,
358  assessments, costs and expenses incurred by REIN.
359
360  **2.3.7.**  **Reductions and Exemptions of Quarterly Licensee Fees:**

361  **2.3.7.1.**  **Reductions of Licensee Fees:**  A reduction in the licensee fees is provided for all
362  Principal Brokers and Managing Brokers. A Broker Member may request a
363  reduction of the licensee fees assessed for any Licensee who is active in REIN and
364  who is a member of another MLS which overlaps REIN's service area, and where
365  Broker Member is also a member. Evidence of membership in another MLS must
366  be provided with the request.
367
368  **2.3.7.2.**  **Exemptions of Licensee Fees:**  A Broker Member may request an exemption of
369  licensee fees for any Licensee who is a member of another MLS which overlaps
370  REIN's service area and where Broker Member is also a member. Evidence of
371  membership in another MLS must be provided. A Licensee is exempt if not joining
372  and not participating in REIN's market. Commercial Licensees who lease or sell
373  only commercial properties and businesses may be exempt. Other exemptions may
374  be available, such as for military deployment or medical; contact REIN for more
375  information. Licensees in this Exempt category will not have access to or receive
376  any REIN services.
377
378  **2.3.7.3.**  **Longevity Exemption:**  A Broker Member may request a Longevity Exemption of
379  the quarterly licensee fee for any Licensee that has been licensed with the Virginia
380  Real Estate Board for 35 years or more and is at least 70 years of age. Under the
381  Longevity Exemption, Licensees have full access to all REIN services.
382
383

384 **2.3.7.4.** **False Declarations/Fines:** The submission of a false declaration by a Broker
385 Member shall automatically revoke the exemption or reduction and subject the
386 Broker Member to payments to REIN of a sum equal to one year's licensee fees for
387 the Licensee involved. A fine may be imposed upon the Broker Member whose
388 representative(s) are found to be in violation of these Rules and Regulations.
389

390 **2.4.** **Confidentiality of Passwords:** Members and Licensees are prohibited from disclosing their REIN
391 Systems' passwords to any other person.
392

393 **2.5.** **Violation of Rules and Regulations:** Any Member or Licensee who fails to abide by any of the Rules
394 and Regulations or who is in breach of any agreement with REIN may be subject to assessment of a
395 fine as determined by REIN's Board of Directors and may be restricted from access to the REIN
396 Systems until such time as such person is in compliance with the Rules and Regulations and is not in
397 default under the terms of any agreement with REIN. Refer to REIN's Procedures Manual for a
398 detailed schedule of fines, which may be adjusted, from time to time and in any particular case, by
399 action of REIN's Board of Directors.
400

# 3. <u>LISTINGS</u>

401
402

**3.1.** **Exclusive Listing Submission Requirements:**

403
404

405 **3.1.1.** **Exclusive Listings (Broker Members Only of REIN):** All Exclusive Listings (collectively
406 "Listings" and singularly a "Listing") shall be input into the REIN System no later than two
407 days, excluding weekends and Federal holidays, from the List Date (first day of the listing
408 period). The amount of time from the List Date until the end date of the listing period is the
409 "Term". Commercial listings are encouraged but not required to be input.
410

411 **3.1.2.** **Exclusive Listings (As a Broker Member of REIN and another MLS)**: All Exclusive
412 Listings shall be input into (a) the REIN System, (b) any other multiple listing service, or (c)
413 both REIN and the other MLS.
414

415 **3.1.3.** **Exclusive Listings- Out-of-State Listings**: All Exclusive Listings require the listing agent
416 to have a real estate license from the state in which the listing is located. A REIN Licensee
417 who wishes to show and/or sell a listing must be licensed in the state where the listing is
418 located. The listing agents must include in the Agent Remarks section of the listing the agent's
419 real estate license number and state.
420

421 **3.1.4** **Auction Listings: (refer to REIN's *Policies and Procedures* for more information on
422 Auction disclosure requirements)** Active auction listings are  permitted in the REIN
423 System under List Type "Auction" with a valid listing agreement. A key condition for
424 listing auction properties is in the disclosure requirements. There can be no doubt that a
425 listing is an auction, what type of auction and conditions of the auction. For transparency of
426 the property being an auction, the following must be disclosed:
427

428 a. Auction Type: Minimum Bid, Absolute, or Reserved Bid Auction
429 b. How a member can represent the bidder
430 c. Showing information
431 d. List price determination (assessed value, minimum opening bid, or other)
432 e. Compensation to the selling firm upon a client's bid being accepted
433 f. Contact information for the Listing Firm
434

**3.1.5**    **Rights to Data:**  Broker Members are required to use REIN's Property Data Input & Feature Sheet forms with each Exclusive Listing, which must be signed by the Seller and listing agent. Seller and listing firm represent and warrant that they are the owners of all Listings Information regarding the property and agree to indemnify and hold REIN harmless for any claim brought against REIN arising out of REIN's use of such Listings Information. Seller and listing firm transfer and assign all rights of ownership and copyright to REIN for all Listings Information regarding the property that are input into REIN's Systems. Seller and Listing firm shall allow such information to be used by REIN or any other entity for any lawful purpose, as deemed appropriate by REIN, consent to such submission to REIN and REIN's use thereof.

**3.1.6**    **Compliance with Governmental Laws:**  Each listing entered into the REIN database shall comply with all local, state and federal laws, rules, regulations and disclosures, including but not limited to fair housing, lead-based paint, AICUZ/APZ, VA Residential Property Disclosure, Property Owner Associations and Fees, Condominium Associations and Fees, Co-operative Associations and Fees, Timeshares and Fees, etc.  Listing firm shall be responsible and liable for each such listing and shall indemnify, save and hold harmless REIN and its officers, directors, shareholders, employees and agents from and against any and all costs, liabilities, damages, law suits, claims and expenses (including reasonable attorney's fees) incurred in connection with or arising out of or resulting from a violation or violations of such laws, rules, regulations and disclosures.

**3.1.7**    **Non-REIN Listing Agreement Addendum (NRLA):**  REIN Members and Licensees may use REIN's Standard Listing Agreement or another listing agreement for listings to be entered into the REIN System.  Should a Member or Licensee use an agreement other than REIN's Standard Listing Agreement, the Non-REIN Exclusive Marketing or Listing Agreement (NRLA) is required to be used and signed by the seller and the Licensee. Bank owned properties are exempt from this requirement.

**3.1.8**    **Required Upload of Disclosure Forms to Listings in REIN System:**  The following signed disclosure forms which are mandated by the state or federal government are required to be uploaded, as applicable, to the listing at the time the listing is input into the REIN System:

   1)    Residential Property Disclosure Statement (DPOR)

   2)    Virginia Real Estate Board (VREB) – AICUZ (if applicable)

   3)    Virginia Real Estate Board (VREB) – SEPTIC (if applicable)

   4)    Disclosure of Information of Lead-Based Paint and/or Lead-Based Paint Hazards (LEAD-1) (if built prior to 1978, REO's **NOT** excluded)

   5)    Disclosure of Defective Drywall (VREB)- (if applicable)

   6)    Disclosure of Property Previously Used To Manufacture Methamphetamine (DPOR)- (if applicable)

This enables all Licensees to access the signed disclosure forms on a listing. This information is to be provided to a buyer prior to contract ratification as required by law. The applicable documents must be uploaded within five (5) business days of listing input (excluding weekends and federal holidays). The disclosure forms are to be uploaded individually under the correct form title so they are easily identifiable. Failure to upload/submit the required signed documents within five (5) business days will result in a fine assessed to the listing agent. Continued non-compliance to this rule may result in progressive fines.

New, signed, Disclosure Forms must be obtained and uploaded to the listing when any of the following occur:

   1)    An updated version of the form becomes available

2)    Ownership of the property changes

3)    There is a material change to the condition of the property

**3.1.9    Short Sale & Other Third Party Approval Disclosure:** When the listing agent becomes aware that the sale of the listing requires the approval of any party other than the Seller (such as with a short sale, REO or a cooperative unit), the listing agent must indicate the appropriate "Third Party" disclosure in the "Disclosure" category in the REIN System.

**3.2    Listing Rules:**

**3.2.1    Compliance Checking:** REIN will regularly check listings for data accuracy and compliance of REIN's Rules and Regulations. REIN has the right to review a listing agreement if there is any compliance related question.

**3.2.2    Deal Direct With Seller:** If a listing firm wants the selling firm to deal directly with the seller involving showing and submission of contract and/or contract negotiations, the statement "Deal Direct with Seller" must be stated only in the Agent Remarks field and/or Showing Instructions field.

**3.2.3    Duplicate Listings:** No more than one active or pending listing for the same property type may be listed in the system unless listed as a Contract Owner.

**3.2.4    Listing Availability/Withdrawal**: When a listing is no longer available for sale the listing firm must withdraw the listing from the REIN System or mark the listing as pending, off market, or other status as applicable.

**3.2.5    Listing Errors:** In the event a listing contains an error or a reference which does not conform to these Rules and Regulations, REIN may correct the error or delete the reference. REIN may delete the listing if a listing firm repeats a similar error, or reference, after receiving notice of such error or non-conforming reference.

**3.2.6    Listings Solicitation:** REIN Licensees shall not use any REIN Listing Information to solicit a listing which is currently listed exclusively with another REIN firm, nor shall REIN Licensees solicit a seller currently listing a property with a REIN firm to terminate or breach any existing agreement with another REIN firm. As listings expire or are withdrawn from the REIN System, their status is reported via the daily Hotsheet in the REIN System. Those are the sources within the REIN System for obtaining such data.

**3.2.7    List Type:** Listing agents are required to disclose the correct List Type according to the brokerage agreement i.e., SAER (Standard Agent Exclusive Right), LSEA (Limited Service Exclusive Agency), etc.

**3.2.8    Marketing (Signage & Keyboxes):** The List Date of a listing agreement is the beginning day of the listing period or "Term." The property will be available for marketing and showing to all REIN Members no sooner than the List Date. The listing agent and firm may not market the property (i.e., putting a sign in the yard, advertising the property, holding open houses, etc.) until the List Date. A REIN approved keybox may be placed on a listing no sooner than the List Date.

**3.2.9    Owner of Record:** Legal owners' names must be entered on all listings. For listings owned by or sold through a bank, mortgage company, or being handled by a corporate buyout, or those properties in the process of foreclosure or corporate transfer in which another entity is

handling the sale, the following may be named in the Owner field: the bank/lender's name, corporation name, "Corporate", or "Real Estate Owned" (REO).

**3.2.10** **Ownership:** Listing agent is required to indicate the ownership type (i.e., Fee Simple, Condominium, Co-operative, Timeshare, Biz, Leasehold). Depending on the ownership type the property may fall under the Commonwealth of Virginia Property Acts (i.e. Condominium Act). Refer to the Policies and Procedures Manual.

**3.2.11** **Required Photo for Residential Listings**: All residential listings, including properties sold, input into REIN's System are required to have at least one (1) exterior photo of the property. The photo must be of the home or property (no pictures of pets, other landscapes, signage, nearby places, etc.). New construction listings may upload a rendering of the property. A photo must be uploaded within five (5) business days of listing input, including the date of input. If the photo is not uploaded within five (5) business days, on day six (6) REIN will automatically order one (1) exterior photo to be taken by a photographer and the listing agent will be billed for the service. (Full photo guidelines are set forth in the REIN Policies and Procedures Manual).

    **3.2.11.1** **Out Of Area Listings**: One (1) exterior photo is required for all listings located Out of Area, to be uploaded within 5 business days of listing input. Failure to upload a photo will result in a fine, and continued non-compliance may result in progressive fines.

    **3.2.11.2** **FSBO and Auction Listings**: One (1) exterior photo is required to be uploaded to the system within 5 business days of the listing being input as "Sold". A photographer will not be sent to take a photo.

    **3.2.11.3** **Land and Commercial Listings**: Uploading a photo is recommended but optional for these property types.

**3.2.12** **Use of a Prior Listing's Photos:** Listing photos are only to be used on the listing in which they were originally submitted. The two exceptions are a property being re-listed by the same Broker Member submitting the original photos or a Broker Member receiving authorization from the owner of the photo to re-use it on a new listing.

**3.2.13** **Duplicate Photos:** Duplicate photos are not to be uploaded to listings within the REIN System. Uploading the same photo multiple times to a listing in the REIN System is not permitted. Duplicate photos are subject to being removed by REIN.

**3.2.14** **Photos and Virtual Tours (Branded):** Listing photos and virtual tours may contain surveys, floor plans and plat maps, along with images of other documents deemed necessary to the visual description of the property (such as neighborhood signage). Any alterations or photoshopping to photos that misrepresent the property is prohibited; the only exception to this is virtual staging, which is allowed but must be disclosed in Public Remarks.

Listing photos may not contain:

1. Promotional information that serves as branding for a person or company; this includes names, phone numbers, signage, email addresses, website addresses, photos of the agent or firm, logos and audio.
2. Superimposed text, images, graphic overlays, watermarks, etc.; this includes open house information. (NOTE: All open house notifications are restricted to the Open House field, available under Open Houses when modifying a listing.)

REIN provides four (4) fields for Virtual Tours: (1) Unbranded Tour, (2) Branded Tour, (3) 3D Tour, (4) Aerial Drone Tour. Tours with agent and/or firm branding are only permitted in the field labeled as Branded Tour. It is a violation to place a branded tour in the unbranded, 3D or aerial drone fields. Photos and tours that are presented to the public may not link to YouTube or other video platforms where the agent/firm name is displayed. No URL's are allowed in the Public Remarks section.

**3.2.15  Property Types:**  The correct Property Type must be indicated on the listing agreement.

**3.2.16  Public Remarks:**  "Public Remarks" are displayed on Consumer Handouts and may be displayed on Broker Member and Licensee websites. Photos are also considered Public Remarks and must adhere to the same guidelines. Licensees, with seller's authorization, may use Public Remarks to provide property descriptions or marketing information with the following exceptions:

   1. It may not offer financial or other incentives dependent upon the buyer not engaging a broker, which is contrary to REIN's organizational purpose of "operating a means of cooperation among Members."
   2. It may not contain any firm, agent, or seller contact information, or any website address.
   3. It does not violate any local, state or federal laws.

For New Construction properties, it is permissible to include incentives tied to the use of the builder's mortgage or closing attorneys, all subject to federal and state regulations including but not limited to CRESPA.

**3.2.17  Settled Sales & Settled Price Reporting:**  Settled sales must be reported within ten (10) consecutive days of settlement by both the listing and the selling firm.  If neither firm reports the settled sale, both firms will be assessed a fee.  However, if the selling firm reports and the listing firm does not process the listing as settled within the ten (10) days, the listing firm will be assessed both the listing and the selling firm's fees. Settlement is the closing date and is not based on the sale being recorded with the city/county or when the closing check has been received by the firm.

**3.2.18  Signatures:**  For each listing input into the REIN System, Seller's signature is required on both the listing and the completed REIN Property Data Input Form.  Broker Member and/or listing agent are also required to sign both forms.

**3.2.19  Subdivision (Correct Assignment):**  The listing must include the legal (platted) subdivision name and corresponding area/division number for searchability within the MLS.

**3.2.20  Submission Requirements of All Changes Including Status Changes:**  Listing Broker Members are required to input all changes including status changes within two (2) days (excluding weekends and Federal holidays) of the authorized change.

**3.2.21  Withdrawals/Back-on-Markets/Re-lists:**  If a listing is withdrawn and re-listed by the same listing agent with the same Broker Member Firm within sixty (60) days of the original list date, the listing agent will be charged a re-list fee and a new listing agreement is required. If the property is re-listed by another agent within the same firm, there will be no charge. To avoid a re-list fee, listing firms may re-activate the listing to "Active" status by completing the Back-On-Market section of a Listing Change Form using the same MLS number.

3.2.22    **Under Contract Reporting:**  All ratified contracts including contingency contracts on listed properties must be reported and input into the REIN System within five (5) days, excluding weekends and Federal holidays, of the ratification date. All non-contingent contracts are required to be processed as "Pending". Contingency contracts are permitted to remain in the "Active" status provided the proper Contingency Disclosure is input (i.e. Home Inspection, POA, etc.). When the last contingency is removed, the listing must be processed as "Pending" (using the ratified date and not the date of contingency removal). Listing agents are responsible for the accurate reporting of the selling firm and selling agent.

# 4    COOPERATION AMONG MEMBERS/OFFER OF COMPENSATION

## 4.1 Cooperation Rules:

4.1.1    **Advertising of Listings:**  Advertising by any Member, Licensee or Affiliate of any property listed with REIN is prohibited without the written permission of the listing Broker Member.

4.1.2    **Advertising of List Price:**  Neither the Seller nor the listing firm may advertise the listed property for a different price than currently listed in the REIN System.

4.1.3    **Appointments:**  Appointments for showing property listed in REIN shall, unless otherwise authorized by the listing firm, be conducted through the listing firm.

4.1.4    **Availability to Show:**  All Broker Members and their Licensees may show a REIN listing.

4.1.5    **Contract Negotiations:**  Negotiations for the sale of such property shall, unless otherwise authorized by the listing firm, be conducted through the listing firm.

4.1.6    **Listing Signage:**  To comply with Virginia state code 18 VAC 135-20-190, only "For Sale" signs of the listing Broker Member may be placed on a property listed in REIN.  The sign must provide the contact information for the listing firm.  Sellers with an Exclusive Listing with a REIN Member Firm are restricted from placing their own "For Sale" sign on their property or from adding their own contact information to the listing Broker Member's sign. Should a Seller violate REIN's rule, REIN shall withdraw the listing from the REIN System, and notify the listing Broker Member by letter with a copy to the Seller. The listing may only be reinstated upon receiving a signed assurance from the Seller that Seller has stopped violating REIN's rule and will not violate REIN's rule again. Should the Seller violate this rule on the listed property a second time regardless of whether they have re-listed with a different REIN Broker Member, the listing will be withdrawn and the Seller will be denied having their property listed in the REIN System for a period of ninety (90) days from the second violation.

Owner Agents: A Broker Member or Licensee who has an interest in property for sale may withhold the property from REIN provided they use a sign other than their standard company sign that is used to display listings entered into the REIN System.  The sign used should clearly state they are an Owner Agent and should not have any reference back to the Member Firm.

4.1.7    **Limited Showing Instructions:**  All listings that are entered into the REIN System must be available for showing by other Broker Members and Licensees as of the List Date.  Showing instructions such as "Do Not Show Until (future date)" are not permitted.  Taking a listing and holding it until it is ready to be shown is against REIN Rules and Regulations and will result in a Pocket Listing fine. Having such a listing or placing excessive showing limitations on a listing may result in a Pocket Listing fine.

**4.1.8  Listing Inquiry Responsiveness:** Listing firms are required to respond to inquiries by other REIN members concerning the availability and accessibility of listed properties. Repetitive complaints under this rule, if found justified by REIN, may subject the listing firm to a fine.

**4.1.9  Unreported ("Pocket") Listings and Requirement to Input Listings when there is an Agreement to Promote the Sale of Properties**: Unreported Listings ("Pocket Listing") refer to those listings which are held back from input into the REIN System by the listing agent or Broker Member. REIN's Rules and Regulations require **ALL** Exclusive Listings to be input into the REIN System within two (2) days from the list date, excluding weekends and Federal holidays.

To promote the cooperation and compensation that is essential to the effective operation of REIN, **ALL** agreements signed by a property seller authorizing any efforts by a REIN licensee promoting the sale of a specific property ("Sales Agreement"), require a listing agreement, in the form required by these Rules. The listing must be input into the REIN System within two (2) days, excluding weekends and Federal holidays, from the "List Date," which is the date the property may be first advertised. (The List Date may be different than the date the seller(s) signed the listing agreement.) These requirements apply to all such Sales Agreement(s), including actual listing agreements, agency or brokerage agreements, or any other written permission to advertise the property in any medium (e.g., social media, internet, print). Violation of this Rule will result in a fine, in accordance with REIN's current schedule, for failing to properly and timely input a property into the REIN System which is a "Pocket Listing" violation.

REIN Rules require Broker Members and Licensees to comply with state law (Rule 3.1.6). Specifically, VA Code §54.1-2131(A)(2)(a), states, "marketing activities on behalf of the seller" shall be conducted "in accordance with the brokerage agreement," which brokerage agreement must be in writing (Va. Code §54.1-2137(A) and (B)). VAC-135-20-190(E)(4) requires a written agreement to be signed before an agent can advertise the sale of any specifically identifiable property.

**4.1.10  Fee/Charge as a Condition to Make an Offer:** In the spirit of cooperation, listings may not be input with a monetary condition to submit an offer. When input to the MLS system, Members, their clients, or other third parties related to the transaction (such as in the case of REOs) may not require a fee, charge or other monetary obligation from another member or their client or customer as a condition of submitting an offer on listings that are input into the REIN System.

## 4.2  Offer of Compensation:

**4.2.1  Commission Rates:** Commission rates for the sale, lease or management of property shall be negotiable between the Broker Member and their client.

**4.2.2  Blanket Unilateral Offer of Compensation:** In filing Exclusive Listings with REIN, Broker Members make blanket unilateral offers of compensation to the other Broker Members and shall therefore specify on each listing filed with REIN the compensation being offered by the listing broker to the other REIN Broker Members. This is necessary because cooperating Broker Members have the right to know what their compensation will be prior to commencing their efforts to sell.

**4.2.3  Amount of Compensation:** The essential and appropriate requirement by a multiple listing service is that the information to be published shall clearly inform the Broker Members and their Licensees as to the compensation they will receive in cooperative transactions. Any

change or a potential change to the compensation must be disclosed by the listing Broker Member in writing in advance of the Selling and/or Leasing Firm producing an offer, or listing and selling Broker Members must otherwise agree in writing.

Display Form of Offer of Compensation in MLS:  Listings in the REIN system must have a value in the compensation field, and it may not be zero. The compensation specified shall appear in one of two forms:

    **1.**  By showing a percentage of the gross selling price or rental price.

    **2.**  By showing a definite dollar amount

The listing Broker Member retains the right to determine the amount of compensation offered to sub-agents, buyer agents, or to brokers acting in other agency or non-agency capacities, which may be the same or different.  This shall not preclude the listing Broker Member from offering any Broker Members compensation other than the compensation indicated on Broker Member's listings as published by REIN.   In this case, however,  the listing Broker Member must inform the other Broker Members in writing in advance of the Selling and/or Leasing Firm producing an offer, and provided that the modification in the specified compensation is not the result of any agreement among all or any other Broker Members of REIN.

**4.2.4**  **Special Commission Arrangement (SCA):** The Special Commission Arrangement field (SCA) on the listing data input form is used to disclose to cooperating brokers that the listing firm has a special commission arrangement with the Seller should the listing firm also be the selling firm. This data field is a Yes/No field with "Yes" representing that there is a special commission arrangement.

**4.2.5**  **Commission Protection Term:**  Each listing Broker Member agrees to be bound by REIN's commission protection term of ninety (90) days from the expiration or the termination of the listing period.  This clause requires the Seller to pay the listing firm the commission if the Seller sells his property during the commission protection term to any person who was shown the property by a Broker Member during the listing period or sells to any person with whom the listing firm or any selling firm had negotiated for the purchase of the property.  In the event the Seller enters into an Exclusive Listing agreement with another licensed real estate firm upon the expiration or termination of the original listing agreement, then the commission protection term shall be null and void.

**4.2.6**  **Disputes:**   REIN has specifically chosen not to adopt any mechanism to resolve disputes arising between Broker Members regarding Offer of Compensation, and will not be involved in resolution of any such disputes.  REIN encourages its Broker Members to engage in non-binding mediation to attempt to resolve any such disputes.  REIN nonetheless intends for its rule to establish a binding standard and duty for its Broker Members, which could be independently enforced in court or arbitration proceedings by Broker Members.  Broker Members agree to indemnify and hold harmless REIN for any judgment, attorney fees, interest and costs that REIN becomes liable for as a result of any conduct on the part of applicant.

# 5  <u>USE OF  REIN LISTINGS INFORMATION</u>

**5.1**  **REIN Ownership:**  The REIN Listings Information, including the listing data of any real property, the Broker Member and Licensee information, and the photos, is owned by REIN. REIN Listings Information including the content, compilations and data formats, is the sole and exclusive property of REIN.

**5.2**    **Use of REIN Listings Information:** REIN Listings Information is provided to Authorized Users for use only in accordance with REIN's Bylaws, Rules and Regulations and the terms of the REIN ID Assignment and License Agreement to which all Authorized Users have agreed. The Listings Information is designed to facilitate and further the exchange of information and services among Authorized Users for the sale, mortgage, lease and management of real property and the use of the Listings Information for any other purpose is strictly prohibited. Appraiser Members shall use the Listings Information solely for the purpose of providing background and comparable information for appraisals in connection with the purchase, sale, lease, ownership, financing and refinancing of real property and for other similar uses. No Authorized User shall disclose, disseminate, sell, rent, license, sublicense or in any other way permit others to use the Listings Information except in accordance with these Rules and Regulations.

**5.3**    **REIN's Copyright:** REIN's copyright must appear on all reports which contain Listings Information including all reports generating from REIN's System, and any custom reports created by Authorized Users incorporating or using, in whole or in part, Listings Information.

**5.4**    **Membership Email Information:** REIN membership email information that is accessible through the REIN System may not be used for any unsolicited commercial email (spam) by any Authorized Users.

**5.5**    **REIN Contracts & Forms:**

    **5.5.1**    **Copyright:** REIN has copyrighted its forms regardless of the form or media in or on which the original and other copies may subsequently exist related to the sale or lease of real property. REIN provides its Broker Members and their Licensees the specific right to use such forms in accordance with these Rules and Regulations and the REIN Bylaws. Appraiser Members are not entitled to use any of REIN copyrighted forms without the permission of REIN.

    **5.5.2**    **Right to Use:** Broker Members and their Licensees shall use the REIN Standard Listing Agreement (together with forms directly related to such listing agreement) only in transactions in which such Broker Member is the listing broker. Broker Member and their Licensees shall use the REIN Standard Purchase Agreement and related addenda only in transactions in which such Broker Member is directly involved as a real estate broker or real estate salesperson (as defined in VA Code §54.1-2100 and 2101) in accordance with VA Code §54.1-2101.1. Broker Members, Licensees, and Administrative Personnel shall not provide the REIN contracts and forms to any non-member for use by that non-member or for use for any other purposes, and any such action shall be a violation of these Rules and Regulations.

    **5.5.3**    **Altering Contracts & Forms:** Any Member or Licensee altering the text of any REIN sales contract (including addenda, if any) ("Contract") has an affirmative obligation to conspicuously disclose the text alteration to all other potential signatories of the Contract, within the text of the Contract itself, for example, by blacklining the text to show the changes, or by inserting the altered text in a materially different color, or in a materially different font, or in a text comment box showing the change.

    **5.5.4**    **Using REIN Forms With Non-Approved Vendors:** A Broker Member or Licensee may not use REIN forms on systems provided by vendors other than the one which is then under contract with REIN to provide forms services, without a signed REIN Forms License Agreement in effect, granting that Broker Member (and its Licensees) the right to use REIN forms, on systems provided by such vendor.

848         **5.5.5**     **FINES:** Any violations of the Rules in this Section 5.5.1 through 5.5.4, inclusive, shall
849         subject the Broker Member and/or Licensee to monetary fines, as established by the Board of
850         Directors of REIN from time to time, and is included on REIN's then-current Fine Schedule.

851

852   **5.6**     **Listing Firm Name:** A Broker Member shall ensure that any Active, Pending or Sold Listings
853         Information that is provided to a customer or a client identifies the name of the listing firm in a readily
854         visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface
855         used in the display of REIN Listings Information.

856

857   **5.7**     **Perpetual License in Broker's Own Listings:** Broker Member is granted a perpetual license by
858         REIN to use, manipulate, control, distribute and display Broker Member's own listings in any way,
859         shape or form Broker Member so chooses at Broker Member's sole discretion. Broker Member is free
860         to enter into agreements with Vendors and third parties regarding use and display of Broker Member's
861         own listings.

862

863   **5.8**     **Confidential Fields:** Certain fields contained in Listings Information are confidential and shall not
864         be disseminated to the general public, customers or clients in any circumstances. These confidential
865         fields presently are: commission fields, owner's name and contact information, tenant information,
866         vacant status, mortgage balance, lockbox information, showing instructions and agent remarks. List
867         Date is a confidential field, however, it may be disclosed to clients by an agent. Confidential fields
868         are not permitted to be "discoverable" by a consumer anonymously through a public search.
869         Commission fields may not be disseminated to the general public or customers but may be disclosed
870         to clients who may be subject to payment of such commission on a case by case basis.

871

872   **5.9**     **Limited Use of Off-Market Listings (Expired, Withdrawn & Fall-Through):** Expired, Withdrawn
873         and Fall-Through listings may be used by Broker Members and Licensees for the purpose of
874         prospecting and soliciting listings from sellers. In addition, Broker Members and Licensees may use
875         Expired, Withdrawn and Fall-Through listings in compiling a comparative market analysis on a
876         subject property <u>only</u> for (i) assisting a seller in determining their list price and (ii) assisting a buyer
877         in determining an offer price. Appraiser Members may use Expired, Withdrawn and Fall-Through
878         listings in an appraisal on a subject property.

879

880   **5.10**    **Comparative Market Analysis (CMA)**: Broker Members and Licensees are authorized to use
881         Listings Information for the preparation of CMA Reports in which a narrow subset of Listings
882         Information is provided to a single recipient, subject to Broker Member's and Licensee's discretion
883         and control and provided the CMA is prepared by a Broker Member or Licensees.

884

885   **5.11**    **REIN Listings Information Distribution ("Reasonable" Number of Copies):** Broker Members
886         and Licensees may reproduce and distribute to prospective buyer(s), seller(s) or tenant(s) a reasonable
887         number of single copies of listing data, excluding confidential data, which relate to properties in which
888         the prospective buyer(s), seller(s) or tenant(s) are interested. Broker Members and Licensees shall
889         use all reasonable diligence in dispersing no more Listings Information than shall be deemed
890         reasonably necessary in servicing prospective or existing customers or clients. Appraiser Members
891         and Licensees may reproduce a reasonable number of single copies of Listings Information which
892         relate to an appraisal of a specific property.

893

894   **5.12**    **Administrative Personnel Access:** Broker Members and Appraiser Members may permit their
895         administrative personnel, properly registered with and authorized by REIN, to have access to and use
896         Listings Information, to the same extent as, and only on behalf of, the Broker Member or Appraiser
897         Member. Any such access or use by administrative personnel shall be subject to all Rules and
898         Regulations. The Broker Member or Appraiser Member shall at all times be fully and completely
899         responsible for the compliance of its own authorized administrative personnel with Rules and
900         Regulations.

**5.13**    **REIN System Public Records and Tax Data:** Members acknowledge that they will use the public records and tax information solely in connection with the purchase, sale, lease, ownership, financing and refinancing of real property and for other similar purposes and that the use of the tax information for any other purposes is prohibited unless permitted by REIN. No Member shall use tax information with respect to any real property for the preparation of calculations, appraisals or reports for persons who have no interest in said real property except for lenders of such real property.

**5.14**    **REIN System Usage:** Authorized Users may use the functionality provided in the REIN System, including export functionality, subject to these Rules and Regulations. Prior authorization from REIN is required for the consistent export of more Listings Information than approved (approximately 500 listings per day).

**5.15**    **Display of Listing Information on Electronic Media (i.e. website, social media, etc.):** Authorized Users may only display REIN Listings Information of other Broker Members on Electronic Media if received from an authorized Data Feed.

**5.16**    **Use/Misuse of Statistical Reports, Charts, Graphs and Broker Standing/Ranking Reports:**

**5.16.1**    **REIN Copyrighted Statistical Reports, Charts and Graphs:** Broker Members and Licensees are permitted to cite REIN statistics which are prepared on a monthly basis and distributed to REIN Broker Members and Licensees. Statistical reports, charts, and graphs may be shared with clients (those with whom there is an agency relationship established) but not distributed to the general public without authorization from REIN. Broker Members and Licensees are permitted to compile their own statistics from REIN Listings Information, however, they may only reference REIN as the source of the Listings Information used for compiling their own statistics.

**5.16.2**    **REIN Copyrighted Standings / Ranking Reports:** The reports may not be disseminated to the public. Information contained in the reports may be used in advertising, marketing and in recruiting materials.

**5.16.3**    **Disclosures:** Broker Members and Licensees are responsible for properly disclosing REIN as the source of Listings Information for any statistics or analytics produced. Disclosures include that all interpretations, analytics, or derivations thereof are the sole responsibility of the Broker Member or Licensee, and not attributable to REIN.

# 6    <u>USE AND DISPLAY OF LISTINGS INFORMATION/DATA FEEDS</u>

**6.1 Analytic Data Feed:** As described herein, Broker Members, Licensees and Vendors may only use Listings Information that has been received through an Analytic Data Feed from REIN.

**6.1.1**    **Definition**: The Analytic Data Feed allows for the use of Listings Information in Broker Members', Licensees' or Vendors' products and services for the production or functioning of analytics, statistics, historical trends, and agent/broker productivity tools; the outcome of which will be used only by Broker Members, Broker Member's Licensees and their customers/clients, such as Competitive Market Analysis reports. Listings Information included in the Real Estate Transaction Standard (RETS) Analytic Data Feed shall not exceed the prior five (5) years.

**6.1.2  Eligibility**: For a fee, Broker Members, Licensees (with Broker's permission) and Vendors are eligible to access the Analytic Data Feed (Brokers and Licensees may serve as their own "Vendor").

All analytical applications are subject to the Broker Member's oversight, supervision and accountability. Broker Member may revoke consent for any of their Licensees to receive the Analytic Data Feed by notifying REIN in writing.

A Vendor may request an Analytic Data Feed, provided they are sponsored by a REIN Broker Member who will be using that Vendor's product.

**6.1.3  Initiation**: Broker Members, Licensees, or Vendors will submit to REIN a completed Broker Sponsorship Form for Data Feed initiation. REIN will perform an Acceptable Use review of the proposed use of Listings Information.

**6.1.4  Data License Agreement:** Broker Members, Licensees or Vendors shall sign a REIN MLS Data Access and License Agreement before receiving a Data Feed and shall be bound by the terms of this agreement regulating the use of the Listings Information and required disclosures.

**6.1.5  Compliance Review:** Prior to making the application or product publicly accessible ("live"), Vendor must present REIN staff with the fully functioning test version of the application using REIN test data for compliance checking. Two compliance reviews are included for one product or application with the initial fee for compliance with REIN's Rules and Regulations. Any review thereafter will incur a charge to the Vendor. Once the application has been approved by REIN, the application may go "live." The application or product must be accessible to REIN staff at all times for monitoring and ensuring compliance with applicable Rules and Regulations and policies. Vendor (or Broker Member/Licensee serving as their own Vendor) must notify REIN of substantive changes to existing products that impact the display or use of Listings Information or any new products for REIN's compliance review which may incur a review fee. Failure to notify REIN of changes or additions will incur a fine and review fee.

**6.1.6  Statistics, Data and Display to Non-REIN Members:** The Analytic Data Feed is subject to the following general Data Feed rules regarding display and use of Listings Information:

1. Aggregate format: All data released to non-REIN members must be in an aggregated format (i.e. totals, averages, sums, medians, etc.) only.

2. Use of Individual Listings: Underlying data used to support or create statistics (i.e. specific or individual listings) may only be accessed by current Members and their clients, and may not otherwise be disseminated to non-REIN members or the general public. Listing firm's name must be disclosed wherever the greatest amount of Listings Information (detail) is divulged on individual listings. This display/disclosure is subject to REIN approval, and in accordance with state code based on the (geographic) location of the listing.

**6.1.7  Disclosures:** Vendor must disclose the use of Listings Information for any statistics or analytics produced. Disclosure includes identifying REIN as the source of the Listings Information and that all interpretations, analytics, or derivations thereof are the sole responsibility of the Vendor, and not attributable to REIN.

**6.1.8**  **Broker Oversight Over Licensees' Applications:** The Licensee must apply for a separate Analytic Data Feed (sponsored by, and subject to the approval of, the Licensee's Broker Member) if a Licensee's service or product differs from REIN-approved products or services.

**6.1.9**  **Protection of Listings Information:** Vendor is responsible for protecting Listings Information from misappropriation by employing reasonable efforts to monitor and prevent unauthorized accessing, reproduction or use of the Listings Information.

**6.1.10**  **Listing Integrity:** Listings Information may not be changed or altered.

**6.1.11**  **Off Market Listings (Withdrawn, Expired and Fall-Thru):** Listings may be displayed to Members' and Licensees' clients only, not the general public.

**6.1.12**  **Purging of Listings Information:** Vendors licensing the data will certify that all Listings Information that is no longer authorized for use will be purged from servers no later than five (5) days from the last day the listing was received via the Analytic Data Feed.

**6.1.13**  **Notification of Changes to Analytic Data Feed or Rules:** REIN will provide Vendor a minimum of seven (7) days advance notice of changes to REIN's Rules and Regulations and/or procedures governing Analytic Data Feed(s). A reasonable time frame will be provided, as determined by REIN, to comply with such changes. Vendor's failure to timely comply with such rules or procedures changes may result in a fine or REIN's suspension of Analytic Data Feed services to Vendor.

**6.1.14**  **Fees**: Fees are outlined in the REIN MLS Data Access and License Agreement.

## 6.2 IDX: Use & Display of REIN Listings Information for Website and Other Applications:

**6.2.1**  **Internet Data Exchange (IDX) Data Feed:** IDX Data Feed is available for use on Broker Member & Licensee applications. IDX Data Feed includes all listings of those Brokers who have agreed to participate and cooperate. Broker Member, Licensees, and Vendors may only use Listings Information that has been received through an IDX Data Feed from REIN.

**6.2.2**  **Definition of IDX**: IDX is a standard for advertising of real estate listings, and encompasses all advertising mechanisms, technologies and services, including but not limited to websites, virtual searches, voice delivery of information, video, text messaging, mobile applications, mobile computers, virtual applications and others.

**6.2.3**  **General IDX Rules:**

**6.2.3.1**  **IDX Participating Broker Member Opt-In/Opt-Out:**  Broker Members and Licensees will use or display only the listings of other IDX Participating Broker Members who have opted-in their Listings Information.  Broker Member is by default opted-in and is considered an IDX Participating Broker.  Any Broker Member may, at its discretion, choose to not allow other Broker Members and Licensees to use Broker Member's own listings by opting-out. To opt-out of an IDX Data Feed, Broker Member must notify REIN in writing. A Broker Member who opts-out, also forfeits the right to receive and display an IDX Data Feed.

**6.2.3.2**  **Data Feed Eligibility:** Vendors and Broker Members or Licensees serving as their own "Vendor", with Broker's consent, are eligible to access the RETS IDX Data Feed for a fee. Broker Member, Licensees, and Vendor may only use Listings

1054    Information that has been received through an IDX Data Feed from REIN.
1055
1056    IDX Data Feed requests will be reviewed by REIN and approved based on meeting
1057    REIN's acceptable use policies. All IDX applications from a Broker Member's
1058    Licensee are subject to the Broker Member's oversight, supervision and
1059    accountability. Broker Member may revoke consent for any of their Licensees to
1060    receive the IDX Data Feed by notifying REIN in writing. A Vendor may request an
1061    IDX Data Feed, provided they are sponsored by a Broker Member who will be
1062    using that Vendor's product.
1063

1064  **6.2.3.3**   **REIN MLS Data Access and License Agreement:** Broker Members, Licensees
1065    and/or Vendors shall sign a REIN MLS Data Access and License Agreement before
1066    receiving a Data Feed and shall be bound by the terms regulating the use of the
1067    Listings Information and required disclosures.
1068

1069  **6.2.3.4**   **Compliance Review:**   Prior to making the application or product publicly
1070    accessible ("live"), Vendor must present REIN staff with the fully functioning test
1071    version of the application using REIN test data for compliance checking. Two
1072    compliance reviews are included for one product or application with the initial fee
1073    for compliance with REIN's Rules and Regulations.  Any review thereafter will
1074    incur a charge to the Vendor.  Once the application has been approved by REIN,
1075    the application may go "live."  The application or product must be accessible to
1076    REIN staff at all times for monitoring and ensuring compliance with applicable
1077    Rules and Regulations and policies.
1078

1079  **6.2.3.5**   **Application/Product Additions, Changes and Updates:** Vendor (or Broker
1080    /Licensee serving as his own Vendor) must notify REIN of substantive changes to
1081    existing products that impact the display or use of Listings Information or any new
1082    products for REIN's compliance review which may incur a review fee. Failure to
1083    notify REIN of changes or additions will incur a fine and review fee.
1084

1085  **6.2.3.6**   **Broker Oversight Over Licensees' Applications:** The Licensee must apply for a
1086    separate IDX Data Feed, (sponsored by, and subject to the approval of, the
1087    Licensee's Broker Member) if a Licensee's service or product differs from REIN-
1088    approved products or services.
1089

1090  **6.2.3.7**   **State(s) Code Compliance:**   Broker Member must comply with all states'
1091    advertising requirements applicable to Licensees based on the geographic location
1092    of the listing (e.g., Virginia Administrative Code (VAC), Title 18 (Professional and
1093    Occupational Licensing), 135-20-190. Advertising by licensees).
1094

1095  **6.2.3.8**   **Listing Number Look-up:** On websites that display REIN Listings Information,
1096    a listing number look-up search must be available.
1097

1098  **6.2.3.9**   **Updating IDX Data:** All MLS downloads and updates to products/applications
1099    must be performed at least once every two (2) days.  Products must display the last
1100    update date in the Full Disclosure statement. *See Disclosures and Disclaimers*
1101    *section.*
1102

1103  **6.2.3.10**  **Purging REIN Listings Information:** Listings Information may not be
1104    accumulated. Vendor is required to assure that all Listings Information that is no
1105    longer authorized for display is purged from servers no later than five (5) days from

the last day the listing was received via the IDX Data Feed.

**6.2.3.11 Protection of Listings Information:** Vendor is responsible for protecting Listings Information from misappropriation by employing reasonable efforts to monitor and prevent "scraping", re-syndication or other unauthorized accessing, reproduction or use of the Listings Information.

**6.2.3.12 Notification of Changes to IDX Data Feed or Rules:** REIN will provide Vendor a minimum of seven (7) days advance notice of changes to the Rules and Regulations and/or IDX Data Feed(s). A reasonable time frame will be provided, as determined by REIN, to comply with such changes. Failure to comply may result in a fine or suspension of IDX Data Feed services.

**6.2.3.13 Co-Mingling of Other MLS Listings:** REIN listings may be co-mingled with other MLSs' listing data. *See Disclosures and Disclaimers section.*

**6.2.3.14 Display of Price Changes:** Display of price changes (reduced, increased) during the current term of an active listing is permitted.

**6.2.3.15 Excluded Listings:** Broker Member or Licensee may exclude from display certain Listings Information based on objective criteria (such as geography, list price, property type, property list type, cooperative compensation offered) that is consistently applied. In the event Broker Member or Licensee chooses to exclude properties as prescribed herein, Broker Member or Licensee shall disclose this to the public as outlined in the Excluded Listings Disclosure herein (6.2.7.6).

**6.2.3.16 Listing Integrity:** Listings Information provided in the IDX Data Feed may not be changed or altered, except as provided in 6.2.3.17.

**6.2.3.17 Enhanced Listings:** Subject to the limitations herein, Broker Member or Licensee may enhance REIN listings including additional remarks, photos, and open house information, mapping, demographics, school and census information provided the source of such data is clearly disclosed as outlined in the Enhanced Listing Disclosure (6.2.7.5). Enhancements must be clearly differentiated from the REIN Listings Information. Broker Members or the Licensee expressly assumes all responsibility and liability for the accuracy of such enhancements.

**6.2.3.18 Listing Firm's Name**: Listing firm's name must be disclosed wherever the greatest amount of Listings Information (detail) is divulged, especially pertaining to individual listings. This display/disclosure is subject to REIN approval, and in accordance with state code based on the (geographic) location of the listing.

### 6.2.4   Active and Pending Data Rules:

**6.2.4.1 Use:** A seller's listing is by default opted-in to the IDX Data Feed. A seller may request in writing that their listing not be included in the IDX Data Feed; these listings will be excluded.

**6.2.4.2 Sellers' Addresses/Mapping:** A seller's address is by default opted-in to the IDX Data Feed, unless the seller requests in writing that their address not be displayed or accessible by mapping features.

**6.2.4.3** **Data Fields Allowed:** Data fields provided in the IDX Data Feed are authorized for use as set forth in the data field table and may not be changed or altered.

**6.2.4.4** **Listing Status Use and Display:** Active Listings may be displayed as Active, New, Increased or Reduced. "Back on Market" is not permitted on display of a listing. Listings with the "Pending" status may be displayed as "Under Contract".

## 6.2.5 Sold Data Rules:

**6.2.5.1** **Request for Sold Data and Authorization:** Sold Data shall be provided in the IDX Data Feed only if the specific product requested by the Broker, Licensee or Vendor, and approved by REIN, requires Sold Data for its valid functioning.

**6.2.5.2** **Use**: Settled sales will be included in the IDX Data Feed and available for use on authorized applications. This includes those listings and addresses that were previously opted-out while in "Active" or "Pending" status. The only exception is settled sales in which the new owner has requested to be excluded from data distribution in the IDX Data Feed.

**6.2.5.3** **Data Fields Allowed:** Sold Data fields provided in the IDX Data Feed are authorized for use as set forth in the data field table and may not be changed or altered.

**6.2.5.4** **Sold Price Display:** Only the sold price is authorized for display or use; no pricing derivatives, history, ratios, etc. are permitted.

**6.2.5.5** **Firm Names:** Both listing and selling firm information will be included in the IDX Data Feed. Disclosure of the listing firm name is required as described in the IDX rules. Disclosure of the selling firm name is optional.

**6.2.5.6** **Excluded Sold Listings:** The new owner of a sold property may request in writing to REIN to omit the home's photos or sold information from being disseminated in an IDX Data Feed. The broker may not make such request. Such requests must be honored by all Broker Members and the listing's information may not be used for public website display.

The IDX Data Feed will contain addresses of all settled sales with the exception of excluded sold listings.

## 6.2.6 Expired, Withdrawn, Fall-Thru Listings:

**6.2.6.1** **Use:** "Expired", "Withdrawn", "Fall-Thru" listings are included in the IDX Data Feed but may not be searchable by a consumer.

**6.2.6.2** **Display:** "Off-Market" listings may be displayed only as follows:

1. All "Withdrawn", "Expired", and "Fall-Thru" listings may only denote the status as "Off-Market" whenever authorized for display or conveyance.

2. Consumers may view "Off-Market" listings provided the listing was saved while it was in an "Active" status. Change of status information for the prior 120 days of all "Off-Market" listings will be supplied in order for the correct status to be

1210     noted on any consumer's previously "saved" listings (i.e. "shopping cart" /
1211     "favorites").

1213 **6.2.7**    **Disclosures and Disclaimers:**

1215 **6.2.7.1**   **Required Disclosure**: The REIN Full Disclosure Statement must be
1216     presented/displayed in its entirety, or the Abbreviated Copyright Statement must be
1217     presented/displayed, wherever the listing firm name is conveyed. If the Abbreviated
1218     Copyright Statement is used, the Full Disclosure Statement must be accessible via
1219     hyperlink or other means. The Abbreviated Copyright Statement and Full
1220     Disclosure Statement are described in full in the following sections.

1222 **6.2.7.2**   **Abbreviated Copyright:** The Abbreviated Copyright Statement is as follows:

1224     *© (current year) REIN, Inc. Information Deemed Reliable But Not Guaranteed*

1227 **6.2.7.3**   **Full Disclosure:** REIN's full disclosure is as follows:

1229     *The listings data displayed on this medium comes in part from the Real Estate*
1230     *Information Network Inc. (REIN) and has been authorized by participating listing*
1231     *Broker Members of REIN for display. REIN's listings are based upon Data*
1232     *submitted by its Broker Members, and REIN therefore makes no representation or*
1233     *warranty regarding the accuracy of the Data. All users of REIN's listings database*
1234     *should confirm the accuracy of the listing information directly with the listing agent.*

1236     *© (current year) REIN. REIN's listings Data and information is protected under*
1237     *federal copyright laws. Federal law prohibits, among other acts, the unauthorized*
1238     *copying or alteration of, or preparation of derivative works from, all or any part of*
1239     *copyrighted materials, including certain compilations of Data and information.*
1240     *COPYRIGHT VIOLATORS MAY BE SUBJECT TO SEVERE FINES AND*
1241     *PENALTIES UNDER FEDERAL LAW.*

1243     *REIN updates its listings on a daily basis. Data last updated: xx/xx/xxxx.*

1245 **6.2.7.4**   **Duplicate Listings Disclaimer:** The Duplicate Listings Disclaimer is as follows:

1247     *Some listings may be duplicated in the search results due to the co-mingling of*
1248     *listings from more than one multiple listing service. Should there be different listing*
1249     *information between the duplicated listings; user is advised to verify the accuracy*
1250     *of the listing information before making any financial decisions.*

1252 **6.2.7.5**   **Enhanced Listings Disclosure:** The recommended content for Enhanced Listings
1253     Disclosure is:

1255     *Some or all of the listings (or listings Data) represented in this application have*
1256     *been enhanced with Data not provided by REIN. The enhancements are as*
1257     *follows:_____(insert here)___ . The source of these enhancements*
1258     *are:_____(insert here)_____.*

1260 **6.2.7.6**   **Excluded Listings Disclosure:** The recommended content for Excluded Listings
1261     Disclosure is:

*This application does not include information on all of the properties available for sale at this time.*

**6.3    Virtual Office Websites (VOW's):**

**6.3.1    NAR/DOJ Section 19.1:**

**6.3.1.1**    A Virtual Office Website ("VOW") is a Broker Member's or Licensee's Internet website, or a feature of a Broker Member's website, through which the Broker Member is capable of providing real estate brokerage services to consumers with whom the Broker Member has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search REIN Listings Information, subject to the Broker Member's oversight, supervision, and accountability.  A non-principal broker or Licensee affiliated with a Broker Member may, with his or her Broker Member's consent, operate a VOW.  Any VOW of a non-principal broker or Licensee is subject to the Broker Member's oversight, supervision, and accountability.

**6.3.1.2**    As used in Section 19 of these Rules, the term "Broker Member" includes a Broker Member's affiliated non-principal brokers and sales licensees – except when the term is used in the phrases "Broker Member's consent" and "Broker Member's oversight, supervision, and accountability."  References to "VOW" and "VOWs" include all VOWs, whether operated by a Broker Member, by a non-principal broker or Licensee, or by an Affiliated VOW Partner ("AVP") on behalf of a Broker Member.

**6.3.1.3**    "Affiliated VOW Partner" ("AVP") refers to an entity or person designated by a Broker Member to operate a VOW on behalf of the Broker Member, subject to the Broker Member's supervision, accountability and compliance with the VOW Policy. No AVP has independent participation rights in REIN by virtue of its right to receive information on behalf of a Broker Member.  No AVP has the right to use REIN Listings Information except in connection with operation of a VOW on behalf of one or more Broker Members. Access by an AVP to REIN Listings Information is a derivative of the rights of the Broker Member on whose behalf the AVP operates a VOW.

**6.3.1.4**    As used in Section 19 of these Rules, the term "REIN Listings Information" refers to active and pending Listings Information and sold Data provided by Broker Members to REIN and aggregated and distributed by REIN to Broker Members.

**6.3.2    NAR/DOJ Section 19.2:**

**6.3.2.1**    The right of a Broker Member's VOW to display REIN Listings Information is limited to that supplied by REIN.  However, a Broker Member with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices.

**6.3.2.2**    Subject to the provisions of the VOW Policy and these Rules, a Broker Member's VOW, including any VOW operated on behalf of a Broker Member by an AVP, may provide other features, information, or functions, e.g. Internet Data Exchange ("IDX").

**6.3.2.3**   Except as otherwise provided in the VOW Policy or in these Rules, a Broker Member need not obtain separate permission from other REIN Broker Members whose listings will be displayed on the Broker Member's VOW.

### 6.3.3   NAR/DOJ Section 19.3:

**6.3.3.1**   Before permitting any consumer to search for or retrieve any REIN Listings Information on his or her VOW, the Broker Member must take each of the following steps:

1.   The Broker Member must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

2.   The Broker Member must obtain the name of, and a valid email address for, each Registrant. The Broker Member must send an email to the address provided by the Registrant confirming that the Registrant has agreed to the Terms of Use (described in subsections 6.3.3.4, 6.3.3.5 and 6.3.3.6 below). The Broker Member must verify that the email address provided by the Registrant is valid and that the Registrant has agreed to the Terms of Use.

3.   The Broker Member must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The Broker Member may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password.  The Broker Member must also assure that any email address is associated with only one user name and password.

**6.3.3.2**   The Broker Member must assure that each Registrant's password expires on a date certain but may provide for renewal of the password. The Broker Member must at all times maintain a record of the name, email address, user name, and current password of each Registrant.  The Broker Member must keep such records for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password.

**6.3.3.3**   If REIN has reason to believe that a Broker Member's VOW has caused or permitted a breach in the security of REIN Listings Information or a violation of REIN's Rules and Regulations, the Broker Member shall, upon request of REIN, provide the name, email address, user name, and current password, of any Registrant suspected of involvement in the breach or violation.  The Broker Member shall also, if requested by REIN, provide an audit trail of activity by any such Registrant.

**6.3.3.4**   The Broker Member shall require each Registrant to review, and affirmatively to express agreement (by mouse click or otherwise) to, a "Terms of Use" provision that provides at least the following:

1.   That the Registrant acknowledges entering into a lawful consumer-broker relationship with the Broker Member;

2.   That all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use;

3.   That the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW;

4.   That the Registrant will not copy, redistribute, or retransmit any of the information provided except in connection with the Registrant's consideration of the purchase or sale of an individual property;

5.   That the Registrant acknowledges REIN's ownership of, and the validity of REIN's copyright in, REIN's database.

**6.3.3.5**   The Terms of Use Agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Broker Member. Any agreement entered into at any time between the Broker Member and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Broker Member must be established separately from the Terms of Use, must be prominently labeled as such, and may not be accepted solely by mouse click.

**6.3.3.6**   The Terms of Use Agreement shall also expressly authorize REIN, and other REIN Broker Members or their duly authorized representatives, to access the VOW for the purposes of verifying compliance with REIN Rules and Regulations and monitoring display of Broker Member' listings by the VOW. The Agreement may also include such other provisions as may be agreed to between the Broker Member and the Registrant.

**6.3.4**   **NAR/DOJ Section 19.4:**  A Broker Member's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Broker Member to ask questions, or get more information, about any property displayed on the VOW. The Broker Member or a non-principal broker or Licensee licensed with the Broker Member, must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Broker Member and displayed on the VOW.

**6.3.5**   **NAR/DOJ Section 19.5:**  A Broker Member's VOW must employ reasonable efforts to monitor for, and prevent, misappropriation, "scraping," and other unauthorized use of REIN Listings Information. A Broker Member's VOW shall utilize appropriate security protection such as firewalls as long as this requirement does not impose security obligations greater than those employed concurrently by REIN.

**6.3.6**   **NAR/DOJ Section 19.6:**

**6.3.6.1**   A Broker Member's VOW shall not display listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to REIN that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Broker Member who operates a VOW may provide to consumers via other delivery mechanisms, such as email, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet.

1401  **6.3.6.2**  A Broker Member who lists a property for a seller who has elected not to have the
1402         property listing or the property address displayed on the Internet shall cause the
1403         seller to execute a document that includes the following (or a substantially similar)
1404         provision:

1405                      **Seller Opt-Out Form**
1406
1407                      1. Please check either Option a or Option b
1408
1409                      a. [   ] I have advised my broker or sales agent that I do not want the
1410                      listed property to be displayed on the Internet.
1411
1412
1413                                         OR
1414
1415
1416                      b. [   ] I have advised my broker or sales agent that I do not want the
1417                      address of the listed property to be displayed on the Internet.
1418
1419                      2.  I understand and acknowledge that, if I have selected option a,
1420                      consumers who conduct searches for listings on the Internet will not see
1421                      information about the listed property in response to their search.
1422
1423                      _____
1424                      Initials of seller

1425  **6.3.6.3**  The Broker Member shall retain such forms for at least one year from the date they
1426         are signed, or one (1) year from the date the listing goes off the market, whichever
1427         is greater.

1428  **6.3.7**  **NAR/DOJ Section 19.7:**

1429  **6.3.7.1**  Subject to subsection 6.3.7.2, a Broker Member's VOW may allow third-parties (i)
1430         to write comments or reviews about particular listings or display a hyperlink to such
1431         comments or reviews in immediate conjunction with particular listings, or (ii)
1432         display an automated estimate of the market value of the listing (or hyperlink to
1433         such estimate) in immediate conjunction with the listing.
1434
1435  **6.3.7.2**  Notwithstanding the foregoing, at the request of a seller the Broker Member shall
1436         disable or discontinue either or both of those features described in subsection
1437         6.3.7.1 as to any listing of the seller. The listing broker or agent shall communicate
1438         to REIN that the seller has elected to have one or both of these features disabled or
1439         discontinued on all Broker Members' websites.  Subject to the foregoing and to
1440         Section 6.3.8 (19.8), a Broker Member's VOW may communicate the Broker
1441         Member's professional judgment concerning any listing.  A Broker Member's
1442         VOW may notify its customers that a particular feature has been disabled "at the
1443         request of the seller."
1444
1445  **6.3.8**  **NAR/DOJ Section 19.8:**  A Broker Member's VOW shall maintain a means (e.g., e-mail
1446         address, telephone number) to receive comments from the listing broker about the accuracy
1447         of any information that is added by or on behalf of the Broker Member beyond that supplied
1448         by REIN and that relates to a specific property displayed on the VOW. The Broker Member
1449         shall correct or remove any false information relating to a specific property within forty-eight

1450    (48) hours following receipt of a communication from the listing broker explaining why the
1451    data or information is false. The Broker Member shall not, however, be obligated to correct
1452    or remove any data or information that simply reflects good faith opinion, advice, or
1453    professional judgment.

1454

1455    **6.3.9    NAR/DOJ Section 19.9:**  A Broker Member shall cause the REIN Listings Information
1456    available on its VOW to be refreshed at least once every two (2) days.
1457

1458    **6.3.10   NAR/DOJ Section 19.10:**  Except as provided in these Rules, REIN's Vow Policy or any
1459    other applicable REIN rules or policies, no Broker Member shall distribute, provide, or make
1460    accessible any portion of the REIN Listings Information to any person or entity.
1461

1462    **6.3.11   NAR/DOJ Section 19.11:**  A Broker Member's VOW must display the Broker Member's
1463    privacy policy informing Registrants of all of the ways in which information that they provide
1464    may be used.
1465

1466    **6.3.12   NAR/DOJ Section 19.12:**  A Broker Member's VOW may exclude listings from display
1467    based only on objective criteria, including, but not limited to, factors such as geography, list
1468    price, type of property, cooperative compensation offered by listing broker.
1469

1470

1471    **6.3.13   NAR/DOJ Section 19.13:**  A Broker Member who intends to operate a VOW to display
1472    REIN Listings Information must notify REIN of its intention to establish a VOW and must
1473    make the VOW readily accessible to REIN and to all REIN Broker Members for purposes of
1474    verifying compliance with these Rules, the VOW Policy, and any other applicable REIN rules
1475    or policies.
1476

1477    **6.3.14   NAR/DOJ Section 19.14:** A Broker Member may operate more than one VOW himself or
1478    herself or through an AVP.  A Broker Member who operates his or her own VOW may
1479    contract with an AVP to have the AVP operate other VOWs on his or her behalf.  However,
1480    any VOW operated on behalf of a Broker Member by an AVP is subject to the supervision
1481    and accountability of the Broker Member.
1482

1483    **6.3.15   NAR/DOJ Section 19.15:**  A Broker Member's VOW may not make available for search by,
1484    or display to, Registrants any of the following information:
1485

1486    **6.3.15.1** Expired, withdrawn, or fall-through listings unless requested by the Registrant and
1487    subject to the "Limited Use of Off-Market Listings" Rule (5.7.).
1488

1489    **6.3.15.2** The compensation offered to other REIN Broker Members.
1490

1491    **6.3.15.3** The type of listing agreement, i.e., exclusive right to sell or exclusive agency.
1492

1493    **6.3.15.4** The seller's and occupant's name(s), phone number(s), or e-mail address(es).
1494

1495    **6.3.15.5** Instructions or remarks intended for cooperating brokers only, such as those
1496    regarding showings or security of listed property.
1497

1498    **6.3.15.6** Sold information of recent sales in which the new owner has requested in writing
1499    to REIN to exclude their home's sold information from display.  Notwithstanding

1500     the foregoing, a Broker Member who operates a VOW may provide to consumers
1501     via other delivery mechanism, such as email, fax, or otherwise, the listings of recent
1502     sales in which the new owner has requested not to have their property displayed on
1503     the Internet.
1504

1505 **6.3.16 NAR/DOJ Section 19.16:** A Broker Member shall not change the content of any REIN
1506     Listings Information that is displayed on a VOW from the content as it is provided by REIN.
1507     The Broker Member may, however, augment REIN Listings Information with additional
1508     information not otherwise prohibited by these Rules or by other applicable REIN Rules or
1509     Policies as long as the source of such other information is clearly identified. This rule does
1510     not restrict the format of display of REIN Listings Information on VOWs or the display on
1511     VOWs of fewer than all of the listings or fewer than all of the authorized information fields.
1512

1513 **6.3.17 NAR/DOJ Section 19.17:** A Broker Member shall cause to be placed on his or her VOW a
1514     notice indicating that the REIN Listings Information displayed on the VOW is deemed
1515     reliable but is not guaranteed accurate by REIN. A Broker Member's VOW may include other
1516     appropriate disclaimers necessary to protect the Broker Member and/or REIN from liability.
1517

1518 **6.3.18 NAR/DOJ Section 19.18:** A Broker Member shall cause any listing data that is displayed
1519     on his or her VOW to identify the name of the listing firm in a readily visible color, in a
1520     reasonably prominent location, and in typeface not smaller than the median typeface used in
1521     the display of listing data.
1522

1523 **6.3.19 NAR/DOJ Section 19.19:** A Broker Member shall limit the number of listings that a
1524     Registrant may view, retrieve, or download to not more than 250 current Listings and not
1525     more than 250 pending or sold Listings in response to any inquiry.
1526

1527 **6.3.20 NAR/DOJ Section 19.20:** A Broker Member shall require that Registrants' passwords be
1528     reconfirmed or changed every ninety (90) days.
1529

1530 **6.3.21 NAR/DOJ Section 19.21:** A Broker Member may display advertising and the identification
1531     of other entities ("co-branding') on any VOW the Broker Member operates or that is operated
1532     on his or her behalf.  However, a Broker Member may not display on any such VOW
1533     deceptive or misleading advertising or co-branding.  For purposes of this Section, co-branding
1534     will be presumed not to be deceptive or misleading if the Broker Member's logo and contact
1535     information (or that of at least one Broker Member, in the case of a VOW established and
1536     operated on behalf of more than one Broker Member) is displayed in immediate conjunction
1537     with that of every other party, and the logo and contact information of all Broker Members
1538     displayed on the VOW is as large as the logo of the AVP and larger than that of any third
1539     party.
1540

1541 **6.3.22 NAR/DOJ Section 19.22:** A Broker Member shall cause any listing displayed on his or her
1542     VOW that is obtained from other sources, including from another MLS or from a broker not
1543     participating in REIN, to identify the source of the listing.
1544

1545 **6.3.23 NAR/DOJ Section 19.23:** With the exception of listings from another MLS, a Broker
1546     Member shall cause any listing displayed on his or her VOW obtained from other sources, to
1547     be searched separately from listings in REIN.   A Participant who co-mingles REIN listings
1548     with listings from other MLSs is required to include a Duplicate Listings Disclaimer.
1549

1550 **6.3.24 NAR/DOJ Section 19.24:** Broker Members and the AVPs operating VOWs on their behalf
1551     must execute the license agreement required by REIN.

**6.3.25 Disclosures and Disclaimers:** Broker Members' VOWs must adhere to the Disclosure and Disclaimer requirements as outlined in section 6.2.7.

**6.4** **Broker Member's Own Listings ("BMO") Data Feed:** Broker Member's Own Listings Data Feed is a customizable REIN data feed containing an individual firm's listings.

# 7 <u>KEYBOX SYSTEMS</u>

7.1 **Keybox System**: REIN recognizes the use of the Supra Keybox System ("Keybox System") as the primary system for properties listed in the REIN System. REIN and the Virginia Peninsula Association of REALTORS® ("VPAR") share the same system code on the keyboxes. This allows keyholders of REIN and keyholders of VPAR to access keyboxes on REIN listings. REIN Broker Members and their Licensees and Appraiser Members who belong to another MLS and have their Supra key service through the other MLS may request to have REIN's system code programmed into their Supra key for accessing keyboxes on REIN listings.

**7.2.** **Key Issuance**: Broker Member and their Licensees and Appraiser Members are authorized to access REIN listed properties via issuance of the Supra "Key" which is the XpressKEY, eKEY Basic or eKEY Professional.

**7.3.** **REIN Keybox System Rules**: For REIN Keybox System users, the rules pertaining to the Keybox System are set forth in the *XpressKEY, eKEY Basic, eKEY Professional, IBox Keyboxes, and the Keybox Information Manager Computer System ("KIM") Policies and Procedures* ("Policies and Procedures"). The Policies and Procedures may be amended, revised or supplemented from time to time by REIN's Board of Directors.

**7.4.** **Other Approved MLS/Association Keybox System:** Other MLS/Association Keybox Systems, including Virginia Peninsula Association (VPAR), Chesapeake Bay and Rivers Association, Williamsburg Association, Albemarle Area Association, Eastern Shore Association and Richmond Association of REALTORS, are approved for use on listings that are submitted to both REIN and to the other MLS/Association.

# 8 <u>AMENDMENTS</u>

**8.1** **Proposal Process:** Any proposed amendment (including addition or deletion) to these Rules and Regulations may be offered in writing to the Board of Directors by any REIN Broker Member in good standing.

**8.2** **Adoption:** Any proposed amendment (including addition or deletion) may be adopted by a two-thirds vote of the total membership (6 of 9) of the Board of Directors at any Board of Directors meeting. If the proposed amendment receives only a simple majority vote of the total membership of the Board of Directors but less than the requisite two-thirds vote, then, at the option of the full majority of Board Members voting in favor of such amendment, the proposed amendment shall be put before the next meeting of the Board of Directors or the next regular meeting of the stockholders or at a special stockholders' meeting called for that purpose. If, as provided, the proposed amendment, change or deletion is referred to the next Board of Directors Meeting and receives an affirmative two-thirds vote of the total membership of the Board of Directors, the proposal would be adopted. If, as provided, the proposed amendment, change or deletion is referred to a stockholders' meeting for

1599     action, a simple majority of the votes cast would be necessary for adoption of the amendment, change
1600     or deletion.
1601
1602

1603    **8.3**    **Submission to Stockholders:**  Any proposed amendment (including addition or deletion) to these
1604    Rules and Regulations offered in writing to the Board of Directors, as provided above, which does
1605    not receive a majority vote of the Board of Directors, shall not be submitted to the stockholders for
1606    consideration, unless a majority of the Board of Directors elect to put the amendment before the
1607    stockholders at the next regular meeting of the stockholders or at a special stockholders' meeting
1608    called for that purpose. Two-thirds of the votes cast at such meeting shall be necessary to adopt the
1609    proposed amendment.
1610
1611

1612  **9**   **<u>MISCELLANEOUS  NOTICES</u>**
1613

1614    **9.1**    **Notices:**  Notices relating to procedural and other miscellaneous matters pertaining to the business of
1615    REIN which are approved by its Board of Directors and delivered to the Members shall be deemed a
1616    part of and enforced in accordance with these Rules and Regulations.
1617

1618  **10**  **<u>PROMULGATION OF RULES AND REGULATIONS</u>**
1619

1620    **10.1**   **Availability**:  It is the responsibility of REIN to ensure the Rules and Regulations are made available
1621    to all Broker Members and their Licensees.  REIN shall publish the Rules and Regulations on REIN's
1622    "members only" website at www.reinmls.com which is accessible to all "active" Broker Members,
1623    their Licensees and authorized personnel.  Broker Members are to ensure that the contents of the Rules
1624    and Regulations and all future changes thereto are made available to all of their personnel on a
1625    continuing basis